1   Steven R. Blackburn, State Bar No. 154797
    Leslie J. Mann, State Bar No. 95467
2   Rachel S. Hulst, State Bar No. 197330
    EPSTEIN BECKER & GREEN, P.C.
3   One California Street, 26th Floor
    San Francisco, California 94111-5427
4   Telephone:     415.398.3500
    Facsimile:     415.398.0955
5   SBlackburn@ebglaw.com
    LMann@ebglaw.com
6   RHulst@ebglaw.com

7   Attorneys for Defendant
    LUCENT TECHNOLOGIES, INC.

8

9                    **UNITED STATES DISTRICT COURT**

10             **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

11                     **SAN FRANCISCO DIVISION**

12

13  DEPARTMENT OF FAIR EMPLOYMENT          **E-FILING**
    AND HOUSING, an agency of the State of
14  California,                            CASE NO.: 3:07-cv-03747-PJH

15              Plaintiff, and             **COMPENDIUM OF CALIFORNIA
                                           AUTHORITIES IN SUPPORT OF
16  STEVEN J. CARAUDDO                     DEFENDANT LUCENT
                                           TECHNOLOGIES' REPLY BRIEF IN
17              Plaintiff-Intervenor       SUPPORT OF PARTIAL MOTION TO
                                           DISMISS
18      v.
                                           **[FRCP 12(b)(6)]**
    LUCENT TECHNOLOGIES, INC., and
19  DOES 1 through 20,                     Hearing Date:  April 16, 2008
                                           Time:          9:00 a.m.
20              Defendants.                Courtroom:     3, 17th Floor

21                                         Judge Phyllis J. Hamilton

22

23

24

25

26

27

28
                                    - 1 -

SF:165111v1                          Compendium of California Authorities in Support of
                                    Defendant's Reply Brief in Support of Partial Motion to Dismiss
                                    Case No. 3:07-cv-03747-PJH

1

**CALIFORNIA CASES**                                                    **TAB NO.**

2

*Austin v. Massachusetts Bonding & Insurance Co.*

3
　　56 Cal.2d 596 (1961) ...................................................................................1

4

*Bartalo v. Superior Court*

5
　　51 Cal.App.3d 526 (1975) ...........................................................................2

*Gantt v. Sentry Ins.*

6
　　1 Cal.4th 1083 (1992) ..................................................................................3

7

*Green v. State of California*

8
　　42 Cal.4th 254 (2007) ..................................................................................4

9

*Jackson v. County of L.A.*

10
　　60 Cal.App.4th 171 (1997) ...........................................................................5

11

*Jennings v. Marralle*

12
　　8 Cal.4th 121 (1994) ....................................................................................6

13

*Jensen v. Wells Fargo Bank*

14
　　85 Cal.App.4th 245 (2000) ...........................................................................7

*Peralta Community College Dist. v. Fair Employment and Housing Commissions*

15
　　52 Cal.3d 40 (1990) .....................................................................................8

16

*Sequoia Ins. Co. v. Sup. Ct. (Norden)*

17
　　13 Cal.App.4th 1472 (1993) .........................................................................9

18

**CALIFORNIA STATUTES**                                                **TAB NO.**

19

California Government Code

20
　　§ 12926........................................................................................................10

21
　　§ 12940, *et seq.* .........................................................................................11

　　§ 12965........................................................................................................12

22
/ / /

23

24

25

26

27

28

- 2 -

SF:165111v1                          Compendium of California Authorities in Support of
                                     Defendant's Reply Brief in Support of Partial Motion to Dismiss
                                     Case No. 3:07-cv-03747-PJH

1

**<u>TREATISES</u>**                                                                                         **<u>TAB NO.</u>**

2

Weil & Brown, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL
(The Rutter Group 2005)
    § 6:787 ...................................................................................................................13
Rylaarsdam & Turner, CAL. PRAC. GUIDE: CIV. PRO. BEFORE TRIAL – STATUTE
OF LIMITATIONS (The Rutter Group 2007)
    § 8:275 ...................................................................................................................14

3

4

5

6

7

DATED:  April 2, 2008                          EPSTEIN BECKER & GREEN, P.C.

8

9

By:  /s/ Rachel S. Hulst
        Steven R. Blackburn

10

        Leslie J. Mann
        Rachel S. Hulst

11

Attorneys for Defendant
LUCENT TECHNOLOGIES, INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SF:165111v1                          Compendium of California Authorities in Support of
Defendant's Reply Brief in Support of Partial Motion to Dismiss
Case No. 3:07-cv-03747-PJH

# TAB 1

LEXSEE 56 CAL.2D 596

**HARRY E. AUSTIN et al., Plaintiffs and Appellants, v. MASSACHUSETTS BONDING AND INSURANCE COMPANY, Defendant and Respondent** [*]

[*] Reporter's Note: This case was previously entitled, "Austin v. Pacific States Securities Corp."

**S. F. No. 20690**

**Supreme Court of California**

*56 Cal. 2d 596; 364 P.2d 681; 15 Cal. Rptr. 817; 1961 Cal. LEXIS 322*

**September 11, 1961**

**PRIOR HISTORY:**    APPEAL from a judgment of the Superior Court of Alameda County.  Cecil Mosbacher, Judge.

Action against a securities brokerage corporation and others to recover securities and moneys.

**DISPOSITION:**    Reversed. Judgment for defendant bonding company after demurrer to amended complaint, attempting to state a cause of action against such defendant as surety on defendant broker's bond, was sustained without leave to amend, reversed.

**HEADNOTES**

**CALIFORNIA        OFFICIAL        REPORTS HEADNOTES**

**(1a) (1b) Limitation of Actions--Commencement of Proceedings--Change in Parties Defendant.** --Where a complaint sets forth or attempts to set forth a cause of action against a defendant designated by fictitious name and his true name is thereafter discovered and substituted by amendment, he is considered a party to the action from its commencement so that the statute of limitations stops running as of the date of the earlier pleading.

**(2)        Id.--Commencement        of        Proceedings--Amendments.** --Where an amendment is sought after the statute of limitations has run, the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts.

**(3)  Pleading--Amendment--Effect--Relation.**    --The rule which makes relation back of an amendment de-

pendent on whether recovery is sought on the same general set of facts as those alleged in the original complaint is in accordance with the basic principle of code pleading that a litigant need only allege the facts warranting recovery. The results required by this rule may be reached under the "wholly different cause of action" test by interpreting "cause of action" as referring to the facts on which the rights of action are based rather than the rights or obligations arising therefrom, but the term has been used so often to mean legal liability or obligation that its use in connection with the problem of relation back of amendments results in confusion and undue restrictions of the right to amend.

**(4) Limitation of Actions--Commencement of Proceedings--Amendments.** --In an action against a securities brokerage corporation and several fictitious defendants in which the existence of a bond for faithful performance of the corporation's duties as broker was alleged from the outset and an amended complaint substituted the bonding company, which gave the bond, for one of the defendants designated by fictitious name, where both the original and amended complaints alleged the same defalcations by the corporation and its officers with respect to plaintiffs' securities and moneys, and these defalcations constituted the grounds for the action on the bond added by the amended complaint, both pleadings were based on the same general state of facts. Had the bonding company been sued by its true name in the original complaint, the amendment changing the character of its obligation from that of principal to that of surety would have related back for purposes of the statute of limitations; the fact that it was initially designated by fictitious name does not warrant a different result.

56 Cal. 2d 596, *; 364 P.2d 681, **;
15 Cal. Rptr. 817, ***; 1961 Cal. LEXIS 322

**(5) Parties--Designation--Suing by Fictitious Name.** -- Plaintiff's right to use a fictitious name where he is ignorant of defendant's true name is conferred by *Code Civ. Proc., § 474*, and the purpose is to enable plaintiff to bring suit before it is barred by limitations. This procedure does not subject defendant to undue hardship.

**(6) Limitation of Actions--Commencement of Proceedings--Change in Parties Defendant.** --A defendant unaware of a suit against him by a fictitious name is in no worse position if, in addition to substituting his true name, the amendment makes other changes in the allegations on the basis of the same general set of facts.

**(7) Id.--Commencement of Proceedings--Change in Parties Defendant.** --As to a defendant who knows that he has been designated by a fictitious name in the original complaint, application of the rule that an amended complaint will be deemed filed as of the date of original complaint, provided recovery is sought in both pleadings on the same general set of facts, does not affect him differently from a defendant designated by his true name.

**(8) Id.--Commencement of Proceedings--Amendments.** --A plaintiff who did not know defendant's true name at the time the original complaint was filed has at least as great a need for the liberality of amendment permitted by the modern rule of relation back as a plaintiff who knew defendant's name throughout, and he should not be penalized merely because he was compelled to resort to his statutory right of using a fictitious name.

**(9) Id.--Commencement of Proceedings--Amendments.** --The policy in favor of litigating cases on their merits is equally applicable whether defendant is sued by a fictitious name or by his true name, and such policy was of particular importance in an action against a securities brokerage company where the bond forming the basis of the alleged liability of a bonding company, originally sued as a fictitious defendant and specifically named in an amended complaint, was required by *Corp. Code, § 25703*, for the protection of the public.

**COUNSEL:** Johnson & Harmon and Robert H. Johnson for Plaintiffs and Appellants.

Weinstock, Anderson, Maloney & Chase and Harold J. Chase for Defendant and Respondent.

**JUDGES:** In Bank. Gibson, C. J. Traynor, J., Schauer, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

**OPINION BY:** GIBSON

**OPINION**

[*598] [**681] [***817] Certain of the plaintiffs appeal from a judgment entered in favor of defendant Massachusetts Bonding and Insurance Company after its general demurrer to an amended complaint was sustained without leave to amend.

[**682] [***818] Plaintiffs on September 19, 1957, brought an action against Pacific States Securities Corporation, some of its officers, and certain defendants sued under fictitious names, to recover securities and moneys. The complaint, without making any distinction between those sued by their true names and those designated by fictitious names, alleged that "defendants" acted as brokers and agents for plaintiffs and refused to deliver securities and moneys which they had received on behalf of plaintiffs. It was also alleged that defendants, in making a license application on behalf of Pacific, "filed therewith surety bond in the sum of $ 5,000 for the faithful performance of its duties as a licensed broker" and that defendants and [*599] each of them held out and represented that defendant Bunce had power to act for Pacific and that "they, the said defendants," were duly licensed to act as brokers. Plaintiffs averred that they did not know the true names of the defendants sued under fictitious names, and leave was asked to amend the complaint to show the true names when discovered.

The amended complaint was filed with leave of court on October 8, 1959. It repeats substantially the allegations of the original complaint as to the plaintiffs who have appealed, substitutes Massachusetts Bonding for one of the defendants designated by a fictitious name, alleges that Massachusetts Bonding executed the surety bond, makes the bond a part of the pleading, and adds allegations of fraudulent conduct by Bunce and of negligence by other officers of Pacific. The bond provides that any person who sustains an injury covered by it may bring an action on the bond within two years from the time the act or default complained of occurred. [1]

> 1    *Section 25703 of the Corporations Code*, which requires the filing of a bond by applicants for a broker's certificate, contains a similar provision.

The position of Massachusetts Bonding is that the action against it is barred because the amended complaint, which for the first time named it as a party, was filed more than two years after the rights of plaintiffs accrued. Plaintiffs contend that the action against the bonding company must be regarded as having been commenced by the original complaint, which was filed within the two-year period. Although Massachusetts Bonding relies on the contractual limitation, authorities

56 Cal. 2d 596, *; 364 P.2d 681, **;
15 Cal. Rptr. 817, ***; 1961 Cal. LEXIS 322

concerning the statute of limitations are applicable by analogy.

**(1a)** Where a complaint sets forth, or attempts to set forth, a cause of action against a defendant designated by fictitious name and his true name is thereafter discovered and substituted by amendment, he is considered a party to the action from its commencement so that the statute of limitations stops running as of the date of the earlier pleading. ( *Hoffman v. Keeton, 132 Cal. 195, 196-197 [64 P. 264]; Farris v. Merritt, 63 Cal. 118, 119; Day v. Western Loan & Bldg. Co., 42 Cal.App.2d 226, 231 et seq. [108 P.2d 702]*; see *Stanley v. Kawakami, 127 Cal.App.2d 277, 278 [273 P.2d 709]; Sullivan v. Wright, 124 Cal.App.2d 836, 838 [269 P.2d 671]; Kolodziejski v. Hover, 124 Cal.App.2d 731, 733 [269 P.2d 163]; Gates v. Wendling Nathan Co., 27 Cal.App.2d 307, 314 et seq. [81 P.2d 173].*) In the original complaint a [*600] cause of action was stated against the defendant designated by fictitious name in whose place Massachusetts Bonding was later substituted, but the character of the legal obligation of Massachusetts Bonding alleged in the amended complaint is different from that set forth in the original complaint. The first complaint alleged that the "defendants" (which necessarily included those designated by fictitious names) were brokers for plaintiffs and refused to deliver securities and moneys to which plaintiffs were entitled. There was no allegation that any of the defendants executed the surety bond or that any of them was being sued as a surety rather than as a principal. Thus the action against the fictitiously named defendant who subsequently was replaced by Massachusetts Bonding was for refusal to deliver property as a principal, [**683] [***819] whereas in the amended complaint Massachusetts Bonding was sued as surety on the bond. The decisive question is whether under these circumstances the amendment relates back to the original complaint for purposes of the statute of limitations.

**(2)** The modern rule with respect to actions involving parties designated by their true names in the original complaint is that, where an amendment is sought after the statute of limitations has run, the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts. (*Eichler Homes of San Mateo, Inc. v. Superior Court (1961), 55 Cal.2d 845, 847 [13 Cal.Rptr. 194, 361 P.2d 914]; Brooks v. E. J. Willig Truck Transp. Co. (1953), 40 Cal.2d 669, 681 [255 P.2d 802]; Wennerholm v. Stanford University School of Medicine (1942), 20 Cal.2d 713, 718 [128 P.2d 522, 141 A.L.R. 1358]; Stockwell v. McAlvay (1937), 10 Cal.2d 368, 375 [74 P.2d 504].*) This rule is the result of a development which, in furtherance of the policy that cases should be decided on their merits, gradually broadened

the right of a party to amend a pleading without incurring the bar of the statute of limitations.

Some early cases held that an amendment stating any new cause of action could not relate back and that a plaintiff could not amend so as to change the legal theory of his action. ( *Hackett v. Bank of California (1881), 57 Cal. 335, 336; Anderson v. Mayers (1875), 50 Cal. 525, 527.*) Subsequent cases held that a mere change in legal theory would not prevent an amendment from relating back but that an amendment [*601] would not relate back if it set forth "a wholly different cause of action," i.e., "a wholly different legal liability or obligation." ( *Wells v. Lloyd (1936), 6 Cal.2d 70, 88 [56 P.2d 517]; Frost v. Witter (1901), 132 Cal. 421, 424 et seq. [64 P. 705, 84 Am.St.Rep. 53]; cf. Klopstock v. Superior Court (1941), 17 Cal.2d 13, 19 et seq. [108 P.2d 906, 135 A.L.R. 318].*) In the *Klopstock* case it was unnecessary to consider whether the right of a party to amend should be further broadened, since we held that the amendment there involved was proper under the "wholly different cause of action" test. This test was referred to in *Wennerholm v. Stanford University School of Medicine (1942), 20 Cal.2d 713, 717-718 [128 P.2d 522, 141 A.L.R. 1358]*, but after setting forth the modern rule permitting relation back of amendments based on the same general set of facts, the opinion concluded that no different cause of action was stated where the amendment did not essentially change the factual situation upon which recovery was predicated. The later cases of *Eichler Homes of San Mateo, Inc. v. Superior Court (1961), 55 Cal.2d 845 [13 Cal.Rptr. 194, 361 P.2d 914]*, and *Brooks v. E. J. Willig Truck Transp. Co., (1953), 40 Cal.2d 669 [255 P.2d 802]*, rely solely on the modern rule without mentioning the older test.

**(3)** The rule which makes relation back of an amendment dependent upon whether recovery is sought on the same general set of facts as those alleged in the original complaint is in accordance with the basic principle of code pleading that a litigant need only allege the facts warranting recovery. ( *County of Santa Clara v. Hayes Co., 43 Cal.2d 615, 619 [275 P.2d 456]; California W.S.L. Ins. Co. v. Tucker, 15 Cal.2d 69, 71 [98 P.2d 511]*; see Clark on Code Pleading (2d ed. 1947) pp. 717-718.) The results required by this rule may be reached under the "wholly different cause of action" test by interpreting the term "cause of action" as referring to the facts upon which the rights of action are based rather than the rights or obligations arising therefrom (see Clark on Code Pleading, *supra*, p. 731), but the term has been used so often to mean legal liability or obligation that its use in connection with the problem of relation back of amendments results in confusion and undue restrictions of the right to amend. It should be noted that subdivision (c) of *rule 15 of the Federal Rules of Civil Procedure*,

56 Cal. 2d 596, *; 364 P.2d 681, **;
15 Cal. Rptr. 817, ***; 1961 Cal. LEXIS 322

which adopts the modern rule, does not use the term "cause of action" and [*602] thus avoids the danger of narrow construction. [**684] [***820] (See Clark on Code Pleading, *supra*, p. 732.) [2]

2 Subdivision (c) of *rule 15 of the Federal Rules of Civil Procedure* provides that whenever the claim asserted in the amended pleading "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." (28 U.S.C.A., *rule 15, subd. (c)*.)

(4) In the present case the original complaint and the amended complaint allege the same defalcations by Pacific and its officers with respect to plaintiffs' securities and moneys, and these defalcations constitute the grounds for the action on the bond added by the amended complaint. Both pleadings are thus based on the same general set of facts, and the existence of a bond for the faithful performance of Pacific's duties as a broker was also alleged from the outset. Had Massachusetts Bonding been sued by its true name in the original complaint, the amendment changing the character of its obligation from that of a principal to that of a surety would have related back for purposes of the statute of limitations. The fact that it was initially designated by a fictitious name does not warrant a different result. (5) The right of a plaintiff to use a fictitious name where he is ignorant of the defendant's true name is one conferred by statute ( *Code Civ. Proc., § 474*), and it has long been recognized that the purpose of the provision is to enable such a plaintiff to bring suit before it is barred by the statute of limitations and that this procedure does not subject the defendant to undue hardship. [3] ( *Irving v. Carpentier, 70 Cal. 23, 26 [11 P. 391].*)

3 *Section 474 of the Code of Civil Procedure* provides: "When the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint, . . . and such defendant may be designated in any pleading or proceeding by any name, and when his true name is discovered, the pleading or proceeding must be amended accordingly. . . ."

(1b) As we have seen, it is settled that a defendant sued by a fictitious name and later brought into the case by an amendment substituting his true name is considered a party to the action from its commencement for purposes of the statute of limitations. (6) A defendant unaware of the suit against him by a fictitious name is in no worse position if, in addition to substituting his true name, the amendment makes other changes in the allegations on the basis of the same general set of facts. (7) And of course, as to a defendant who knows that he has been designated by a fictitious name in the original complaint, application of the modern rule does [*603] not affect him differently from a defendant designated by his true name. (8) When, on the other hand, the problem is approached from the point of view of a plaintiff who did not know the defendant's true name at the time the original complaint was filed, it is obvious that he has at least as great a need for the liberality of amendment permitted by the modern rule as a plaintiff who knew the defendant's name throughout, and he should not be penalized merely because he was compelled to resort to his statutory right of using a fictitious name. (9) The policy in favor of litigating cases on their merits is equally applicable whether a defendant is sued by a fictitious name or by his true name, and that policy is of particular importance in the present case, where the bond forming the basis of the alleged liability of Massachusetts Bonding is required by statute for the protection of the public. ( *Corp. Code, § 25703*.)

The judgment is reversed.

# TAB 2

LEXSEE 51 CAL.APP.3D 526

**ROBERT D. BARTALO, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; IRENE ROSMAN et al., Real Parties in Interest**

**Civ. No. 46156**

**Court of Appeal of California, Second Appellate District, Division Five**

*51 Cal. App. 3d 526; 124 Cal. Rptr. 370; 1975 Cal. App. LEXIS 1393*

**September 19, 1975**

**DISPOSITION:** [***1] The order overruling the demurrer of Bartalo is reversed and the trial court is directed to sustain such demurrer without leave to amend. The alternative writ of mandate heretofore issued is discharged.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

About 13 months before rendition of the California Supreme Court decision establishing that the spouse of an injured person in a tort action has a right of recovery for loss of consortium, a wife was injured in an automobile accident. She filed a complaint within the one-year period after the accident specified in *Code Civ. Proc., § 340, subd. 3*. Soon after the Supreme Court decision, but more than one year after the accident, the complaint was amended to add the husband as a party and to add his cause for loss of consortium. Defendant demurred to this cause on the basis of the one-year statute, but the trial court overruled the demurrer.

On defendant's application for a writ of mandate, the Court of Appeal reversed the order overruling the demurrer and directed that it be sustained without leave to amend. Although acknowledging that the Supreme Court had intended its decision to be retroactive, the Court of Appeal held that the retroactivity was intended to be limited to causes which arose within one year prior to that decision. As another reason for denying the husband the right to join in the wife's complaint, the court adverted to decisional law denying the right to bring a cause after expiration of the applicable statute of limitations. In conclusion, the court took the position that the husband could not defeat operation of the statute through the doctrine of relation back of his cause to that of the wife, in view of the fact that his cause constituted a legal liability or obligation wholly different from that of the wife, and thus was not entitled to the benefit of the doctrine. (Opinion by Hastings, J., with Ashby, Acting P. J., and Loring, J., * concurring.)

 * Assigned by the Chairman of the Judicial Council.

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d Series

**(1a) (1b) Husband and Wife § 52--Actions--By and Against Third Parties--Loss of Consortium--Statute of Limitations.** --In a wife's action for personal injuries sustained about 13 months before rendition of the California Supreme Court decision establishing that the spouse of an injured person in a tort action has a right of recovery for loss of consortium, it was error to overrule defendant's demurrer to the husband's cause of action for loss of consortium added by amendment naming him as an additional plaintiff, where the amendment was made after expiration of the one-year period of *Code Civ. Proc., § 340, subd. 3*, governing personal injury actions.

**(2) Limitation of Actions § 77--Pleading--Amendment--Relation Back.** --Where an additional party plaintiff, joining in a suit brought before the statute of limitations has run against the original plaintiff, seeks to enforce an independent right, the amended pleading does not relate back so as to render substitution permissible or to preclude the defense of the statute of limitations.

**COUNSEL:** Gilbert, Kelly, Crowley & Jennett and John Keiser for Petitioner.

No appearance for Respondent.

No appearance for Real Parties in Interest.

**JUDGES:** Opinion by Hastings, J., with Ashby, Acting P. J., and Loring, J., * concurring.

    \* Assigned by the Chairman of the Judicial Council.

**OPINION BY:** HASTINGS

**OPINION**

    [*528] [**371] (1a) This petition for writ of mandate states that petitioner Robert D. Bartalo (Bartalo) is a defendant in a personal injury case arising out of an automobile accident which occurred on June 15, 1973. Irene Rosman (wife), who was injured in the accident, filed her lawsuit against Bartalo on June 29, 1973. She was the only named plaintiff. On August 21, 1974, *Rodriguez v. Bethlehem Steel Corp.*, 12 Cal.3d 382 [115 Cal.Rptr. 765, 525 P.2d 669], was decided. It established for the first time in California that the spouse of an injured person in a tort action has a right of recovery for loss of consortium. In December of 1974, wife and her husband [***2] Eugene Rosman (husband) noticed a motion for an order permitting them to file an amended complaint naming husband as an additional plaintiff and adding a second cause of action for loss of consortium. Their motion was granted. Bartalo demurred to the second cause of action of the amended complaint on the ground that it was barred by the statute of limitations (one year from date of the accident). The demurrer was overruled and the instant petition followed. We issued an alternative writ of mandate.

    Argument

    Bartalo contends that *Rodriguez* addressed itself to the issue of retroactivity and the statute of limitations where the court states on page 408 the following: "The solution of the majority of the other courts, which we adopt, is simply to declare that for reasons of fairness and sound administration a spouse will not be permitted to initiate an action for loss of consortium -- even though not barred by the statute of limitations -- when the action of the other spouse for the negligent or intentional injury giving rise to such loss was concluded by settlement or judgment prior to the effective date of this decision. [Citations.] n30".

    Footnote 30 states: "It is probable [***3] that few if any such claims exist in any event, as serious injury cases are rarely settled or brought to judgment within one year after the occurrence of the injury, the governing period of limitations (*Code Civ. Proc., § 340, subd. 3*).

With the exception of such cases, all claims for loss of consortium not barred by the statute of limitations may now be asserted: for the reasons persuasively stated in *Fitzgerald v. Meissner & Hicks, Inc.* (1968) *supra*, 157 N.W.2d 595, 598-599, our decision herein is to be given normal retroactive effect within the limits of the statute of limitations."

    [*529] Husband first became a plaintiff in the amended complaint which was filed more than one year after the accident. Bartalo argues that the statute of limitations had run and that *Rodriguez*, per its statement, *supra*, had foreclosed husband's cause of action. Husband argues as follows: (1) That civil actions can only be commenced within the statutory period after the cause of action shall have accrued (*Code Civ. Proc., § 312*) and, until the Supreme Court decided the *Rodriguez* case, he had no cause of action for loss of consortium, therefore the statute of limitation [***4] on his cause of action began to run on the filing of *Rodriguez*; and (2) his wife's complaint can be amended to add him as a party plaintiff; and that an amended complaint relates back to the original complaint when it seeks recovery on the same general facts, and the statute of limitations on *his* cause of action was thereby tolled by the filing of his wife's original complaint. (*Austin v. Massachusetts Bonding & Insurance Co.*, 56 Cal.2d 596, 600-601 [15 Cal.Rptr. 817, 364 P.2d 681]; *Eichler Homes of San Mateo, Inc. v. Superior Court*, 55 Cal.2d 845, 847 [13 Cal.Rptr. 194, 361 P.2d 914]; *Wennerholm v. Stanford Univ. Sch. of Med.*, 20 Cal.2d 713, 717-718 [128 P.2d 522, 141 A.L.R. 1358].)

    For several reasons we conclude that husband's argument is without merit. The first reason is the court's intent in *Rodriguez* to limit filings for loss of consortium only to those persons whose cause [**372] of action arose within one year prior to the filing of its opinion. For example, it does not permit an action to be initiated *even though not barred by the statute of limitation* when the action of the other spouse was determined by judgment or settlement [***5] prior to the effective date of *Rodriguez*. It states that probably few, if any, such claims exist because serious injury cases are rarely settled or brought to judgment *within one year* after the occurrence of the injury; therefore, with the exception of such cases, all claims not barred by the statute of limitations may now be asserted. This language is very persuasive that the Supreme Court was permitting retroactivity only to those causes of action that arose one year or less prior to the filing date of *Rodriguez*. Further, there is still another portion of the court's statement that compels this interpretation. [1] The court says: "for the reasons persuasively stated in *Fitzgerald* v. *Meissner & Hicks, Inc.*, . . . our decision herein is to be given normal retroactive effect [*530] within the limits of the statute of

limitation." The *Fitzgerald* court did, in passing, consider the problem before us. There a wife sought to bring an action for loss of consortium after the Wisconsin court in *Moran v. Quality Aluminum Casting Co., 34 Wis.2d 542 [150 N.W.2d 137]*, had given its blessing to her cause of action. The record before the *Fitzgerald* [***6] court did not disclose whether her husband, who was the injured party, had filed a lawsuit. The wife had filed before the statute of limitation had outlawed her cause of action. The court addressed itself on the question of joinder of the two causes of action. It said at page 599: "If he [husband] has not commenced an action and is desirous of doing so, the complaint may be amended and he may join as a party plaintiff to state his cause of action. *(In this instance it appears that the statute of limitation would be a defense to his claim at this date.)*" (Italics added.) Wisconsin follows the California rule that an amended complaint will take effect on the date of the filing of the original complaint to bar an intervening statute of limitation where the identity of the cause of action remains essentially the same. Apparently, from the comment above, the Wisconsin Supreme Court would not permit a spouse to add his or her complaint for loss of consortium to the other spouse's tort action if the statute of limitation has run.

> 1 Under husband's theory that he can join in wife's complaint, it is possible that in some cases the other spouse could join in the action even though the accident had occurred almost six years earlier. This could happen where an action was filed just before the one-year statute of limitation expired and the case was not calendared for trial until the latter part of the five-year period allowed for the trial to commence. The amendment could be made any time up to date of trial.

[***7] The *Rodriguez* court also was cognizant of the amendment problem. In footnote 29, page 407, the court said: "In the case at bar, for example, Richard Rodriguez originally filed a complaint for his damages alone. Subsequently, *but within the statute of limitation*, he and Mary Anne filed an amended complaint joining their causes of action. . . ."

The second reason for denying husband's joinder in wife's complaint is that California decisional law would deny husband the right to bring his cause of action after the statute of limitation has expired. In *Monroe v. Trustees of the California State Colleges, 6 Cal.3d 399 [99 Cal.Rptr. 129, 491 P.2d 1105]*, a college professor was discharged for failure to sign a required oath. The statute calling for the oath was held constitutional by the Supreme Court in 1952. ( *Pockman v. Leonard, 39 Cal.2d 676 [249 P.2d 267]*). In 1967 the Supreme Court overruled *Pockman*. ( *Vogel v. County of Los Angeles, 68*

*Cal.2d 18 [64 Cal.Rptr. 409, 434 P.2d 961]*.) The professor then applied for and was refused reinstatement. He brought an action seeking both money damages for all of the past years and reinstatement. The [***8] court stated [**373] at pages 406-407: "The normal 'retroactivity' of most civil decisions has never been thought to supersede the operation of the statute of limitations so as to revive old claims which were not pursued because of a previously prevailing contrary rule of law, [*531] [fn. omitted] or to reincarnate dead causes which had fallen to the sword of the statute. Instead, the retroactive application of a judicial decision has traditionally meant only that the rule of law established by the new decision governs events occurring prior to the date of decision, *when such events are at issue in timely filed actions*. For example, although this court's decision in *Muskopf v. Corning Hospital Dist. (1961) 55 Cal.2d 211 [11 Cal.Rptr. 89, 359 P.2d 457]*, abrogating a general governmental immunity to tort claims, was given normal retroactive effect, we recognized that litigants who suffered injury at the hands of the government prior to *Muskopf* would be barred from recovery unless their suits had been 'filed within the ordinary limitations period provided for tort actions.'" [Italics in original.]

A footnote in *Monroe* stated: "In addition to relying [***9] on the retroactivity of *Vogel*, petitioner alternatively contends that the statute of limitations did not begin to run on his claim for wrongful discharge until 1968 because until that date it was allegedly 'impossible' for petitioner to attack the State Personnel Board's decision. No legal obstacle barred a judicial challenge to petitioner's initial discharge, however, and the mere existence of a contrary precedent has never been considered sufficient to toll the running of the statute of limitations." (*Id. at p. 408, fn. 5.*)

In *Lopa v. Superior Court, 46 Cal.App.3d 382 [120 Cal.Rptr. 445]*, the court was dealing with the rights of an automobile passenger (through a guardian ad litem, Lopa, Sr.) to amend *his* complaint and serve the defendant driver (Lopa, Jr.) as a Doe more than three years after the summons had been issued. His original cause of action was against the driver of the other car and eight Does. A guest passenger's cause of action against his driver was first recognized in *Brown v. Merlo, 8 Cal.3d 855 [106 Cal.Rptr. 388, 506 P.2d 212]*, which was decided after the filing of the complaint. The court ruled that the action must be dismissed [***10] for failure to serve the summons within the three-year period. (*Code Civ. Proc., § 581a*). The court in *Lopa* stated on pages 389-390: "The plaintiffs here were unaware that they had a cause of action against Lopa, Jr. until the decision of the Supreme Court in *Brown v. Merlo*. Was it impracticable, impossible or futile for them to attempt to serve Lopa, Jr., as a Doe defendant? It obviously was not im-

51 Cal. App. 3d 526, *; 124 Cal. Rptr. 370, **;
1975 Cal. App. LEXIS 1393, ***

possible in the strictest sense. They could have asserted a claim against him. Had they done so, however, they would immediately have been met by appellate court decisions, [citations] which held that statute to be constitutional.

[*532] "The precise question is whether ignorance of a cause of action constitutes such impracticability and futility as to prevent the running of the statute . . . . [para. ] The circumstances of this case indicate that it was not impracticable and futile to assert the claim now sought to be allowed. The senior Lopas were in no way prevented from trying to assert a cause of action against Lopa, Jr., notwithstanding the guest statute. Surely they faced the real possibility of rebuff, in light of the existing state law. But, that [***11] was the precise hurdle faced by plaintiff in *Brown v. Merlo, supra, 8 Cal.3d 855.* His determination and persistence in preserving his claim that the guest statute was unconstitutional ultimately produced the result he sought." [2]

> 2   In *Estate of Horman, 5 Cal.3d 62 [95 Cal.Rptr. 433, 485 P.2d 785],* the court was facing a similar issue.  On page 71, it said: "Under claimants' tolling theory, whenever a precedent was overturned recognizing a right of action theretofore denied by case law, all persons who had been aggrieved between the decision of the precedent case and the decision of the overruling case could then file suit, no matter how many years had elapsed between.  Such a proposition cannot be sustained.  A contention identical in principle was rejected in *Bates v. Gregory, 89 Cal. 387, 392-397 [26 P. 891].*"

[**374]  Husband, in the case at bench, remained passive while the plaintiff in *Rodriguez* persisted until he obtained his cause of action for loss of consortium. We see [***12] no distinction between the cases.  Husband could have joined with wife in the first complaint and alleged the same cause of action that he now alleges in the amended complaint.  If the reasoning in *Monroe* and *Lopa* is sound, and we think it is, it is directly in point here and should preclude husband from bringing his cause of action after the running of the statute of limitations.

The third reason for rejecting husband's argument is that we do not believe he can join in wife's cause of action in order to bar the intervening statute of limitations. *Austin v. Massachusetts Bonding & Insurance Co., supra, 56 Cal.2d 596,* best summarizes the rule.  Starting on page 600, the court states: "The modern rule with respect to actions involving parties designated by their true names in the original complaint is that, where an amendment is sought after the statute of limitations has run, the amended complaint will be deemed filed as of the date of the original complaint provided recovery is sought in both pleadings on the same general set of facts. [Citations.] This rule is the result of a development which, in furtherance of the policy that cases should be decided on their [***13] merits, gradually broadened the right of a party to amend a pleading without incurring the bar of the statute of limitations.

[*533] "Some early cases held that an amendment stating any new cause of action could not relate back and that a plaintiff could not amend so as to change the legal theory of his action [Citations].  Subsequent cases held that a mere change in legal theory would not prevent an amendment from relating back but that an amendment would not relate back if it set forth 'a wholly different cause of action,' i.e., 'a wholly different legal liability or obligation.' [Citations.] . . .

"The rule which makes relation back of an amendment dependent upon whether recovery is sought on the same general set of facts as those alleged in the original complaint is in accordance with the basic principle of code pleading that a litigant need only allege the facts warranting recovery. [Citations.] The results required by this rule may be reached under the 'wholly different cause of action' test by interpreting the term 'cause of action' as referring to the facts upon which the rights of action are based rather than the rights or obligations arising therefrom [citation], [***14] but the term has been used so often to mean legal liability or obligation that its use in connection with the problem of relation back of amendments results in confusion and undue restrictions of the right to amend. It should be noted that subdivision (c) of *rule 15 of the Federal Rules of Civil Procedure,* which adopt the modern rule, does not use the term 'cause of action' and thus avoids the danger of narrow construction [citation]." (Italics added.)

Husband's claim to a loss of consortium is a wholly different legal liability or obligation.  The elements of loss of society, affection and sexual companionship are personal to him and quite apart from a similar claim of the wife.  True, in a sense it is derivative because it does not arise unless his wife has sustained a personal injury, however, his claim is not for her personal injuries but for the separate and independent loss he sustained.  (See *Fitzgerald v. Meissner & Hicks, Inc., supra.*)

(2) The general rule governing the permissibility of the bringing in of additional plaintiffs after the period of the [**375] statute of limitations has elapsed, or of the assertion of the defense of limitations against them, is [***15] that where the additional party plaintiff, joining in a suit brought before the statute of limitations has run against the original plaintiff, seeks *to enforce an independent right,* the amended pleading does not relate back, so as to render substitution permissible or to pre-

51 Cal. App. 3d 526, *; 124 Cal. Rptr. 370, **;
1975 Cal. App. LEXIS 1393, ***

clude the defense of the statute of limitations. (*51 Am.Jur.2d, Limitation of Action, § 236*, p. 788.)

[*534]  If a husband and wife were both injured in the same accident and the wife sued but the husband did not, the one-year statute of limitations would run on husband's cause of action, and if he tried to sue after the year had run defendant's demurrer that the claim was barred would be sustained.  Surely if wife then tried to amend her complaint to include his cause of action, it would be disallowed.  Except for the fact that *Rodriguez* subsequently gave husband a cause of action, the above hypothetical example is exactly what husband is seeking to do here.  The *Rodriguez* issue, however, is answered by *Monroe* and *Lopa*, and denies him his cause of action.  Husband should have been a litigant in the original complaint.

We are not unaware of cases that have allowed the addition of a new [***16] party by an amendment to the complaint. [3]  However, these cases on analysis are clearly distinguishable.  Generally, a different plaintiff was substituted in because there was a technical defect in the plaintiff's status (an administrator for a deceased plaintiff; a stockholder in place of a corporation; etc.); a necessary party was joined; or a nominal plaintiff was removed and the real party in interest took his place.  A new and additional party -- such as husband here -- seeking damages not previously pleaded on a different obligation after the statute of limitation has passed is not a factual situation that fits into this category.  Once the statute of limitation has passed as to other possible plain-

tiffs, a defendant is entitled to dismiss them from his considerations.  This could be important in settlement negotiations, the importance of which was recognized in *Rodriguez*, where the Supreme Court proclaimed "a spouse will not be permitted to initiate an action for loss of consortium -- *even though not barred by the statute of limitations* -- when the action of the other spouse . . . was concluded by settlement. . . ." Although *Rodriguez* solves the settlement problem [***17] by this statement in loss of consortium actions, it does not solve the problem in other cases not dealing with this exact issue.  If we adopted husband's theory, amendments could be made to add additional parties after the statute of limitation had passed and defendant had settled with the original plaintiff or plaintiffs.

> 3   See *Cal. Gas Retailers v. Regal Petroleum Corp., 50 Cal.2d 844 [330 P.2d 778]; Klopstock v. Superior Court, 17 Cal.2d 13 [108 P.2d 906, 135 A.L.R. 318]; Jensen v. Royal Pools, 48 Cal.App.3d 717 [121 Cal.Rptr. 805]; and Cox v. San Joaquin Light etc. Co., 33 Cal.App. 522 [166 P. 578].*

(**1b**) For the reasons stated above, we conclude that the demurrer was improperly overruled.

[*535]  The order overruling the demurrer of Bartalo is reversed and the trial court is directed to sustain such demurrer without leave to amend. The alternative writ of mandate heretofore issued is discharged. [***18]

TAB 3

LEXSEE 1 CAL.4TH 1083

**VINCENT A. GANTT, Plaintiff and Respondent, v. SENTRY INSURANCE et al., Defendants and Appellants.**

**No. S014212**

**SUPREME COURT OF CALIFORNIA**

*1 Cal. 4th 1083; 824 P.2d 680; 4 Cal. Rptr. 2d 874; 1992 Cal. LEXIS 532; 57 Cal. Comp. Cas 192; 7 I.E.R. Cas. (BNA) 289; 121 Lab. Cas. (CCH) P56,853; 59 Empl. Prac. Dec. (CCH) P41,597; 92 Daily Journal DAR 2803*

**February 27, 1992, Decided**

**PRIOR HISTORY:**    Superior Court of Sacramento County, No. 312807, Joseph A. DeCristoforo, Judge.

**DISPOSITION:**    In sum, we hold that the Workers' Compensation Act does not preempt plaintiff's *Tameny* action for tortious discharge in contravention of fundamental public policy. The judgment of the Court of Appeal is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A former employee of an insurance company filed an action against the company and associated individuals alleging he had been constructively discharged for resisting efforts to induce him to give false information or to withhold information from the Department of Fair Employment and Housing, which was investigating sexual harassment charges filed by a coworker. Judgment was entered on a jury verdict in favor of plaintiff for tortious discharge in violation of the covenant of good faith and fair dealing, and in contravention of public policy, defamation, and intentional infliction of emotional distress. (Superior Court of Sacramento County, No. 312807, Joseph A. DeCristoforo, Judge.) The Court of Appeal, Third Dist., No. C001163, reversed the judgment as to the individual defendants but affirmed in all other respects.

The Supreme Court affirmed the judgment of the Court of Appeal, holding that a termination in retaliation for testifying truthfully concerning a coworker's sexual harassment claim in the context of an administrative investigation is actionable, and that the exclusive remedy provisions of the workers' compensation law did not preempt the claim. The court held that in actions by at-will

employees for tort damages for wrongful discharge in violation of public policy, courts may not declare public policy without a basis in either constitutional or statutory provisions. The court further held that there was direct statutory support for the jury's express finding that the employer violated a fundamental public policy when it constructively discharged the plaintiff employee, in view of *Gov. Code, § 12975*, specifically prohibiting any obstruction of an investigation by the Department of Fair Employment and Housing. Thus, any attempt to induce or coerce an employee to lie to a department investigator plainly contravenes the public policy of the state. (Opinion by Arabian, J., with Lucas, C. J., Panelli, Baxter and George, JJ., concurring. Separate concurring and dissenting opinion by Kennard, J., with Mosk, J., concurring.)

**HEADNOTES**

**CALIFORNIA      OFFICIAL      REPORTS HEADNOTES**
Classified to California Digest of Official Reports, 3d and 4th Series

**(1) Employer and Employee § 8--Contracts of Employment--Termination--At-will Employee--Violation of Public Policy.** --While an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there is no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.

**(2) Employer and Employee § 9--Contracts of Employment--Actions For Wrongful Discharge--Violation of Public Policy.** --In actions by at-will employees for tort damages for wrongful discharge in violation of public policy, courts may not declare public policy without a basis in either constitutional or statutory

1 Cal. 4th 1083, *; 824 P.2d 680, **;
4 Cal. Rptr. 2d 874, ***; 1992 Cal. LEXIS 532

provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees, and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy, and society's interests are served through a more stable job market, in which its most important policies are safeguarded.

**(3) Employer and Employee § 9--Contracts of Employment--Actions For Wrongful Discharge--Violation of Public Policy--Reporting Coworker's Claim of Sexual Harassment.** --An employee who had filed a tort action against his employer stated a cause of action for discharge in violation of public policy by allegations that he was terminated in retaliation for supporting a coworker's claim of sexual harassment. There was direct statutory support for the jury's express finding that the employer violated a fundamental public policy when it constructively discharged the plaintiff employee in retaliation for his refusal to testify untruthfully or to withhold testimony in the course of an investigation by the Department of Fair Employment and Housing. *Gov. Code, § 12975,* specifically prohibits any obstruction of such an investigation. Thus, any attempt to induce or coerce an employee to lie to a department investigator plainly contravenes the public policy of the state.

[See 6 Witkin, Summary of Cal. Law (9th ed. 1987) Torts, § 1357.]

**(4) Workers' Compensation § 7.4--Exclusivity of Remedy--Tort Action Against Employer Not Barred--Wrongful Discharge in Violation of Public Policy.** --A former employee's action against his employer for wrongful discharge in violation of public policy based upon his constructive termination in retaliation for supporting a coworker's claim of sexual harassment, was not preempted by the exclusive remedy provisions of the workers' compensation law (*Lab. Code, §§ 3600, 3602, subd. (a)*). When an employer's decision to discharge an employee results from an animus that violates the fundamental policy of the state proscribing any interference in the official investigation of sexual harassment (*Gov. Code, § 12975*), such misconduct cannot under any reasonable viewpoint be considered a normal part of the employment relationship or a risk reasonably encompassed within the compensation bargain. The obligation to refrain from such conduct is a duty imposed by law on all employers to implement the fundamental public policies of the state; it cannot be bargained away; it is not

preempted by other statutory remedies; and it is not subject to the exclusive remedy provisions of the Labor Code.

**COUNSEL:** Hanson, Bridgett, Marcus, Vlahos & Rudy, Douglas H. Barton and Bonnie Kathleen Gibson for Defendants and Appellants.

Proskauer, Rose, Goetz & Mendelsohn, Steven G. Drapkin, Philip L. Ross, O'Melveny & Myers, Stephen P. Pepe and Craig A. Horowitz as Amici Curiae on behalf of Defendants and Appellants.

Matheny, Poidmore & Sears, Anthony J. Poidmore and Michael A. Bishop for Plaintiff and Respondent.

Joseph Posner as Amicus Curiae on behalf of Plaintiff and Respondent.

**JUDGES:** Opinion by Arabian, J., with Lucas, C. J., Panelli, Baxter and George, JJ., concurring. Separate concurring and dissenting opinion by Kennard, J., with Mosk, J., concurring.

**OPINION BY:** ARABIAN, J.

**OPINION**

[*1085] [**681] [***875] We granted review in this case to consider whether an employee who was terminated in retaliation for supporting a coworker's claim of sexual harassment may state a cause of action for tortious discharge against public policy and, if so, whether the exclusive remedy provisions of the Workers' Compensation Act bar the action. We hold that the claim is [***876] actionable under *Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314] (Tameny),* and is not preempted by the workers' compensation law. [*1086]

I. Procedural Background

Defendants, Sentry Insurance (Sentry), Frank Singer (Singer) and Caroline Fribance (Fribance) appealed from a judgment entered on a jury verdict of $ 1.34 million in favor of plaintiff, Vincent A. Gantt (hereafter plaintiff or Gantt) in his action for tortious discharge in violation of the covenant of good faith and fair dealing and in contravention of public policy ( *Tameny, supra, 27 Cal.3d 167),* defamation, and intentional infliction of emotional distress.

The Court of Appeal reversed the judgment as to the individual defendants but affirmed in all other respects. As to the *Tameny* cause of action, the Court of Appeal noted that the allegation was predicated upon two distinct theories: the first, that plaintiff was constructively

discharged in retaliation for supporting a coworker's claim of sexual harassment; and second, that Sentry attempted to induce plaintiff to give false information or to withhold information from the public agency investigating the sexual harassment charges. Although the Court of Appeal concluded that Gantt's first theory of recovery was preempted by the California Fair Employment and Housing Act (FEHA), it held that the FEHA did not preempt a *Tameny* claim premised on the second theory; that substantial evidence supported the jury's special verdict; and that the action was not barred by the exclusive remedy provisions of the Workers' Compensation Act. [1]

> 1   With respect to Gantt's other causes of action, the Court of Appeal held that the tort claim for breach of the covenant of good faith and fair dealing was invalid under this court's decisions in *Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373]* and *Newman v. Emerson Radio Corp. (1989) 48 Cal.3d 973 [258 Cal.Rptr. 592, 772 P.2d 1059]*; that the intentional infliction of emotional distress claim was barred by the exclusive remedy provisions of the workers' compensation law as construed by this court in *Cole v. Fair Oaks Fire Protection Dist. (1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743]*; and that the defamation action was precluded because of the privileged nature of the statements at issue. Because plaintiff sought recovery against the individual defendants (Singer and Fribance) solely on the grounds of defamation and intentional infliction of emotional distress, the Court of Appeal reversed the judgment as to them. Gantt did not seek review of these portions of the Court of Appeal's decision.

Sentry petitioned this court for review, asserting that neither the facts nor the law supported a *Tameny* claim premised on plaintiff's second theory, and that the action was barred in any event by the workers' compensation law.   After granting review, we requested additional briefing on the question whether a *Tameny* claim must be grounded in a violation of statute or constitutional provision. [2]

> 2   We also requested additional briefing on the question whether, in light of our intervening decision in *Rojo v. Kliger (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373]*, the Court of Appeal erred in holding plaintiff's first *Tameny* theory to have been preempted by the FEHA. Because we uphold plaintiff's *Tameny* claim under the second theory advanced at trial, we need not address this aspect of the decision of the Court of Appeal.

For the reasons set forth below, we conclude that a termination in retaliation for testifying truthfully concerning a coworker's sexual harassment [*1087] claim in the context of an administrative investigation is actionable [**682] under *Tameny, supra,* 27 Cal.3d 167. We further conclude that neither the FEHA nor the Workers' Compensation Act preempts the claim.   Accordingly, we shall affirm the decision of the Court of Appeal.

II. Facts

Viewing the record most strongly in favor of the judgment, as we must ( *Agarwal v. Johnson (1979) 25 Cal.3d 932, 938 [160 Cal.Rptr. 141, 603 P.2d 58]*), the following pertinent chronology of facts appears: In September 1979, Sentry hired Gantt to serve as the sales manager of its Sacramento office.   His mission was to develop the Sacramento sales force.   How successfully he performed this task was the subject of conflicting evidence at trial.   However, as explained below, the record amply supports the jury's specific finding that his demotion and constructive discharge were the product of his support for another employee's sexual harassment claim rather than the result of any legally valid business reason.

The specific circumstances which led to Gantt's estrangement from Sentry centered on Joyce Bruno, who was hired in January 1980 to be the liaison between trade associations and Sentry's Sacramento and Walnut Creek offices.   In that capacity, Ms. Bruno reported to both Gantt and Gary Desser, the manager of the Walnut Creek office, as well as Brian Cullen, a technical supervisor at regional headquarters in Scottsdale, Arizona.

Shortly after she was hired, Ms. Bruno experienced sexual harassment at the hands of Desser.   As the harassment continued, she complained to Gantt.   He recommended she report it to Cullen in Scottsdale.   Ultimately, Gantt himself contacted both Bonnie Caroline, who was responsible for receiving complaints of sexual discrimination, and Dave Berg, his immediate supervisor, about the problem.   Despite these reports, the harassment continued.   Accordingly, Gantt took it upon himself to speak a second time with both Berg and Ms. Caroline.   Finally, in early 1981, Desser was demoted from sales manager to sales representative and replaced by Robert Warren. In March, Ms. Bruno was transferred to a sales representative position.   A month later, however, she was fired.

Gantt stated that he was present at the April meeting in which Berg directed Warren to fire Bruno and ridiculed Gantt for supporting her.   The following month, Berg himself resigned from Sentry following an investigation into claims that he had engaged in sexual harassment.   Berg's replacement, Frank Singer, assumed the title "Director of Sales" and recruited John [*1088]

1 Cal. 4th 1083, *; 824 P.2d 680, **;
4 Cal. Rptr. 2d 874, ***; 1992 Cal. LEXIS 532

Tailby to assume Berg's old position supervising the various sales offices. According to one witness, Tailby said Singer told him that getting rid of Gantt was to be one of his first tasks. Tailby resisted, however, and in 1981 Gantt was ranked among Sentry's top district managers in premium growth.

Bruno, meanwhile, filed a complaint with the Department of Fair Employment and Housing (DFEH). She alleged harassment by Desser and failure by Sentry's higher management to act on her complaints. Caroline Fribance, Sentry's house counsel in charge of labor-related matters, undertook to investigate the matter. Gantt informed Fribance that he had reported Bruno's complaints to personnel in Scottsdale. However, Gantt gained the impression that he was being pressured by Fribance to retract his claim that he had informed Scottsdale of the complaints. Later, following the interview with Fribance, Tailby cautioned Gantt that Singer and others in the company did not care for Gantt. In a follow-up memorandum, Tailby cautioned Gantt that "it sometimes appears that you are involved in some kind of 'intrigue' and 'undercover' operation." In December 1982, Tailby rated Gantt's overall work performance for the year as "acceptable." Without directly informing Gantt, Singer changed the rating to "borderline acceptable/unacceptable."

Shortly thereafter, John Thompson, a DFEH investigator, contacted Fribance to arrange interviews with certain employees, including Gantt. Because of his growing [**683] [***877] unease about Fribance, Gantt arranged to meet secretly with Thompson before the scheduled interview. Gantt told him the facts of which he was aware, including his reporting of Bruno's complaints to Scottsdale, and Thompson assured him that he would be protected under the law from any retaliation for his statements. Thompson gained the impression that Gantt felt he was being pressured and was extremely fearful of retaliation because of his unfavorable testimony.

Gantt met with Fribance the day before his formal DFEH interview. She repeatedly reminded him that he was the only management employee supporting Ms. Bruno's claim that she had notified management about the harassment. Plaintiff felt that Fribance was unhappy with his testimony and that her unstated intent was to induce him to change his story. She also told him about another employee who had been found guilty of sexual harassment but retained by the company because he was a loyal employee. It was also during this meeting that Gantt discovered the change in his December 1982 evaluation. These events confirmed his fears that the company was pressuring him to withhold testimony or face retaliation.

The official DFEH interviews took place the next day. Fribance was present during Thompson's interview with Gantt. Following the interview, [*1089] Fribance asked Thompson why he was not investigating sexual harassment charges against Gantt; she indicated that Gantt had harassed Bruno and was trying to deflect attention from himself. Thompson was surprised by Fribance's statements since he had never experienced a company attorney suggesting that charges be brought against one of the company's own employees. [3]

> 3  Although Fribance disputed Thompson's characterization of her statements, the jury specifically found that Fribance told Thompson that Gantt had sexually harassed Ms. Bruno; that the statement was false; and that Fribance had acted with malice, oppression or fraud.

Less than two months later, on March 3, 1983, Gantt attended an awards ceremony in Scottsdale to accept a life insurance sales award on behalf of his office. The following morning, Singer and Tailby informed him that he was being demoted to sales representative. Shortly thereafter, Gantt's new supervisor, Neil Whitman, warned him that he would be fired if he attempted to undermine Whitman's authority. Gantt was also informed that he would not be given a "book" of existing accounts to start his new job; according to Gantt, such a book was necessary to survive.

During the following month, Gantt was in the office only intermittently. He experienced a variety of illnesses and took vacation time and sick leave. In mid-April he was offered and accepted a position with another company. He left Sentry's payroll in early May. Two months later, he filed the instant lawsuit alleging that "as a result of the pressure applied by the defendants ... he was forced to resign."

As noted earlier, the jury returned a special verdict in favor of Gantt, finding, inter alia, that Gantt had been constructively discharged; that Sentry lacked an "honest good faith belief the termination was warranted for legally valid business reasons"; that Gantt was discharged "in retaliation for his refusal to testify untruthfully or to withhold testimony"; that Gantt was further discharged in retaliation for his "actions or statements with respect to Joyce Bruno's sexual harassment allegations"; and that in committing these acts Sentry acted with malice, oppression or fraud.

III. Discussion

A. *Sources of the Public Policy Exception*

This court first recognized a public policy exception to the at-will employment doctrine in *Tameny, supra,* 27 *Cal.3d 167,* and has since reaffirmed its commitment to

1 Cal. 4th 1083, *; 824 P.2d 680, **;
4 Cal. Rptr. 2d 874, ***; 1992 Cal. LEXIS 532

that principle on several occasions ( *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, 665-671; *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 23 [*1090] *[276 Cal.Rptr. 303, 801 P.2d 1054,* A.L.R.4th 1720]), and [***878] most [**684] recently in *Rojo v. Kliger, supra,* 52 Cal.3d 65, 88-89. Indeed, following the seminal California decision in *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184 [344 P.2d 25], the antecedent to our holding in *Tameny,* the vast majority of states have recognized that an at-will employee possesses a tort action when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn. (See *Cloutier v. Great Atlantic & Pac. Tea Co.* (1981) 121 N.H. 915 [436 A.2d 1140, 1144]; *Coman v. Thomas Mfg. Co., Inc.* (1989) 325 N.C. 172 [381 S.E.2d 445, 447]; *Cummins v. EG & G Sealol, Inc.* (D.R.I. 1988) 690 F.Supp. 134, 137; *Phipps v. Clark Oil & Refining Corp.* (Minn.Ct.App. 1986) 396 N.W.2d 588, 591, and the cases cited therein.)

Yet despite its broad acceptance, the principle underlying the public policy exception is more easily stated than applied. The difficulty, of course, lies in determining where and how to draw the line between claims that genuinely involve matters of public policy, and those that concern merely ordinary disputes between employer and employee. This determination depends in large part on whether the public policy alleged is sufficiently clear to provide the basis for such a potent remedy. In *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, we endeavored to provide some guidelines by noting that the policy in question must involve a matter that affects society at large rather than a purely personal or proprietary interest of the plaintiff or employer; in addition, the policy must be "fundamental," "substantial" and "well established" at the time of the discharge. ( at pp. 669-670.)

We declined in *Foley* to determine whether the violation of a statute or constitutional provision is invariably a prerequisite to the conclusion that a discharge violates public policy. A review of the pertinent case law in California and elsewhere, however, reveals that few courts have recognized a public policy claim absent a statute or constitutional provision evidencing the policy in question. Indeed, as courts and commentators alike have noted, the cases in which violations of public policy are found generally fall into four categories: (1) refusing to violate a statute (see, e.g., *Tameny, supra,* 27 Cal.3d 167 [employee discharged for refusing to participate in illegal price-fixing scheme]; *Petermann v. International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184 [employee terminated for refusing to perjure himself before state legislative committee]); (2) performing a statutory obligation (see, e.g., *Nees v. Hocks* (1975) 272 Ore. 210 [536 P.2d 512] [performing jury duty]); [4] (3) exercising a

statutory right or privilege ( *Wetherton v. Growers Farm Labor Assn.* (1969) 275 Cal.App.2d 168 [79 Cal.Rptr. 543] [*1091] [engaging in union activities]); and (4) reporting an alleged violation of a statute of public importance ( *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159, 35 A.L.R.4th 1015]; see generally Note, *Protecting Employees At Will Against Wrongful Discharge: The Public Policy Exception* (1983) 96 Harv. L.Rev. 1931, 1936-1937; Rust et al., *Employee Termination At Will: A Principled Approach* (1982) 28 Vill. L.Rev. 1, 26-27.)

4    Although the court in *Mallard v. Boring* (1960) 182 Cal.App.2d 390 [6 Cal.Rptr. 171] rejected a public policy claim premised on a retaliatory discharge for engaging in jury service, the court inexplicably failed to consider the clear statutory and constitutional bases for such a claim. (See *Nees v. Hocks, supra,* 536 P.2d 512, 516; *Reuther v. Fowler & Williams, Inc.* (1978) 255 Pa.Super. 28 [386 A.2d 119, 120-121].) Moreover, the Legislature has since enacted specific legislation which makes it unlawful to terminate or otherwise discriminate against an employee for jury service. ( *Lab. Code, § 230.*)

To be sure, those courts which have addressed the issue appear to be divided over the question whether nonlegislative sources may ever provide the basis of a public policy claim. *Pierce v. Ortho Pharmaceutical Corp.* (1980) 84 N.J. 58 [417 A.2d 505, 12 A.L.R.4th 520] is the leading case for a broad interpretation. As the New Jersey Supreme [**685] [***879] Court explained: "The sources of public policy [which may limit the employer's right of discharge] include legislation; administrative rules, regulations or decisions; and judicial decisions. In certain instances, a professional code of ethics may contain an expression of public policy." ( at p. 512.) Several other states have adopted similarly broad views of the public policy exception. (See *Parnar v. Americana Hotels, Inc.* (1982) 65 Hawaii 370 [652 P.2d 625, 631] ["In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy."]; *Palmateer v. International Harvester Co.* (1981) 85 Ill.2d 124 [52 Ill. Dec. 13, 421 N.E.2d 876, 878] ["In general, it can be said that public policy concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions."]; *Boyle v. Vista Eyewear, Inc.* (Mo.Ct.App. 1985) 700 S.W.2d 859, 871 [" 'Public policy' is that principle of law which holds that no one can lawfully do that which tends to be injurious to

the public or against the public good .... It finds its sources in the state constitution, ... in the letter and purpose of a constitutional, statutory or regulatory provision or scheme, ... in the judicial decisions of the state and national courts, ... in 'the constant practice of the government officials,' ... and, in certain instances, in professional codes of ethics."]; *Phipps v. Clark Oil & Refining Corp., supra, 396 N.W.2d 588, 593* ["A public policy exception can be reasonably defined by reference to clear mandates of legislative or judicially recognized public policy."]; *Cloutier v. Great Atlantic & Pac. Tea Co., supra, 436 A.2d 1140, 1144* ["Public policy exceptions [*1092] giving rise to wrongful discharge actions may also be based on non-statutory policies."]; *Wagenseller v. Scottsdale Memorial Hospital (1985) 147 Ariz. 370 [710 P.2d 1025, 1034]* ["reliance on prior judicial decisions, as part of the body of applicable common law, is appropriate ..."]; *Yetter v. Ward Trucking Corp. (1991) 401 Pa.Super. 467 [585 A.2d 1022, 1027]* ["appellant has failed to point to any statutorily or judicially recognized public policy which was violated by appellee in terminating appellant"]; *Payne v. Rozendaal (1986) 147 Vt. 488 [520 A.2d 586, 589]* ["we necessarily reject ... the holdings of some courts that the public policy exception to at will employment contracts must be legislatively defined."]; accord, *Burk v. K-Mart Corp. (Okla. 1989) 770 P.2d 24, 28; Thompson v. St. Regis Paper Co. (1984) 102 Wn.2d 219 [685 P.2d 1081, 1089]; Moore v. A.H. Riise Gift Shops (D.V.I. 1987) 659 F.Supp. 1417, 1423.)*

Other courts have applied a stricter definition to public policy claims. The leading case is *Brockmeyer v. Dun & Bradstreet (1983) 113 Wis.2d 561 [335 N.W.2d 834].* There, the Wisconsin Supreme Court, while recognizing a public policy exception to the employment atwill doctrine, nevertheless limited plaintiffs to contract damages and confined such claims to statutory or constitutional violations. "Given the vagueness of the concept of public policy," the court explained, "it is necessary that we be more precise about the contours of the public policy exception. A wrongful discharge is actionable when the termination clearly contravenes the public welfare and gravely violates paramount requirements of public interest. The public policy must be evidenced by a constitutional or statutory provision." ( at p. 840.) Voicing similar concerns, the Kentucky Supreme Court adopted the *Brockmeyer* definition in *Firestone Textile Co. Div. v. Meadows (Ky. 1983) 666 S.W.2d 730:* "Employers as a group have a legitimate interest to protect by having the cause of action for wrongful discharge clearly defined and suitably controlled. ... [P] When a discharged employee seeks to establish a cause of action for wrongful discharge, it is a question of law for the court to decide whether the reason for discharge is unlawful because of a constitutionally protected right or a right implicit in a statute." ( at p. 733.) Other courts have

adopted similarly restrictive views of the contours of [**686] [***880] the public policy exception. (See *Sabine Pilot Service, Inc. v. Hauck (Tex. 1985) 687 S.W.2d 733, 735; Adams v. George W. Cochran & Co., Inc. (D.C. 1991) 597 A.2d 28, 33-34; Miller v. Fairfield Communities, Inc. (1989) 299 S.C. 23 [382 S.E.2d 16, 19]; Merck v. Advanced Drainage Systems, Inc. (4th Cir. 1990) 921 F.2d 549, 554-555 [applying S.C. law].)* [5]

[5] Although the decision of the Maryland Court of Appeals in *Adler v. American Standard Corp. (1981) 291 Md. 31 [432 A.2d 464],* has been cited for the narrow view of public policy (see *Merck v. Advanced Drainage Systems, Inc., supra, 921 F.2d at pp. 554-555),* in fact the Maryland high court merely cautioned that "recognition of an otherwise undeclared public policy as a basis for a judicial decision involves the application of a very nebulous concept to the facts of a given case, and that declaration of public policy is normally the function of the legislative branch." (*432 A.2d 472.*) A subsequent Maryland Court of Special Appeals decision observed that *Adler* recognized as legitimate sources of public policy "legislative enactments, prior judicial decisions and administrative regulations. ..." ( *Townsend v. L.W.M. Management, Inc. (1985) 64 Md.App. 55 [494 A.2d 239, 242].*)

Turning from other jurisdictions to California law, one finds the courts similarly divided. As we recently observed in *Foley v. Interactive Data [*1093] Corp., supra, 47 Cal.3d 654:* "Several subsequent Court of Appeal cases have limited our holding [in *Tameny*] to policies derived from statute. (See *Shapiro v. Wells Fargo Realty Advisors (1984) 152 Cal.App.3d 467, 477 [199 Cal.Rptr. 613]; Gray v. Superior Court (1986) 181 Cal.App.3d 813, 819 [226 Cal.Rptr. 570]; Tyco Industries, Inc. v. Superior Court (1985) 164 Cal.App.3d 148, 159 [211 Cal.Rptr. 540].) ... [P] At least three other Court of Appeal decisions addressing the issue of where policy giving rise to an action may be found have concluded in dicta that public policy, as a basis for a wrongful discharge action, need not be policy rooted in a statute or constitutional provision. (See *Koehrer v. Superior Court* [(1986)] *181 Cal.App.3d 1155, 1165, 1167 [226 Cal.Rptr. 820]; Garcia v. Rockwell Internat. Corp. (1986) 187 Cal.App.3d 1556, 1561 [232 Cal.Rptr. 490]; Dabbs v. Cardiopulmonary Management Services (1987) 188 Cal.App.3d 1437, 1443-1444 [234 Cal.Rptr. 129].)"* ( at pp. 668-669; see also *Verduzco v. General Dynamics, Convair Div. (S.D.Cal. 1990) 742 F.Supp. 559.)*

Although we have not taken a position on this precise issue, it is true, as plaintiff notes, that this court has not previously confined itself to legislative enactments

when determining the public policy of the state. We have, for example, long declined to enforce contracts inimical to law or the public interest (see *Kreamer v. Earl* (1891) 91 Cal. 112, 117 [27 P. 735]), and long ago declared racial discrimination to be contrary to public policy under the common law duty of innkeepers and common carriers to furnish accommodations to all persons. (*James v. Marinship Corp.* (1944) 25 Cal.2d 721, 740 [155 P.2d 329, 160 A.L.R. 900]; see *Safeway Stores v. Retail Clerks etc. Assn.* (1953) 41 Cal.2d 567, 574 [261 P.2d 721] ["In cases without number the state courts have declared contracts, transactions and activities of individuals, associations and corporations to be contrary to public policy where their legislative departments have not spoken on the subject."]; see also *Craemer v. Superior Court* (1968) 265 Cal.App.2d 216, 222 [71 Cal.Rptr. 193]; *Wagenseller v. Scottsdale Memorial Hosp., supra,* 710 P.2d at p. 1033.) [6]

> 6 As the Court of Appeal has stated: "It is primarily the prerogative of the legislature to declare what contracts and acts shall be unlawful; but courts, following the spirit and genius of the law, written and unwritten, of a state, may declare void as against public policy contracts which, though not in terms specifically forbidden by legislation, are clearly injurious to the interests of society." (*Maryland C. Co. v. Fidelity etc. Co.* (1925) 71 Cal.App. 492, 497 [236 P. 210]; see also *Kreamer v. Earl, supra,* 91 Cal. at p. 117 (internal quotation marks omitted) ["No court will lend its aid to give effect to a contract which is illegal, whether it violate the common or statute law, either expressly or by implication."]; *Althschul v. Sayble* (1978) 83 Cal.App.3d 153, 162 [147 Cal.Rptr. 716].)

The analogy to illegal contracts has particular force. For at root, the public policy exception rests on the recognition that in a civilized society the rights [*1094] of each person [**687] [***881] are necessarily limited by the rights of others and of the public at large; this is the delicate balance which holds such societies together. (1) Accordingly, while an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy. Any other conclusion would sanction lawlessness, which courts by their very nature are bound to oppose. (See *Morrill v. Nightingale* (1892) 93 Cal. 452, 458 [28 P. 1068] [" 'Courts owe it to public justice and to their own integrity to refuse to become parties to contracts essentially violating morality or public policy by entertaining actions upon them.' "].) It is a very short and logical step, therefore, from declining to enforce contracts inimical to law or the public interest, to refusing to

sanction terminations in contravention of fundamental public policy. Indeed, we expressly acknowledged the analogy in *Foley,* noting, in the context of our *Tameny* discussion: "A comparison of the manner in which contracts for illegal purposes are treated is useful." (47 Cal.3d at p. 667, fn. 7; see also *Phipps v. Clark Oil & Refining Corp., supra,* 396 N.W.2d at p. 593.)

Unfortunately, as we have also previously acknowledged, "[t]he term 'public policy' is inherently not subject to precise definition. ... 'By "public policy" is intended that principle of law which holds that no citizen can lawfully do that which has a tendency to be injurious to the public or against the public good. ...' " (*Safeway Stores v. Retail Clerks etc. Assn., supra,* 41 Cal. 2d at p. 575.) It was this rather open-ended definition on which the court relied in *Petermann v. International Brotherhood of Teamsters, supra,* 174 Cal.App.2d 184, 188, the seminal decision articulating the public policy exception to the employment at-will doctrine.

Surveying the extensive and conflicting decisional law summarized above, several general observations are possible. First, notwithstanding the lively theoretical debate over the sources of public policy which may support a wrongful discharge claim, with few exceptions courts have, in practice, relied to some extent on statutory or constitutional expressions of public policy as a basis of the employee's claim. (See, e.g., *Dabbs v. Cardiopulmonary Management Services* (1987) 188 Cal.App.3d 1437, 1443 [234 Cal.Rptr. 129] ["We disagree with the ... suggestion that the Legislature is the only source of policy determinations .... However, ... in this case there is statutory support for plaintiff's assertion her discharge violated a substantial public policy principle."]; see also *Wagenseller v. Scottsdale Memorial Hosp., supra,* 710 P.2d at pp. 1033-1035; *Palmateer v. International Harvester Co.,* [*1095] *supra,* 421 N.E.2d at pp. 878-880; *Boyle v. Vista Eyewear, Inc., supra,* 700 S.W.2d at pp. 871-872; *Cloutier v. Great Atlantic & Pac. Tea Co., supra,* 436 A.2d at pp. 1143-1145.)

Second, it is generally agreed that "public policy" as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch, "lest they mistake their own predilections for public policy which deserves recognition at law." (*Hentzel v. Singer Co., supra,* 138 Cal.App.3d 290, 297.) Indeed, one of the most frequently cited decisions favoring a broad interpretation, *Parnar v. Americana Hotels, Inc., supra,* 652 P.2d 625, observed that courts "should proceed cautiously" if called upon to declare public policy absent some prior legislative expression on the subject. ( at p. 631; accord *Wagenseller v. Scottsdale Memorial Hosp., supra,* 710 P.2d at p. 1034; *Burk v. K-Mart Corp., supra,* 770 P.2d at pp. 28-29;

*Townsend v. L.W.M. Management, Inc., supra, 494 A.2d at p. 242.)*

(2) These wise caveats against judicial policymaking are unnecessary if one recognizes that courts in *wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional [**688] [***882] or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded.

B. *Application of the Public Policy Exception*

Here, we are *not* being asked to declare public policy. (3) The issue as framed by the pleadings and the parties is whether there exists a clear constitutional or legislative declaration of fundamental public policy forbidding plaintiff's discharge under the facts and circumstances presented.

Initially, the parties dispute whether the discharge of an employee in retaliation for reporting a coworker's claim of sexual harassment to higher management may rise to the level of a *Tameny* violation. Sentry argues that such reporting inures only to the benefit of the employee in question rather than to the public at large, and questions the constitutional or statutory basis [*1096] of such a claim. Plaintiff responds that the same constitutional provision (*Cal. Const., art. I, § 8*) that prohibits sexual discrimination against employees and demands a workplace free from the pernicious influence of sexual harassment (see *Rojo v. Kliger, supra, 52 Cal.3d at pp. 89-90*) also protects the employee who courageously intervenes on behalf of a harassed colleague.

Although Sentry did not discriminate against Gantt on account of his sex within the meaning of the constitutional provision, there is nevertheless direct statutory support for the jury's express finding that Sentry violated a fundamental public policy when it constructively discharged plaintiff "in retaliation for his refusal to testify untruthfully or to withhold testimony" in the course of the DFEH investigation. Indeed, *Petermann v. International Brotherhood of Teamsters, supra, 174 Cal.App.2d 184,* "one of the seminal California decisions in this area" ( *Tameny, supra, 27 Cal.3d 167, 173*), presented the parallel situation of an employee who was dismissed

from his position because he had refused to follow his employer's instructions to testify falsely under oath before a legislative committee. Such conduct, the court concluded, could not be condoned as a matter of "public policy and sound morality." "It would be obnoxious to the interests of the state and contrary to public policy and sound morality to allow an employer to discharge any employee ... on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. ... The public policy of this state as reflected in the Penal Code sections referred to above [*Pen. Code, § 118, 653f*] would be seriously impaired if it were to be held that one could be discharged by reason of his refusal to commit perjury." (*174 Cal.App.2d at pp. 188-189.*)

We endorsed the principles of *Petermann* in *Tameny*, holding that an employee who alleged that he was discharged because he refused to participate in an illegal price fixing scheme may subject his employer "to liability for compensatory and punitive damages under normal tort principles." (*27 Cal.3d 167, 169.*) As we explained: "[A]n employer's authority over its employee does not include the right to demand that the employee commit a criminal act to further its interests, and an employer may not coerce compliance with such unlawful directions by discharging an employee who refuses to follow such an order. An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." [**689] [***883] ( at p. 178.)

The instant case fits squarely within the rubric of *Petermann* and *Tameny*. The FEHA specifically enjoins any obstruction of a DFEH investigation. [*1097] *Government Code section 12975* provides: "Any person who shall willfully resist, prevent, impede or interfere with any member of the department or the commission or any of its agents or employees in the performance of duties pursuant to the provisions of this part relating to employment discrimination, ... is guilty of a misdemeanor" punishable by fine or imprisonment. Nowhere in our society is the need greater than in protecting well motivated employees who come forward to testify truthfully in an administrative investigation of charges of discrimination based on sexual harassment. It is self-evident that few employees would cooperate with such investigations if the price were retaliatory discharge from employment.[7]

7    In a supplemental brief, Sentry argues that *Government Code section 12975* was intended to apply only to "physical" interference with DFEH investigators. Nothing in the legislative history or application of the statute reflects such a narrow

scope of operation. Webster defines "impede" as, inter alia, "to interfere with or get in the way of the progress of." (Webster's New Internat. Dict. (3d ed. 1961) p. 1132.) "Interfere" is defined, in part, as "to enter into or take a part in the concerns of others." ( at p. 1178.) Thus, by its plain terms, the statute is not confined to mere "physical" interference with DFEH investigators.

Thus, any attempt to induce or coerce an employee to lie to a DFEH investigator plainly contravenes the public policy of this state. Accordingly, we hold that plaintiff established a valid *Tameny* claim based on the theory of retaliation for refusal to withhold information or to provide false information to the DFEH.

### C. The Workers' Compensation Act Does Not Preempt the Tameny Claim

**(4)** In *Shoemaker v. Myers, supra,* 52 Cal.3d 1, we held, inter alia, that "injuries arising from termination of employment ordinarily arise out of and in the course of the employment within the meaning of *Labor Code section 3600 ....*" ( at pp. 19-20.) [8] Relying on that basic premise, the employer in *Shoemaker* argued that the exclusive remedy provisions of the Workers' [*1098] Compensation Act preempted the plaintiff's wrongful discharge claim brought on a *Tameny* theory. Because it had not been considered by the Court of Appeal, however, we did not address the employer's argument or the plaintiff's response that his *Tameny* cause of action was not preempted "because such a termination ... falls outside the compensation bargain." ( at p. 23.)

[8] Although *Shoemaker* held that "injuries resulting from the termination of employment may be included within the scope of workers' compensation" (*52 Cal.3d at p. 18*), we observed in a footnote that our holding was limited to the circumstances in which a substantial portion of the plaintiff's injuries occurred prior to termination. ( at p. 14, fn. 6.) Such a rule, we explained, "avoids the evidentiary nightmare that might result from application of the *Georgia-Pacific [Corp. v. Workers' Comp. Appeals Bd. (1983) 144 Cal.App.3d 72 (192 Cal.Rptr. 643)]* dictum requiring differentiating between injuries, especially psychological injuries, caused by conduct leading up to the termination and injuries caused by the termination itself. Accordingly, we hold that both the act of termination and the acts leading up to termination necessarily arise out of and occur during and in the course of the employment." ( at p. 20.) That was precisely the situation here. The evidence established that plaintiff's physical and psychological deterioration commenced during the employment, worsened with

his demotion from management to sales, and became acute in the months leading up to his constructive discharge. Accordingly, as in *Shoemaker,* we need not decide whether workers' compensation applies where the injuries arise "only *after* the termination." (*52 Cal. 3d at p. 14, fn. 6,* original italics.)

Sentry, together with amicus curiae Merchants & Manufacturers Association, once again ask this court to revoke or sharply restrict the tort remedy we so recently recognized in *Tameny, supra,* 27 Cal.3d 167, and reaffirmed in *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 1, 665-671, [***884] [**690] and *Rojo v. Kliger, supra,* 52 Cal.3d 65, 88-91. Like the employer in *Shoemaker,* the heart of their argument is that the Workers' Compensation Act provides the exclusive remedy for plaintiff's injuries. [9] As explained below, however, we decline the invitation to retreat from our long-held view that employees discharged in violation of fundamental public policy may bring an action against their employers sounding in tort.

[9] Amicus curiae makes the additional argument that, even if the Workers' Compensation Act does not bar plaintiff's civil action for wrongful termination, the trial court still has no power to award damages for industrial injuries. Because no party took this position in a lower court, we do not address the issue.

The determination that *Tameny* claims are not preempted by the exclusive remedy provisions of the Workers' Compensation Act follows ineluctably from our unwavering commitment to the principle, stated most recently in *Foley v. Interactive Data Corp., supra,* 47 Cal.3d 654, that the *Tameny* cause of action " 'reflects a duty imposed by law upon all employers in order to implement the fundamental public policies [of the state] .... As such, a wrongful discharge suit exhibits the classic elements of a tort cause of action.' " ( at p. 668, quoting *Tameny, supra,* 27 Cal.3d at p. 176.) Indeed, the same day that *Shoemaker* was filed, we reaffirmed our allegiance to this principle by holding, in *Rojo v. Kliger, supra,* 52 Cal.3d 65, that an employee terminated in retaliation for refusing an employer's sexual advances may state a wrongful termination cause of action in tort. ( at pp. 88-91.)

We recognize, of course, the force of the maxim that a case is not authority for a point that was not actually decided therein. ( *Consumers Lobby Against Monopolies v. Public Utilities Com. (1979) 25 Cal.3d 891, 902 [160 Cal.Rptr. 124, 603 P.2d 41].*) However, this court does not engage in idle or capricious acts. We did not recognize the extraordinary claims of the employee terminated in violation of fundamental state policies, claims which

entitle him or her to a wrongful discharge action in tort, only to withdraw that recognition a few years later.

[*1099] Nor does the workers' compensation argument, taken on its own terms, compel a contrary conclusion. Subject to certain statutory exceptions not here applicable, the Workers' Compensation Act in pertinent part provides: "Liability for the compensation provided by this division, in lieu of any other liability whatsoever to any person ... shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment ...." ( *Lab. Code, § 3600, subd. (a).*) Further, "[w]here the conditions of compensation" exist, the right to recover such compensation is the "exclusive remedy" for injury or death of an employee against the employer or coemployee acting within the scope of his or her employment. ( *Lab. Code, § 3602, subd. (a).*)

As we explained recently in *Shoemaker v. Myers, supra, 52 Cal.3d 1, 16:* "[T]he legal theory supporting such exclusive remedy provisions is a presumed 'compensation bargain,' pursuant to which the employer assumes liability for industrial personal injury or death without regard to fault in exchange for limitations on the amount of that liability. The employee is afforded relatively swift and certain payment of benefits to cure or relieve the effects of industrial injury without having to prove fault but, in exchange, gives up the wider range of damages potentially available in tort. [Citations]."

The seemingly straightforward trade-off of this so-called compensation bargain is deceiving, however. Indeed, as we observed in *Shoemaker v. Myers, supra,* "this court and the Courts of Appeal have struggled with the problem of defining the scope of these exclusive remedy provisions." (*52 Cal.3d at p. 15.*) In *Cole v. Fair Oaks* [**691] [***885] *Fire Protection Dist., supra, 43 Cal.3d 148,* for example, we held that the workers' compensation law preempted an aggrieved employee's claim of intentional infliction of emotional distress, explaining: "An employer's supervisory conduct is inherently 'intentional,' " and "it would be unusual for an employee *not* to suffer emotional distress as a result of an unfavorable decision by his employer." ( *at p. 160.*) Therefore, where the acts attributed to the employer constitute a "normal part of the employment relationship," such as a discharge, demotion, discipline or criticism, an employee may not avoid the exclusive remedy provisions of the Labor Code merely by characterizing the employer's decision as one calculated to cause severe emotional disturbance. () [10]

10  We noted in *Cole* that actions for intentional infliction of emotional distress against an employer were upheld in *Agarwal v. Johnson, supra, 25 Cal.3d 932,* and *Alcorn v. Anbro Engineering*

*(1970) 2 Cal.3d 493 [86 Cal.Rptr. 88, 468 P.2d 216],* but neither case considered the exclusive remedy provisions of the Labor Code. *Cole* also noted that a number of cases have held a civil action for intentional infliction of emotional distress is not barred where an employee suffers emotional distress without any accompanying physical injury or disability. (*43 Cal.3d at pp. 155-156.*) However, that was not the case here, and we therefore need not address the issue.

[*1100] Nevertheless, we also recognized in *Cole* that the scope of the Workers' Compensation Act is not universal. We summarized the exceptions in *Shoemaker v. Myers, supra, 52 Cal.3d 1,* as follows: "[I]n *Cole* we also identified a number of instances in which the exclusive remedy provisions are not applicable .... P [T]he exclusive remedy provisions are not applicable under certain circumstances, sometimes variously identified as 'conduct where the employer or insurer stepped out of their proper roles,' ( *Cole v. Fair Oaks Fire Protection Dist., supra, 43 Cal.3d 148, 161; Unruh v. Truck Insurance Exchange (1972) 7 Cal.3d 616, 630 [102 Cal.Rptr. 815, 498 P.2d 1063];* see also *Johns-Manville Products Corp. v. Superior Court* [(1980)] *27 Cal.3d 465, 477-478 [165 Cal.Rptr. 858, 612 P.2d 948, 9 A.L.R.4th 758]*), or 'conduct of an employer having a "questionable" relationship to the employment' ( *Cole, supra, 43 Cal.3d 148, 161; Magliulo v. Superior Court (1975) 47 Cal.App.3d 760, 779 [121 Cal.Rptr. 621]*), but which may be essentially defined as not stemming from a risk reasonably encompassed within the compensation bargain. [Citations]." ( at p. 16.)

When an employer's decision to discharge an employee results from an animus that violates the fundamental public policy of this state proscribing any interference in the official investigation of sexual harassment ( *Gov. Code, § 12975*), such misconduct cannot under any reasonable viewpoint be considered a "normal part of the employment relationship" ( *Cole v. Fair Oaks Fire Protection Dist., supra, 43 Cal.3d at p. 160*) or a "risk reasonably encompassed within the compensation bargain." ( *Shoemaker v. Myers, supra, 52 Cal.2d at p. 16.*) The obligation to refrain from such conduct is a "duty imposed by law upon all employers to implement the fundamental public policies" of the state ( *Tameny, supra, 27 Cal.3d at p. 176*); it cannot be bargained away ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 670, fn. 12*); it is not preempted by other statutory remedies ( *Rojo v. Kliger, supra, 52 Cal.3d 65*); and its breach is most assuredly not a "normal" risk of the employment relationship subject to the exclusive remedy provisions of the Labor Code.

Sentry suggests, nevertheless, that there is something "anomalous" in restricting the recovery of an em-

ployee who incurs a standard "industrial" injury, while extending a tort remedy, including emotional distress damages, to one who suffers similar injuries from sexual or racial discrimination. The answer is that the two employees are *not* similarly situated. We emphasized [**692] [***886] the difference in *Tameny,* when we recognized that " 'public policy and sound morality' " set the latter apart: " 'It would be obnoxious to the interests of the state and contrary to public policy and sound morality to [*1101] allow an employer to discharge any employee ... on the ground that the employee declined to commit perjury, an act specifically enjoined by statute. ...' " (*27 Cal.3d at p. 173,* quoting *Petermann v. International Brotherhood of Teamsters, supra, 174 Cal.App.2d 184, 188-189.*) Accordingly, we held that such a discharge "subject[s] the employer to liability for compensatory and punitive damages under normal tort principles." (*27 Cal.3d at p. 169.*)

The same core values that underlay our holding in *Tameny* explain why such misconduct cannot be deemed "a risk reasonably encompassed within the compensation bargain." As we explained in *Foley v. Interactive Data Corp., supra:* "What is vindicated through the [*Tameny*] cause of action is not the terms or promises arising out of the particular employment relationship involved, but rather the public interest in not permitting employers to impose as a condition of employment a requirement that an employee act in a manner contrary to fundamental public policy." (*47 Cal.3d at p. 667, fn. 7.*) Just as the individual employment agreement may not include terms which violate fundamental public policy (), so the more general "compensation bargain" cannot encompass conduct, such as sexual or racial discrimination, "obnoxious to the interests of the state and contrary to public policy and sound morality."

In sum, we hold that the Workers' Compensation Act does not preempt plaintiff's *Tameny* action for tortious discharge in contravention of fundamental public policy. The judgment of the Court of Appeal is affirmed.

Lucas, C. J., Panelli, J., Baxter, J., and George, J., concurred.

**DISSENT BY: KENNARD, J.,**

**DISSENT**

Concurring and Dissenting.

I join in affirming the judgment. As the majority correctly concludes, plaintiff Vincent A. Gantt's employer violated public policy, as embodied in *Government Code section 12975* (see also, *Lab. Code, § 1102.5*), when it constructively discharged him for refusing to testify untruthfully or to withhold testimony in the course of an agency investigation. Plaintiff is therefore

entitled to his damages for wrongful discharge in violation of public policy. ( *Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654 [254 Cal.Rptr. 211, 765 P.2d 373];* *Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314].*) I agree also that this recovery poses no conflict with the exclusive remedy provisions of the workers' compensation law.

I write separately for two reasons. First, I wish to emphasize that, as the majority opinion states (maj. opn., *ante,* p. 1086 & fn. 2), this court has not addressed plaintiff's alternate theory of recovery, namely, that his employer [*1102] violated public policy when it discharged him for reporting ongoing illegal activity within the company (here, the sexual harassment of plaintiff's coworker). Thus, nothing in the majority opinion should be read as calling into question those decisions recognizing this theory of recovery. (See, e.g., *Collier v. Superior Court (1991) 228 Cal.App.3d 1117 [279 Cal.Rptr. 453];* *Jenkins v. Family Health Program (1989) 214 Cal.App.3d 440 [262 Cal.Rptr. 798];* *Hejmadi v. AMFAC, Inc. (1988) 202 Cal.App.3d 525 [249 Cal.Rptr. 5];* *Hentzel v. Singer Co. (1982) 138 Cal.App.3d 290 [188 Cal.Rptr. 159].*)

My second reason for writing separately is to respond to the majority's statement that a cause of action for wrongful termination in violation of public policy may be based only on public policies expressed in constitutional or statutory provisions. Plaintiff never attempted to articulate a public policy not grounded in a statute or a constitutional provision. Nevertheless, this court insisted that the parties brief the issue, and now purports to decide it. This [**693] [***887] purported decision is doubly misguided. The issue is not raised by the facts of the case or the contentions of the parties, so the majority's comments are purest dicta. And, "[a]s so often happens when a court reaches beyond the confines of the case before it to render a gratuitous advisory opinion, the majority decides the issue incorrectly." ( *City of Sacramento v. State of California (1990) 50 Cal.3d 51, 77 [266 Cal.Rptr. 139, 785 P.2d 522]* [conc. & dis. opn. of Kaufman, J.].)

Courts should confine their decisions to issues actually raised on the facts of a case. The United States Supreme Court has explained its reluctance to issue "advance expressions of legal judgment upon issues which remain unfocused because they are not pressed before the Court with that clear concreteness provided when a question emerges precisely framed and necessary for decision from a clash of adversary argument exploring every aspect of a multi-faceted situation embracing conflicting and demanding interests ...." ( *United States v. Fruehauf (1961) 365 U.S. 146, 157 [5 L.Ed.2d 476, 483, 81 S.Ct. 547].*) Similarly, we have stressed that " '[t]he

rendering of advisory opinions falls within neither the function nor the jurisdiction of this court.' " ( *Coleman v. Department of Personnel Administration (1991) 52 Cal.3d 1102, 1126 [278 Cal.Rptr. 346, 805 P.2d 300].*) Witkin has labeled this form of judicial activism, "Have Opinion, Need Case." (Witkin, Manual on Appellate Court Opinions (1977) § 85, p. 155.)

The question whether an action for wrongful discharge may ever be based on a public policy not originating from statutory or constitutional provisions should await a case in which the public policy at issue has some nonstatutory and nonconstitutional basis. We should not decide this issue in a complete factual vacuum. Because the majority has chosen to address this issue and analyzed it in a faulty fashion, I feel compelled to respond.

[*1103] As the majority acknowledges, courts have for many decades recognized that public policy may legitimately originate not only from constitutional provisions and legislative enactments, but also from other sources. (Maj. opn. *ante,* pp. 1091-1094.) These sources include the decisional law of appellate courts, executive orders, administrative regulations and decisions, and rules of professional conduct. For example, in *James v. Marinship Corp. (1944) 25 Cal.2d 721 [155 P.2d 329, 160 A.L.R. 900],* relying on the judicial development of the common law and on a federal executive department order, this court held that a labor union could not discriminate against members on the basis of race.

After quoting from many cases that present various views on the application of public policy in general and in the wrongful discharge context, the majority concludes, with only perfunctory analysis, that its rule that a wrongful discharge cause of action may be based only on public policies expressed in constitutional or statutory provisions "strikes the proper balance" because "[t]he employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes ...." (Maj. opn., *ante,* p. 1095.) This creates the impression that only statutes or constitutional provisions provide employers with adequate notice of what is forbidden by public policy, and that it is somehow unfair for employers to be bound by other legitimate sources of public policy. This is wrong. Other legitimate sources of public policy, such as judicial decisions or codes of professional ethics, for instance, are readily available to employers or their counsel and thus provide no less "notice" than do statutes or constitutional provisions.

Implicit in the majority's objection to requiring employers to adhere to fundamental public policy set forth in published sources other than statutes or constitutional provisions is the notion that other sources express policies that are not "fundamental" or "substantial" enough.

It may be somewhat easier to characterize as "fundamental" a public policy that is plainly based on the terms of a statute or constitutional provision than to so characterize one that is not so based. But it is a mistake [**694] [***888] to assume that only those policies based on statutes or constitutional provisions are firmly established and important.

An example is helpful. In *Verduzco v. General Dynamics, Convair Div. (S.D.Cal. 1990) 742 F.Supp. 559,* the plaintiff, a production supervisor for a national defense project, alleged that he was terminated because he complained that workers without required security clearances had access to restricted documents, and that "security was so lax that workers at the plant could walk off with blueprints and other material," compromising the national security of the United States. ( at p. 560.)

[*1104] The federal court found no statute that addressed this issue; it stated that "Verduzco is asking this court to recognize a public policy that is not based on or derived from a statute." ( *Verduzco v. General Dynamics, Convair Div., supra, 742 F.Supp. at p. 560.*) Nevertheless, applying California law on wrongful termination, the court held that Verduzco had stated a cause of action for retaliatory dismissal in violation of "a fundamental public interest in preventing unauthorized persons from obtaining access to important technical data relating to military projects." ( at p. 562.)

Under the majority's approach, a plaintiff in Verduzco's position could be discharged without fear of consequences, because he could point to no statute or constitutional provision that was violated by his discharge. But the absence of a statute or constitutional provision should not prevent the recognition of a fundamental public policy in preserving national security that would be violated by the dismissal of an employee who complained that national security was compromised by lax procedures. Indeed, because the policy "inures to the benefit of the public at large rather than to a particular employer or employee," our cases demand its recognition. ( *Foley v. Interactive Data Corp., supra, 47 Cal.3d at p. 669;* accord, *Rojo v. Kliger (1990) 52 Cal.3d 65, 90 [276 Cal.Rptr. 130, 801 P.2d 373].*)

Other examples are no doubt available. But the point is plain. Courts should not be foreclosed from adjudicating wrongful discharge cases based on violations of public policy springing from nonstatutory and nonconstitutional sources. The majority's attempt to constrain the development of the law in a one-size-fits-all judicial straightjacket ignores the essential wisdom of the common law: law is best developed case by case, with attention to the facts of particular cases and the patterns of cases as they develop over time.

Mosk, J., concurred.

TAB 4

LEXSEE 42 CAL.4TH 254

**DWIGHT D. GREEN, Plaintiff and Appellant, v. STATE OF CALIFORNIA, Defendant and Appellant.**

**S137770**

**SUPREME COURT OF CALIFORNIA**

*42 Cal. 4th 254; 165 P.3d 118; 64 Cal. Rptr. 3d 390; 2007 Cal. LEXIS 8910; 19 Am. Disabilities Cas. (BNA) 1092*

**August 23, 2007, Filed**

**SUBSEQUENT HISTORY:** Time for Granting or Denying Rehearing Extended *Green v. State, 2007 Cal. LEXIS 11423 (Cal., Sept. 11, 2007)*
Rehearing denied by *Green (Dwight D.) v. State of California, 2007 Cal. LEXIS 10928 (Cal., Oct. 10, 2007)*

**PRIOR HISTORY:**
Court of Appeal of California, Fourth Appellate District, Division Two, No. E034568. Superior Court of San Bernardino County, No. RCV060816, Ernest George Williams, Judge.*
*Green v. State of California, 132 Cal. App. 4th 97, 33 Cal. Rptr. 3d 254, 2005 Cal. App. LEXIS 1337 (Cal. App. 4th Dist., 2005)*

**DISPOSITION:**    The judgment of the intermediate appellate court was reversed, and the case was remanded for further proceedings.

**SUMMARY:**

CALIFORNIA OFFICIAL REPORTS SUMMARY

Plaintiff, a state employee who had been diagnosed with hepatitis C, sued the state, alleging that the state had discriminated against him because of his disability. A jury returned a general verdict for plaintiff, awarding him $597,088 in economic damages, and $2 million in noneconomic damages. (Superior Court of San Bernardino County, No. RCV060816, Ernest George Williams, Judge.*) The Court of Appeal, Fourth Dist., Div. Two, No. E034568, affirmed the judgment in favor of plaintiff, concluding that the Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*) did not require plaintiff to prove that he was a qualified individual.

    *    Retired judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to

*article VI, section 6 of the California Constitution.*

The Supreme Court reversed the judgment of the Court of Appeal and remanded the case for further proceedings. The court held that the Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*) requires an employee to prove that he or she is a qualified individual. *Gov. Code, § 12940, subd. (a)*'s reference to "any person" cannot reasonably be understood to specially alter the ordinary burden of proof set forth in *Evid. Code, § 500.* Had the Legislature actually intended to relieve an employee of the burden of proving an actionable discrimination on the basis of disability, the court believed the Legislature could and would have done so in a more conspicuous manner. Contrary to plaintiff's contention, the FEHA and the federal Americans with Disabilities Act (ADA) both limit their protective scope to those employees with a disability who can perform the essential duties of the position with reasonable accommodation. The court saw no statutory basis for construing the FEHA any differently from the ADA with regard to an employee's burden of proof. Because the state was prejudiced by the failure to instruct the jury that plaintiff had to prove that he was able to perform the job's essential duties, the state was entitled to a new trial, with proper instructions. (Opinion by Chin, J., with George, C. J., Baxter, and Corrigan, JJ., concurring. Dissenting opinion by Werdegar, J., with Kennard and Moreno, JJ., concurring (see p. 267).) [*255]

**HEADNOTES**

CALIFORNIA OFFICIAL REPORTS HEADNOTES

**(1) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions--Reasonable Accommodation--Burden of Proof.--**The Fair Employment and Housing Act (FEHA) (*Gov. Code,*

§ 12900 et seq.) prohibits discrimination against any person with a disability but, like the federal Americans with Disabilities Act (ADA), provides that the law allows the employer to discharge an employee with a physical disability when that employee is unable to perform the essential duties of the job even with reasonable accommodation (*Gov. Code, § 12940, subd. (a)(1); 42 U.S.C. § 12112(a)*). The FEHA requires employees to prove that they are qualified individuals under the statute just as the federal ADA requires.

**(2) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions--Reasonable Accommodation--Burden of Proof.--**The Legislature has placed the burden on the plaintiff to show that he or she is a qualified individual under the Fair Employment and Housing Act (*Gov. Code, § 12900 et seq.*), i.e., that he or she can perform the essential functions of the job with or without reasonable accommodation.

**(3) Statutes § 21--Construction--Legislative Intent.--**In construing a statute a court ascertains the Legislature's intent in order to effectuate the law's purpose. The court must look to the statute's words and give them their usual and ordinary meaning. The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent.

**(4) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions--Reasonable Accommodation.--**It is not unlawful under federal law to draw a distinction on the basis of a disability if that disability renders an employee unqualified, with or without reasonable accommodation, to perform the essential functions of a position.

**(5) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions.--**Although *Gov. Code, § 12940*, proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties. [*256]

**(6) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions--Reasonable Accommodation--Burden of Proof.--**By its terms, *Gov. Code, § 12940*, part of the Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*), makes it clear that drawing distinctions on the basis of physical or mental disability is not forbidden discrimination in itself. Rather, drawing these distinctions is pro-

hibited only if the adverse employment action occurs because of a disability and the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation. Thus, in an action in which a state employee alleged that he had been discriminated against because of his disability, in order to establish that the state had violated FEHA, the employee bore the burden of proving he was able to do the job, with or without reasonable accommodation.

[*Cal. Forms of Pleading and Practice (2007) ch. 115, Civil Rights: Employment Discrimination, § 115.54*; 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 937.]

**(7) Civil Rights § 3.5--Employment--Disability--Qualified Individual--Essential Functions--Reasonable Accommodation--Burden of Proof.--***Gov. Code, § 12940, subd. (a)*'s use of the term "any person" in listing the various forms of prohibited discrimination does not warrant disregard of the specific language unambiguously providing that an adverse employment action on the basis of disability is not prohibited if the disability renders the employee unable to perform his or her essential duties, even with reasonable accommodation. When read together with *subd. (a)(1), subd. (a)*'s reference to "any person" cannot reasonably be understood to specially alter the ordinary burden of proof set forth in *Evid. Code, § 500*.

**(8) Trial § 99--Omitted Jury Instruction--Failure to Object--Waiver.--**The failure to object to an omitted instruction does not waive any right to the instruction because it is incumbent upon the trial court to instruct on all vital issues in the case.

**(9) Trial § 70--Instructional Error--Prejudicial Effect.--**Instructional error in a civil case is prejudicial where it seems probable that the error prejudicially affected the verdict. [*257]

**COUNSEL:** Pine & Pine, Norman Pine, Beverly Tillett Pine; Law Offices of David H. Greenberg and David H. Greenberg for Plaintiff and Appellant.

Claudia Center, Lewis Bossing and Elizabeth Kristen for Legal Aid Society-Employment Law Center, Disability Rights Advocates, Disability Rights Education and Defense Fund and The Disability Rights Legal Center as Amici Curiae on behalf of Plaintiff and Appellant.

Law Office of Jeffrey K. Winikow and Jeffrey K. Winikow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

42 Cal. 4th 254, *; 165 P.3d 118, **;
64 Cal. Rptr. 3d 390, ***; 2007 Cal. LEXIS 8910

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Jacob A. Appelsmith, Assistant Attorney General, Elizabeth Hong, Vincent J. Scally, Jr., Silvia M. Diaz and Michelle Logan-Stern, Deputy Attorneys General, for Defendant and Appellant.

Paul, Hastings, Janofsky & Walker, Paul W. Cane, Jr., Katherine C. Huibonhoa and Jaime D. Byrnes for Employers Group and California Employment Law Council as Amici Curiae on behalf of Defendant and Appellant.

**JUDGES:** Chin, J., with George, C. J., Baxter, and Corrigan, JJ., concurring. Dissenting opinion by Werdegar, J., with Kennard, and Moreno, JJ., concurring.

**OPINION BY:** Chin

**OPINION**

[***391] [**119] **CHIN, J.**--The Americans with Disabilities Act of 1990 (ADA; *42 U.S.C. § 12101 et seq.*) requires that plaintiffs prove they are "qualified individuals" under the statute, i.e., that they have the ability to perform a job's essential duties before they can prevail in a lawsuit for discrimination. (*42 U.S.C. § 12112(a).*) Although California's [***392] Fair Employment and Housing Act (*Gov. Code, § 12900 et seq.* (FEHA))[1] does not expressly include the term "qualified individual," the question here is whether it includes a similar requirement. In 1997, a Court of Appeal held that it does. (*Brundage v. Hahn (1997) 57 Cal.App.4th 228, 235 [66 Cal. Rptr. 2d 830]* (*Brundage*).) The Court of Appeal here held that it does not.

    1  All statutory references are to the Government Code unless otherwise stated.

    **(1)** The FEHA prohibits discrimination against any person with a disability but, like the ADA, provides that the law allows the employer to discharge an employee with a physical disability when that employee is unable to perform the essential duties of the job even with reasonable accommodation. (*§ 12940, subd. (a)(1); 42 U.S.C. § 12112(a).*) After reviewing the statute's [*258] language, legislative intent, and well-settled law, we conclude the FEHA requires employees to prove that they are qualified individuals under the statute just as the federal ADA requires. We therefore reverse the Court of Appeal's judgment.

[**120] I. FACTS AND PROCEDURAL HISTORY

    The facts and procedural discussion are taken largely from the Court of Appeal opinion, supplemented by the record.

Plaintiff began working for the State of California in 1974. In 1987, plaintiff worked as a stationary engineer for the Department of Corrections at the California Institute for Men in Chino (the Institute). Plaintiff's duties included maintenance and repair of equipment and mechanical systems and supervision and instruction of a crew of inmates. In 1990, plaintiff was diagnosed with hepatitis C. Plaintiff presumably contracted the disease while working on the sewer pipes at the Institute. From 1990 until 1997, plaintiff did not have any work restrictions because of the illness, nor did he lose any time from work. In addition, plaintiff was considered a good employee and received letters of commendation. George Woods, who supervised plaintiff from 1994 through 1997, stated in several letters of commendation that plaintiff was one of his best stationary engineers.

In 1997, plaintiff's physician, Dr. James Wang, began treating plaintiff with the drug interferon or Infergen (a brand of interferon). Plaintiff received Infergen injections as a treatment for hepatitis C. A single course of treatment required injections three times a week for a one-year period. The treatment caused plaintiff to feel fatigued, have trouble sleeping, and to suffer headaches and body aches.

On February 14, 1997, supervisor Woods received a letter from Dr. Wang, requesting that plaintiff be put on light duty until at least May or June of 1997. Woods accommodated plaintiff and allowed him to arrive to work late on the days he received the Infergen injections. At times, Woods assigned plaintiff to positions that did not require heavy labor. In all other respects, plaintiff continued to perform his duties.

On January 11, 1999, plaintiff was reprimanded for coming into work late on various days. Plaintiff explained to his employer that his ongoing medical condition prevented him from being punctual at times.

In June 1999, plaintiff injured his back while lifting a garbage disposal. The injury was unrelated to any side effects from the interferon treatment. Plaintiff continued working, but on the recommendation of the doctor treating [*259] his back was placed on light duty. Defendant had a policy that employees could be on light duty for a [***393] limited time only. Because plaintiff's back problems continued to restrict him to light duty work, in November 1999, defendant placed plaintiff on disability leave.

On July 3, 2000, plaintiff returned to work cleared for full duty, taking sick leave to attend physical therapy sessions for his back injury only. At that time, the Institute's return to work coordinator, Kristi Hilliker, reviewed plaintiff's file. Hilliker noticed the 1997 doctor's report the workers' compensation's qualified medical examiner (Dr. Alvin Markowitz) prepared at the time

42 Cal. 4th 254, *; 165 P.3d 118, **;
64 Cal. Rptr. 3d 390, ***; 2007 Cal. LEXIS 8910

plaintiff began receiving his interferon injections. The report recommended plaintiff for light duty only. Based on this report, Hilliker concluded that plaintiff should not have been cleared for full duty work, and decided to meet with plaintiff that same day. Before the meeting could take place, however, plaintiff went to the coordinator's office complaining of fatigue due to his hepatitis, and requested to see a doctor. He met with the Institute's associate warden of business services, Sheila Tatum, and Hilliker. Plaintiff told them that he was feeling tired and wanted to see his doctor. Tatum and Hilliker told plaintiff that based on work restrictions contained in the 1997 medical report, plaintiff was incapable of performing his duties and could not return to work. They discussed various options with plaintiff, who initially decided to take disability retirement.

After the meeting, plaintiff and Hilliker communicated about plaintiff's options. Plaintiff received a letter from Hilliker dated October 2, 2000, informing him that unless he could be cleared for full duty, he could not return to his position as a stationary engineer. In November of the same year, plaintiff sought permission to return to work. Hilliker denied his request based on 1999 findings of a workers' compensation proceeding [**121] that found plaintiff had suffered a work-related injury.

Plaintiff subsequently filed a disability discrimination claim with the Department of Fair Employment and Housing. He then filed a complaint for damages in the superior court alleging that defendant discriminated against him because of his disability. Dr. Markowitz's 1997 report was not admitted into evidence, and Dr. Markowitz was not allowed to testify. The jury returned a general verdict for plaintiff, awarding him $ 597,088 in economic damages, and $ 2 million in noneconomic damages.

Defendant moved for a new trial challenging the trial court's decision to exclude Dr. Markowitz's testimony. The trial court rejected defendant's contention, but ruled that the motion for a new trial would be granted unless plaintiff accepted a remittitur, which plaintiff did.

On appeal, defendant raised several claims, including: The jury's verdict was not supported by the evidence; a decision of the workers' compensation judge barred plaintiff's disability discrimination claim; the court abused its [*260] discretion in excluding evidence of the subsequent Workers' Compensation Appeals Board proceeding and the testimony of Dr. Alvin Markowitz, the qualified medical examiner for the administrative proceeding; the trial court erred in failing to instruct the jury on the elements of a FEHA claim and the defenses; and the award of $ 2 million in noneconomic damages was excessive. Plaintiff cross-appealed, claiming that the trial court exceeded its au-

thority in reducing the noneconomic damages and abused its discretion in denying the requested amount of attorneys fees.

The Court of Appeal affirmed the judgment in plaintiff's favor. Recognizing that trial court never instructed the jury on the element of qualification or inability to perform, [***394] the Court of Appeal held that the FEHA "does not require plaintiff to prove that he is a qualified individual. Rather, the burden is on defendant to establish that plaintiff is incapable of performing his essential duties with reasonable accommodation." We granted defendant's petition for review.

**(2)** As we explain, we disagree with the statement of defendant's burden of proof adopted by the Court of Appeal and advocated by plaintiff here. Instead, we conclude that the Legislature has placed the burden on a plaintiff to show that he or she is a qualified individual under the FEHA (i.e., that he or she can perform the essential functions of the job with or without reasonable accommodation). As explained further below, legislative intent, case law, and legislative history support defendant's position--a view that also finds support in *Evidence Code section 500*, which requires a plaintiff to prove each fact essential to the claim for relief he or she is asserting.

## II. DISCUSSION

### A. *Statutory Analysis*

Why have the California cases, beginning with *Brundage, supra, 57 Cal.App.4th at page 235*, nearly unanimously presumed plaintiffs must prove, as their federal counterparts under the ADA, that they are qualified individuals under the FEHA in order to prevail in their lawsuits? The answer lies in the statute's plain meaning, which is clear and unambiguous.

**(3)** Under settled canons of statutory construction, in construing a statute we ascertain the Legislature's intent in order to effectuate the law's purpose. (*Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1386-1387 [241 Cal. Rptr. 67, 743 P.2d 1323].*) We must look to the statute's words and give them their usual and ordinary meaning. (*DaFonte v. Up-Right, Inc. (1992) 2 Cal.4th 593, 601 [7 Cal. Rptr. 2d 238, 828 P.2d 140].*) The statute's plain meaning controls the court's interpretation unless its words are ambiguous. If the plain language of a statute is unambiguous, no court need, or should, go beyond that pure expression of legislative intent. (*Ibid.*) [*261]

We therefore begin our statutory analysis with a comparison of the ADA and the FEHA provisions at issue. We then discuss plaintiff's statutory interpretation and why we disagree with it under the premise that a

statute's meaning is guided by the plain words the Legislature chose. (*Kobzoff v. Los* [**122] *Angeles County Harbor/UCLA Medical Center (1998) 19 Cal.4th 851, 861 [80 Cal. Rptr. 2d 803, 968 P.2d 514].*)

The ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." (*42 U.S.C. § 12112(a).*) In turn, the ADA defines the term "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (*42 U.S.C. § 12111(8).*)

(4) Federal case law interpreting the ADA is clear that an employee bears the burden of proving, among other elements, that he or she meets the definition of a "qualified individual with a disability" in order to establish a violation of the ADA. Speaking in terms of the elements for which a plaintiff bears the burden of proof at trial, the high court has explained that "[a]n ADA [***395] plaintiff bears the burden of proving that she is a 'qualified individual with a disability'--that is, a person 'who, with or without reasonable accommodation, can perform the essential functions' of her job." (*Cleveland v. Policy Management Systems Corp. (1999) 526 U.S. 795, 806 [143 L. Ed. 2d 966, 119 S. Ct. 1597]; see also Jones v. Potter (6th Cir. 2007) 488 F.3d 397, 403; Browning v. Liberty Mut. Ins. Co. (8th Cir. 1999) 178 F.3d 1043, 1047; Waggoner v. Olin Corp. (7th Cir. 1999) 169 F.3d 481, 484; Laurin v. Providence Hosp. (1st Cir. 1998) 150 F.3d 52, 56, 58-59; Monette v. Electronic Data Systems Corp. (6th Cir. 1996) 90 F.3d 1173, 1178, 1184, 1186 & fn. 12; Katz v. City Metal Co., Inc. (1st Cir. 1996) 87 F.3d 26, 30, 33; Chandler v. City of Dallas (5th Cir. 1993) 2 F.3d 1385, 1389-1390, 1393-1394* [Rehabilitation Act of 1973]; *see also E.E.O.C. v. Wal-Mart Stores, Inc. (8th Cir 2007) 477 F.3d 561, 568.*) This qualification element of the plaintiff's burden of proof was also found in the predecessor to the ADA, the *Rehabilitation Act of 1973*. Many decisions analyzing the earlier enactment are relied upon in interpreting the ADA. (See, e.g., *Monette v. Electronic Data Systems Corp., supra, 90 F.3d at pp. 1177-1178; Chandler v. City of Dallas, supra, 2 F.3d at pp. 1389-1390, 1393-1394; see also Rizzo v. Children's World Learning Centers, Inc. (5th Cir. 1996) 84 F.3d 758, 763,* affd. en banc *(2000) 213 F.3d 209; White v. York Intern. Corp. (10th Cir. 1995) 45 F.3d 357, 360-361 & fn. 5; Doe v. New York University (2d Cir. 1981) 666 F.2d 761, 776-777.*) The reason is clear; it is not unlawful under federal law to draw a distinction on the basis of a disability if that disability renders an employee [*262] unqualified, with or without reasonable accommodation, to perform the essential functions of a position.

California has prohibited employment discrimination based on physical handicap since 1973. (*Colmenares v. Braemar Country Club, Inc. (2003) 29 Cal.4th 1019, 1024-1025 [130 Cal. Rptr. 2d 662, 63 P.3d 220].*) "In 1980, that prohibition and the definition of physical handicap to include 'impairment of sight, hearing, or speech, or impairment of physical ability' were incorporated into the newly enacted FEHA." (*Id. at pp. 1024-1025,* quoting Stats. 1980, ch. 992, § 4, pp. 3140, 3144.)

(5) Like the ADA, and like its predecessor the *Rehabilitation Act of 1973,* today the FEHA, *section 12940,* subdivision (a), prohibits discrimination based on an employee's physical disability. Under the FEHA, it is unlawful "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition ... of any person, ... to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (*Ibid.*) Although *section 12940* proscribes discrimination on the basis of an employee's disability, it specifically limits the reach of that proscription, excluding from coverage those persons who are not qualified, even with reasonable accommodation, to perform essential job duties: "This part does not prohibit an employer from refusing to hire or discharging an employee [**123] with a physical or mental disability ... where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." (*§ 12940, subd. (a)(1).*)

[***396] (6) By its terms, *section 12940* makes it clear that drawing distinctions on the basis of physical or mental disability is not forbidden discrimination *in itself.* Rather, drawing these distinctions is prohibited *only if* the adverse employment action occurs because of a disability *and* the disability would not prevent the employee from performing the essential duties of the job, at least not with reasonable accommodation. Therefore, in order to establish that a defendant employer has discriminated on the basis of disability in violation of the FEHA, the plaintiff employee bears the burden of proving he or she was able to do the job, with or without reasonable accommodation.

In this sense, the FEHA is strikingly similar to the ADA, which as indicated prohibits employer discrimina-

tion against any "qualified individual with a disability," i.e., discrimination against "an individual with a disability [*263] who, with or without reasonable accommodation, can perform the essential functions of the employment position." (42 U.S.C. § 12111(8); see 42 U.S.C. § 12112(a).) This similarity between the state and federal enactments is not a coincidence, but reflects the Legislature's deliberate effort in 1992 to conform the FEHA to this ADA provision. As the legislative history discloses, the Legislature amended the FEHA in 1992 by clarifying that an employee must be able to perform the "essential duties with reasonable accommodations." (Stats. 1992, ch. 913, § 1, p. 4282.) In passing the amendment, at least one legislative analysis observed the Legislature's "conformity [to the ADA rules] will benefit employers and businesses because they will have one set of standards with which they must comply in order to be certain that they do not violate the rights of individuals with physical or mental disabilities." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1077 (1991-1992 Reg. Sess.) as amended Jan. 6, 1992, p. 4.) It is clear, then, that the Legislature incorporated the ADA requirement with full knowledge of the purpose the language serves in the ADA--as a means of distinguishing permissible employment practices from impermissible disability discrimination based on the employee's ability to perform in the particular employment position with reasonable accommodation. Thus, even if there were some conceivable ambiguity regarding the burden issue prior to that point in time, no such ambiguity existed afterward.

Requiring a plaintiff employee who seeks relief under the FEHA to shoulder the burden of producing evidence and persuading the trier of fact that the defendant employer engaged in impermissible disability discrimination against him or her as a qualified individual, as defined by the FEHA, is consistent with the general rule in California that "a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief ... that he is asserting." (Evid. Code, § 500.) As in the typical civil action seeking relief in a California court, it is reasonable to require a plaintiff who alleges a FEHA violation as a basis for recovery to prove the elements of a claim for violation of the ADA, including by proving the element that the defendant impermissibly discriminated because the plaintiff was able to do the job with or without reasonable accommodation.

Plaintiff contends that the employer bears the burden to prove that a plaintiff employee is not qualified to sue under the FEHA, essentially asserting that the lack of qualification constitutes an affirmative defense. In support of this argument, plaintiff points to language in the FEHA stating the statutory provisions apply to *any person* making a discrimination claim. In plaintiff's view,

this particular language in the FEHA differs significantly from the [***397] ADA, which omits the "any person" language and instead reflects an unambiguous intent to protect a "qualified individual" only. [*264]

[**124] The Court of Appeal agreed with plaintiff, reasoning that the statutory phrase "any person" applies to any plaintiff alleging a claim of disability discrimination under the FEHA. (§ 12940, subd. (a).) The court interpreted the FEHA's use of this phrase to mean that a plaintiff need not prove that he or she satisfies the ADA's "qualified individual" requirement, but that lack of qualification would be an affirmative defense.

(7) We are not persuaded. The FEHA's use of the term "any person" in listing the various forms of prohibited discrimination does not warrant disregard of the specific language unambiguously providing that an adverse employment action on the basis of disability is *not prohibited* if the disability renders the employee unable to perform his or her essential duties, even with reasonable accommodation. When read together with *subdivision (a)(1)*, subdivision (a)'s reference to "any person" cannot reasonably be understood to specially alter the ordinary burden of proof set forth in *Evidence Code section 500*. Had the Legislature actually intended to relieve a plaintiff employee of the burden of proving an actionable discrimination on the basis of disability, thereby departing significantly from federal law, we believe it could and would have done so in a more conspicuous manner.

Contrary to plaintiff's contention and the Court of Appeal's position, the FEHA and the ADA both limit their protective scope to those employees with a disability who can perform the essential duties of the employment position with reasonable accommodation. (Compare § 12940, subd. (a)(1) with 42 U.S.C. §§ 12111(8), 12112(a).) We see no statutory basis for construing the FEHA any differently from the ADA with regard to a plaintiff employee's burden of proof.

B. *Plaintiff's Additional Claims*

Plaintiff contends that our statute is not clear, and that confusion on the burden of proof requirement is apparent in jury instructions on the definition of "qualified individual." For example, under *BAJI No. 12.12*, an instruction that was given in this case over defendant's objection that it should be amended to include a qualification element, the plaintiff is not required to prove his or her ability to perform the essential duties of the job with or without reasonable qualification. By contrast, the Judicial Council of California Civil Jury Instructions include the capacity to perform the essential duties of the job as one of the elements of proof for a disability discrimination claim under *section 12940, subdivision (a)*. (Judicial Council of Cal. Civ. Jury Instns. (June 2006

rev.) *CACI No. 2540.*) The Directions for Use for *CACI No. 2540* observe, however, that "there [is] a divergence of authority on whether the plaintiff is required to prove that he or she has the ability to perform the essential duties of the job." [*265]

The Directions for Use following *CACI No. 2540* compare *Brundage* with a later decision, *Bagatti v. Department of Rehabilitation (2002) 97 Cal.App.4th 344 [118 Cal. Rptr. 2d 443]. Bagatti* dealt with *section 12940, subdivision (m)*, which governs an employer's obligation to afford reasonable accommodations to a worker with a disability. The court held that the plaintiff was not required to prove whether she could perform the essential functions of her position in order to establish a prima facie case of discrimination, concluding that these were requirements under the ADA but not under the FEHA. (*Bagatti, supra, 97 Cal.App.4th at pp. 360-362.*) [***398] Although it agreed with the *Bagatti* holding, the Court of Appeal here correctly concluded that *Bagatti* provided little guidance on the qualification issue because it involved a cause of action for the failure to accommodate under *section 12940, subdivision (m)*, and the court believed it was unlikely the jury relied on the plaintiff's reasonable accommodation cause of action in reaching its verdict.

In addition, in claiming ambiguity under the FEHA, plaintiff also relies on the fact that in 1992 the Legislature amended the FEHA in order to replace the former [**125] term "physical handicap" with the term "physical disability" and to provide a greater amount of protection to employees than that provided under the 1990-enacted ADA. (*§ 12940*, as amended by Stats. 1992, ch. 913, § 23.1, pp. 4313-4316.) In amending the FEHA in significant part, including replacing the former term "physical handicap" with the term "physical disability," the Legislature stated: "It is the intent of the Legislature in enacting this act to strengthen California law in areas where it is weaker than the [ADA] and to retain California law when it provides more protection for individuals with disabilities than the [ADA]." (Stats. 1992, ch. 913, § 1, p. 4282; see *Colmenares v. Braemar Country Club, Inc., supra, 29 Cal.4th at p. 1026.*) In 2000, the Legislature also declared: "Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded additional protections." (*§ 12926.1, subd. (a).*)

The fact that the Legislature intended to provide plaintiffs with broader substantive protection under the FEHA, however, does not affect the Legislature's contemplation that a plaintiff must prove that he or she can perform the essential functions of the job in order to prevail on a claim under the FEHA. As we have explained, in disability discrimination actions, the plaintiff has not shown the defendant has done anything wrong until the

plaintiff can show he or she was able to do the job with or without reasonable accommodation.

Plaintiff next contends that the California Code of Regulations further supports his statutory interpretation because it emphasizes the differences between the FEHA requirements and the ADA. The dissent claims that the administrative agency's adoption of the regulations is entitled to great weight [*266] and supports plaintiff's position. The regulations provide that in California: "Disability discrimination is established by showing that an employment practice denies, in whole or in part, an employment benefit to an individual because he or she is an individual with a disability." (*Cal. Code Regs., tit. 2, § 7293.7.*) Plaintiff claims that the regulations provide additional support for his claim that under the FEHA, whether an employee is qualified or has the ability [*267] to perform the job's essential duties is for the employer to prove as part of its defense of the disability action.

To the extent the California Code of Regulations arguably creates ambiguity about the element of proof of a disability discrimination claim (see e.g., *Cal. Code Regs., tit. 2, § 7293.8, subd. (b)*), we find the Legislature's intent supports defendant's position and must prevail. (See *Morris v. Williams (1967) 67 Cal.2d 733, 748 [63 Cal. Rptr. 689, 433 P.2d 697]* [administrative regulations that alter or amend a statute or enlarge or impair its scope are void and courts may strike them down].) Initially, plaintiff fails to consider the fact that since its codification, the FEHA has not imposed liability on an employer if an employee, even a disabled employee, could not perform his or her duties with or without reasonable accommodation. Indeed, [***399] the Legislature has never indicated the intent to compel an employer to employ such a person who could not perform the essential job duties with or without reasonable accommodation. To do so would defy logic and establish a poor public policy in employment matters.

### C. Instructional Error

(8) As noted, the trial court read a pattern instruction to the jury that did not require plaintiff to shoulder the burden of proving he was qualified for the position, notwithstanding defendant's request that the instruction be modified to include the requirement. (*BAJI No. 12.12.*) The trial court did not instruct the jury on the FEHA's requirement that plaintiff must prove he was qualified for the position, or able to perform the job's essential duties. Both parties requested the jury be given *BAJI No. 12.14*, the "inability to perform defense," but the trial court inexplicitly omitted the instruction. Neither party objected to the omission, but the failure to object does not waive any right to the instruction because it is incumbent upon the trial court to instruct on all vital issues in the case.

42 Cal. 4th 254, *; 165 P.3d 118, **;
64 Cal. Rptr. 3d 390, ***; 2007 Cal. LEXIS 8910

*(Manguso v. Oceanside Unified School Dist. (1984) 153 Cal. App. 3d 574, 581-582 [200 Cal. Rptr. 535]* [erroneous instruction on material element of law deemed excepted to even absent objection at trial].)

**(9)** Instructional error in a civil case is prejudicial " 'where it seems probable' that the error 'prejudicially affected the verdict.' " (*Soule v. General Motors Corp. (1994) 8 Cal.4th 548, 580 [34 Cal. Rptr. 2d 607, 882* [**126] *P.2d 298].*) The jury here was never instructed that plaintiff must prove that he was able to perform the job's essential duties. For this reason, defendant was prejudiced by the failure to so instruct, and we believe defendant is entitled to a new trial, with proper instructions, unless the evidence shows as a matter of law that plaintiff cannot meet his burden.

III. CONCLUSION

Based on the foregoing, we conclude that under the FEHA, a plaintiff must demonstrate that he or she was qualified for the position sought or held in the sense that he or she is able to perform the essential duties of the position with or without reasonable accommodation. Juries should be so instructed. We therefore reverse the judgment of the Court of Appeal and remand the matter for proceedings consistent with this decision.

George, C. J., Baxter, J., and Corrigan, J., concurred.

**DISSENT BY:** Werdegar

**DISSENT**

**WERDEGAR, J.,** Dissenting.--I respectfully dissent.

The issue in this case is simple: In an action for disability discrimination under California's Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*), [1] which party bears the burden of proving that the plaintiff's disability did or did not prevent the plaintiff from performing the essential duties of the job? Is ability to perform an element of the plaintiff's cause of action or is inability to perform an affirmative defense for the employer? As I explain below, although the statutory language at issue (*§ 12940, subd. (a)(1)*) does not expressly assign the burden of proof, established principles of statutory interpretation demonstrate that the reading best according with legislative intent is that inability to perform the job's essential duties is a defense on which employers have the burden of proof.

> 1   All further unspecified statutory references are to the Government Code.

[***400] To reach its contrary conclusion, the majority ignores the statute's structure, distorts its legislative

and regulatory history, and relies on inapposite authority. But fundamentally, a single logical error pervades the majority's discussion. Because *section 12940, subdivision (a)(1)* relieves employers from liability for firing or refusing to hire a disabled person if the disability prevents that person from performing the position's essential functions, the majority reasons, proof of ability to perform must be part of the plaintiff's case. (See maj. opn., *ante*, at pp. 262-264, 265-266.) This syllogism rests on the false premise that no affirmative defense exists or can exist to a claim of disability discrimination. In fact, as I will explain, *section 12940* provides for several affirmative defenses, inability to perform being only one. [*268]

In effect, the majority creates a presumption that people with disabilities cannot perform in the workplace. Certainly, some disabilities prevent the performance of some jobs, even with reasonable accommodations by the employer; in those circumstances, the Legislature has relieved employers from any liability by affording them the affirmative defense provided in *section 12940, subdivision (a)(1)*. But the rule that individuals with disabilities are presumed unable to work until they prove otherwise is not one intended by the Legislature. The majority simply reads it into the statute.

**Discussion**

I. *Under FEHA, Inability to Perform Is an Affirmative Defense*

To interpret FEHA in accord with the legislative intent, we start with the language of the statute. The pertinent language of *section 12940* is as follows:

"It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification ... :

"(a) For an employer, because of the ... physical disability, mental disability, ... of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment [**127] or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

"(1) This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations."

42 Cal. 4th 254, *; 165 P.3d 118, **;
64 Cal. Rptr. 3d 390, ***; 2007 Cal. LEXIS 8910

The statute makes clear that employers do not face liability under FEHA for firing or refusing to hire a disabled person who is unable, even with reasonable accommodations, to perform the essential duties of the position. In this case, for example, if because of his hepatitis C plaintiff Dwight D. Green was unable to perform the essential duties of a stationary engineer at a state prison, defendant State of California did not violate FEHA by terminating him because of his disability. The only interpretive question we face is who [*269] bore the burden of proof on that issue--plaintiff or defendant. As nothing in the statute expressly allocates the burden of proof, I [***401] turn to other accepted guides to legislative intent.

A. *The burden of proof on an exception ordinarily lies with the party invoking the exception.*

*Section 12940, subdivision (a)* first prohibits in general terms, and without any pertinent limitation, adverse employment actions taken because of a person's physical or mental disability (as well as, e.g., race, sex and religion). In a new paragraph (*id., subd. (a)(1)*), it then separately provides, as an exception to that prohibition, that an employer may terminate or refuse to hire a disabled person where, because of the disability, the person is unable to perform the job's essential duties. (See *Cassista v. Community Foods, Inc. (1993) 5 Cal.4th 1050, 1056, fn. 5 [22 Cal. Rptr. 2d 287, 856 P.2d 1143]* [describing inability to perform as an exception to the discrimination prohibition].)

In a civil case, ordinarily, "[o]ne who claims the benefit of an exception from the prohibition of a statute has the burden of proving that his claim comes within the exception." (2A Singer, Statutes and Statutory Construction (6th ed. 2000 rev.) § 47:11, p. 251; see, e.g., *United States v. First City Nat. Bank (1967) 386 U.S. 361, 366 [18 L. Ed. 2d 151, 87 S. Ct. 1088]; Da Vinci Group v. San Francisco Residential Rent etc. Bd. (1992) 5 Cal.App.4th 24, 28 [6 Cal. Rptr. 2d 461].*) That interpretive guideline is clearly applicable to *section 12940.* Unlike the federal *Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.),* which incorporates into its central prohibitory provision a requirement the plaintiff be able, with reasonable accommodation if necessary, to perform the position's essential tasks (see *42 U.S.C. §§ 12112(a)* [referring to a "*qualified* individual with a disability" (italics added)], *12111(8)* [defining that term]), FEHA first states an unlimited prohibition against disability discrimination and then provides an exception for inability to perform. The difference is indicative of legislative intent. Absent a strong counterindication, I would apply the general rule that " ' "[o]ne seeking to be excluded from the sweep of the general statute must establish that the exception applies." ' " (*City

of Lafayette v. East Bay Mun. Utility Dist. (1993) 16 Cal.App.4th 1005, 1017 [20 Cal. Rptr. 2d 658];* see *Barnes v. Chamberlain (1983) 147 Cal. App. 3d 762, 767 [195 Cal. Rptr. 417].*)

B. *The various exceptions in section 12940, subdivision (a)(1) should be construed harmoniously.*

We should interpret *section 12940, subdivision (a)(1)* as a whole, construing its parts harmoniously and sensibly together and giving closely related [*270] provisions compatible readings if possible. (*Troppman v. Valverde (2007) 40 Cal.4th 1121, 1135, fn. 10 [57 Cal. Rptr. 3d 306, 156 P.3d 328]; Hsu v. Abbara (1995) 9 Cal.4th 863, 871 [39 Cal. Rptr. 2d 824, 891 P.2d 804].*) The Legislature, in the same sentence of *section 12940, subdivision (a)(1)* that contains the inability-to-perform exception, [**128] also set out two health or safety exceptions, removing from the general disability discrimination prohibition the discharge or refusal to hire a person who because of his or her disability "cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations." These health or safety exceptions have long been read both administratively and judicially as creating *defenses,* on which defendants bear the burden of proof. (*Cal. Code Regs., tit. 2, § 7293.8, subds. (c), (d); American National Ins. Co. v. Fair Employment & Housing Com. (1982) 32 Cal.3d 603, 609-610 [186 Cal. Rptr. 345, 651 P.2d 1151]* (*American National*); *Raytheon Co. v. Fair Employment & Housing* [***402] *Com. (1989) 212 Cal. App. 3d 1242, 1252 [261 Cal. Rptr. 197]; Sterling Transit Co. v. Fair Employment Practice Com. (1981) 121 Cal. App. 3d 791, 798-799 [175 Cal. Rptr. 548].*)

Indeed, in *American National* this court read *section 12940, subdivision (a)(1)* as providing essentially a single sentence covering both inability to perform and inability to perform safely and without health risks. While barring disability discrimination in FEHA, the Legislature, we explained, "made present inability to perform a particular job efficiently, safely, and without danger to health one of the few defenses to a charge of discrimination. (*§ 12940, subd. (a)(1)*)." (*American National, supra, 32 Cal.3d at pp. 609-610.*) The majority, ignoring our prior interpretation in *American National,* now incongruously treats the sentence's two provisions differently, transforming the inability-to-perform portion from a defense to an element of the plaintiff's case. Nothing in the statute suggests the Legislature intended the inability-to-perform exception, uniquely, to be part of the plaintiff's case.

The majority's unharmonious reading also creates a potential for confusion at trial that the Legislature surely did not intend. An employer's claim that, because of dis-

ability, the plaintiff was unable to perform is not always distinguishable from a claim that, because of disability, employing the plaintiff would have endangered his or her health or safety or that of others in the workplace. In the present case, for example, defendant claims plaintiff, because of his disability, could not keep secure physical control over the inmates with whom he worked, with possibly "life-threatening" consequences. This is clearly a safety concern, and on retrial the jury in this case will presumably be given (as it was in the first trial) *BAJI No. 12.16* or an equivalent instruction placing on defendant the burden to prove the health or safety exception applicable. But at the same time, according to the majority (maj. opn., *ante*, at pp. 266-267), the jury must be instructed that plaintiff [\*271] bears the burden of showing he can perform the job's essential duties--duties that, defendant asserts, include maintaining security over inmates. How the jury--or any future jury in a similar case--is expected to follow these contradictory directions is, to say the least, unclear.

C. *The Fair Employment and Housing Commission (FEHC) interprets section 12940, subdivision (a)(1) as providing an affirmative defense.*

The FEHC, the agency charged with adjudicating FEHA enforcement actions and interpreting FEHA by regulation (*§ 12935, subd. (a)*), also reads the statute as establishing an inability-to-perform defense. The FEHC's 1987 regulation (*Cal. Code Regs., tit. 2, § 7293.8, subd. (b)* (Code of Regulations *section 7293.8(b)*)), placed in the same code section as the two health or safety defenses, provides: "Inability to Perform. It is a permissible defense for an employer or other covered entity to demonstrate that, after reasonable accommodation has been made, the applicant or employee cannot perform the essential functions of the position in question because of his or her disability." This regulation, the FEHC explained at the time, would "mak[e] clear that it is the employer's burden to prove, in defense of its discrimination, that the handicap would render the person unable to perform" (FEHC, Notice of Proposed Changes (Mar. 16, 1987) p. 1); its adoption would conform the commission's regulations to *section 12940, subdivision (a)(1)*, which the commission believed "clearly [\*\*129] makes inability [\*\*\*403] to perform a defense." (FEHC, Final Statement of Reasons for Changes to Physical Handicap Regulations (Oct. 15, 1987) p. 4.)

The FEHC, employing its expertise developed adjudicating and administering FEHA, adopted Code of Regulations *section 7293.8(b)* after reaching the same conclusion in precedential adjudicative decisions [2] and after full notice, public comment, and deliberation. The commission has maintained its interpretation consistently for more than 20 years since first adopting it.

2    See *Dept. Fair Empl. & Hous. v. Cairo* (1984) No. 84-04, FEHC Precedential Decisions 1984-1985, CEB 3, page 15 (1984 WL 54284 at page \*11); *Dept. Fair Empl. & Hous. v. Kingsburg Cotton Oil Co.* (1984) No. 84-30, FEHC Precedential Decisions 1984-1985, CEB 11, page 28 (1984 WL 54310 at page \*21).

An administrative agency's reasonably contemporaneous statutory interpretation, adopted by the agency responsible for administering the statute after full deliberation and consistently maintained since, is entitled to great weight and will be overturned only if clearly erroneous. (*Sara M. v. Superior Court (2005) 36 Cal.4th 998, 1012-1014 [32 Cal. Rptr. 3d 89, 116 P.3d 550]*; *Yamaha Corp. of America v. State Bd. of Equalization (1998) 19 Cal.4th 1, 12-13 [78 Cal. Rptr. 2d 1, 960 P.2d 1031]*.) Following this principle, we have previously [\*272] deferred to the FEHC's regulations and precedential decisions interpreting FEHA. (*Colmenares v. Braemar Country Club, Inc. (2003) 29 Cal.4th 1019, 1029-1030 [130 Cal. Rptr. 2d 662, 63 P.3d 220]*; cf. *Gay Law Students Assn. v. Pacific Tel. & Tel. Co. (1979) 24 Cal.3d 458, 491 [156 Cal. Rptr. 14, 595 P.2d 592]*.) The FEHC's interpretation of *section 12940, subdivision (a)(1)*, far from being clearly erroneous, accords with the most reasonable reading of the statute's language, as explained above. We should accord it great weight. (Accord, *Ackerman v. Western Elec. Co., Inc. (9th Cir. 1988) 860 F.2d 1514, 1518-1519* [holding, in reliance on Code Reg. *§ 7293.8(b)*, that the burden of proving inability to perform lies with the defendant].)

The majority concedes Code of Regulations *section 7293.8(b)* "arguably" places the burden of proof on employers, but insists the regulation is inconsistent with the statute because the Legislature "has not imposed liability on an employer if an employee, even a disabled employee, could not perform his or her duties with or without reasonable accommodation." (Maj. opn., *ante*, at p. 266.) Here, the majority succumbs to the fallacy I identified at the outset. That the employer is not liable when the employee's disability renders the employee unable to perform does *not* imply ability to perform must be part of the plaintiff's case; rather, inability to perform may logically be made a matter of defense. [3] The FEHC's interpretation of *section 12940, subdivision (a)(1)* as providing an affirmative defense is thus not inconsistent with the legislative intent. Indeed, the FEHC's interpretation [\*\*\*404] is the most reasonable one, given the statute's language and structure.

3    For the same reason, the majority begs the question in arguing that the burden of proof must logically lie with plaintiffs because, under *section*

42 Cal. 4th 254, *; 165 P.3d 118, **;
64 Cal. Rptr. 3d 390, ***; 2007 Cal. LEXIS 8910

12940, subdivision (a)(1), disability discrimina-
tion is not prohibited unless "the adverse em-
ployment action occurs because of a disability
*and* the disability would not prevent the em-
ployee from performing the essential duties of the
job." (Maj. opn., *ante*, at p. 262.) The fundamen-
tal logical flaw in the majority's reasoning is its
premise that FEHA provides no affirmative de-
fenses to a disability discrimination claim. As
discussed above (pt. I.B. of this dissent) and be-
low (pt. II.A. of this dissent), that premise is
false.

D. *The Legislature, while amending section 12940, sub-
division (a)(1), has acquiesced in the FEHC's interpreta-
tion.*

Legislative acquiescence in this long-standing ad-
ministrative interpretation supports the conclusion that
the FEHA has correctly interpreted *section 12940, subdi-
vision (a)(1). (Sara M. v. Superior Court, supra, 36
Cal.4th at pp. 1014-1015.)* Not once in the 20 years that
Code of Regulations *section 7293.8(b)*, the definitive
FEHC regulation, has been on the books--and applied in
every disability discrimination action adjudicated by the
agency-- [**130] has the Legislature indicated any dis-
approval. In that time, the Legislature has amended *sec-
tion 12940, subdivision (a)(1)* at least once: in 1992, it
[*273] changed references to "handicap" to "disability"
and substituted the phrase "essential duties even with
reasonable accommodations" for the word "duties."
(Stats. 1992, ch. 913, § 23.1, p. 4313.)

The majority argues that this change was intended to
incorporate into FEHA the federal ADA's allocation of
burden of proof. (Maj. opn., *ante*, at p. 262.) But the
ADA *expressly* allocates the burden of proof by requir-
ing the plaintiff to prove he or she is a "qualified indi-
vidual," defining that phrase to mean an individual who
can perform the job's essential functions. Had the Legis-
lature intended to abrogate the FEHC's construction of
*section 12940, subdivision (a)(1)* by adopting the ADA's
approach it would presumably have likewise inserted a
"qualified individual" requirement into *section 12940,
subdivision (a)* and defined that term as in the ADA.
Moreover, while the 1992 amendments (a broad act mak-
ing changes in public accommodations and housing law
as well as employment) were generally intended to con-
form FEHA to the recently enacted ADA, the Legislature
made very clear its intent that the ADA was to be a floor
for protection of disabled Californians, not a ceiling.
Section 1 of the 1992 act is explicit: "It is the intent of
the Legislature in enacting this act to strengthen Califor-
nia law in areas where it is weaker than the [ADA] and
to retain California law when it provides more protection
for individuals with disabilities than the [ADA]." (Stats.

1992, ch. 913, § 1, p. 4282.) The majority's supposition
that the 1992 Legislature intended to *weaken* California's
protections for the disabled by imposing a new burden of
proof on disability discrimination plaintiffs is thus with-
out foundation.

II. *The Majority's Nontextual Arguments Fail Scrutiny*

The majority offers two arguments drawn from out-
side the text of *section 12940, subdivision (a)(1)* for
placing on plaintiffs the burden of proof regarding ability
to perform: *Evidence Code section 500* mandates it, and
prior Court of Appeal decisions support it. Neither with-
stands analysis.

A. *Evidence Code section 500.*

First, the majority relies on *Evidence Code section
500*, which the majority quotes as providing that " 'a
party has the burden of proof as to each fact the existence
or nonexistence of [***405] which is essential to the
claim for relief ... that he is asserting.' " (Maj. opn., *ante*,
at p. 263.) But the majority's quotation omits a crucial
phrase. The statute actually provides that "a party has
the burden of proof as to each fact the existence or nonexis-
tence of which is essential to the claim for relief *or de-
fense* that he is asserting." (*Evid. Code, § 500*, italics
added.) *Evidence Code section 500* establishes that ordi-
narily the party to whose case a fact is essential bears the
burden of proving that [*274] fact, but the statute "does
not attempt to indicate what facts may be essential to a
particular party's claim for relief or defense." (Cal. Law
Revision Com. com., reprinted at 29B pt. 1 West's Ann.
Evid. Code (1995 ed.) foll. § 500, p. 554.) It does not,
therefore, tell us which facts are part of a disability dis-
crimination claim for relief under FEHA and which are
raised by way of defense.

If there were no possible affirmative defenses to a
disability discrimination claim under FEHA--if every
ultimate fact bearing on illegality were necessarily an
element of the plaintiff's cause of action--then *Evidence
Code section 500* would support the majority's position.
But affirmative defenses do exist. Disability discrimina-
tion under FEHA is subject to the health or safety de-
fenses of *Government Code section 12940, subdivision
(a)(1)*, discussed earlier in this opinion, as well as the
general defense of "bona fide occupational qualification"
established by the introductory phrase of *section 12940*. [4]
Reference [**131] to *Evidence Code section 500* thus
does not assist in answering the question presented here:
Is ability to perform part of the claim for relief or is in-
ability an affirmative defense?

4  *Section 12940* prohibits discrimination on the
specified bases "unless based upon a bona fide
occupational qualification." A bona fide occupa-

tional qualification is an employer practice that "on its face excludes an entire group of individuals on a basis enumerated in the Act (e.g., all women or all individuals with lower back defects)," but which is justified because the employer proves that "all or substantially all of the excluded individuals are unable to safely and efficiently perform the job in question and because the essence of the business operation would otherwise be undermined." (*Cal. Code Regs., tit. 2, § 7286.7, subd. (a)*; see *West v. Bechtel Corp. (2002) 96 Cal.App.4th 966, 983-984 [117 Cal. Rptr. 2d 647]*; *Bohemian Club v. Fair Employment & Housing Com. (1986) 187 Cal.App.3d 1, 19-20 [231 Cal. Rptr. 769].*)

B. *Brundage and the* McDonnell Douglas *prima facie case.*

For decisional authority, the majority invokes *Brundage v. Hahn (1997) 57 Cal.App.4th 228 [66 Cal. Rptr. 2d 830]* (*Brundage*) and other appellate decisions assertedly following it. (Maj. opn., *ante*, at pp. 257, 260.) In doing so, the majority goes astray in two ways: First, it implicitly confuses the elements of a cause of action under *section 12940, subdivision (a)*--the issue presented here--with the requirements for indirect proof of discriminatory motive by circumstantial evidence (the *McDonnell Douglas* prima facie case [5] referenced in *Brundage*)--an issue not involved in this case. Second, as a consequence of the foregoing, it fails to acknowledge that *Brundage* has nothing to say about the issue before us.

5    *McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792 [36 L. Ed. 2d 668, 93 S. Ct. 1817]* (*McDonnell Douglas*).

In a brief and expressly nondispositive discussion, the *Brundage* court stated that one of the ingredients for a so-called *McDonnell Douglas* prima [*275] facie case for disability discrimination is proof the plaintiff is either "a qualified individual" or " 'qualified for the job.' " (*Brundage, supra, 57 Cal.App.4th at p. 236 & fn. 1.*) In the case before it, however, the court held summary judgment was proper because the undisputed evidence showed the plaintiff was not fired "because of" her disability (*§ 12940, subd. (a)*) but [***406] for a nondiscriminatory reason (*Brundage, at pp. 236-237*); it thus had no occasion to and did not address, even in dictum, the proper allocation under FEHA of burden of proof on ability to perform.

The *McDonnell Douglas* prima facie case referenced in *Brundage* is "designed to assure that the 'plaintiff [has] his day in court despite the unavailability of direct evidence.' " (*Trans World Airlines, Inc. v. Thurston (1985)*

*469 U.S. 111, 121 [83 L. Ed. 2d 523, 105 S. Ct. 613].*) It does not define the elements of the cause of action and "does not apply in every employment discrimination case. For instance, *if a plaintiff is able to produce direct evidence of discrimination, he may prevail without proving all the elements of a prima facie case.*" (*Swierkiewicz v. Sorema N.A. (2002) 534 U.S. 506, 510 [152 L. Ed. 2d 1, 122 S. Ct. 992]*, italics added; accord, *Trans World Airlines, Inc. v. Thurston, at p. 121*; see also *Rizzo v. Children's World Learning Centers, Inc. (5th Cir. 1996) 84 F.3d 758, 762* [same as to a disability discrimination plaintiff who proved discriminatory intent by direct evidence].)

The *McDonnell Douglas* test is inapplicable here, where plaintiff has shown by direct (indeed, undisputed) evidence that defendant terminated him because of his disability. Defendant's responsible manager told plaintiff at the time that he could not return to his job as a stationary engineer because, due to his hepatitis C, he had not been medically cleared for full duty in that position. (Maj. opn., *ante*, at pp. 258-260.) The question here was not *why* the employer took the action it took, but whether the employer's admittedly discriminatory decision was legally warranted, i.e., was justified by plaintiff's asserted inability to perform. Irrespective, therefore, of whether a plaintiff generally must show he or she is "qualified" in order to make a *McDonnell Douglas* prima facie case, plaintiff here had no need to do so because he had sufficient direct evidence he was fired because of his disability. [6]

6    The *McDonnell Douglas* test is also inapplicable here because this appeal arises not from summary judgment or nonsuit but from a jury verdict. Once an intentional discrimination case proceeds to jury deliberations, the existence of a prima facie case plays no role--the jury is not instructed on its requisites. (*Caldwell v. Paramount Unified School Dist. (1995) 41 Cal.App.4th 189, 203-205 [48 Cal. Rptr. 2d 448].*)

[**132]  *Brundage* did not hold qualification is an element of the FEHA employment discrimination cause of action, and indeed it is not. Every disparate-treatment plaintiff under FEHA must show that the action complained of was taken "because of" a prohibited basis. (*§ 12940, subd. (a).*) Where, as in the [*276] usual case, the plaintiff seeks to prove discriminatory intent by circumstantial evidence, the plaintiff indeed will need to show he or she was qualified for the position (or, in a termination case, was competently performing the job) in order to make a prima facie case. But in the relatively rare case where the plaintiff has direct evidence of discrimination, as where the employer has expressly dismissed or refused to hire the plaintiff on a prohibited

basis, the plaintiff generally need not *also* show that he or she can perform. [7] This is such a case.

    7   For example, if a restaurant's manager rejects a female applicant for a wait staff position with the explanation that "We only hire men as waiters here," the rejected applicant can show sex discrimination by direct evidence and need not *also* prove that she would have been a competent waitress. She has shown the adverse action was taken "because of ... disability" (§ *12940, subd. (a)*) and need not also show qualification, because qualification, while sometimes an ingredient of the *McDonnell Douglas* prima facie case, is not an element of the cause of action.

    Similarly, a disabled plaintiff who (as in this case) shows he was told, "We're letting you go because your illness makes you unable to do the work" has proven discrimination by sufficient evidence to get to a jury. The employer may attempt to show that the discrimination was not illegal because the illness really did, even with reasonable accommodation, prevent the plaintiff from fulfilling his duties (§ *12940, subd. (a)(1)*), but in this situation qualification is a matter for defense, not part of plaintiff's case.

[***407] For these reasons *Brundage* and its progeny are inapposite. Indeed, the only decision (prior to the Court of Appeal's in this case) that has considered *section 12940, subdivision (a)(1)*'s history of administrative interpretation and rendered a holding on the burden of proof issue is the Ninth Circuit's decision in *Ackerman v.*

*Western Elec. Co., Inc., supra, 860 F.2d at pages 1518-1519.* The *Ackerman* court agreed with the FEHC that the burden lay with defendants. Oddly, *this* decision the majority completely ignores.

**Conclusion**

    The majority's mandate that persons with disabilities be presumed unable to work until they prove themselves able is supported by neither the text nor the history of FEHA. To the contrary, such a presumption is precisely what our antidiscrimination law was designed to combat. In 1973, when a prohibition on physical handicap discrimination was first added to former *Labor Code section 1420*, the predecessor of *Government Code section 12940* (together with the inability-to-perform exception later included in *section 12940, subdivision (a)(1)*), the legislative goal was "to create a positive attitude toward employment of the handicapped and ... obtain more job opportunities for disabled citizens who are now on welfare rolls." (Cal. Health and Welf. Agency, Enrolled Bill Rep. on Assem. Bill No. 1126 (1973-1974 Reg. Sess.) Sept. 21, 1973, p. 1.) By barring discrimination on the basis of disability, while allowing employers to defend on grounds of inability to perform, the Legislature sought to overcome the then widespread assumption that disabled people had no place in the workplace. Now, by reading into FEHA a [*277] requirement that persons with disabilities must prove their ability to perform before they can complain of discrimination, the majority effectively endorses this legally discredited assumption. For this reason, I dissent.

    Kennard, J., and Moreno, J., concurred.

TAB 5

LEXSEE 60 CAL.APP.4TH 171

**EDDIE JACKSON, Plaintiff and Appellant, v. COUNTY OF LOS ANGELES, Defendant and Respondent.**

**No. B107622.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION ONE**

*60 Cal. App. 4th 171; 70 Cal. Rptr. 2d 96; 1997 Cal. App. LEXIS 1071; 7 Am. Disabilities Cas. (BNA) 1256; 62 Cal. Comp. Cas 1670; 97 Cal. Daily Op. Service 9565; 97 Daily Journal DAR 15261*

**December 19, 1997, Decided**

**SUBSEQUENT HISTORY:** [***1] Review Denied March 11, 1998, Reported at: *1998 Cal. LEXIS 1541*.

**PRIOR HISTORY:** APPEAL from a judgment of the Superior Court of Los Angeles County, No. BC113925, Frances Rothschild, Judge.

**DISPOSITION:** The judgment is affirmed.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A county safety police officer who sustained a work-related back injury received a workers' compensation award, and in compliance with the award's restriction mandating that the officer's employment be free of emotional stress and strain, the county placed him on extended medical leave. The officer subsequently filed a discrimination action against the county under the Americans with Disabilities Act of 1990 (ADA) (*42 U.S.C. § 12101 et seq.*). The trial court granted summary judgment for the county. (Superior Court of Los Angeles County, No. BC113925, Frances Rothschild, Judge.)

The Court of Appeal affirmed, holding that the officer was judicially estopped from making a showing that he was a "qualified individual with a disability" under the ADA (*42 U.S.C. § 12112(a)*), since he had agreed to the stress-free work restriction in order to receive his workers' compensation award. Even though the term "disability" is used differently in determining eligibility for workers' compensation than for purposes of the ADA, findings made in the administrative proceeding may, in some situations, judicially estop an employee from pursuing an ADA claim. Because this employee would have

had to show that he could perform the essential functions of the job he held or desired, with or without reasonable accommodation, in order to prevail on his ADA claim (*42 U.S.C. § 12111(8)*), a position totally inconsistent with the position he successfully pursued in the workers' compensation proceeding, he was judicially estopped from pursuing his ADA claim. (Opinion by Masterson, J., with Ortega, Acting P. J., and Dunn, J.,* concurring.)

* Judge of the Municipal Court for the Long Beach Judicial District, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

**HEADNOTES**

**CALIFORNIA OFFICIAL REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Civil Rights § 3--Employment--Doctrine of Judicial Estoppel--Claim Under Americans With Disabilities Act--Inconsistent Position at Workers' Compensation Proceeding.** --In a discrimination action brought against a county under the Americans with Disabilities Act of 1990 (ADA) (*42 U.S.C. § 12101 et seq.*), by a county safety police officer who had sustained a work-related back injury, and who had been placed on extended medical leave pursuant to a work restriction contained within a workers' compensation award, that his further employment be free of emotional stress and strain, the officer was judicially estopped from making a showing that he was a "qualified individual with a disability" under the ADA (*42 U.S.C. § 12112(a)*), where he had agreed to the stress-free work restriction in order to receive his workers' compensation award. Even

60 Cal. App. 4th 171, *; 70 Cal. Rptr. 2d 96, **;
1997 Cal. App. LEXIS 1071, ***; 7 Am. Disabilities Cas. (BNA) 1256

though the term "disability" is used differently in determining eligibility for workers' compensation than for purposes of the ADA, findings made in the administrative proceeding may, in some situations, judicially estop an employee from pursuing an ADA claim. Because this employee would have had to show that he could perform the essential functions of the job he held or desired, with or without reasonable accommodation, in order to prevail on his ADA claim (42 U.S.C. § 12111(8)), a position totally inconsistent with the position he successfully pursued in the workers' compensation proceeding, he was judicially estopped from pursuing his ADA claim.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 306.]

**(2) Summary Judgment § 26--Appellate Review-- Scope of Review.** --A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established or that there is a complete defense to that cause of action. Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. The appellate court must determine whether the facts as shown by the parties give rise to a triable issue of material fact. In making this determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed. The reviewing court accepts as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true.

**(3) Summary Judgment § 25--Appellate Review-- Plaintiff's Theory of Liability.** --Typically, a plaintiff's theory of liability determines the analysis to be applied on a summary judgment motion.

**(4) Estoppel and Waiver § 2--Definitions and Distinctions--Judicial Estoppel: Words, Phrases, and Maxims--Judicial Estoppel.** --Judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity of the judicial process. This obviously contemplates something other than the permissible practice of simultaneously advancing in the same action inconsistent claims or defenses which can then, under appropriate judicial control, be evaluated as such by the same tribunal, thus allowing an internally consis-

tent final decision to be reached. Consequently, judicial estoppel is especially appropriate where a party has taken inconsistent positions in separate proceedings. Sometimes referred to as the doctrine of preclusion of inconsistent positions, the doctrine is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse effect on the judicial process. The doctrine cannot be invoked when the position first assumed was taken as a result of ignorance or mistake.

**(5) Estoppel and Waiver § 2--Definitions and Distinctions--Judicial Estoppel Distinguished From Collateral Estoppel: Judgments § 81--Collateral Estoppel.** --The distinction between collateral estoppel and judicial estoppel is fairly easy to make; accordingly, courts seldom confuse these two doctrines. Collateral estoppel bars a party from relitigating an issue of ultimate fact that a court already has adjudicated. It deals with the finality of judgment on factual matters that were fully considered and decided. Judicial estoppel, on the other hand, prevents inconsistent positions whether or not they have been the subject of a final judgment. Collateral estoppel deprives a party of the right to relitigate an issue. The rationale is to conserve judicial resources by preventing repetitive litigation. In contrast, judicial estoppel deprives a party only of the right to assert a particular position. Judicial estoppel is designed to maintain the purity and integrity of the judicial process by preventing inconsistent positions from being asserted.

**(6) Estoppel and Waiver § 2--Definitions and Distinctions--Judicial Estoppel--Equitable Estoppel: Judgments § 81--Collateral Estoppel.** --Judicial estoppel differs from equitable estoppel. A party may invoke equitable estoppel to prevent an opponent from changing positions if (1) the party was an adverse party in the prior proceeding, (2) he or she detrimentally relied upon his or her opponent's prior position, and (3) he or she would now be prejudiced if a court permitted his opponent to change positions. Equitable estoppel focuses on the relationship between the parties and is designed to protect litigants from injury caused by less than scrupulous opponents. By contrast, judicial estoppel focuses on the relationship between the litigant and the judicial system and is designed to protect the integrity of the judicial process. By definition, equitable estoppel requires privity, reliance, and prejudice because the doctrine concentrates on the relationship between the parties to a specific case. Conversely, none of these elements is or should be required under the judicial estoppel doctrine. The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts the judicial machinery.

(7) **Estoppel and Waiver § 2--Definitions and Distinctions--Judicial Estoppel--Application.** --The doctrine of judicial estoppel should apply when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake.

**COUNSEL:** Robert M. Moss for Plaintiff and Appellant.

Melanie E. Lomax for Defendant and Respondent.

**JUDGES:** Opinion by Masterson, J., with Ortega, Acting P. J., and Dunn, J.,[*] concurring.

> [*]   Judge of the Municipal Court for the Long Beach Judicial District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**OPINION BY:** MASTERSON

**OPINION**

[*174] [**97] **MASTERSON, J.**

Plaintiff Eddie Jackson, a safety police officer with the County of Los Angeles (County), sustained a work-related injury to his back. [*175] He filed a workers' compensation claim, but continued to perform his job without the need for any accommodation. Jackson received a workers' compensation award of $ 48,359. The award also contained a work restriction mandating that Jackson's [**98] employment be free from emotional stress and strain. In compliance with the work restriction, the County placed Jackson on extended medical leave.

Jackson filed this action [***2] under the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101-12213), alleging that the County had discriminated against him because of his disability. The trial court granted summary judgment in favor of the County on the ground that Jackson's work restriction rendered him unqualified for employment. We affirm.

BACKGROUND

In October 1974, Jackson began his employment with the County as a safety police officer I. At some point, he was assigned to County-U.S.C. Medical Center (Medical Center) and was promoted to safety police officer III. According to Jackson's performance evaluations, his job responsibilities included protecting patients, visitors, employees, and members of the public from acts of violence; safeguarding County property by responding to

fires, bomb threats, and hazardous material spills; and arresting individuals engaged in criminal activity. These duties required that Jackson carry a firearm.

The formal class specification for the position of safety police officer III states that "[p]ositions allocable to this class . . . [are assigned to] isolated fixed posts, or conduct individual foot and vehicle patrol of premises where the patrons and clientele [***3] include a high proportion of aggressive and quarrelsome individuals and groups hostile to authority, and who often react to the frustration of having rules imposed that regulate their behavior by resorting to physical assault upon persons or property. The areas included within these assignments are often invaded by groups and/or individuals who come upon the premise[s] to commit crimes such as theft, vandalism and rape. . . . [P] Positions allocable to this class are distinguished from full-time peace officer positions by the limited nature of their law enforcement authority. Such authority is limited to the enforcement of law only as necessary to prevent injury to persons or damage to or theft of property within the area or areas of the County facility of facilities of the shift to which they are posted or assigned." The class specification indicates that the position of safety police officer III has a physical class rating of "4," which means that the physical demands of the job are "arduous."

In March 1991, Jackson sustained an injury while restraining a hyperactive patient who was on phencyclidine, commonly known as PCP. Shortly [*176] thereafter, Jackson filed a claim [***4] for workers' compensation benefits, alleging injuries to his back, shoulder, and psyche. While the claim was pending, Jackson continued to perform his job satisfactorily. He did not miss any work because of the injury. Nor did he request or require any accommodation to perform his job.

In connection with the workers' compensation claim, Jackson's attorney selected two physicians, Drs. Richard Low and Jack Kroeger, to evaluate his injuries. [1] In a report dated April 16, 1992, Dr. Low found that Jackson suffered from several work-related health problems, including hypertension. Dr. Low stated: "Mr. Jackson is labor disabled based solely upon the condition of worsening hypertension. Furthermore, this condition is now permanent and stationary for purposes of rating." Under the heading, "Work Restrictions," DR. LOW ADVISED: "By virtue of the worsening hypertension, and based solely on this condition, the patient is restricted to working in an environment free of emotional stress and strain, and no heavy work as fatigue tends to aggravate these findings and set him up for life threatening complications."

> [1]   Jackson's appellate counsel did not represent him in the workers' compensation proceeding.

60 Cal. App. 4th 171, *; 70 Cal. Rptr. 2d 96, **;
1997 Cal. App. LEXIS 1071, ***; 7 Am. Disabilities Cas. (BNA) 1256

[***5] On September 10, 1992, Dr. Kroeger reported: "The subjective factors of disability are occasional slight to moderate low back pain when getting out of bed in the morning. [P] . . . The objective factors of disability include restriction of low back motion with pain on terminal range, tenderness in the area and 50 restricted squatting." Under the heading, "Work Restrictions," DR. KROEGER STATED: "Mr. Jackson is to avoid quick back movements and strains, including heavy lifting, repeated bending and stooping." Under [**99] the heading, "Rehabilitation," DR. KROEGER WROTE: "Mr. Jackson is a Qualified Injured Worker. He is unable to return to his usual occupation as a safety police [officer]. He is eligible for vocational retraining and rehabilitation."

At the County's request, Jackson was also evaluated by Randolph Noble, M.D. In a February 1, 1993, report, Dr. Noble concluded: "Mr. Jackson is presently working full time and there does not appear to be an internal medicine disability precluding him from his usual and customary job activities. [P] . . . [I]t is my opinion that Mr. Jackson could perform his usual and customary occupational duties without restriction. Work preclusions [***6] are not indicated."

In early April 1993, Jackson's workers' compensation claim was resolved by way of the parties' "Stipulations with Request for Award," which they filed with the Workers' Compensation Appeals Board. The stipulations [*177] recited that Jackson's injuries had caused "permanent disability" of 62 1/4 percent "for which indemnity is payable . . . in the sum of $ 48,359.00 . . . ." THE STIPULATIONS FURTHER STATED: "The parties mutually agree that Applicant is under a work restriction as follows: [P] a) no heavy lifting, repetitive bending and stooping and quick back movements and strains (Dr. Kroeger 9/10/92). [P] b) work environment free from emotional stress and strain and no heavy work (Dr. Low 4/16/92)." The stipulations were signed by Jackson, his attorney, and a representative of the County. [2] On April 8, 1993, a workers' compensation judge issued an award based on the stipulations. The award expressly incorporated the work restrictions set forth in the stipulations.

> 2  The stipulations did not rely on or refer to Dr. Noble's conclusion that Jackson could work without restrictions.

[***7] By letter dated April 19, 1993, the County's workers' compensation administrator informed Adele Harris, who worked in the County's "return-to-work" unit, of Jackson's work restrictions. Subsequently, Jackson's superiors decided that his work restriction mandating a stress-free environment precluded him from continuing to serve as a safety police officer and that there

were no accommodations that would permit him to continue in that job.

On April 23, 1993, Jackson's supervisor told him that he was being relieved of his duties as a safety police officer because there were no positions that were free from emotional stress. In an effort to accommodate Jackson's work restrictions, the County attempted to find another position for him at the Medical Center or in a different safety police division within the department of health services. The County also provided Jackson with vocational rehabilitation services through Anami Rehabilitation Services, Inc. However, Jackson withdrew from the rehabilitation program after a few weeks. The only position he wanted or would consider was that of safety police officer III. Beginning on or about April 23, 1993, Jackson was placed on a medical leave [***8] of absence. At that time, the County still considered him to be an employee.

In October 1993, Jackson filed a charge with the United States Equal Employment Opportunity Commission (EEOC), alleging that the County had violated the ADA. In July 1994, he received a right-to-sue letter from the United States Department of Justice authorizing him to file a civil suit under the ADA within 90 days. The department did not make any determination regarding the merits of Jackson's claim.

In October 1994, Jackson filed this action, alleging that the County had violated the ADA by failing to accommodate his disability and by terminating his employment on April 23, 1993. Jackson also alleged that the County had treated him as if he had a disability when in fact he did not.

[*178]  In May 1996, Jackson filed a motion for summary adjudication, seeking to establish the County's liability under the ADA as a matter of law. For its part, the County moved for summary judgment, arguing that it had not unlawfully discriminated against Jackson. On July 24, 1996, the trial court continued the hearing on both motions and instructed the parties to file supplemental [**100] memoranda discussing the effect, [***9] if any, of the workers' compensation award on Jackson's lawsuit. The parties complied. After the presentation of oral argument, the trial court granted summary judgment for the County. The trial court concluded that, under the doctrine of judicial estoppel, Jackson's workers' compensation award precluded his ADA claim. Judgment was entered accordingly. [3] Jackson filed a timely appeal. [4]

> 3  By granting the County's summary judgment motion, the trial court implicitly denied Jackson's summary adjudication motion.

4    Under *California Rules of Court, rule 15(a)*, "[t]he statement of any matter in the record shall be supported by appropriate reference to the record." As to statements of fact, *rule 15(a)* is intended to direct the appellate court to *evidence* in the record. (See *Eistrat v. J. C. Wattenbarger & Sons (1960) 181 Cal. App. 2d 57, 63 [5 Cal. Rptr. 77].)* Here, both parties repeatedly cite their own "separate statement" (see *Code Civ. Proc., § 437c, subd. (b))* as the *sole* support for numerous "facts." However, a separate statement is not evidence; it *refers* to evidence submitted in support of or opposition to a summary judgment motion. In an appellate brief, an assertion of fact should be followed by a citation to the page(s) of the record containing the supporting evidence. Of course, we do not suggest that citations to a separate statement cannot be helpful. For example, where the separate statement of the party opposing summary judgment indicates that a fact is undisputed, a citation to that page of the separate statement is of valuable assistance.

[***10] DISCUSSION

(1a) The County contends that the work restrictions imposed on Jackson by the workers' compensation award rendered him unqualified for employment and that, as a result, the County did not unlawfully discriminate against him because of a disability. We agree.

Summary judgment is appropriate if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law. ( *Code Civ. Proc., § 437c, subd. (c).)*

(2) "A defendant seeking summary judgment has met the burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action cannot be established [or that there is a complete defense to that cause of action]. . . . Once the defendant's burden is met, the burden shifts to the plaintiff to show that a triable issue of fact exists as to that cause of action. . . . In reviewing the propriety of a summary judgment, the appellate court independently reviews the record that was before the trial court. . . . We must determine whether the facts as [*179] shown by the parties give rise to a triable issue of material fact. . . . In making this [***11] determination, the moving party's affidavits are strictly construed while those of the opposing party are liberally construed." ( *Hanooka v. Pivko (1994) 22 Cal. App. 4th 1553, 1558 [28 Cal. Rptr. 2d 70]*, citations omitted; see also *Code Civ. Proc., § 437c, subd. (o)(2).)* We accept as undisputed facts only those portions of the moving party's evidence that are not contradicted by the opposing party's evidence. ( *Kelleher*

*v. Empresa Hondurena de Vapores, S.A. (1976) 57 Cal. App. 3d 52, 56 [129 Cal. Rptr. 32].)* In other words, the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true. (See *Zeilman v. County of Kern (1985) 168 Cal. App. 3d 1174, 1179, fn. 3 [214 Cal. Rptr. 746]; Neinstein v. Los Angeles Dodgers, Inc. (1986) 185 Cal. App. 3d 176, 179 [229 Cal. Rptr. 612].)*

A. *The ADA*

The ADA makes it unlawful for an employer to "discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, [***12] conditions, and privileges of employment." (*42 U.S.C. § 12112(a)*.) A "qualified individual with a disability" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (*Id., § 12111(8)*.) "Disability" means (1) a physical or mental impairment that substantially limits one or more of the major life activities of an individual, (2) a record of such an [**101] impairment, *or* (3) being regarded as having such an impairment. (*Id., § 12102(2)*.) [5] "Reasonable accommodation" includes "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position." (*29 C.F.R. § 1630.2(o)(ii) (1997)*.) [6] "Essential functions" are "the fundamental job duties of the employment position the individual with a disability holds or desires. [They] [*180] do[] not include the marginal functions of the position." (*29 C.F.R. § 1630.2(n)(1) (1997)*.)

5    "Major life activities" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." (*29 C.F.R. § 1630.2(i) (1997)*.) With respect to the major life activity of "working," the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." (*Id., § 1630.2(j)(3)(i)*.)

[***13]

6    Reasonable accommodation may include job restructuring, the use of part-time or modified

work schedules, and reassignment to a vacant position. (*42 U.S.C. § 12111(9)(B)*; see generally, *29 C.F.R. § 1630.2(o) (1997)*.)

The ADA prohibits several forms of "discrimination," INCLUDING: "(1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of [his] disability . . .; [P] . . . [P] [(2)] excluding or otherwise denying equal jobs or benefits to a qualified individual because of [his] known disability . . .; [and] [P] [(3)] not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business . . . ." (*42 U.S.C. § 12112(b)(1), (4), (5)(A)*.) "Undue hardship" means an action requiring significant difficulty or expense by the employer. (*Id.*, [***14] *§ 12111(10)(A)*; *29 C.F.R. § 1630.2(p) (1997)*; see also *42 U.S.C. § 12111(10)(B)* [discussing factors to be considered in determining whether reasonable accommodation would impose an undue hardship on employer].)

(**1b**) From the record, it appears that Jackson's ADA claim may be based on several distinct theories of liability. The complaint alleged that Jackson was discharged because of his disability (i.e., a "disparate treatment" theory). Yet, he offered evidence to the effect that he did not have an actual disability but the County treated him as if he did (i.e., a "perceived disability" theory). Moreover, he argues that the County did not reasonably accommodate his disability (i.e., a "failure to accommodate" theory). (**3**) Typically, a plaintiff's theory of liability determines the analysis to be applied on a summary judgment motion. (See *Brundage v. Hahn (1997) 57 Cal. App. 4th 228, 236 [66 Cal. Rptr. 2d 830]* [applying burden-shifting analysis of *McDonnell Douglas Corp. v. Green (1973) 411 U.S. 792 [93 S. Ct. 1817, 36 L. Ed. 2d 668]* to disparate treatment claim under ADA]; *Bultemeyer v. Fort Wayne Community Schools (7th Cir. 1996) 100 F.3d 1281, 1283-1287* [burden-shifting [***15] analysis of *McDonnell Douglas* applies to disparate treatment claims under ADA but not to claims based on failure to accommodate]; *Williams v. Channel Master Satellite Systems, Inc. (4th Cir. 1996) 101 F.3d 346, 348 & fn. 1* [burden-shifting analysis of *McDonnell Douglas* not appropriate where employer admits that it terminated employee because of her alleged disability].)

(**1c**) In any event, regardless of Jackson's particular theory of liability, he cannot prevail unless he is a "qualified individual with a disability." (*42 U.S.C. § 12112(a)* [prohibiting discrimination against a "qualified individual with a disability"]; *Bultemeyer v. Fort Wayne Community Schools, supra, 100 [*181] F.3d at p. 1284* [". . .

the ADA prohibits discrimination against only 'qualified individual[s] with a disability' "].) We find that, under the doctrine of judicial estoppel, Jackson is precluded from making that showing.

### B. *Judicial Estoppel*

(**4**) "Judicial estoppel prevents a party from asserting a position in a legal proceeding [**102] that is contrary to a position previously taken in the same or some earlier proceeding. The doctrine serves a clear purpose: to protect the integrity [***16] of the judicial process." (*Cleveland v. Policy Management Systems Corp. (5th Cir. 1997) 120 F.3d 513, 517*, fn. omitted.) "This obviously contemplates something other than the permissible practice . . . of simultaneously advancing in the same action inconsistent claims or defenses which can then, under appropriate judicial control, be evaluated as such by the same tribunal, thus allowing an internally consistent final decision to be reached." (*Allen v. Zurich Ins. Co. (4th Cir. 1982) 667 F.2d 1162, 1167*; see *Rader Co. v. Stone (1986) 178 Cal. App. 3d 10, 29 [223 Cal. Rptr. 806]* [plaintiff permitted to plead alternative or inconsistent theories in complaint]; Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1997) PP 6:242 to 6:247, pp. 6-50 to 6-52 [same].) Consequently, judicial estoppel is especially appropriate where a party has taken inconsistent positions in separate proceedings. (See, e.g., *Astor Chauffeured Limousine v. Runnfeld Inv. (7th Cir. 1990) 910 F.2d 1540, 1547-1548*; Note, *Judicial Estoppel: The Refurbishing of a Judicial Shield* (1987) 55 Geo. Wash. L.Rev. 409, 418-419; see also *Rissetto v. Plumbers and Steamfitters* [***17] *Local 343 (9th Cir. 1996) 94 F.3d 597, 605*.)

" 'The doctrine of judicial estoppel, sometimes referred to as the doctrine of preclusion of inconsistent positions, is invoked to prevent a party from changing its position over the course of judicial proceedings when such positional changes have an adverse impact on the judicial process. . . . "The policies underlying preclusion of inconsistent positions are 'general consideration[s] of the orderly administration of justice and regard for the dignity of judicial proceedings.' " . . . Judicial estoppel is "intended to protect against a litigant playing 'fast and loose with the courts.' " ' " (*Russell v. Rolfs (9th Cir. 1990) 893 F.2d 1033, 1037*.) "It seems patently wrong to allow a person to abuse the judicial process by first [advocating] one position, and later, if it becomes beneficial, to assert the opposite." (Comment, *The Judiciary Says, You Can't Have It Both Ways: Judicial Estoppel--A Doctrine Precluding Inconsistent Positions* (1996) 30 Loyola L.A. L.Rev. 323, 327 (hereafter *You Can't Have It Both Ways*).)

Although the doctrine of judicial estoppel has been recognized in California, our courts have not established

[***18] a clear set of principles for applying it. [*182] This is not surprising since "[t]hroughout its history, judicial estoppel has been a confusing . . . doctrine." (*You Can't Have It Both Ways, supra,* 30 Loyola L.A. L.Rev. at p. 353.) One early decision commented that "[t]his form of estoppel is of vague application . . ., and it is not our purpose to fix its boundaries." ( *Associated Creditors' Agency v. Wong (1963) 216 Cal. App. 2d 61, 67 [30 Cal. Rptr. 705].)* Another court has stated that "[t]he proper application of this doctrine is at best uncertain." ( *Ng v. Hudson (1977) 75 Cal. App. 3d 250, 258 [142 Cal. Rptr. 69].)* Yet, it has long been settled that "[o]ne to whom two inconsistent courses of action are open and who elects to pursue one of them is afterward precluded from pursuing the other." ( *Schulze v. Schulze (1953) 121 Cal. App. 2d 75, 83 [262 P.2d 646].)* Further, it is well established that, for the doctrine to apply, the seemingly conflicting positions "must be clearly inconsistent so that one necessarily excludes the other." ( *Coleman v. Southern Pacific Co. (1956) 141 Cal. App. 2d 121, 128 [296 P.2d 386].)* Moreover, the doctrine [***19] "cannot be invoked where the position first assumed was taken as a result of ignorance or mistake." (*Ibid.*) [7]

> 7 Two decisions have discussed judicial estoppel in the context of lender liability claims where the debtor failed to list or identify those claims in a prior bankruptcy proceeding ( *Conrad v. Bank of America (1996) 45 Cal. App. 4th 133, 146-147, 161-162 [53 Cal. Rptr. 2d 336]; Billmeyer v. Plaza Bank of Commerce (1995) 42 Cal. App. 4th 1086, 1091-1092 & 1091, fn. 2 [50 Cal. Rptr. 2d 119]).* Another court has addressed the doctrine in an action for dissolution of marriage ( *In re Marriage of Dekker (1993) 17 Cal. App. 4th 842, 849-850 [21 Cal. Rptr. 2d 642]).* The most recent decision to discuss the doctrine involved a disability claim under the California Fair Employment and Housing Act (FEHA) ( *Gov. Code, § 12900 et seq.*) ( *Prilliman v. United Air Lines, Inc. (1997) 53 Cal. App. 4th 935, 956-964 [62 Cal. Rptr. 2d 142]).*

[**103] **(5)** In understanding the doctrine of judicial estoppel, [***20] it is helpful to distinguish it from other forms of estoppel. "The distinction between collateral estoppel and judicial estoppel is fairly easy to make; accordingly, courts seldom confuse these two doctrines. Collateral estoppel bars a party from relitigating an issue of ultimate fact that a court already has adjudicated. It deals with the finality of judgment on factual matters that were fully considered and decided. Judicial estoppel, on the other hand, prevents inconsistent positions whether or not they have been the subject of a final judgment. . . . Collateral estoppel deprives a party of the right to relitigate an issue. The rationale is to conserve judicial re-

sources by preventing repetitive litigation. In contrast, judicial estoppel deprives a party only of the right to assert a particular position. . . . Judicial estoppel is designed to maintain the purity and integrity of the judicial process by preventing inconsistent positions from being asserted." (Comment, *Precluding Inconsistent Statements: The Doctrine of Judicial Estoppel* (1986) *80 Nw. U. L.Rev. 1244, 1247-1248,* fns. omitted (hereafter *Precluding Inconsistent Statements*); [*183] accord, *Teledyne Industries,* [***21] *Inc. v. N.L.R.B. (6th Cir. 1990) 911 F.2d 1214, 1219-1220.*)

**(6)** Judicial estoppel also differs from equitable estoppel. "A party may invoke equitable estoppel to prevent his opponent from changing positions if (1) he was an adverse party in the prior proceeding; (2) he detrimentally relied upon his opponent's prior position; and (3) he would now be prejudiced if a court permitted his opponent to change positions. Equitable estoppel 'focuses on the relationship between the parties,' and is designed to protect litigants from injury caused by 'less than scrupulous opponents.' By contrast, judicial estoppel focuses on 'the relationship between the litigant and the judicial system,' and is designed 'to protect the integrity of the judicial process.' [P] . . . By definition, equitable estoppel requires privity, reliance, and prejudice because the doctrine concentrates on the relationship between the parties to a specific case. Conversely, none of these elements is or should be required under the judicial estoppel doctrine. . . . The gravamen of judicial estoppel is not privity, reliance, or prejudice. Rather, it is the intentional assertion of an inconsistent position that perverts [***22] the judicial machinery." (*Precluding Inconsistent Statements, supra,* 80 Nw. U. L.Rev. at pp. 1248-1249, fns. omitted; accord, *You Can't Have It Both Ways, supra,* 30 Loyola L.A. L.Rev. at pp. 328-332; Ziegler, *Judicial Estoppel: The Doctrine of Preclusion of Inconsistent Positions,* 11 Inside Litigation No. 3 (Mar. 1997) p. 15 (hereafter Ziegler); *Billmeyer v. Plaza Bank of Commerce, supra,* 42 Cal. App. 4th at p. 1092; *Teledyne Industries, Inc. v. N.L.R.B., supra,* 911 F.2d at pp. 1219-1220.)

**(7)** In accordance with the purpose of judicial estoppel, we conclude that the doctrine should apply when: (1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3) the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was not taken as a result of ignorance, fraud, or mistake. (See *Coleman v. Southern Pacific Co., supra,* 141 Cal. App. 2d at p. 128; *Rissetto v. Plumbers and Steamfitters Local 343, supra,* 94 F.3d at pp. 604-605; [***23] *Hindman v. Greenville Hosp. Sys. (D.S.C. 1996) 947 F. Supp. 215,*

221; *Consolidated Stores Inc. v. Gargis (Ala.Civ.App. 1996) 686 So.2d 268, 274-275; Timothy Christian Schools v. Village (1996) 285 Ill.App.3d 949 [221 Ill.Dec.261, 675 N.E.2d 168, 173]; Precluding Inconsistent Statements, supra,* 80 Nw. U. L.Rev. at pp. 1258-1267; *Ziegler, supra,* 11 Inside Litigation No. 3 at pp. 16-17.) [8]

> 8   Under the majority view, the party sought to be estopped must have been successful in asserting the earlier position. (See *Rissetto v. Plumbers and Steamfitters Local 343, supra,* 94 F.3d at p. 601; *You Can't Have It Both Ways, supra,* 30 Loyola L.A. L.Rev. at pp. 336-344.) If the earlier position was not adopted by the tribunal, there is no danger of inconsistent results and thus no impairment of the judicial process. (See *You Can't Have It Both Ways, supra,* 30 Loyola L.A. L.Rev. at pp. 325-328, 353-355; *Precluding Inconsistent Statements, supra,* 80 Nw. U. L.Rev. at pp. 1254-1258, 1270; *Ziegler, supra,* 11 Inside Litigation No. 3 at p. 17.) Nevertheless, judicial estoppel is an equitable doctrine. ( *Prilliman v. United Air Lines, Inc., supra,* 53 Cal. App. 4th at p. 963; *In re Marriage of Dekker, supra,* 17 Cal. App. 4th at p. 850.) Consequently, we cannot rule out the possibility that, in a future case, circumstances may warrant application of the doctrine even if the earlier position was not adopted by the tribunal. (See *Allen v. Zurich Ins. Co., supra,* 667 F.2d at p. 1167 ["Though perhaps not necessarily confined to situations where the party asserting the earlier contrary position [has] prevailed, [judicial estoppel] is obviously more appropriate in that situation."].)

[***24]   [*184]   [**104]   *C. The Effect of the Workers' Compensation Award*

**(1d)** Although the ADA is a federal statute, we apply state law principles of judicial estoppel in determining whether Jackson's claim is barred. "Judicial estoppel enables a court to protect itself from manipulation. The interested party is thus the court in which a litigant takes a position incompatible with one the litigant has previously taken. The tribunal in which the litigant made the first statement could also be interested . . ., but it is not in a position to do anything about its interest. Therefore, for all practical purposes, the interests of the second court are uniquely implicated and threatened by the taking of an incompatible position." ( *Rissetto v. Plumbers and Steamfitters Local 343, supra,* 94 F.3d at pp. 603-604.) Accordingly, state law governs the issue before us, although federal decisions may provide guidance on the subject. (See *Prilliman v. United Air Lines, Inc., supra,* 53 Cal. App. 4th at pp. 959-960.)

"A significant number of federal courts have . . . decided that a person who characterizes herself as 'totally disabled' in order to receive state, federal, or even insurance benefits [***25] will normally be estopped from proving that she is a qualified individual with a disability within the meaning of the ADA or similar state laws. [Citations.] Different courts have positioned themselves on the other side of this dispute, holding that one who represents herself as 'totally disabled' for purposes extraneous to the ADA should still have an opportunity to recover under that statute. [Citations.]" ( *Dush v. Appleton Elec. Co. (8th Cir. 1997) 124 F.3d 957, 961-962.)

In *Rissetto v. Plumbers and Steamfitters Local 343, supra,* 94 F.3d 597, the Ninth Circuit held that federal principles of judicial estoppel barred the plaintiff's claims, including an age discrimination claim under the FEHA, where she had received workers' compensation benefits for temporary total disability. The plaintiff's civil action was premised on the theory that she had been able to perform her job but that she had been constructively discharged. ( *Id. at pp. 599, 606.*) However, the Ninth Circuit found that [*185] theory to be inconsistent with the basis of the employee's workers' compensation award. As the court explained: "[P]laintiff claimed and obtained money [in the workers' [***26] compensation proceeding] on the basis of an assertion that she had an 'inability to work,' indeed a 'total' inability to earn income. Yet she claims in this lawsuit that she was performing her job adequately and that defendants' cutting her down to one or two days per week was a mere pretext for age discrimination, rather than an appropriate response to her physical inability to perform her job. [P] Plaintiff cannot be permitted to recover money twice on these inconsistent positions. We hold that, having obtained a favorable [workers' compensation] settlement based on her assertion that she could not work, plaintiff was estopped from claiming that she was performing her job adequately." ( *Id. at pp. 605-606.*)

In *Dush v. Appleton Elec. Co., supra,* 124 F.3d 957, the employer had terminated an employee for failure to work a full eight-hour day. The employee argued that her termination violated the ADA because she was a "qualified individual with a disability." In particular, she claimed that she could have continued to work with a reasonable accommodation, i.e., a light-duty assignment. Relying on the doctrine of judicial estoppel, the Eighth Circuit affirmed summary [***27] judgment for the employer based on the findings made in the employee's workers' compensation proceeding. The court stated: "[Plaintiff] posits that being 'totally disabled' for purposes of Nebraska's workers' compensation law has no bearing on the question of whether she is a qualified individual with a disability. This is because the ADA includes the concept of 'reasonable accommodation,'

60 Cal. App. 4th 171, *; 70 Cal. Rptr. 2d 96, **;
1997 Cal. App. LEXIS 1071, ***; 7 Am. Disabilities Cas. (BNA) 1256

whereas workers' [**105] compensation law does not. . . . According to [the plaintiff], she could have been totally disabled under Nebraska law, but still have been able to perform the essential functions of her job with a reasonable accommodation (namely, reduced hours). . . . The problem with this contention, however, is that the workers' compensation court addressed the issue of shorter shifts and specifically ruled that [the plaintiff] was 'unable to continue this light duty employment on any long term sustained basis.' At least in this case, then, the workers' compensation proceedings in Nebraska did, indeed, take into account the only reasonable accommodation which [the plaintiff] now asserts would have allowed her to perform her job. Consequently, the state administrative tribunal's characterization [***28] of [the plaintiff] as 'totally disabled' was equivalent to a finding that she was not qualified under the ADA." ( *Id. at pp. 964-965*, citations and fns. omitted.)

Similarly, in *Cheatwood v. Roanoke Industries (N.D.Ala. 1995) 891 F. Supp. 1528*, the findings made in a workers' compensation proceeding precluded an employee's ADA claim alleging discriminatory termination. There, the employee worked for an industrial manufacturer of plastic parts as [*186] a machine operator, making such products as playground equipment and 60gallon tanks. The job of machine operator required significant bending, stooping, and stretching, as well as the routine lifting of objects weighing up to 110 pounds. In July 1991, the employee sustained a back injury. He remained out of work for approximately two and one-half years while he sought workers' compensation benefits. In February 1994, a workers' compensation judge found that the employee had sustained a disability with a rating of 56 percent and that he "had the permanent work restrictions of lifting no more than 25 pounds and no prolonged bending, stooping, or lifting." ( *Id. at p. 1535*.) The day after the employee received the workers' [***29] compensation award, he attempted to return to his former job. The employer informed him that he was being terminated because all of the positions at the plant required lifting more than 25 pounds. In rejecting the employee's contention that he was a "qualified individual with a disability," the district court invoked the doctrine of judicial estoppel, noting that the workers' compensation proceeding had determined that "plaintiff was physically unable to perform the essential functions of any job at defendant's plant as of [his date of termination], even with accommodation." ( *Id. at p. 1538*.) The district court therefore granted summary judgment for the employer. [9]

[9] We rely on *Cheatwood* to the extent that the *findings* in the employee's workers' compensation proceeding precluded his ADA claim. We express no opinion on the *Cheatwood* court's suggestion that the employee's *testimony* in the administrative proceeding could provide a basis for applying judicial estoppel.

Finally, in [***30] *Prilliman v. United Air Lines, Inc., supra, 53 Cal. App. 4th 935*, Division Seven of this court declined to apply judicial estoppel to bar an employee's disability discrimination claim under the FEHA. In *Prilliman*, the plaintiff, a pilot, was grounded and placed on disability leave after United Airlines learned that he had been diagnosed with acquired immune deficiency syndrome. The plaintiff alleged that United Airlines had failed to accommodate his disability since it had not determined whether he could perform an alternative nonflight job (e.g., pilot instructor). For its part, United Airlines argued that, under the doctrine of judicial estoppel, the employee's receipt of disability benefits from the company, the Social Security Administration, and the State of California precluded his discrimination claim. ( *Id. at pp. 944, 946*.) According to United Airlines, the employee's receipt of disability benefits was inconsistent with his contention in the FEHA action that he was able to work in a nonflight job. In addition, on an application for company benefits, the plaintiff's treating physician had stated that the plaintiff was on "permanent total disability." ( *Id.* [***31] *at pp. 943-944, 963*.) The Court of Appeal concluded that judicial estoppel did not apply because the plaintiff's disability discrimination claim was not "clearly inconsistent" with the position he had taken in seeking disability benefits. ( *Id. at p. 963*.)

[*187] From these authorities, we discern that the term "disability," as used in determining income eligibility under benefit programs [**106] such as workers' compensation, is not necessarily used in the same way for purposes of the ADA. However, while "disability" may have different meanings in the two contexts, the findings made in the administrative proceeding may, in some situations, judicially estop an employee from pursuing an ADA claim.

This conclusion is consistent with a recent "enforcement guidance" issued by the EEOC, the agency statutorily charged with administering the ADA. (See *42 U.S.C. § 12116, 12117*.) [10] As the EEOC has explained:

[10] For a thorough discussion of the deference to be accorded the EEOC's interpretation of the ADA, see *Sicard v. City of Sioux City (N.D.Iowa 1996) 950 F. Supp. 1420, 1433-1435*.

[***32] "Because the ADA definitions of the terms 'disability' and 'qualified individual with a disability' are tailored to the broad remedial purposes of the Act, they differ from the definitions of the same or similar terms used in other laws and benefits programs designed for other purposes. The definitions of the terms used in the Social Security Act, state workers' compensation laws,

disability insurance plans, and other disability benefits programs are tailored to the purposes of those laws and programs. Therefore, representations made under those laws and programs are not determinative of coverage under the ADA. . . .

"

"The workers' compensation definitions of 'disability' reflect the purposes of workers' compensation laws. Those laws provide a system for securing prompt and fair settlement of employees' claims against employers for occupational injury and illness. In that regard, the laws generally require employers to compensate employees who are injured in the course of employment for the resulting loss of earning capacity and for medical care. Thus, workers' compensation provides benefits to individuals whose earning capacity has been reduced because of a work-related [***33] injury. Because of the emphasis on lost earning capacity, the workers' compensation definitions of disability generally focus on what a person can no longer do rather than on what s/he still is capable of doing with or without reasonable accommodation.

"To receive workers' compensation benefits, an employee generally must prove that s/he has a compensable 'disability' as defined by the applicable workers' compensation statute. The term 'disability' in this context most commonly means loss or reduction of earning power that results from a work-related injury.

[*188] "Some [workers' compensation] statutes, however, do not define 'disability' in terms of lost earning capacity. Instead, under these statutes, an injured worker has a 'disability' if his/her physical efficiency has been substantially reduced, or if s/he is unable to perform the same work with the same ease as before the injury or is unable to do heavy work that s/he could do before the injury. Under these statutes, the worker has a 'disability' even if s/he is employed at the same work and at the same wages as before the injury.

"

"[U]nlike the ADA definition of 'qualified individual with a disability,' [***34] the workers' compensation definitions of 'disability' do not distinguish between marginal and essential functions and do not consider whether an individual can work with reasonable accommodation. In many workers' compensation cases, a person has a 'total disability' when s/he is unable to do certain tasks, even if those tasks are marginal functions or if s/he could perform them with reasonable accommodation. Thus, a person may be 'totally disabled' for workers' compensation purposes and yet still be able to perform a position's essential functions with or without reasonable accommodation. [P] . . . [P] . . . Accordingly, an individual receiv-

ing workers' compensation benefits still may be entitled to protection under the ADA." (EEOC Enforcement Guidance on the Effect of Representations Made in Applications for Benefits on the Determination of Whether a Person Is a "Qualified Individual with a Disability" Under the Americans with Disabilities Act of 1990, in Avoiding Workplace Litigation (PLI Litig. & Admin. Practice Course Handbook Series No. H4-5261 (1997) pp. 151-164, fns. omitted, cited with approval in *Swanks v. WMATA (D.C. Cir. 1997) 116 F.3d 582, 586 [325 App.D.C. 238]*.) [***35]

In this case, the County acknowledges that it removed Jackson from his job and placed [**107] him on an extended medical leave because of his disability. In granting summary judgment, the trial court did not invoke judicial estoppel based on any representations Jackson had made in seeking workers' compensation benefits (e.g., that he was "disabled"). Nor did the trial court rely on Jackson's receipt of disability benefits or on the finding in the workers' compensation proceeding that he had a "permanent disability" (with a rating of 65 percent). Rather, the trial court found that judicial estoppel barred Jackson's ADA claim because of the position he took in the workers' compensation proceeding with respect to his work restrictions. We agree. [11]

> 11  Because this case involves the application of judicial estoppel to an assertion of fact--that Jackson had to work in a stress-free environment--we need not decide whether the doctrine also applies to assertions of law. (See *Helfand v. Gerson (9th Cir. 1997) 105 F.3d 530, 535* [while some courts limit judicial estoppel to a party's factual positions, the majority of federal courts also apply the doctrine to legal assertions].)

[***36]

Workers' compensation awards may be based upon stipulations between the parties. ( *Lab. Code, § 5702*.) A "Stipulations with Request for Award" is [*189] assigned to a workers' compensation judge, who will either make findings and an award based on the stipulations, set the matter for hearing to take testimony, or conduct further investigation into the matter. (Cal. Workers' Compensation Practice (Cont.Ed.Bar 3d ed. 1985) § 5.41, pp. 174-175; *Lab. Code, § 5702*.) All medical reports and other documentary evidence must be submitted with the stipulations so that the workers' compensation judge can ensure that the stipulations are fair to the applicant. (Cal. Workers' Compensation Practice, *supra*, § 5.41, p. 175.) "If the stipulation does not adequately reflect the disability of the applicant, it [is] not . . . accepted by the workers' compensation judge as the basis for his or her award." ( *Draper v. Workers' Comp. Appeals Bd. (1983) 147 Cal. App. 3d 502, 507 [195 Cal. Rptr. 248]*; accord,

*Robinson v. Workers' Comp. Appeals Bd. (1987) 194 Cal. App. 3d 784, 792-793 [239 Cal. Rptr. 841].*)

Here, the "Stipulations with Request for Award" stated that the parties had [***37] "mutually agree[d]" that Jackson was under a restriction that his "work environment [be] free from emotional stress and strain and no heavy work." The stipulations cited Dr. Low's April 16, 1992, report as support for that restriction. Dr. Low had found that "[b]y virtue of . . . worsening hypertension, and based solely on this condition, the patient is restricted to working in an environment free of emotional stress and strain, and no heavy work as fatigue tends to aggravate these findings and set him up for life threatening complications." The workers' compensation judge accepted the parties' stipulations and approved the work restriction as part of the award. [12]

> [12] Jackson points out that the award was not final on April 23, 1993, when the County relieved him of his duties and put him on medical leave. Actually, the award did not become final until five years after Jackson's injury, i.e., in March 1996. (See *Lab. Code, § 5410, 5803- 5805, 5900, 5903; Greatorex v. Board of Administration (1979) 91 Cal. App. 3d 54, 57 [154 Cal. Rptr. 37].*) However, as stated, while the doctrine of *collateral* estoppel requires a final judgment, *judicial* estoppel does not.

[***38] To prevail on his ADA claim, Jackson must establish that he is a "qualified individual with a disability." (See *42 U.S.C. § 12112(a); Bultemeyer v. Fort Wayne Community Schools, supra, 100 F.3d at p. 1284.*) In other words, Jackson must prove that he could perform the essential functions of the job he held or desired, with or without reasonable accommodation. (*42 U.S.C. § 12111(8).*) To make such a showing, Jackson would have to assert a position in this action that is totally inconsistent with the position he successfully pursued in the workers' compensation proceeding. The doctrine of judicial estoppel forecloses that attempt.

[*190] After receiving the workers' compensation award, the only job Jackson wanted or would consider was that of safety police officer III. Yet, at his deposition, Jackson admitted that all of the duties of a safety police officer III involve stress. That admission is not surprising given the responsibilities of a safety police officer III, as described in Jackson's performance evaluations and in the formal class specification for the job. Moreover, in opposing summary judgment, Jackson submitted a declaration from a physician [**108] (Dr. George Smith) [***39] who stated: " '[S]tress' is unavoidable in our daily lives and, certainly, in our work. . . . An excellent employee who seeks to challenge his or her capacity to perform in accepting difficult complex

tasks may be under as much 'stress' as an employee who, through lack of qualification or suitability for a job, is challenged to do the minimum necessary for acceptable performance. In addition, conflict between employees or between an employee and a supervisor are 'stressful' situations that may arise in any employment setting." Indeed, when David Zamorano, who works in the Medical Center's human resources department, was asked at his deposition whether he knew of any jobs that are free of stress and strain, he replied, "I don't believe there are any."

On this record, we find that the elements of judicial estoppel have been satisfied. First, Jackson has taken two positions: In the workers' compensation proceeding, he agreed with Dr. Low's assessment that he had to have a stress-free job; in this action, he claims that he could perform the essential functions of a safety police officer III. Second, both positions were taken in judicial or quasi-judicial administrative proceedings. [***40] Third, Jackson was successful in asserting the first position: The requirement of a stress-free job appeared in the parties' "Stipulations with Request for Award" (which Jackson and his attorney signed), and the workers' compensation judge adopted the stipulations in making the award. Fourth, the two positions are totally inconsistent: Jackson cannot have a stress-free work environment *and* perform the essential functions of a safety police officer III. The County has classified that job as "arduous" for good reason, and Jackson has admitted that *all* of the duties of a safety police officer III involve stress. Nor was a reasonable accommodation possible. Despite the County's efforts to rehabilitate Jackson and find him an alternative job, he withdrew from the rehabilitation program and indicated that the only job he wanted was that of safety police officer III. [13] Finally, Jackson's first position--that he needed a stress-free work environment--was not the result of ignorance, fraud, or [*191] mistake. Jackson knowingly agreed to the work restriction based on the report of Dr. Low, who evaluated Jackson at his attorney's request. The parties' stipulations recited the [***41] work restriction in language taken almost verbatim from Dr. Low's report. [14]

> [13] In *Pesterfield v. Tennessee Valley Authority (6th Cir. 1991) 941 F.2d 437,* an employee brought a claim under the federal Rehabilitation Act of 1973 (*29 U.S.C. § 791 et seq.*), alleging that he had been terminated because of his handicap. The employee suffered from a psychological condition that rendered him unable to work if he was subjected to the "slightest hint of rejection or criticism." (*941 F.2d at p. 441.*) The Sixth Circuit affirmed the district court's conclusion that the employer could not have reasonably accommodated the employee. The district court had stated

that it could not " '. . . imagine any jobs where plaintiff could be immunized from any criticism or other normal stresses of the workplace. To accommodate the plaintiff, [the employer] would have had to . . . place[] him in a virtually stress-free environment. The court finds that such a job does not exist at the [employer's facility] *and perhaps cannot be found in any workplace.*' " (*Ibid.,* italics added.)

14  In *Prilliman v. United Air Lines, Inc., supra,* 53 Cal. App. 4th 935, the court commented that any change in the plaintiff's position was not "unjust" to the employer. ( *Id. at pp. 960, 963.*) We do not interpret this comment to require detrimental reliance by the party invoking judicial estoppel. (See *Billmeyer v. Plaza Bank of Commerce, supra,* 42 Cal. App. 4th at p. 1092 [" 'The doctrine does not require reliance or prejudice before a party may invoke it.' "]; see also pt. B, *ante* [distinguishing judicial estoppel from equitable estoppel].) In any event, it would be unjust to allow Jackson to change positions. In the workers' compensation proceeding, the parties mutually agreed to the work restrictions. The County was legally bound to comply with them. (See *Robinson v. Workers' Comp. Appeals Bd., supra,* 194 Cal. App. 3d at p. 790.*) Further, Dr. Low had stated in his report that a stressful environment, in conjunction with heavy work, could "set [Jackson] up for life threatening complications." Under these circumstances, it would be unjust to permit Jackson to ignore the work restrictions for purposes of his ADA claim.

[***42] In closing, we comment briefly on the evidence submitted by Jackson in opposing summary judgment, none of which created a triable issue of material fact. First, although Dr. Noble--the physician selected by the County--found that Jackson was not subject to any work restrictions, the parties did not base their stipulations for the award on his report, nor did the workers' compensation [**109] judge rely on it in making the award. Second, we find irrelevant the testimony of Jackson's expert that the 65 percent disability rating did not prevent Jackson from performing the essential functions of his job with or without accommodation. We have concluded that judicial estoppel barred Jackson's ADA claim based on the work restriction mandating a stress-free environment, not on the finding of permanent disability or the particular disability rating. Lastly, the fact that Jackson may have been performing his job satisfactorily *before* the workers' compensation award does not mean the County should have allowed him to continue in that job *after* the award. Jackson expressly agreed in the workers' compensation proceeding to be bound by the

work restriction recommended by Dr. Low, and the workers' [***43] compensation judge included that restriction in the award. The requirement that Jackson work in a stress-free environment precluded his continued performance as a safety police officer III, just as it bars his ADA claim. The doctrine of judicial estoppel ensures that Jackson will not "speak out of both sides of [his] mouth . . . before this court." ( *Reigel v.* [*192] *Kaiser Foundation Health Plan of N.C. (E.D.N.C. 1994) 859 F. Supp. 963, 970.*) [15]

15  Before the summary judgment motion was filed, the trial court had found, in ruling on the parties' *in limine* motions for trial, that certain requests for admissions, which had been deemed admitted against the County, were inadmissible because they were ambiguous, irrelevant, or incomplete. Nonetheless, in opposing summary judgment, Jackson relied on those same requests for admissions. The County objected to their consideration based on the *in limine* ruling. The trial court implicitly sustained the objection, stating that it had considered the objections and was basing its decision on evidence that was competent and admissible. We find no error in the trial court's determination that the requests for admissions did not preclude summary judgment for the County. (See *Fredericks v. Kontos Industries, Inc. (1987) 189 Cal. App. 3d 272, 277 [234 Cal. Rptr. 395]* [where admission is susceptible of different meanings, trial court must use its discretion to determine admission's scope and effect]; *Aguimatang v. California State Lottery (1991) 234 Cal. App. 3d 769, 797-798 [286 Cal. Rptr. 57]* [evidentiary rulings on summary judgment are reviewed for abuse of discretion]; *Biljac Associates v. First Interstate Bank (1990) 218 Cal. App. 3d 1410, 1419-1420 [267 Cal. Rptr. 819]* [trial court need not expressly rule on each evidentiary objection in summary judgment context].)

[***44] DISPOSITION

The judgment is affirmed.

Ortega, Acting P. J., and Dunn, J., [*] concurred.

*    Judge of the Municipal Court for the Long Beach Judicial District, assigned by the Chief Justice pursuant to *article VI, section 6 of the California Constitution.*

Appellant's petition for review by the Supreme Court was denied March 11, 1998.

# TAB 6

LEXSEE 8 CAL.4TH 121

**JANET JENNINGS, Plaintiff and Appellant, v. JAMES J. MARRALLE et al., Defendants and Respondents.**

**No. S034510.**

**SUPREME COURT OF CALIFORNIA**

*8 Cal. 4th 121; 876 P.2d 1074; 32 Cal. Rptr. 2d 275; 1994 Cal. LEXIS 3947; 9 I.E.R. Cas. (BNA) 1768; 65 Fair Empl. Prac. Cas. (BNA) 850; 94 Cal. Daily Op. Service 5948; 94 Daily Journal DAR 10773*

**August 1, 1994, Decided**

**PRIOR HISTORY:** Superior Court of Orange County, No. 627736, Thomas N. Thrasher, Judge.

**DISPOSITION:** The judgment of the Court of Appeal is reversed and that court is directed to remand to the trial court with instructions to modify its judgment to include a dismissal of the action.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A terminated employee brought an action against her former employer, alleging wrongful termination, age discrimination in violation of the Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*), and failure to pay back wages and pension benefits. Defendant removed the action to federal court. That court granted defendant summary judgment on the second cause of action on the basis that defendant employed fewer than five persons and thus was not an employer within the meaning of FEHA, dismissed the third cause of action without prejudice to the extent it concerned federal law, and remanded the matter to state court. The superior court subsequently denied plaintiff's motion for leave to amend her complaint to allege a common law cause of action for wrongful termination in violation of public policy prohibiting discrimination in employment on the basis of age. The remaining issues were submitted to binding arbitration, where an award was entered. The superior court entered judgment on the arbitrator's award, and plaintiff appealed the portion of the superior court's judgment denying her leave to amend her complaint. (Superior Court of Orange County, No. 627736, Thomas N. Thrasher, Judge.) The Court of Appeal, Fourth Dist., Div. Three, No. G012912, reversed and directed the superior court to accept the proposed amended complaint for filing.

The Supreme Court reversed the judgment of the Court of Appeal and directed that court to remand the matter to the trial court with instructions to modify its judgment to include a dismissal of the action. The court held that the trial court did not err in denying plaintiff's motion for leave to amend to allege a wrongful termination in violation of public policy. FEHA clearly states a public policy against age discrimination in *Gov. Code, § 12920.* However, *Gov. Code, § 12926, subd. (d)*, restricts employer liability under FEHA to employers of five or more persons. Thus, the Legislature did not intend to make the right to be free of age discrimination by small employers a fundamental public policy. Further, there is no statutory or constitutional provision, other than FEHA, prohibiting age discrimination. Therefore, notwithstanding the inclusion of age in FEHA, there is no fundamental right that precludes age discrimination by small employers. The court preliminarily held that a judgment on an arbitration award is appealable as to prearbitration judicial rulings on claims not submitted to arbitration which are independent of the arbitrated claim. (Opinion by Baxter, J., expressing the unanimous view of the court.)

**HEADNOTES**

**CALIFORNIA          OFFICIAL          REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) (1c) (1d) Appellate Review § 20--Decisions Appealable--Interlocutory     Orders--Prearbitration Judicial Rulings Not Submitted to Arbitration: Arbitration and Award § 30--Judicial Action on Award-- Appeal.** --Although *Code Civ. Proc., § 1141.23*, prohib-

8 Cal. 4th 121, *; 876 P.2d 1074, **;
32 Cal. Rptr. 2d 275, ***; 1994 Cal. LEXIS 3947

its an appeal from an award resulting from judicial arbitration, a judgment on an arbitration award is appealable as to prearbitration judicial rulings on claims not submitted to arbitration which are independent of the arbitrated claim. Generally, interlocutory orders are appealable from a final judgment, and appellate review of these judicial determinations should not be foreclosed merely because the parties thereafter stipulate to submit the remaining claims to arbitration. The statutory scheme for judicial arbitration provides for trial de novo by court or jury (*Code Civ. Proc., § 1141.20*), but this remedy does not affect pre-arbitration judicial rulings foreclosing claims that were not submitted to arbitration. Those rulings are reviewable only by appeal from the judgment. If the submission of some, but not all, of the claims in a civil action foreclosed appellate review of prearbitration rulings on the remaining claims, there would be a substantial disincentive to judicial arbitration, which would be inconsistent with the legislative intent that arbitration be encouraged. (*Code Civ. Proc., § 904.1, subd. (a)(1)*.) (Disapproving to the extent it may be inconsistent: *Supple v. City of Los Angeles (1988) 201 Cal.App.3d 1004 [247 Cal.Rptr. 554]*.)

**(2) Appellate Review § 10--Jurisdiction--Existence of Appealable Judgment.** --The existence of an appealable judgment is a jurisdictional prerequisite to an appeal. A reviewing court must raise the issue on its own initiative whenever a doubt exists as to whether the trial court has entered a final judgment or other order or judgment made appealable by *Code Civ. Proc., § 904.1*.

**(3) Courts § 16--Jurisdiction--Parties' Consent.** --Jurisdiction may not be conferred on a court by consent of the parties.

**(4) Appellate Review § 20--Decisions Appealable--Interlocutory Orders.** --An order sustaining a demurrer, granting summary adjudication of certain claims, or denying leave to amend the complaint is generally reviewable on appeal from the final judgment in the action.

**(5) Employer and Employee § 9--Actions for Wrongful Discharge-- Discharge in Violation of Public Policy.** --An action in tort seeking damages for discharge from employment in contravention of public policy is an exception to the general rule, now codified in *Lab. Code, § 2922*, that, unless otherwise agreed by the parties, an employment relationship is terminable at will. However, only termination in violation of a fundamental public policy expressed in a statute or a constitutional provision will support a wrongful discharge action.

**(6) Civil Rights § 3--Employment--Age Discrimination--Employer Not Covered by Fair Employment** and Housing Act--Employee's Common Law Action for Wrongful Termination in Violation of Public Policy: Employer and Employee § 9--Actions for Wrongful Discharge. --In a wrongful termination action, the trial court did not err in denying plaintiff's motion to amend her complaint to allege a cause of action for wrongful termination in violation of public policy. Plaintiff originally alleged age discrimination under the Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*), and summary judgment was granted defendant on the basis that he employed fewer than five persons and thus was not an employer within the meaning of FEHA. In *Gov. Code, § 12920*, FEHA clearly states a public policy against age discrimination. However, *Gov. Code, § 12926, subd. (d)*, restricts employer liability under FEHA to employers of five or more persons. Thus, the Legislature did not intend to make the right to be free of age discrimination by small employers a fundamental public policy. Further, there is no statutory or constitutional provision, other than FEHA, prohibiting age discrimination. Therefore, notwithstanding the inclusion of age in FEHA, there is no fundamental right that precludes age discrimination by small employers.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 304.]

**COUNSEL:** Marvin D. Mayer and William Quackenbush for Plaintiff and Appellant.

Joseph Posner as Amicus Curiae on behalf of Plaintiff and Appellant.

Rutan & Tucker, James L. Morris, Carol L. Demmler and Bruce W. Hamby for Defendants and Respondents.

Bernard L. Allamano, Fred J. Hiestand, Proskauer, Rose, Goetz & Mendelsohn, Jeffrey A. Berman, Steven G. Drapkin and Monica J. Lizka-Miller as Amici Curiae on behalf of Defendants and Respondents.

**JUDGES:** Opinion by Baxter, J., expressing the unanimous view of the court.

**OPINION BY:** BAXTER, J.

**OPINION**

[*124] [**1075] [***276] **BAXTER, J.**

The Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*) [1] declares, as a public policy of this state, a necessity to protect and safeguard the right and opportunity to seek, obtain, and hold employment without discrimination on various grounds, among which is age. (*§ 12920.*) [2] [**1076] [***277] In furtherance

of that policy the FEHA declares that the right to employment without discrimination is a civil right (§ 12921) [3] and creates administrative remedies that are intended to eliminate discriminatory practices in hiring and employment. (§ 12960 et seq.) We are asked to decide whether an employee to whom those remedies are not available because her employer does not regularly employ five or more persons may, nonetheless, maintain a common law tort action for damages for wrongful discharge in violation of the public policy stated in *section 12920.*

  1  All future statutory references are to the Government Code unless otherwise indicated.
  2  *Section 12920* provides: "It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age.

    "It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for such reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general.

    "Further, the practice of discrimination because of race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability in housing accommodations is declared to be against public policy. It is the purpose of this part to provide effective remedies which will eliminate such discriminatory practices.

    "This part shall be deemed an exercise of the police power of the state for the protection of the welfare, health, and peace of the people of this state."
  3  *Section 12921* provides: "The opportunity to seek, obtain and hold employment without discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age is hereby recognized as and declared to be a civil right."

We conclude that permitting such an action would be inconsistent with the legislative intent reflected in various provisions of the FEHA and, in particular, *subdivision (d) of section 12926* which, by defining employer

as a [*125] person "regularly employing five or more persons," restricts employer liability for violations of the FEHA age provision to employers subject to the FEHA. This exemption of small employers from the FEHA ban on age discrimination was enacted simultaneously to, and is inseparable from, the legislative statement of policy. For that reason, and because no other statute or constitutional provision bars age discrimination, we conclude that there presently exists no "fundamental policy" which precludes age discrimination by a small employer. Thus, there is no independent basis for an action for tortious discharge in violation of policy.

We shall therefore reverse the judgment of the Court of Appeal.

I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Jennings initiated this action in the Orange County Superior Court on June 15, 1990, naming defendant Marralle, her former employer, and his professional corporation as defendants (hereafter defendant). The complaint stated three causes of action: wrongful termination, age discrimination in violation of *section 12941,* and failure to pay back wages and pension benefits.

With regard to the first and subsequent counts, Jennings alleged that she had been employed by defendant from May 5, 1986, to April 12, 1990; that defendant expressly and impliedly represented to her that she would be employed indefinitely as long as she carried out her duties competently; and that notwithstanding her competent performance her employment was terminated on April 12, 1990. Plaintiff also alleged that the termination was due solely to her age, and that defendant acted to prevent her from receiving employment benefits to which she was entitled.

With regard to the second count, Jennings alleged that she was an employee covered by *section 12941;* that defendant was an employer within the meaning of former subdivision (c) (now subdivision (d)) of *section 12926;* that she had filed a complaint with the Department of Fair Employment and Housing (the department); and that on April 28, 1990, the department issued a "Right to Sue" letter to her.

The third count alleged that as a result of defendant's actions Jennings had not received benefits to which she was entitled as a vested beneficiary of defendant's pension plan and sought back wages.

Defendant removed the action to the United States District Court for the Central District of California pursuant to *28 United States Code section* [*126] *1441.* That court granted summary judgment for defendant on the second count, finding that defendant was not an employer within the meaning of the FEHA because he did

not employ five or more persons. The third cause of action was dismissed without prejudice "to the extent [it] concerns pension benefits [and] arises [**1077] [***278] under ERISA, *29 U.S.C. § 1001 et seq.*" The state law claim for breach of an implied contract and the portion of the third count involving overdue wages was remanded to the state court.

Jennings then sought leave to amend the complaint to state a common law cause of action for wrongful termination in violation of public policy as recognized in *Rojo v. Kliger (1990) 52 Cal.3d 65 [276 Cal.Rptr. 130, 801 P.2d 373].* The proposed complaint alleged that the termination of plaintiff's employment violated public policy prohibiting discrimination in employment on the basis of age. The superior court denied the motion for leave to amend.

The remaining issues were then submitted to binding arbitration. The arbitrator's award was entered on June 4, 1992. Plaintiff then appealed from "the judgment entered on June 4, 1992, as to that portion of the judgment denying plaintiff leave to amend her complaint ...." The Court of Appeal reversed the judgment with directions that the proposed amended complaint be accepted for filing.

## II. APPELLATE JURISDICTION

Because the parties submitted the remaining issues to binding judicial arbitration following denial of Jennings's motion for leave to amend, made after the federal court had granted summary judgment for defendant on the count seeking damages for violation of the FEHA ban on age-related employment discrimination, the only judgment entered by the superior court was a judgment on the arbitrator's award. That award did not encompass any matters related to the FEHA count or the denial of plaintiff's motion to amend that count.

**(1a)** Preliminarily, therefore, we must determine whether plaintiff has appealed from an appealable order or judgment. **(2)** The existence of an appealable judgment is a jurisdictional prerequisite to an appeal. A reviewing court must raise the issue on its own initiative whenever a doubt exists as to whether the trial court has entered a final judgment or other order or judgment made appealable by *Code of Civil Procedure section 904.1.* ( *Olson v. Cory (1983) 35 Cal.3d 390, 398 [197 Cal.Rptr. 843, 673 P.2d 720];* [*127] *Committee for Responsible Planning v. City of Indian Wells (1990) 225 Cal.App.3d 191, 195 [275 Cal.Rptr. 57].*) **(1b)** Here, a doubt exists by virtue of *Code of Civil Procedure section 1141.23,* which provides that an award resulting from judicial arbitration "shall have the same force and effect as a judgment in any civil action or proceeding, *except that it is not subject to appeal* and it may not be attacked or set aside except as provided by *Section 473, 1286.2,* or Ju-

dicial Council rule." (Italics added.) To determine the effect of this provision on the appeal here, we asked the parties to file briefs addressing the question of whether an appealable order or judgment had been entered.

Both parties contend that the appeal is proper and identify the order denying plaintiff leave to amend as the basis for this appeal. Plaintiff states that the appeal "is from that portion of the judgment entered by the Superior Court on June 8 [*sic*], 1991 which denied Appellant's motion to amend her complaint ...." In support of her belief that an appealable judgment was entered by the trial court, she has submitted the following documents of which we take judicial notice:

1. A June 8, 1992, "Judgment after Binding Arbitration" in which the superior court awarded plaintiff damages of $ 1,693.18, plus costs of suit.

2. A "Notice of Review Hearing" filed July 22, 1991. That notice recites: "the conference had been set to review the status of the stipulation between the parties to refer the First and Third causes of action of the complaint to binding judicial arbitration. Such stipulation does not affect the right of any party to appeal any prior court orders or judgments."

3. A copy of a letter dated September 21, 1992, in which defendant's counsel confirmed that the "execution by plaintiff of a Notice of Satisfaction of Judgment does not waive your client's ability to maintain an appeal on the subject of her desire to assert a common law cause of action for age discrimination."

[**1078] [***279] The latter two documents reveal that in stipulating to judicial arbitration of the remaining causes of action, the parties understood that plaintiff's right to appeal would be preserved as to issues and causes of action not submitted to arbitration. **(3) (1c)** Although jurisdiction may not be conferred by consent of the parties ( *Estate of Hanley (1943) 23 Cal.2d 120 [142 P.2d 423, 149 A.L.R. 1250]; Caruso v. Snap-Tite, Inc. (1969) 275 Cal.App.2d 211 [79 Cal.Rptr. 642]*), the parties' understanding is relevant to a determination of the scope of arbitration and the effect of the subsequent award. [*128]

A superior court judgment, unless it is interlocutory, is normally appealable. ( *Code Civ. Proc., § 904.1.*) [1] On appeal from a superior court judgment, "the reviewing court may review ... any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from or which substantially affects the rights of a party ...." (*Id.,* § 906.) **(4)** Thus, an order sustaining a demurrer, granting summary adjudication of certain claims, or denying leave to amend the complaint is generally reviewable on appeal from the final judgment in the action. **(1d)** Absent an

express waiver of the right to appeal, appellate review of these judicial determinations should not be foreclosed merely because the parties thereafter stipulate to submit the remaining claims to arbitration, if those claims are independent of those submitted to arbitration.

4    *Code of Civil Procedure section 904.1*: "(a) An appeal may be taken from a superior court in the following cases:

"(1) From a judgment, except (A) an interlocutory judgment ....

"(2) From an order made after a judgment made appealable by paragraph (1).

"(3) From an order granting a motion to quash service of summons or granting a motion to stay or dismiss the action on the ground of inconvenient forum.

"(4) From an order granting a new trial or denying a motion for judgment notwithstanding the verdict.

"(5) From an order discharging or refusing to discharge an attachment or granting a right to attach order.

"(6) From an order granting or dissolving an injunction, or refusing to grant or dissolve an injunction.

"(7) From an order appointing a receiver.

"(8) From an interlocutory judgment, order, or decree, hereafter made or entered in an action to redeem real or personal property from a mortgage thereof, or a lien thereon, determining the right to redeem and directing an accounting.

"(9) From an interlocutory judgment in an action for partition determining the rights and interests of the respective parties and directing partition to be made.

"(10) From an order made appealable by the provisions of the Probate Code or the Family Code.

"(11) From an interlocutory judgment directing payment of monetary sanctions by a party or an attorney for a party if the amount exceeds five thousand dollars ($ 5,000).

"(12) From an order directing payment of monetary sanctions by a party or an attorney for a party if the amount exceeds five thousand dollars ($ 5,000).

"(b) Sanction orders or judgments of five thousand dollars ($ 5,000) or less against a party or an attorney for a party may be reviewed on appeal by that party after entry of final judgment in the main action, or, at the discretion of the court of appeal, may be reviewed upon petition for an extraordinary writ."

The statutory scheme for judicial arbitration provides that a party who is dissatisfied with an arbitration award may elect a trial de novo by court or jury. ( *Code Civ. Proc., § 1141.20*.) It is the availability of this remedy that justifies and explains the prohibition of appeal from judicial arbitration awards. This remedy does not affect pre-arbitration judicial rulings foreclosing claims that were not submitted to arbitration, however. Those rulings are reviewable only by appeal from the judgment. If the submission of some, but [*129] less than all, of the claims in a civil action foreclosed appellate review of pre-arbitration rulings on the remaining claims, there would be a substantial disincentive to judicial arbitration. This could be inconsistent with the legislative intent that arbitration be encouraged. ( *Code Civ. Proc., § 1141.10*.)

To avoid this disincentive, and thus to encourage parties to stipulate to judicial arbitration, we conclude that a judgment on an arbitration award is appealable as to pre-arbitration judicial rulings on claims not submitted to arbitration which are independent of the arbitrated claim. [5]

5    To the extent that it may be inconsistent with this conclusion, we disapprove *Supple v. City of Los Angeles (1988) 201 Cal.App.3d 1004 [247 Cal.Rptr. 554]*.

[**1079] [***280] This conclusion is consistent with the language of *Code of Civil Procedure section 1141.23*. Under that provision, it is the arbitration award itself that is "not subject to appeal." The judgment incorporating the award is appealable ( *Code Civ. Proc., § 904.1, subd. (a)(1)*), and brings before the appellate court for review all intermediate judicial rulings on independent claims that were not submitted to arbitration. Accordingly, we conclude that the judgment is appealable and brings up for appellate review the court's order denying leave to amend the complaint to assert a claim for wrongful discharge in violation of fundamental public policy.

III. AGE DISCRIMINATION IN EMPLOYMENT

(5) An action in tort seeking damages for discharge from employment in contravention of public policy is an exception to the general rule, now codified in *Labor Code section 2922*, [6] that unless otherwise agreed by the

parties, an employment is terminable at will. That exception was recognized in *Tameny v. Atlantic Richfield Co. (1980) 27 Cal.3d 167 [164 Cal.Rptr. 839, 610 P.2d 1330, 9 A.L.R.4th 314]* (*Tameny*), where the court noted that a growing number of states permitted a tort action for termination which contravenes public policy. The specific holding, however, was only that "an employer's authority over its employee does not include the right to demand that the employee commit a criminal act .... An employer engaging in such conduct violates a basic duty imposed by law upon all employers, and thus an employee who has suffered damages as a result of such discharge may maintain a tort action for wrongful discharge against the employer." ( *Id., at p. 178*.)

> 6  *Labor Code section 2922:* "An employment, having no specified term, may be terminated at the will of either party on notice to the other. Employment for a specified term means an employment for a period greater than one month."

Because the *Tameny* decision and its progeny (see *Rojo v. Kliger, supra, 52 Cal.3d 65; Foley v. Interactive Data Corp. (1988) 47 Cal.3d 654 [254 [*130] Cal.Rptr. 211, 765 P.2d 373])* did not make clear the scope of the exception to the terminable-at-will employment relationship, we addressed that question in *Gantt v. Sentry Insurance (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680]*. There the court concluded that only termination in violation of a fundamental public policy expressed in a statute or a constitutional provision will support a wrongful discharge action. ( *Id., at p. 1095*.) After reviewing the sources of public policy recognized by other states in which a wrongful termination action is permitted, we held: (1) The public policy exception to the right to terminate an employee at will must be found in either a constitutional or statutory provision; (2) "[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." ( *Id., at p. 1094*.) *Gantt* did not involve alleged discriminatory hiring and retention practices or public policy declared in the FEHA, however. Whether discrimination in employment on the basis of age violates a "fundamental" public policy has not been resolved by this court. We need not decide that question here since the "public policy" on which plaintiff relies is not applicable to defendant. He is not an "employer" subject to the age discrimination provisions of the FEHA.

**(6)** The FEHA is a statute which clearly states a public policy against discrimination on the basis of age in employment. However, the FEHA, which declares the right to employment without discrimination to be a civil right and establishes that right as public policy of this state, simultaneously limits the application of the act's enforcement provisions to employers of five or more persons. Thus, while the Legislature has made a broad statement of policy, it has not extended that policy to small employers. The FEHA gives plaintiff no remedy as defendant [**1080] [***281] does not regularly employ five or more persons.

The absence of an FEHA remedy would not negate the existence of a common law tort remedy if another law created the right on which this action is predicated. The FEHA expressly preserves rights created in other statutes, stating in *section 12993, subdivision (a)*: "The provisions of this part shall be construed liberally for the accomplishment of the purposes thereof. Nothing contained in this part shall be deemed to repeal any of the provisions of the Civil Rights Law or of any *other* law of this state relating to discrimination because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or age, unless those provisions provide less protection to the enumerated classes of persons covered under this part." (Italics added.)

Age discrimination in employment has been subject to statutory limitations since 1961, when former *section 2072* was added to the Unemployment [*131] Insurance Code as part of chapter 9.5, entitled "Employment of Older Workers." (Stats. 1961, ch. 1623, § 1, p. 3517.) That legislation also declared an age-related policy in *section 2070 of the Unemployment Insurance Code:* "It is the public policy of the State of California that manpower should be used to its fullest extent. This statement of policy compels the further conclusion that human beings seeking employment, or retention thereof, should be judged fairly and without resort to rigid and unsound rules that operate to disqualify significant portions of the population from gainful and useful employment. Accordingly, use by employers, employment agencies, and labor organizations of arbitrary and unreasonable rules which bar or terminate employment on the ground of age offend the public policy of this State." (Stats. 1961, ch. 1623, § 1, p. 3517.)

The Legislature established discrimination on the basis of age as an unlawful employment practice in 1972 when it repealed *Unemployment Insurance Code section 2072* and enacted former *section 1420.1 of the Labor Code*, a part of the Fair Employment Practices Act. (Stats. 1972, ch. 1144, § 1, p. 2211.) Former *section 1420.1 of the Labor Code* made it an unlawful employment practice "for an employer to refuse to hire or employ, or to discharge, dismiss, reduce, suspend, or demote, any individual between the ages of 40 and 64 solely on the ground of age, except in cases where the law compels or provides for such action...."

8 Cal. 4th 121, *; 876 P.2d 1074, **;
32 Cal. Rptr. 2d 275, ***; 1994 Cal. LEXIS 3947

Former *section 1420.1 of the Labor Code* and former *section 2072 of the Unemployment Insurance Code* each made it unlawful to refuse to hire or employ, or to discriminate against, persons between the ages of 40 and 64 solely on the ground of age. However, the Labor Code definition of employer limited application of the statutory provisions to employers of five or more persons. (Lab. Code, former § 1413.) Under the Unemployment Insurance Code provision the threshold had been six employees. (Unemp. Ins. Code, former § 2071, subd. (4).)

When former *section 1420.1 of the Labor Code* was adopted in 1972 as part of the Fair Employment Practices Act (Lab. Code, former § 1410 et seq.; see Stats. 1959, ch. 121, p. 1999 [the Fair Employment Practices Act]), it replaced former *section 2072 of the Unemployment Insurance Code.* Although the language of the new ban on age discrimination was substantially identical to that of the prior statute, the Legislature did not add age discrimination to the categories of discrimination declared to be violations of public policy in former *sections 1411* and *1412 of the Labor Code.*

When the FEHA was enacted the Fair Employment Practices Act, including former *section 1420.1 of the Labor Code,* was repealed. Therefore, while [*132] the Legislature declared its intent that the FEHA not repeal other state laws governing discrimination in employment, it expressly repealed the former statutory bar to age discrimination. At the time *subdivision (a) of section 12993* was enacted, although *Unemployment Insurance Code section 2070* declared arbitrary age discrimination in employment to be contrary to public policy, there was no statutory prohibition of age discrimination in employment, and there had never been one applicable to small employers.

[**1081] [***282] As the Court of Appeal recognized, and plaintiff concedes, there is presently no law of this state other than the FEHA which proscribes discrimination on the basis of age. Thus, while the FEHA is cumulative to *preexisting* common law and statutory rights ( *Rojo v. Kliger, supra, 52 Cal.3d 65, 79),* it is not so with respect to a cause of action for age discrimination in employment.

Because *Tameny* was decided while the FEHA was still undergoing the legislative process, [7] and age was included among the types of discrimination declared to be in violation of public policy under *sections 12920* and *12921* (Stats. 1980, ch. 992, § 4, pp. 3142-3143), the Legislature may have been aware when it adopted the FEHA that the court would recognize some violations of public policy in the discharge of an at-will employee as a basis for a tort action.

7    *Tameny* was decided on June 2, 1980. The FEHA, which originated as Assembly Bill No. 3165, was finally passed when the Assembly concurred in Senate amendments on August 26, 1980.

Nonetheless, the FEHA ban on discrimination in employment applies only to employers of five or more persons (*§ 12926, subd. (d)*). It seems clear, therefore, that the Legislature did not intend to make the right to be free of age discrimination by a small employer a "fundamental" public policy and to thereby subject employers who are not within the FEHA's statutory prohibitions and remedies to *Tameny*-based common law civil liability for age discrimination.

The Court of Appeal concluded that the absence of FEHA remedies for age discrimination by employers of fewer than five persons reflected only the Legislature's creation of an "arbitrary cutoff" of liability for the convenience of the administrative agency charged with responsibility for administering the FEHA remedies. As this court explained in *Robinson v. Fair Employment & Housing Com. (1992) 2 Cal.4th 226 [5 Cal.Rptr.2d 782, 825 P.2d 767],* however, that was not the sole purpose of the small employer exemption. That purpose had two aspects: "relieving the administrative body of the burden of enforcement where few job opportunities are available, *and* [*133] . . . keeping the agency out of situations in which discrimination is too subtle or too personal to make effective solutions possible." ( *Id., at p. 240,* italics added.)

The Court of Appeal also concluded that no public policy outweighed the protection against age discrimination in employment established by *section 12920,* and saw no reason to deny plaintiff a common law remedy based on the public policy expressed in the statute. Therefore, the court held, while a person covered under the act is required to exhaust FEHA remedies and may not base a claim on the policy expressed in the act, noncovered persons may base a common law cause of action on that policy. In so doing, the Court of Appeal distinguished *Strauss v. A. L. Randall Co. (1983) 144 Cal.App.3d 514 [194 Cal.Rptr. 520],* in which another court held that there is no common law cause of action for age discrimination in employment based on the FEHA statement of public policy. The employee in *Strauss,* the court reasoned, was a person covered by the FEHA and thus had a FEHA remedy while Jennings did not.

The Court of Appeal acknowledged that this court had discussed the Strauss decision at length in *Rojo v. Kliger, supra, 52 Cal.3d 65,* and had not disapproved that court's conclusion that no common law cause of action was created by the public policy statements in the

FEHA. Nonetheless, the Court of Appeal reasoned, Jennings must be allowed a remedy if the employee is a victim of the discrimination prohibited under the public policy of the state.

Defendant, who relies on the history of the FEHA explored in *Robinson v. Fair Employment & Housing Com., supra, 2 Cal.4th 226*, argues that the age discrimination ban in the FEHA does not reflect a "fundamental" public policy of the type which the court held would support a common law action in *Gantt v. Sentry Insurance, supra, 1 Cal.4th 1083*. Relying on the history of the FEHA small employer exemption [**1082] [***283] discussed in *Robinson v. Fair Employment & Housing Com., supra, 2 Cal.4th 226*, he contends that the conclusion of the Court of Appeal is contrary to the legislative intent in limiting statutory remedies for age discrimination to discrimination by persons who regularly employ five or more persons. That history included the explanation of the FEHA small employer exception offered in Tobriner, *California FEPC* (1965) 16 Hastings L.J. 333, 342: "A sense of justice and propriety led the framers to believe that individuals should be allowed to retain some small measure of the so-called freedom to discriminate; besides, they feared the political repercussions of eliminating totally an area of free choice whose infringement had been so bitterly opposed. In the second place, the framers believed that discrimination on a small scale would prove exceedingly difficult to detect and police. Third, it was believed that an employment [*134] situation in which there were less than five employees might involve a close personal relationship between employer and employees and that fair employment laws should not apply where such a relationship existed. Finally, the framers were interested primarily in attacking protracted large-scale discrimination by important employers and strong unions. Their aim was not so much to redress each discrete instance of individual discrimination as to eliminate the egregious and continued discriminatory practices of economically powerful organizations. Thus, they could afford to exempt the small employer." (Fn. omitted; see also Brennan, *State Legislation Prohibiting Discrimination in Employment Because of Age* (1967) 18 Hastings L.J. 539, 551.)

Therefore, defendant argues, the legislative intent underlying the inclusion of age in the public policy declarations in *sections 12920* and *12921* must be gleaned by reading those sections in conjunction with the definition of employer found in *section 12926*, which includes the small employer exemption and also exempts nonprofit religious associations and corporations.

Amicus curiae California Dental Association, noting these exceptions, argues that to qualify as a fundamental public policy within the meaning of *Gantt v. Sentry Insurance, supra, 1 Cal.4th 1083*, and thus support a common law cause of action, the policy must be one of universal application. That test, it argues, is supported by the reasoning of the court in *Foley v. Interactive Data Corp., supra*, where the court concluded that there was no distinct public interest at stake unless an employer violated a "fundamental duty imposed on all employers for the protection of the public interest." (*47 Cal.3d at p. 670, fn. 12*.)

Plaintiff concedes that age is not entitled to the same broad protection as are race and gender, that it does not enjoy constitutional protection, and that age-based preferences have been upheld where age is a bona fide occupational qualification or some other legitimate governmental interest warrants such treatment. She argues, however, that the limitation of FEHA remedies to employers of five or more persons does not signal approval of age-based discrimination by smaller employers. The public policy declared in *section 12920*, she claims, is not limited to employment by employers of five or more persons.

We agree with plaintiff that the public policy declared by the Legislature in *section 12920* applies to all employers. It does not follow, however, that in declaring that policy the Legislature intended to create the basis for a common law tort action and to thereby subject employers whom it expressly exempted from FEHA coverage to liability for age discrimination. That it [*135] did not is suggested by the statement in *section 12993* that the act does not repeal any *other* laws relating to discrimination. That statement reflects an intent to create new rights within the FEHA statutory scheme while leaving existing rights intact, not intent to create new common law rights.

The exemption of small employers from the statutory bar to discrimination on the basis of age, an exemption which is not based on bona fide occupational qualifications and which is not found in section 12940, distinguishes the age-related rights created by the FEHA from the fundamental rights against discrimination on other bases, rights which [**1083] [***284] predate the FEHA and have their origin in the Constitution, other statutes, or common law. We conclude therefore that, notwithstanding the inclusion of "age" in the policy and civil rights provisions of the FEHA, the Legislature did not intend by those provisions to establish age discrimination by a small employer as a new "fundamental" right for violation of which a wrongful termination action would lie.

The reasoning which supported our holding in *Gantt v. Sentry Insurance, supra, 1 Cal.4th 1083*, makes it clear that the inclusion of age in the policy statement of the FEHA alone is not sufficient to establish a "fundamental" public policy for the violation of which an employer may be held liable in a common law tort action.

8 Cal. 4th 121, *; 876 P.2d 1074, **;
32 Cal. Rptr. 2d 275, ***; 1994 Cal. LEXIS 3947

The Legislature's decision to exclude small employers from the FEHA and the omission of any other legislation barring discrimination on the basis of age precludes finding a fundamental policy that extends to age discrimination by small employers.

We explained in *Gantt* that "[a] public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, *the public policy exception presents no impediment to employers that operate within the bounds of law.* Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more stable job market, in which its most important policies are safeguarded." ( *Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1095,* italics added.)

While the FEHA includes age among the categories protected by public policy against discrimination in employment, it does not make discrimination by an employer of less than five persons unlawful. Employers of four or fewer persons are exempt under the FEHA and no other law makes discrimination on the basis of age unlawful. It would be unreasonable to expect  [*136] employers who are expressly exempted from the FEHA ban on age discrimination to nonetheless realize that they must comply with the law from which they are exempted under pain of possible tort liability. We do not ascribe such a purpose to the Legislature.

Permitting such actions is not shown to be necessary to achieve the Legislature's goal in including a limited ban on age discrimination in the FEHA. The Legislature intended of FEHA itself "to provide effective remedies which will eliminate" the discriminatory practices condemned by the act. (§ 12920.) Those practices, declared to be unlawful employment practices, are such only when engaged in by "employers," i.e., a "person regularly employing five or more persons." (§ 12926, subd. (d).)

The trial court did not err in denying Jennings's motion for leave to amend to state a common law *Tameny*-based cause of action for age discrimination. [8]

> 8    Defendant also argues that the proposed amendment of the complaint could not state a cause of action because the *Tameny* claim in fact related to pension benefits and was preempted by the Employee Retirement Income Security Act (ERISA), 29 United States Code section 10001 et seq. This argument is based on Jennings's allegation that she was fired because her age made defendant's pension plan prohibitively expensive.
>
> The Court of Appeal did not address the ERISA issue. Inasmuch as we have concluded that no common law *Tameny*-based cause of action may be stated for violation of the FEHA policy against age discrimination, we need not do so.

## IV. DISPOSITION

The judgment of the Court of Appeal is reversed and that court is directed to remand to the trial court with instructions to modify its judgment to include a dismissal of the action.

Lucas, C. J., Mosk, J., Kennard, J., Arabian, J., George, J., and Werdegar, J., concurred.

# TAB 7

LEXSEE 85 CAL.APP.4TH 245

**LEANNE JENSEN, Plaintiff and Appellant, v. WELLS FARGO BANK, Defendant and Respondent.**

**No. B134875.**

**COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT, DIVISION FOUR**

*85 Cal. App. 4th 245; 102 Cal. Rptr. 2d 55; 2000 Cal. App. LEXIS 924; 11 Am. Disabilities Cas. (BNA) 389; 2000 Cal. Daily Op. Service 9699; 2000 Daily Journal DAR 12895*

**December 5, 2000, Decided**

**NOTICE:**    [***1] Opinion certified for partial publication. *

        * Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II and III.

**SUBSEQUENT HISTORY:**    Rehearing Denied December 28, 2000.
    Review Denied March 14, 2001, Reported at: *2001 Cal. LEXIS 1629.*

**PRIOR HISTORY:**    APPEAL from a judgment of the Superior Court of Los Angeles County. Super. Ct. No. BC190801. Haley J. Fromholz, Judge.

**DISPOSITION:**    The judgment is reversed in part and affirmed in part. The matter is remanded to the trial court for further proceedings on the FEHA claim. Costs on appeal are awarded to appellant.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

    A bank manager, who suffered from posttraumatic stress disorder after she was the victim of an attempted bank robbery, brought an action against her employer for violation of the California Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*) alleging defendant's failure to reasonably accommodate her disability (*Gov. Code, § 12940, subd. (k)*), discharge in violation of public policy, breach of contract, and breach of the implied covenant of good faith and fair dealing. The trial court granted summary judgment to defendant on all of plaintiff's claims. (Superior Court of Los Angeles County, No. BC190801, Haley J. Fromholz, Judge.)

    The Court of Appeal affirmed the judgment in part, for reasons discussed in the unpublished part of the opinion, and reversed in part, remanding to the trial court for further proceedings. The court held that the trial court erred in granting summary judgment to defendant on plaintiff's FEHA claim. Posttraumatic stress disorder may meet the FEHA definition of mental disability. Given the absence of evidence on the issue of the severity of plaintiff's mental disorder, summary judgment should not have been granted on the ground she failed to show that she was disabled under FEHA. Further, if an employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith. In this case, a factual dispute existed as to each of these criteria. (Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.)

**HEADNOTES**

**CALIFORNIA        OFFICIAL        REPORTS HEADNOTES**
Classified to California Digest of Official Reports

**(1a) (1b) Civil Rights § 3--Employment--Job Discrimination--Based on Disability--Fair Employment and Housing Act--Required Showing--Reasonable Accommodation of Disability.**    --A disabled claimant

85 Cal. App. 4th 245, *; 102 Cal. Rptr. 2d 55, **;
2000 Cal. App. LEXIS 924, ***; 11 Am. Disabilities Cas. (BNA) 389

bringing suit under the California Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*) for employment discrimination (*Gov. Code, § 12940 subd. (a)*) can establish a prima facie case by proving that: (1) he or she suffers from a disability; (2) he or she is a qualified individual; and (3) he or she was subjected to an adverse employment action because of the disability. The term "qualified individual" comes from the federal Americans with Disabilities Act (ADA) (*42 U.S.C. § 12101 et seq.*). A "qualified individual" for purposes of the FEHA can be different from a "qualified individual" for purposes of the ADA. The claimant need not prove a causal connection between the disability and the adverse employment action by direct evidence. It is sufficient to show that he or she was subject to an adverse employment action and that he or she was replaced by a nondisabled person or was treated less favorably than nondisabled employees. The elements of a FEHA claim based on an employer's failure to reasonably accommodate an employee's disability (*Gov. Code, § 12940, subd. (k)*) are different. The claimant proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing position. Establishing that an adverse employment action was caused by the employee's disability is irrelevant to this type of claim. Under the express provisions of the FEHA, the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself.

**(2a) (2b) (2c) (2d) (2e) Civil Rights § 3--Employment--Job Discrimination--Based on Disability--Reasonable Accommodation of Disability--Posttraumatic Stress Disorder--Breakdown in Interactive Process.** --In an action brought by a bank manager who suffered from posttraumatic stress disorder after she was the victim of an attempted bank robbery against her employer for violation of the California Fair Employment and Housing Act (FEHA) (*Gov. Code, § 12900 et seq.*), alleging defendant's failure to reasonably accommodate her disability (*Gov. Code, § 12940, subd. (k)*), the trial court erred in granting summary judgment to defendant. Posttraumatic stress disorder may meet the FEHA definition of mental disability. Given the absence of evidence on the issue of the severity of plaintiff's mental disorder, summary judgment should not have been granted on the ground she failed to show that she was disabled under FEHA. Also, factual disputes existed as to other material facts. Although plaintiff rejected a temporary job, a temporary position is not a reasonable accommodation. Further, defendant never attempted to establish that there were no available reassignments; instead it improperly attempted to shift the entire burden of locating a suitable vacant position to plaintiff. Moreover, to the extent de-

fendant rejected plaintiff for more qualified or more senior employees, defendant failed to accord plaintiff the preferential consideration to which she was entitled. Finally, defendant did not establish there were no disputed facts concerning which party was responsible for the breakdown in the interactive process.

[See 2 Witkin, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 306.]

**(3) Civil Rights § 2--Definitions and Distinctions--Americans with Disabilities Act--Disability Based on Mistaken Perception of Impairment.** -- A person is regarded as disabled for purposes of the Americans with Disabilities Act (*42 U.S.C. § 12101 et seq.*) if: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.

**(4) Civil Rights § 3--Employment--Job Discrimination--Based on Disability--Reasonable Accommodation of Disability--Americans with Disabilities Act--Interactive Process.** --Under the Americans with Disabilities Act (ADA) (*42 U.S.C. § 12101 et seq.*), the regulatory requirement to engage in an informal, interactive process in order to attempt to identify a reasonable accommodation for a disabled employee is mandatory, and failure to do so can form an independent basis for a claim under the ADA. This obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation. For the process to work, both sides must communicate directly and exchange essential information. Neither side can delay or obstruct the process. When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to isolate the cause of the breakdown and then assign responsibility so that liability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown. An employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process. To put the entire burden for finding a reasonable accommodation on the disabled employee or to, in effect, exempt the employer from the process of identifying reasonable accommodations, conflicts with the goals of the ADA. An offer to bid on other jobs does not represent a reasonable accommodation; reassignment involves more than a mere opportunity for disabled employees to compete.

**(5) Civil Rights § 3--Employment--Job Discrimination--Based on Disability--Reasonable Accommodation of Disability--Summary Judgment.** --When a

85 Cal. App. 4th 245, *; 102 Cal. Rptr. 2d 55, **;
2000 Cal. App. LEXIS 924, ***; 11 Am. Disabilities Cas. (BNA) 389

disabled employee brings an action against his or her employer for the employer's failure to reasonably accommodate the disability (*Gov. Code, § 12940, subd. (k)*), the employer cannot prevail on summary judgment unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith.

**COUNSEL:** Duchrow & Barker and David J. Duchrow for Plaintiff and Appellant.

Fisher & Phillips, James J. McDonald, Jr., and David A. Hosilyk for Defendant and Respondent.

**JUDGES:** Opinion by Curry, J., with Epstein, Acting P. J., and Hastings, J., concurring.

**OPINION BY:** CURRY

**OPINION**

[*248] [**57] **CURRY, J.**

Respondent Wells Fargo Bank obtained summary judgment on appellant Leanne Jensen's claims for violation of the California Fair Employment and Housing Act ( *Gov. Code, § 12900 et seq.*, [***2] hereafter FEHA), discharge in violation of public policy, breach of contract, and breach of implied covenant of good faith and fair dealing. With regard to the FEHA claim, Wells Fargo persuaded the trial court (1) that the disability suffered by Jensen--posttraumatic stress disorder brought on by an attempted bank robbery--did not substantially limit her ability to participate in major life activities, and (2) that she had been reasonably accommodated, principally by being allowed to identify, from a company list of open job postings positions meeting her work restrictions and to compete for them [*249] equally against other candidates. We reverse the trial court's grant of summary judgment as it pertains to the FEHA claim and remand.

FACTUAL          AND          PROCEDURAL
BACKGROUND

Jensen began working in banking right out of high school. Her second job was with United California Bank in 1980, and she continued with that company until it merged with First Interstate Bank. She worked for First Interstate until it, in turn, merged with Wells Fargo in 1996. During her career, Jensen worked as a teller, fi-

nancial service representative, customer service representative, loan processor, assistant [***3] vice-president, and branch manager. All of her experience involved working with the public in a bank branch.

[**58] *The Bank Robbery*

On August 2, 1996, shortly after Jensen accepted a postmerger employment offer from Wells Fargo, she was the victim of an attempted robbery. As the branch manager, Jensen was the first employee to arrive at the bank that morning. Two robbers approached her as she placed her keys in the door, put a gun to her head, and ordered her to unlock the door. Once inside, she was told to disarm the alarm and open the vault and ATM (automated teller machine). When she said she did not have the combinations, the robbers repeatedly threatened to kill her, at one point tying her up, putting two guns to her head, and pulling the hammers back. After the assistant manager arrived, the robbers tried to use Jensen as bait to decoy her into coming inside. Fortunately, the assistant manager became suspicious and alerted the authorities.

During the robbery attempt, the robbers went through Jensen's purse. Finding her driver's license, they made a point of telling Jensen that they knew where she lived. When the police arrived, they arrested two people who were [***4] later tried and convicted. Jensen believes, however, that there were two others involved who have never been apprehended. After this ordeal, Jensen tried to return to her position, but found the situation too stressful. She stopped going to work in mid-August. Since that time, Jensen has received workers' compensation rehabilitation benefits and long-term disability benefits. She has not returned to work in any capacity.

*The Complaint*

On May 11, 1998, Jensen filed a complaint against Wells Fargo for violation of FEHA, discharge in violation of public policy, breach of written [*250] contract, and breach of implied covenant of good faith and fair dealing. As amended, the FEHA claim alleged that, after the robbery attempt, Jensen was diagnosed as suffering from posttraumatic stress disorder, which, according to her psychiatrist, precludes her from working in a bank branch. The complaint alleged that Jensen has psychiatric symptoms which cause her to become anxious and fearful to a disabling degree when she has to interact with men who remind her of the robbers. According to the complaint, Jensen "made [Wells Fargo] aware of her disability"; "requested accommodation for [***5] her mental disability"; "applied for numerous transfers within the company, to different positions and to different locations, in order to maintain her employment"; and "located available positions which would accommodate her disability." But Wells Fargo informed her it had no "'job available within [her] work restrictions.'" Jensen

contended that this communication represented not just a violation of FEHA, but also a discharge in violation of public policy.

In the breach of contract and breach of implied covenant claims, Jensen alleged generally that her employment was governed by a series of writings and oral representations which Wells Fargo breached. The complaint does not describe these alleged writings and oral representations with any specificity.

*Wells Fargo's Summary Judgment Motion*

Wells Fargo moved for summary judgment. In its moving papers, Wells Fargo contended that Jensen's claims for breach of contract and breach of implied covenant of good faith and fair dealing failed because Jensen was an at-will employee. Wells Fargo presented evidence of a two-page employment offer signed by Jensen in May 1996 which stated that the employment, if she accepted it, would [***6] be at will.

Wells Fargo further contended that Jensen had never actually been terminated and pointed to the lack of any evidence that a representative of the bank had ever told Jensen orally or in writing that she was discharged. The statement of undisputed facts set forth evidence to establish that a Wells Fargo vice-president of human [**59] resources, Jean Dicken-Phillips, "was assigned to work with [Jensen] to find her a suitable position within [her work] restrictions within the Wells Fargo organization." [1] The statement further said that "Wells Fargo continues to send [Jensen] postings regarding open positions within the Wells Fargo organization" and that "Wells Fargo is still willing to work with [Jensen] to locate a suitable position within the Wells Fargo organization."

> [1] Dicken-Phillips's declaration stated that she was instructed to discontinue contact with Jensen in May 1997.

[*251] Specifically with regard to the FEHA claim, Wells Fargo did not dispute that Jensen suffers [***7] from posttraumatic stress disorder or that it prevents her from returning to work as a branch manager or in a branch location. The statement of undisputed facts and the evidence supporting it contained no discussion of the nature or severity of Jensen's disorder other than to concede that it prevented her from working in a branch. Nor did Wells Fargo dispute that Jensen can work in other positions that do not involve working in a branch.

Much of the statement of facts consists of descriptions of a series of positions Jensen applied for over the years following the attempted robbery, and an explanation of why she was not selected for each position discussed. For example, paragraphs 17 and 18 of the statement of undisputed facts state: "[Jensen] applied for a

Client Services/Rep Operations Wholesale Services position" and "[Jensen] did not have the required skills for the Client Services/Rep Wholesale Services position." PARAGRAPHS 21 AND 22 PROVIDE: "On December 9, 1996, [Jensen] applied for a posted Lease Servicing Consultant position" and "The Lease Servicing Consultant job was filled by two internal candidates who were current Wells Fargo employees previously working in the [***8] same department." PARAGRAPHS 23 AND 24 PROVIDE: "On December 9, 1996, [Jensen] applied for a posted Liquidation Specialist Position" and "The supervisor, Gordon Smith, sent [Jensen] a letter on January 15, 1997, that others with qualifications more closely matched his needs."

Evidence was also presented that Jensen "refused a courtesy interview in the trust department," "told Jean Dicken-Phillips that she was afraid of sales, customers, etc., and that she needed an 'office environment' " when Dicken-Phillips attempted to interest her in a human resources opening in April 1997, and "refused a temporary research position in El Monte/Retail General Lending Operations." The statement of undisputed facts states that Dicken-Phillips "looked into" a position in the Pasadena office, but because it was above a branch and customers occasionally went upstairs, rejected it. The statement attributes the following to Jensen: "[SHE] SAID SHE COULD NOT OR WOULD NOT: 1) visit a branch office; 2) perform a sales job; 3) work in certain geographic areas, including El Monte; 4) work in a non-office environment; 5) take a job for less than she was previously earning; 6) accept a temporary position. [***9] " [2]

> [2] Dicken-Phillips stated in her declaration that Jensen's doctor reported she could not work in a branch. Jensen reportedly told Dicken-Phillips that she could not perform in any position that required her to visit a branch banking office, could not be assigned to a sales job, could not work in specific geographic areas, and did not want to speak with departmental managers regarding her skills and qualifications when there was not an actual job opening because it made her anxious and just got her hopes up. The fact that Jensen would not take a job for less than she was previously earning was supported by Jensen's response to the following question asked at her deposition: "What salary were you looking for when you began looking for an alternative job at Wells Fargo?" SHE REPLIED: "Approximately the same salary that I was receiving."

[*252] *Jensen's Opposition*

Jensen's opposition to the summary judgment motion was primarily supported by her own declaration. In

it, she stated [**60] [***10] that immediately after the robbery, she returned to work for a few partial days before she completely stopped going. In discussions with her supervisor, she asked if it would be possible for her to have an assistant, but did not receive a response. She was told on August 14 that another person would be acting as branch manager in her absence. At some point in August or September, she was told she was being replaced as branch manager, but that Wells Fargo would find an alternate branch if she wanted to come back to work. Her supervisor reportedly told her she could return to work only if she had a doctor's release which, due to her condition, was never forthcoming.

Jensen stated that once the decision was made to seek reassignment to a nonbranch position, she had difficulty obtaining the bulletin which contained Wells Fargo's open position listings and repeatedly had to call to remind someone to mail her a copy. In November 1996, she spoke with human resources manager Lynn Secrest about a posted job in client services in which she was interested. She was later informed she did not have the technical skills the job required. Secrest got her an interview for an unposted job in the cash [***11] management department. During the interview, she was told they wanted someone with cash management experience. In December 1996, she applied for the position of lease servicing consultant. She received no follow-up from anyone.

Jensen had her first contact with Dickten-Phillips in March 1997. Jensen sent Dickten-Phillips a list of six jobs she was interested in obtaining and which she felt she could handle with restrictions. No interviews resulted from that contact. In March and April, Jensen applied on her own for jobs as a customer services representative in Long Beach, a trust associate, and a loan administrator. She never received interviews for any of these positions and was never told why not. Also in April, with the assistance of Dickten-Phillips, Jensen applied for the position of compliance representative. She was later informed that that position was no longer being offered. In April, Jensen was offered a temporary job in El Monte intended to last three months, which she turned down.

In June 1997, Jensen applied, at Dickten-Phillip's suggestion, for a human resources position in El Monte with a shift that ended at 1:00 a.m. Jensen [*253] admitted she was nervous [***12] about the thought of walking through the parking lot to get to her car at that hour and was concerned about other employees becoming upset with her in that position. She later received word that she was no longer being considered for the position.

In September 1997, Jensen was assigned to a new coordinator, Susan Price. She left messages with Price

about a position she was interested in, but received no return calls. She did not hear from anyone at Wells Fargo again until after filing this lawsuit in May 1998.

Jensen denied telling anyone at Wells Fargo that she had to have a position which paid the same as branch manager, and pointed out that some of the positions she applied for paid a lower salary. She also denied refusing to interview with the trust department or refusing to work in certain geographical locations. She admitting not wanting to interact with the public or strangers in person or to go to unfamiliar locations to develop and generate sales leads.

Jensen stated that as a result of the robbery, she suffers from anxiety, nervousness, depression, lack of confidence, a helpless feeling, and a feeling of humiliation. She has headaches, grinds her teeth, and has nightmares [***13] and trouble sleeping. She also suffers panic attacks. She maintains that due to her condition, she is unable to work at any job in a bank branch location or one that involves working with the public or with cash. She stated she would prefer, but "do[es] not absolutely require," working during daylight hours, where parking is secure, where someone can accompany her to her car, and where [**61] there is a private place where she can go if she suffers a panic attack.

The trial court granted the motion for summary judgment. The court explained in its order that Wells Fargo was entitled to summary adjudication on the FEHA claim on three grounds: (1) "[Wells Fargo] offers evidence that [Jensen's] doctor released her to resume work in a capacity other than in a branch or an in-store branch [citation], showing that [Jensen's] Posttraumatic Stress Disorder ('PTSD') and depression did not substantially limit a major life activity . . ."; (2) "[Wells Fargo] offers evidence that [Jensen] is unable to perform the essential functions of her original job as a branch manager [citations] and that [Jensen] was unable to perform the essential functions of any of the alternate [***14] jobs she sought, with or without reasonable accommodation [citations]"; (3) "[Wells Fargo] offers evidence that it never told [Jensen] that her employment was terminated [citation], [Wells Fargo] continued to assist [Jensen] in searching for other jobs within [Wells Fargo's] organization [citations], and [Wells Fargo] remains willing to help [Jensen] return to work [citations]."

[*254] With regard to the other claims, the court agreed that there was no evidence to establish that Jensen had been discharged and that the agreement signed by Jensen made her an at-will employee. Appeal was taken from the judgment entered.

DISCUSSION

I. FEHA Claim

A defendant meets its burden on a motion for summary judgment or summary adjudication by proving that one or more elements of a cause of action alleged in the complaint cannot be established, or that there is a complete defense to that cause of action. ( *Molko v. Holy Spirit Assn.* (1988) 46 Cal. 3d 1092, 1107 [252 Cal. Rptr. 122, 762 P.2d 46]; see Code Civ. Proc., § 437c, [***15] subd. (o)(2).)

**(1a)** In support of its contention that Jensen was unable to establish any of the essential elements of a FEHA claim, Wells Fargo referred to the elements set forth in *Brundage v. Hahn* (1997) 57 Cal. App. 4th 228 [66 Cal. Rptr. 2d 830]. In *Brundage*, the court stated that a disabled claimant bringing suit under the FEHA "can establish a prima facie case by proving that: (1) plaintiff suffers from a disability; (2) plaintiff is a qualified individual; [3] and (3) plaintiff was subjected to an adverse employment action because of the disability. [Citation.]" ( *Id.* at p. 236, fn. omitted.) This does not mean that the plaintiff must prove a causal connection between the disability and the adverse employment action by direct evidence. The court acknowledged that the plaintiff can establish the latter element for purposes of a wrongful discharge or adverse employment action claim by showing that " 'he or she was subject to an adverse employment action' " and that " 'he or she was replaced by a non-disabled person or was treated less favorably than [***16] non-disabled employees.' [Citation.]" ( *Id.* at p. 236, fn. 1, [*255] quoting *Taylor v. Principal Financial Group, Inc.* (5th Cir. 1996) 93 F.3d 155, 162.) [4]

3   The term "qualified individual" comes from the federal Americans with Disabilities Act (42 U.S.C. § 12101 et seq., hereafter ADA) which defines "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." (*Id.*, § 12111(8).) The ADA defines "disability" to include "a physical or mental impairment that substantially limits one or more of the major life activities of such individual[.]" (*Id.*, § 12102(2)(A).) As we will see, the FEHA does not follow this definition of disability verbatim, so that a "qualified individual" for purposes of the FEHA can be different from a "qualified individual" for purposes of the ADA.

4   This is in line with United States Supreme Court authority holding that a member of a protected group establishes a prima facie case for employment discrimination for failure to hire by presenting evidence that, despite possessing the requisite qualifications, he or she was rejected, and that, after that rejection, the position re-

mained open and the employer continued to seek applicants from persons with complainant's qualifications. ( *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802 [93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668].) In *Mixon v. Fair Employment & Housing Com.* (1987) 192 Cal. App. 3d 1306 [237 Cal. Rptr. 884], the court held that a prima facie case for discriminatory discharge is established through evidence of the following: "(1) complainant belongs to a protected class; (2) his job performance was satisfactory; (3) he was discharged; and (4) others not in the protected class were retained in similar jobs, and/or his job was filled by an individual of comparable qualifications not in the protected class." ( *Id.* at p. 1318; accord, *Caldwell v. Paramount Unified School Dist.* (1995) 41 Cal. App. 4th 189, 197 [48 Cal. Rptr. 2d 448].)

[***17] The plaintiff in *Brundage*, a woman suffering from manic depression, was allegedly [**62] terminated for failing to come back to work after taking leave and being absent without permission or explanation. The primary issue in *Brundage* was whether the employer's asserted basis for termination was pretextual. The claim in *Brundage* thus arose under Government Code section 12940, subdivision (a), which provides that it is an unlawful employment practice "[f]or an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." The employer established that it had no knowledge of the plaintiff's disability prior to the termination, and prevailed on summary judgment.

The elements set forth [***18] in *Brundage* apply to a Government Code section 12940, subdivision (a) employment discrimination case, where an employee or prospective employee who is fully qualified and able to perform the functions of a particular position is terminated from the position or not hired for it in the first place, and the suspected reason is the employee's membership in one of the listed classifications. In that situation, the courts agree that it is the plaintiff's responsibility to prove that he or she is a member of a protected class set forth in FEHA (such as a person with a disability); that he or she is qualified to perform the duties of the position (with or without reasonable accommodation in the case of a disability claim); and that he or she was subject to adverse employment action or not hired be-

cause of the disability or membership in another class described in FEHA. (See, e.g., [*256] *Deschene v. Pinole Point Steel Co.* (1999) 76 Cal. App. 4th 33, 44 [90 Cal. Rptr. 2d 15] [employee with diabetes and heart condition terminated after incidents of insubordination]; *Pensigner v. Bowsmith, Inc.* (1998) 60 Cal. App. 4th 709, 719 [70 Cal. Rptr. 2d 531] [***19] [employee with developmental reading disorder terminated from position as sales representative after refusing to take reading evaluation tests].)

**(2a)**

Jensen's claim is different. Her claim falls under Government Code section 12940, subdivision (k), which makes it an unlawful employment practice "[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an . . . employee." Since her ordeal, Jensen has concededly been unable to perform the usual functions of branch manager, the position for which she was qualified and in which she was employed until August 1996. The question here is whether Wells Fargo failed to reasonably accommodate her in accordance with subdivision (k); specifically, whether Wells Fargo failed to accommodate her by "reassignment to a vacant position," one of the methods of "reasonable accommodation" specified in the statutory definition, Government [**63] Code section 12926, subdivision (n)(2). [5]

> 5  Government Code section 12926, subdivision (n) provides: " 'Reasonable accommodation' may include either of the following: [P] (1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities. [P] (2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities."

**[***20]  (1b)**

The elements of a failure to accommodate claim are similar to the elements of a *Government Code section 12940, subdivision (a)* discrimination claim, but there are important differences. The plaintiff must, in both cases, establish that he or she suffers from a disability covered by FEHA and that he or she is a qualified individual. For purposes of a section 12940, subdivision (k) claim, the plaintiff proves he or she is a qualified individual by establishing that he or she can perform the essential functions of the position to which reassignment is sought, rather than the essential functions of the existing posi-

tion. (See, e.g., *Smith v. Midland Brake, Inc.* (10th Cir. 1999) 180 F.3d 1154, 1161-1162; *AKA v. Washington Hosp. Center* (D.C. Cir. 1998) 156 F.3d 1284, 1300-1301 [332 App.D.C. 256].) More significantly, the third element discussed in *Brundage*--establishing that an "adverse employment action" was caused by the employee's disability--is irrelevant to this type of claim. Under the express provisions of the FEHA, [***21] the employer's failure to reasonably accommodate a disabled individual is a violation of the statute in and of itself. ( Gov. Code, § 12940, subd. (k).) With these differences in mind, we turn to the evidence set forth in the summary [*257] judgment motion to test whether Wells Fargo succeeded in negating an essential element of Jensen's FEHA claim.

*A. Existence of Disability*

**(2b)** Wells Fargo first sought to persuade the court that Jensen's condition--posttraumatic stress disorder--did not meet the statutory definition of disability as a matter of law. Wells Fargo relied on *Muller v. Automobile Club of So. California* (1998) 61 Cal. App. 4th 431 [71 Cal. Rptr. 2d 573], which held that a mental disorder does not meet the FEHA definition of disability unless it "substantially limits a major life activity." ( *Id. at p. 443*, fn. omitted.) The court reached this conclusion by borrowing from the statute's definition of *physical* disability, which states that a physical condition does not qualify as a disability unless it " '[l]imits an individual's ability to participate in major life activities.' " ( *Id. at p. 440*, [***22] quoting *Gov. Code, § 12926, subd. (k)(1)(B)*.) The court recognized that the FEHA definition of mental disability did not contain that phrase or anything like it, but concluded it was a "legislative oversight." (*Muller, at p. 443, fn. 6.*) The court in *Muller* imported part of its definition from the ADA, which states that the disability must "*substantially* limit[] one or more of the major life activities . . . ." (*42 U.S.C. § 12102(2)(A)*, italics added; see *Muller, at p. 440*.) Subdivision (k)(1)(B) of section 12926 of the Government Code, the definitional provision for FEHA, states that physical disability includes a disease, disorder, condition, etc., that "[l]imits an individual's ability to participate in major life activities." The term "substantially" does not appear. The court disagreed with a contrary holding in *Pensinger v. Bowsmith, Inc.*, *supra*, 60 Cal. App. 4th 709, in which the court, finding no ambiguity, declined to look beyond the plain language of the statute. ( [***23] *Muller*, at p. 443, fn. 6.)

Recently, this court expressed its agreement with *Pensinger* and disagreement with *Muller* in *Swenson v. County of Los Angeles* ' (Cal. App.). [**64] Our decision in that case is currently on review before the Supreme Court. Until the Supreme Court expresses a contrary decision, we shall continue to adhere to our conclusion that the plain meaning of the language used in the

85 Cal. App. 4th 245, *; 102 Cal. Rptr. 2d 55, **;
2000 Cal. App. LEXIS 924, ***; 11 Am. Disabilities Cas. (BNA) 389

FEHA's definition of mental disability, and the absence of any potential absurd result from following the plain language, require us to follow the Legislature's language and give a broader meaning to mental disability than to physical disability.

> * Reporter's Note: Review granted January 13, 2000 (S083916). On January 24, 2001, review dismissed and cause remanded to Court of Appeal, Second Appellate District, Division Four.

We are further persuaded of the erroneousness of the decision in *Muller* by a recent amendment to the FEHA signed by the Governor on September 30, [*258] 2000. [***24] (See Stats. 2000, ch. 1049.) The Legislature added a new Government Code section 12926.1, which contains its findings and declarations. Section 12926.1, subdivision (c), explains: "[T]he Legislature has determined that the definitions of 'physical disability' and 'mental disability' under the law of this state require a 'limitation' upon a major life activity, but do not require, as does the Americans with Disabilities Act of 1990, a 'substantial limitation.' This distinction is intended to result in broader coverage under the law of this state than under that federal act." (Stats. 2000, ch. 1049, § 6.) The new provision goes on to state: "[U]nder the law of this state, 'working' is a major life activity, regardless of whether the actual or perceived working limitation implicates a particular employment or a class or broad range of employments. [P] . . . Notwithstanding any interpretation of law in Cassista v. Community Foods (1993) 5 Cal. 4th 1050 [22 Cal. Rptr. 2d 287, 856 P.2d 1143] [which held that federal interpretations of the ADA were [***25] useful guides to the construction of the FEHA], the Legislature intends (1) for state law to be independent of the Americans with Disabilities Act of 1990, (2) to require a 'limitation' rather than a 'substantial limitation' of a major life activity . . . ." (Stats. 2000, ch. 1049, § 6; Gov. Code, § 12926.1, subds. (c) & (d).) Assuming this represents a legislative attempt to clarify the existing statute, it would apply to cases which predate its passage. (See *Western Security Bank v. Superior Court* (1997) 15 Cal. 4th 232, 243-244 [62 Cal. Rptr. 2d 243, 933 P.2d 507] [" ' "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute." ' " (Quoting *RN Review for Nurses, Inc. v. State of California* (1994) 23 Cal. App. 4th 120, 125 [28 Cal. Rptr. 2d 354], fn. omitted.)]

Moreover, even were we to agree with Wells Fargo that [***26] the definition of mental disability should be limited as stated in *Muller* and the ADA, Wells Fargo failed to meet its burden as a defendant moving for

summary judgment in establishing that Jensen's disability was insufficient to limit her ability to substantially participate in major life activities. The court in *Muller* did not hold that posttraumatic stress disorder cannot, as a matter of law, meet that test. It merely held that where a federal district court, after "carefully review[ing]" the evidence, concluded that plaintiff's psychological impairment " 'was of limited duration and did not substantially limit a major life activity' " in connection with a claim brought under the ADA, that finding collaterally estopped her from raising the same issue in front of the state court. ( *Muller v. Automobile Club of So. California, supra,* 61 Cal. App. 4th at p. 443.) Federal courts that utilize the more restrictive definition of mental disability advocated by Wells Fargo, have held that plaintiffs suffering from cases of posttraumatic stress disorder may be able [*259] [***27] to state a claim under the ADA depending on the severity of the disorder. (See, e.g., *Paleologos v. Rehab Consultants, Inc.* (N.D.Ga. 1998) 990 F. Supp. 1460, 1464; *Sherback v. Wright Automotive Group* (W.D.Pa. 1997) 987 F. Supp. 433, 436.) [**65] Wells Fargo presented no evidence in its moving papers concerning Jensen's disability or how it impacted her daily life. Reviewing the statement of undisputed facts and the evidence presented in support of the motion, we learn nothing about the severity of her mental condition other than that it prevents her from working at a branch with the public and with money but does not preclude her from working in a position which does not include those factors. Jensen stated in her declaration that she suffers from anxiety, nervousness, depression, lack of confidence, a helpless feeling, a feeling of humiliation, headaches, teeth grinding, nightmares, sleeplessness, and panic attacks. On these facts, we cannot say that the stress disorder does not meet the definition of disability even were we to apply the stricter ADA test.

The trial court pointed to the fact that Jensen's doctor released her to resume work in [***28] a capacity other than in a branch as proof that Jensen's disorder did not substantially limit a major life activity. But if the ability to work in some capacity were the test of covered disability, then no disabled person could ever state a FEHA claim based on failure to accommodate. Given the absence of evidence on the issue of the severity of Jensen's mental disorder, summary judgment should not have been granted on this ground.

### B. *Regarded as Disabled*

Jensen alternatively contends that her claim should go forward whether or not her disability meets the statutory definition because she was "regarded as disabled" by Wells Fargo when it engaged in efforts to accommodate her. The relevant FEHA definition of an individual regarded as disabled applies only to those who suffer cer-

tain specified physical disabilities or those who have a condition with "no present disabling effect" but which "may become a physical disability . . . ." ( Gov. Code, § 12926, subd. (k)(3) & (4).) Since Jensen obviously does not meet that definition, she asks us to engraft provisions of the ADA, contending that the Legislature would want the courts to "incorporate[] any provision [***29] of the ADA that would result in broader protection of the civil rights of persons with a mental [or] physical disability." As we have said, we do not believe the Legislature intends for us to disregard express definitions in the FEHA which differ from those found in the ADA. In any event, Jensen does not state a claim under the ADA.

(3) As this court recently recognized in *Real v. City of Compton (1999) 73* [*260] *Cal. App. 4th 1407 [87 Cal. Rptr. 2d 531]:* "A person is 'regarded as' disabled [for purposes of the ADA] if: '(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities.' [Citation.]" ( *Id.* at p. 1416, quoting *Sutton v. United Air Lines, Inc.* (1999) 527 U.S. 471, 489 [119 S. Ct. 2139, 2149-2150, 144 L. Ed. 2d 450].) **(2c)**

Wells Fargo may well regard Jensen as disabled, since she has repeatedly insisted she [***30] is. But regarding an employee as disabled, without more, does not give rise to an employment discrimination claim. As we also said in *Real,* " 'An employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity.' [Citation.]" ( *Real v. City of Compton, supra,* at p. 1416, quoting *Sutton v. United Air Lines, Inc., supra,* at p. 490.)

Wells Fargo made no employment decision adverse to Jensen based on any perceived disability. It merely attempted to accommodate her after her request. That is not a basis for liability under the regarded as disabled standard.

*C. Reasonable Accommodation*

Wells Fargo sought to establish, through undisputed facts, that it did everything [**66] it was required to do under the statute to reasonably accommodate Jensen. Wells Fargo believes it supported this by proving that "[Jensen] was not qualified to continue performing her job or the jobs *she sought*." (Italics added.) This represents [***31] a misunderstanding of both its responsibility as an employer faced with a disabled employee's request for reassignment and its burden as a party moving for summary judgment.

Both of these issues--an employer's obligation once an employee has brought to its attention his or her inability to perform a particular job function due to a covered disability and the burden of proof on an employer moving for summary judgment on a claim of failure to reasonably accommodate a disabled employee--were recently discussed in an in bank decision of the Ninth Circuit in *Barnett v. U.S. Air, Inc.* (9th Cir. 2000) 228 F.3d 1105. The employee in *Barnett*, a warehouse worker, had seriously injured his back and sought accommodation either through purchase of special lifting equipment or reassignment to office work. The employer initially assigned the employee to the mail room after his injury, but then informed [*261] him that other workers with greater seniority were going to be transferred to the mail room positions, and placed him on job injury leave. Later, after filing formal charges of discrimination with the Equal Employment Opportunity Commission (EEOC), the employee received [***32] a letter informing him that he could bid for any job within the company which fit his restrictions. The employee brought suit for failure to reasonably accommodate and failure to engage in an interactive process with the goal of finding a reasonable accommodation. The district court granted summary judgment in favor of the employer.

(4) The primary issue in *Barnett* was whether the regulatory requirement to engage in an informal, interactive process in order to attempt to identify a reasonable accommodation was mandatory, and whether failure to do so could form an independent basis for a claim under the ADA. The court held that "the interactive process is a mandatory rather than a permissive obligation on the part of employers under the ADA and that this obligation is triggered by an employee or an employee's representative giving notice of the employee's disability and the desire for accommodation." ( *Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1114.) The Ninth Circuit explained that [***33] "[t]he interactive process requires communication and good-faith exploration of possible accommodation between employers and individual employees" with the goal of "identify[ing] an accommodation that allows the employee to perform the job effectively." (*Ibid.*) The court noted that for the process to work "[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process." ( *Id.* at pp. 1114-1115, fn. omitted.) When a claim is brought for failure to reasonably accommodate the claimant's disability, the trial court's ultimate obligation is to " 'isolate the cause of the breakdown . . . and then assign responsibility' so that '[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown.' [Citation.]" ( *Id.* at p. 1115, quoting *Beck v. University of Wis. Bd. of Regents* (7th Cir. 1996) 75 F.3d 1130, 1135-1137.) The court concluded that "an employer cannot prevail at

the summary judgment stage if there is [***34] a genuine dispute as to whether the employer engaged in good faith in the interactive process." ( *Barnett v. U.S. Air, Inc., supra*, 228 F.3d at p. 1116, fn. omitted.)

The employer in *Barnett* argued that the employee should bear the burden of demonstrating the availability of a reasonable accommodation. The court disagreed: "To put the entire burden for finding a reasonable accommodation on the disabled employee or, effectively, to exempt the employer from the process of identifying reasonable accommodations, conflicts with [**67] the goals of the ADA. The interactive process is at the heart of the ADA's process and essential to accomplishing its goals. It is the primary vehicle for identifying [*262] and achieving effective adjustments which allow disabled employees to continue working without placing an 'undue burden' on employers. Employees do not have at their disposal [***35] the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has." ( *Barnett v. U.S. Air, Inc., supra*, 228 F.3d at p. 1113.)

The court in *Barnett* was unimpressed with the employer's purported attempt to accommodate by "offer[ing] that [the employee] could apply for any position for which he was qualified given his restrictions and for which he had sufficient seniority." ( *Barnett v. U.S. Air, Inc., supra*, 228 F.3d at p. 1117.) The court specifically held that an offer to bid on other jobs, "a right [the employee] already had," did not represent a reasonable accommodation. (*Ibid.*) "[R]eassignment involves more than a mere opportunity for disabled employees to compete[.]" ( *Id.* at p. 1118.) Nor did the court accept the employer's contention that reassignment to the [***36] mail room was not an option since it would have required it to make an exception to its seniority policy. Quoting EEOC guidelines, the court concluded that " 'Reassignment means that the employee gets the vacant position if s/he is qualified for it. Otherwise, reassignment would be of little value and would not be implemented as Congress intended.' " (*Ibid.*; accord, *Smith v. Midland Brake, Inc., supra*, 180 F.3d at pp. 1164-1165 ["[I]f the reassignment language merely requires employers to consider on an equal basis with all other applicants an otherwise qualified existing employee with a disability for reassignment to a vacant position, that language would add nothing to the obligation not to discriminate, and would thereby be redundant."]; *AKA v. Washington Hosp. Center, supra*, 156 F.3d at p. 1304 ["[T]he word 'reassign' must mean more than allowing an employee to apply for a job on the same basis as anyone

else. An employee who on his own initiative applies for and obtains a job elsewhere in the enterprise would not be described as having been [***37] 'reassigned'; the core word 'assign' implies some active effort on the part of the employer." (Fn. omitted.)].)

**(2d)**

We recognize that the term "informal, interactive process" is a term utilized by the EEOC in promulgating regulations under the ADA (see *29 C.F.R. § 1630.2(o)(3) (2000)*), and that the regulations promulgated under the version of FEHA in effect at the time relevant to the present case do not contain that terminology. (See *Cal. Code Regs., tit. 2, § 7293.9 et seq.* [6]) **(5)**

Without deciding whether all of the details of the reasonable accommodation process described in the federal regulations apply to claims made [*263] under the FEHA or whether a separate claim exists for failure to engage in the interactive [**68] process in good faith, [7] we agree that, assuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's [***38] organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith. **(2e)**

Reviewing the evidence presented in support of and in opposition to summary judgment, it is evident that a factual dispute exists as to whether Jensen was offered a reasonable accommodation, whether there was any open position within the Wells Fargo organization which could have accommodated her qualifications and limitations, or whether the informal process broke down, and, if so, which party was responsible.

6  *Section 7293.9 of title 2 of the California Code of Regulations* requires that: "Any employer or other covered entity shall make reasonable accommodation to the disability of any individual with a disability if the employer or other covered entity knows of the disability, unless the employer or other covered entity can demonstrate that the accommodation would impose an undue hardship." The Code of Regulations gives the following examples of reasonable accommodation: "Reasonable accommodation may, but does not necessarily, include, nor is it limited to, such measures as: [P] (1) Accessibility. Making exist-

ing facilities used by employees readily accessible to and usable by individuals with disabilities; [P] (2) Job Restructuring. Job restructuring, reassignment to a vacant position, part-time or modified work schedules, acquisition or modification of equipment or devices, adjustment or modification of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar actions." (*Ibid.*)

[***39]
    7    Wells Fargo does not dispute its obligation to undertake a " 'reasonable effort' to determine an appropriate accommodation, via 'a flexible, interactive process' involving the employer and the disabled employee . . . ." In the recent amendments to FEHA previously discussed, the Legislature expressly "affirm[ed] the importance of the interactive process between the applicant or employee and the employer in determining a reasonable accommodation, as this requirement has been articulated by the Equal Employment Opportunity Commission in its interpretive guidance of the Americans with Disabilities Act of 1990." (Stats. 2000, ch. 1049, § 6; *Gov. Code, § 12926.1.*)

    First, the evidence established that Jensen was put on unpaid leave while she collected workers' compensation and long-term disability. Her job was left open for only a short period, but she was told that Wells Fargo would find her a position as branch manager in another location whenever she was ready to come back. Holding a job open for a disabled employee who needs time to recuperate or heal is in itself [***40] a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future. (See, e.g., *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal. App. 4th 215, 226 [87 Cal. Rptr. 2d 487].) It is undisputed, however, that both parties [*264] understood early on that Jensen was unlikely ever to be able to return to branch work. At that point, the focus turned to reassignment to a nonbranch position as the accommodation sought by both sides.

    As to whether a reasonable accommodation was ever offered, Dicken-Phillips discussed with Jensen a temporary job and a night job, both situated in El Monte. Jensen was offered the temporary job, and does not dispute that she rejected it. A temporary position is not, however, a reasonable accommodation. It represents, like unpaid leave, a way to put a disabled employee on hold while the attempt to locate a permanent position is ongoing. (See *Champ v. Baltimore County (D.Md. 1995) 884 F. Supp. 991, 999-1000;* [***41] *Nguyen v. IBP, Inc. (D.Kan. 1995) 905 F. Supp. 1471, 1485-1486.*) As far as

the permanent position in El Monte was concerned, Jensen made clear in her declaration it was never offered. It cannot, therefore, support summary judgment on the basis that Jensen was offered a reasonable accommodation which she refused.

    Turning to the question of whether there was an available reassignment, Wells Fargo never attempted to definitively establish that there were no positions within its organization which met Jensen's qualifications and restrictions. Instead, it presented evidence through declarations of its supervisory personnel that, with regard to the positions Jensen located and applied for on her own, she either lacked the required skills or lacked some of the preferred qualifications and that the positions [**69] went to others who were better qualified. [8] This begs the question of whether there were other vacant positions within the Wells Fargo organizational structure of which she was unaware or unknowledgeable which might have met her limitations and [*265] qualifications. [9] It also represents an improper attempt to shift the entire burden of locating a [***42] suitable vacant position to the disabled employee. As the Ninth Circuit said in *Barnett*: "Employees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. Putting the entire burden on the employee to identify a reasonable accommodation risks shutting out many workers simply because they do not have the superior knowledge of the workplace that the employer has." ( *Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1113.)

    8    For the client services representative position, she reputedly lacked "advanced knowledge of Window 3.1/95 and computer hardware"; for the lease services consultant position which was filled "by two internal candidates who were current Wells Fargo employees previously working in the same department," she reputedly lacked "PC/Windows and Kelly Blue Book experience"; for the liquidation specialist position which was filled by "others with qualification more closely matched [to the position's] needs," she reputedly lacked "basic PC, advanced typing and data entry skills"; and for a position in human resources, she reputedly lacked "extensive prior experience in workers compensation . . . ." With regard to positions applied for in loan administration and compliance representative, Wells Fargo submitted excerpts from Jensen's deposition in which she admitted she did not have experience in preparing loan documents and closing of construction and real estate loans or in handling trust regulatory reporting. With regard to a customer service representative position, the supervisor's declaration stated, "While Ms. Jensen did have some of the

required skills, she was not hired because she did not have the preferred skills [of] Investment Experience and a College Degree." The position was given "to two people who had college degrees, with the relevant investment experience and who had the additional positive quality of being bilingual."

[***43]

9  Wells Fargo's own moving papers indicate that there was a position in the Pasadena office which Jensen might have been able to fill, but Dicken-Phillips looked into it and decided against it without consulting Jensen based on Dicken-Phillips's understanding of Jensen's limitations.

Moreover, to the extent Wells Fargo rejected Jensen for positions for which she was qualified because it had applicants who were more qualified or had seniority, it overlooks that when reassignment of an existing employee is the issue, the disabled employee is entitled to preferential consideration. ( *Barnett v. U.S. Air, Inc., supra,* 228 F.3d at p. 1107; *Smith v. Midland Brake, Inc., supra,* 180 F.3d at pp. 1164-1165; *AKA v. Washington Hosp. Center, supra,* 156 F.3d at p. 1304.) Having failed to establish unequivocally that Jensen was unqualified for any vacant position within the organization, summary judgment was inappropriate on this ground.

Finally we look at [***44] the facts with regard to whether the breakdown in the informal, interactive process was due to Jensen or Wells Fargo. Wells Fargo contends that it provided "individual attention and assistance in an ongoing job search . . . ." The evidence established that prior to the assignment of the matter to Dicken-Phillips in March 1997, Jensen received some informal assistance from Human Resources Manager Lynn Secrest. [10] Jensen's declaration makes clear that she was expected to identify possible reassignments from Wells Fargo's job listings on her own, and that the company liaisons made little effort [**70] to identify which, if any, of the vacant positions met her limitations and qualifications or could be altered to accommodate her. Secrest obtained one interview, for an unposted vacancy in the cash management department, which Jensen was not offered. [11]

10  Wells Fargo refers in its brief to a third "return to work coordinator," Susan Price. Price was not mentioned in the moving papers, and there was no evidence presented to the trial court concerning the efforts undertaken by Price to assist Jensen in locating a suitable reassignment. Jensen stated in her declaration that she attempted to contact Price several times after receiving notice that her case had been assigned to Price, and

never received a return call. We will, therefore, ignore Price for purposes of our analysis.

[***45]

11  In a declaration filed in support of the summary judgment motion, Beverly Turner, one of the people who interviewed Jensen for this position, stated: "This position requiredintermediate computer knowledge and skills as well as a knowledge of the products and services. We did not accept Ms. Jensen for the position because 1) she did not have the technical computer knowledge and skills required for this job nor the product knowledge; and 2) there were other candidates who were clearly more qualified for the position given their background."

Evidence was presented which suggested that Jensen was not fully cooperating with efforts to place her. Although the only actual restrictions clearly [*266] identified by the doctors revolved around working in a bank branch, working with the public, and working with money, Dicken-Phillips reported that Jensen kept adding to the list: she could not visit a branch for any period of time, she could not work in sales, she could not work in specific geographic areas, she could not work with strangers, she could not work with or around people who reminded [***46] her of the perpetrators, etc. In addition, Dicken-Phillips asserted that Jensen refused to talk to departmental managers regarding her skills and qualifications prior to the existence of an actual opening because "it made her anxious and just got her hopes up."

Jensen admits that she made at least some of these restrictions known to Dickten-Phillips, although she now identifies them as "preferences." This seems to us a distinction without a difference. If these conditions were brought up during the informal, interactive process in which Wells Fargo was engaged in a dialogue in an attempt to identify a suitable reassignment, then Wells Fargo was entitled to consider them restrictions and take them into account in determining whether a suitable opening existed. It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the present opportunity with a concise list of restrictions which must be met to accommodate the employee. As *Barnett* makes clear, it is the responsibility of both sides to keep communications [***47] open and neither side has a right to obstruct the process. Jensen could not legitimately refuse to talk to Wells Fargo personnel who were ready to offer assistance in identifying and locating a suitable position whether or not they had a particular opening in mind. For purposes of summary judgment, however, the important point is that Jensen denied including on her list many of the restrictions remembered by Dickten-Phillips and denied that she refused to talk to anyone at Wells Fargo.

85 Cal. App. 4th 245, *; 102 Cal. Rptr. 2d 55, **;
2000 Cal. App. LEXIS 924, ***; 11 Am. Disabilities Cas. (BNA) 389

On these conflicting and equivocal facts, it cannot be said that Wells Fargo met its burden of establishing the absence of a triable issue of material fact with respect to reasonable accommodation or that Jensen was responsible for the breakdown in the informal, interactive process. It is possible that Jensen was not acting in good faith by adding to her list of restrictions for the purpose of discouraging job offers, or that her list of restrictions was unworkable and that she was simply unqualified for any opening at the bank [*267] during the period after the robbery which met her restrictions and qualifications. [12] But Wells Fargo did not establish that there were no disputed facts concerning [***48] these points, and, as the moving party, [**71] failed to meet its burden to establish a right to summary judgment on the FEHA claim.

12  For example, Jensen stated that she panicked when she happened to see an African-American computer repairman because he reminded her of the robbers and that she is susceptible to panic attacks whenever she is around African-Americans who remind her of her attackers. An employer is

not required to potentially offend other members of its staff in order to accommodate an irrational fear.

II, III [*]

    [*]  See footnote, *ante*, page. 245.

. . . .

DISPOSITION

The judgment is reversed in part and affirmed in part. The matter is remanded to the trial court for further proceedings on the FEHA claim. Costs on appeal are awarded to appellant.

Epstein, Acting P. J., and Hastings, J., concurred.

[***49] A petition for a rehearing was denied December 28, 2000, and respondent's petition for review by the Supreme Court was denied March 14, 2001. Baxter, J., did not participate therein. Chin, J., and Brown, J., were of the opinion that the petition should be granted.

# TAB 8

LEXSEE 52 CAL.3D 40

**PERALTA COMMUNITY COLLEGE DISTRICT, Plaintiff and Respondent, v.
FAIR EMPLOYMENT AND HOUSING COMMISSION, Defendant and Appellant;
ROSE BROWN, Real Party in Interest and Respondent**

**No. S009487**

**Supreme Court of California**

*52 Cal. 3d 40; 801 P.2d 357; 276 Cal. Rptr. 114; 1990 Cal. LEXIS 5488; 54 Fair Empl.
Prac. Cas. (BNA) 1239; 55 Empl. Prac. Dec. (CCH) P40,481; 90 Cal. Daily Op. Service
9234; 90 Daily Journal DAR 14566*

**December 20, 1990**

**PRIOR HISTORY:**
   Superior Court of Alameda County, No. 573674-4,
Donald P. McCullum, Judge.

**DISPOSITION:**   The judgment of the Court of Appeal
is reversed with directions to affirm the trial court's
judgment.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

   After finding that a temporary employee of a com-
munity college district suffered sexual harassment on the
job, the Fair Employment and Housing Commission
awarded her out-of-pocket expenses and compensatory
damages for injury to her dignity and esteem, and for
humiliation, embarrassment, emotional pain and distress.
The district petitioned the superior court for a writ of
administrative mandamus. The superior court denied the
petition as to the commission's findings of sexual har-
assment, but ordered stricken that part of the decision
awarding the employee compensatory damages, on the
ground that such damages are not within the commis-
sion's authority. (Superior Court of Alameda County, No.
573674-4, Donald P. McCullum, Judge.) The Court of
Appeal, First Dist., Div. Two, No. A025369, reversed,
finding that the commission was authorized by the Fair
Employment and Housing Act (*Gov. Code, § 12900 et
seq.*) to award compensatory damages.

   The Supreme Court reversed the judgment of the
Court of Appeal with directions to affirm the trial court's
judgment. The court held that the commission exceeded
its authority in awarding the employee compensatory
damages. In view of the language and purpose of *Gov.*

*Code, § 12900 et seq.*, the failure of *Gov. Code, § 12970*,
expressly to authorize an award of general compensatory
damages, the existence in other civil rights statutes of
express authorization for such awards, the unlikelihood
of a legislative grant by implication of unbridled power
to an administrative agency to make monetary awards
without guidelines or limitations, cases from other states
and relevant federal precedent, the court held that the
commission lacks the statutory authority to award com-
pensatory damages. (Opinion by Panelli, J., with Lucas,
C. J., Mosk, Eagleson and Arabian, JJ., concurring.
Separate dissenting opinion by Broussard, J., with Ken-
nard, J., concurring.)

**HEADNOTES**

**CALIFORNIA          OFFICIAL          REPORTS
HEADNOTES**
Classified to California Digest of Official Reports, 3d
Series

**(1) Civil Rights § 8--Actions--Damages--Fair Em-
ployment and Housing Act.** --In a private action under
the Fair Employment and Housing Act ( *Gov. Code, §
12900 et seq.*), the superior court may award compensa-
tory and punitive damages.

**(2) Civil Rights § 3--Employment--Compensability of
Emotional Distress.** --Employment discrimination, in-
cluding sexual harassment, can cause emotional distress.
Emotional distress in this context refers to the full gamut
of intangible mental suffering, including not only physi-
cal pain, but also fright, nervousness, grief, anxiety,
worry, mortification, shock, humiliation, indignity, em-
barrassment, apprehension, terror or ordeal. Such distress
is a compensable injury under traditional theories of tort

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

law, and courts in appropriate cases may award an injured employee who successfully asserts a statutory cause of action both punitive and compensatory damages.

**(3a) (3b) (3c) (3d) (3e) Civil Rights § 8--Actions--Damages--Fair Employment and Housing Act--Authority of Commission to Award Compensatory Damages.** --The Fair Employment and Housing Commission exceeded its authority in awarding compensatory damages to a community college district temporary employee who had suffered employment discrimination in the form of sexual harassment, for damage to her dignity and esteem, and for humiliation, embarrassment, emotional pain and distress. In view of the language and purpose of the Fair Employment and Housing Act ( *Gov. Code, § 12900 et seq.*), the failure of *Gov. Code, § 12970*, expressly to authorize an award of general compensatory damages, the existence in other civil rights statutes of express authorization for such awards, the unlikelihood of a legislative grant by implication of unbridled power to an administrative agency to make monetary awards without guidelines or limitations, cases from other states and relevant federal precedent, the commission lacks the statutory authority to award compensatory damages. An employee who seeks such damages must pursue his or her judicial remedies in a court action.

[See 8 **Witkin**, Summary of Cal. Law (9th ed. 1988) Constitutional Law, § 768.]

**(4) Statutes § 34--Construction--Language--Words and Phrases--Ejusdem Generis (General Limited by Specific).** --The doctrine of *ejusdem generis* states that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would have not mentioned the particular things or classes of things, which would in that event become mere surplusage.

**(5) Statutes § 20--Construction--Judicial Function--Clear Legislative Intent.** --Where the Legislature has demonstrated the ability to make its intent clear, it is not the province of the court to imply an intent left unexpressed.

**(6) Statutes § 39--Construction--Giving Effect to Statute--Conformation of Parts.** --Statutes must be harmonized, both internally and with each other, to the extent possible. Interpretive constructions that render some words surplusage are to be avoided.

**(7) Statutes § 42--Construction--Aids--Declaration by Later Legislature.** --The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law. This is especially true when such declared intent is without objective support in either the language or history of the legislation and is contrary as well to the practice of the affected agency.

**(8) Civil Rights § 3--Employment--Fair Employment and Housing Act--Purpose of Alternative Forms of Redress.** --A primary purpose of the alternative systems of redress for employment discrimination under the Fair Employment and Housing Act ( *Gov. Code, § 12900 et seq.*) is to permit efficient and prompt administrative disposition--without cost to the victim--of claims that are amenable to conciliation or to corrective equitable remedies, and thus do not warrant a full-scale judicial proceeding with its attendant expense and delay, while reserving to the judicial system, with its attendant constitutional and statutory safeguards, those statutory claims that seek significant non-quantifiable monetary recompense or that the complainant wishes to join with non-statutory causes of action. Another more general purpose is to lessen the burden of the trial courts and foster judicial economy by promoting the resolution of disputes by specialized boards. Consequently, if the employee's complaint reveals significant intangible loss, such as emotional distress, or discloses facts suitable for an award of punitive damages, or the complainant wishes to join a statutory cause of action with other legal causes of action, the Department of Fair Employment and Housing may forgo the administrative procedure in favor of a private civil action by the employee to recover all of his or her damages, including mental anguish and distress.

**(9) Damages § 32--Procedure--Province of Court and Jury--Fixing Amount of Emotional Distress Damages.** --Harm suffered from emotional distress, though less susceptible of precise measurement than more tangible pecuniary losses or physical injuries would be, is no less real or worthy of compensation. Given the intangible nature of the harm, it is the members of the jury who, when properly instructed, are in the best position to assess the degree of harm suffered and to fix a monetary amount as just compensation therefor.

**COUNSEL:** John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, and Marian M. Johnston, Deputy Attorney General, for Defendant and Appellant.

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

Richard J. Moore, County Counsel, and William E. Rundstron, Deputy County Counsel, for Plaintiff and Respondent.

Max E. Robinson, County Counsel (Fresno), J. Wesley Merritt, Deputy County Counsel, Michael D. Ott, County Counsel (Madera), Greg Kamptner, Deputy County Counsel, Behrens & Viau, Jerome M. Behrens, Burke, Williams & Sorenson and Richard R. Terzian as Amici Curiae on behalf of Plaintiff and Respondent.

Vivian Schneider for Real Party in Interest and Respondent.

**JUDGES:** Opinion by Panelli, J., with Lucas, C. J., Mosk, Eagleson and Arabian, JJ., concurring. Separate dissenting opinion by Broussard, J., with Kennard, J., concurring.

**OPINION BY: PANELLI**

**OPINION**

[*43] [**358] [***115] In *Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379 [241 Cal.Rptr. 67, 743 P.2d 1323]* (hereafter *Dyna-Med*) we held that the California Fair Employment and Housing Act (FEHA or Act) ( *Gov. Code, § 12900 et seq.*) [1] does not authorize the Fair [*44] Employment and Housing Commission (Commission) to award punitive damages. In the present case we consider whether the Commission has statutory authority to award compensatory damages, a question we reserved in *Dyna-Med*.

1 All further statutory references are to the Government Code unless otherwise indicated.

[**359] [***116] I. *Facts*

Rose Brown was a temporary employee with the Peralta Community College District (Peralta) during the 1980-1981 school year. She was terminated in April of 1981. Shortly after her termination, she filed a complaint with the Department of Fair Employment and Housing (the Department), in which she alleged that her immediate supervisor had subjected her to various acts of sexual harassment. The Department filed an accusation with the Commission. Following a hearing, the Commission found in Ms. Brown's favor and awarded her $ 374.55 for her out-of-pocket expenses and $ 20,000 "to compensate her for the damage to her dignity and esteem, and [for] her humiliation, embarrassment, emotional pain and distress."

Peralta petitioned the superior court for a writ of administrative mandamus. ( *Code Civ. Proc., § 1094.5.*)

The superior court denied the petition as to the Commission's findings of sexual harassment, but ordered stricken that part of the decision awarding Ms. Brown compensatory damages, as not within the authority of the Commission. On appeal by the Commission, the Court of Appeal, one justice dissenting, reversed. The court held that the Commission is authorized by the FEHA to award compensatory damages.

Because there is a conflict among the Courts of Appeal concerning the Commission's authority to award compensatory damages, we granted review to secure uniformity of decision.

II. *Analysis*

A. *Background*

In *Dyna-Med, supra, 43 Cal.3d 1379*, we reviewed the origins, purposes and provisions of the FEHA. The California Fair Employment Practice Act (FEPA) (former *Lab. Code, § 1410 et seq.*) was enacted in 1959 and recodified in 1980 as part of the FEHA (Stats. 1980, ch. 992, § 4, p. 3140 et seq.). The law establishes that freedom from discrimination in employment on specified grounds, including sex, is a civil right (§ 12921) and such discrimination is against public policy (§ 12920). The law declares [*45] discrimination or harassment [2] on the specified grounds an unlawful employment practice. (§ 12940, subd. (h).)

2 The Commission has defined sexual harassment as "verbal, physical, or sexual behavior directed at an individual because of her, or his, gender." ( *Dept. Fair Emp. & Hous.* v. *Ambylou Enterprises, Inc.* (1982) No. 82-06, FEHC Precedential Decisions 1982-1983, CEB 3, p. 6; *Cal. Code Regs., tit. 2, § 7287.6, subd. (b)(1)*.)

Concerning harassment generally, the Commission has stated that "[a]lmost any type of conduct may constitute harassment. The potential range includes, but is not limited to, conduct which is verbal (such as epithets, derogatory comments or slurs), physical (such as assault, impeding or blocking movement, or any physical interference with normal work or movement), or visual (the display of pictures, writings, objects, or photographs which are derogatory or offensive). ( Cal. [Code Regs.] tit. 2, § 7287.6, subd. (b)(1).)" ( *Dept. Fair Emp. & Hous.* v. *Fresno Hilton Hotel* (1984) No. 84-03, FEHC Precedential Decisions 1984-1985, CEB 2, p. 28, fn. 7.)

The statute creates two administrative bodies: the Department, whose function is to investigate, conciliate, and seek redress for claimed discrimination (§§ 12901,

12930), and the Commission, which performs adjudicatory and rulemaking functions (§§ 12903, 12935). An aggrieved person may file a complaint with the Department (§ 12960), which must promptly investigate (§ 12963). If the Department deems a claim valid it seeks to resolve the matter -- in confidence -- by conference, conciliation, and persuasion. (§ 12963.7.) If that fails or seems inappropriate, the Department may issue an accusation to be heard by the Commission. (*§§ 12965, subd. (a), 12969.*)

If the Department fails to issue an accusation within 150 days after the filing of the complaint, or if it earlier determines not to prosecute the case and the matter is not otherwise resolved, the Department must give the complainant a "right to sue" letter. The complainant may then bring a civil suit in superior court. (*§ 12965, subd. (b); Dyna-Med, supra, 43 Cal.3d at pp. 1382-1384; Commodore Home Systems, Inc. v. Superior Court (1982) 32 Cal.3d 211, 213-214 [\*\*360] [\*\*\*117] [185 Cal.Rptr. 270, 649 P.2d 912]* (hereafter *Commodore Home Systems*).) (**1**) In a private action under the FEHA, the superior court may award compensatory and punitive damages. ( *State Personnel Bd. v. Fair Employment & Housing Com. (1985) 39 Cal.3d 422, 429 [217 Cal.Rptr. 16, 703 P.2d 354]; Commodore Home Systems, supra, 32 Cal.3d at p. 221*.)

When, as in the case at bench, an accusation issues, the Commission holds a hearing. The hearings are full evidentiary proceedings governed by the California rules of evidence and conducted in accordance with the California Administrative Procedure Act (§ 11500 et seq.). (§ 12972.) The Department serves as prosecutor and advocate on the complainant's behalf and also bears the costs of the hearing. (*§ 12969*.) The hearing is presided [\*46] over by an administrative law judge (ALJ) (§ 11512, subd. (a)), who renders a proposed decision to the Commission, which then either adopts the decision as its own or, after reviewing the administrative record, adopts a different decision (§ 11517). Either party can petition the superior court for a writ of administrative mandamus. (§ 11523; *Code Civ. Proc., § 1094.5* .)

If the Commission finds that the respondent employer or labor union has engaged in an unlawful discrimination practice, it is required to state its findings of fact and determination and to issue and serve on the parties a cease and desist order. (*§ 12970, subd. (a)*.) In addition, pursuant to *section 12970, subdivision (a)*, the Commission is authorized to require the respondent to "take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization, as, in the judgment of the commission, will effectuate the purposes of [the FEHA], and including a requirement for report of the manner of

compliance." Because it is undisputed that the Commission's authority must come from the Act, our disposition of the instant case turns on the meaning of this latter provision.

In concluding that the statute authorized the Commission to award compensatory damages, the Court of Appeal first looked to the words of the statute. The court observed that the phrase "including, but not limited to" enlarged the Commission's authority, and that the statute authorizes the Commission to fashion such remedies as "in the judgment of the commission" will effectuate the purposes of the Act. (*§ 12970, subd. (a)*.) From these phrases, taken together with the legislative directive that the Act is to be "construed liberally for the accomplishment of [its] purposes" (§ 12993, subd. (a)), the court determined that the plain language of the statute allowed compensatory damages, if the judgment of the Commission is that the damages are necessary.

The Court of Appeal next considered the legislative intent in enacting the law. The purpose of the Act, the court noted, is to "provide effective remedies which will eliminate such discriminatory practices" that are contrary to the public policy of the state. (*§ 12920*; see *Commodore Home Systems, supra, 32 Cal.3d at p. 220*.) Compensatory damages are a necessary and effective remedy, the court concluded, because such damages are effective at both punishing and deterring and, as in the instant case, may provide the only suitable remedy available to the victim of the unlawful discrimination. [3] Furthermore, the availability of compensatory damages may actually promote [\*47] the important conference and conciliation goals of the Act, in that employers may be more willing to confer and negotiate if they know the Commission can impose damages against them.

3  The Department did not seek backpay or reinstatement of Ms. Brown, who, as indicated, was a temporary employee, nor did the Commission make a finding that her termination was the result of sexual harassment.

In *Dyna-Med, supra, 43 Cal.3d 1379*, decided after the Court of Appeal's opinion in this case, we rejected the argument that the expansive language of *section 12970*, subdivision [\*\*361] [\*\*\*118] (a), taken together with the legislative statement of purpose (*§ 12920*) and directive that the Act should be liberally construed (§ 12993, subd. (a)), authorized the Commission to award punitive damages. The statutorily authorized remedies, we noted, are "exclusively corrective and equitable in kind. They relate to matters which serve to make the aggrieved employee whole in the context of the employment. [para.] Punitive damages, by contrast, are neither equitable nor corrective; punitive damages serve but one purpose -- to punish and through punishment, to

deter." (*43 Cal.3d at p. 1387*.) Consequently, although we recognized that in their deterrent effect punitive damages would further the purpose of the Act to eliminate unlawful discrimination, in light of the "extraordinary nature" of such damages we found the foregoing factors "insufficient to support an inference that the Legislature intended sub silentio to empower the commission to impose punitive damages." (*Id. at p. 1389*.)

Seeking to distinguish *Dyna-Med, supra, 43 Cal.3d 1379*, the Attorney General argues that, unlike punitive damages, compensatory damages are of the same make-whole kind as the other statutorily enumerated remedies. Compensatory damages include out-of-pocket losses and general damages for emotional distress. (See *Memphis Community School Dist. v. Stachura (1986) 477 U.S. 299, 307 [91 L.Ed.2d 249, 258-259, 106 S.Ct. 2537]; Hess v. Fair Employment & Housing Com. (1982) 138 Cal.App.3d 232, 237 [187 Cal.Rptr. 712, 33 A.L.R.4th 958]*.) Emotional distress, he observes, is a compensable injury (*Delta Farms Reclamation Dist. v. Superior Court (1983) 33 Cal.3d 699, 711 [190 Cal.Rptr. 494, 660 P.2d 1168]*), and courts have consistently recognized that emotional and mental injuries often occur as a result of discrimination. (E.g., *Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 497-498 [86 Cal.Rptr. 88, 468 P.2d 216]; Hess v. Fair Employment & Housing Com., supra; Woods-Drake v. Lundy (5th Cir. 1982) 667 F.2d 1198, 1203*.) The state Legislature, he maintains, impliedly recognized this concept when in 1982 it amended the Act to provide, inter alia, that "[l]oss of tangible job benefits shall not be necessary in order to establish harassment." (Former § 12940, subd. (i), see now § 12940, subd. (h).) Often, as in the instant case (see fn. 3, *ante*), compensatory damages are the only significant remedy available to the victim of harassment. Consequently, the Commission's authority to award compensatory damages must be [*48] upheld in order to serve public policy concerns, preserve the Commission as an effective enforcement mechanism, and avoid constitutional equal protection problems; any decision to the contrary, the Attorney General urges, would both destroy the effectiveness of the Commission and also deny meaningful relief for many of the most meritorious discrimination claims.

Before addressing the Attorney General's argument, we think it important to emphasize what this case is *not* about. (**2**) There is absolutely no dispute in this case that employment discrimination, including sexual harassment as occurred here, can cause emotional distress, [4] that such distress is a compensable injury under traditional theories of tort law (e.g., *Agarwal v. Johnson (1979) 25 Cal.3d 932, 952-953 [160 Cal.Rptr. 141, 603 P.2d 58]; Alcorn v. Anbro Engineering, Inc., supra, 2 Cal.3d 493, 498*), or that courts in appropriate cases may award an injured

employee who successfully asserts a statutory cause of action both punitive and compensatory damages (*Commodore Home Systems, supra, 32 Cal.3d at p. 215*). Nor is there at issue the validity of an express statutory authorization for an administrative award of compensatory damages. (Cf. §§ 12987, subd. (2) [authorizing Commission [**362] [***119] to award "actual damages" in housing discrimination cases], 19702, subd. (e) [authorizing State Personnel Board to award compensatory damages in employment discrimination cases].) (**3a**) Rather, the sole issue before us is whether under the employment discrimination provisions of the FEHA, which make no reference to compensatory or any damages, the Commission has the authority to award unlimited compensatory damages, or must an employee who seeks such damages pursue his or her judicial remedies in a court action.

> 4 We use the term "emotional distress" to refer to the full gamut of intangible mental suffering, including not only physical pain, but also "fright, nervousness, grief, anxiety, worry, mortification, shock, humiliation, indignity, embarrassment, apprehension, terror or ordeal." (*Capelouto v. Kaiser Foundation Hospitals (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880]*.)

### B. *The Statute*

As in *Dyna-Med, supra, 43 Cal.3d 1379*, we start, as we must, with the statute itself. (*Id. at p. 1386*.) The stated purpose of the FEHA is to provide effective remedies that will eliminate discriminatory practices. (§ 12920; *Dyna-Med, supra, 43 Cal.3d at p. 1387*.) To this end the Legislature, as noted, has authorized the Commission, on finding that a respondent employer or labor union has engaged in an unlawful discrimination practice, to issue an order requiring the respondent to cease and desist from the practice and "to take *such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to* [*49] *membership in any respondent labor organization*, as in the judgment of the commission, will effectuate the purposes of [the Act], and including a requirement for report of the manner of compliance." (§ 12970, subd. (a), italics added.)

Construing *section 12970* in light of established principles of statutory construction, in *Dyna-Med* we concluded that the Legislature had intended to authorize the Commission "*to take such other remedial action as in its judgment seems appropriate to redress a particular unlawful employment practice and to prevent its recurrence, thus eliminating the practice*" (*43 Cal.3d at p. 1390*, fn. omitted, italics added). The statutorily authorized remedies, we observed, "are exclusively corrective

and equitable in kind. *They relate to matters which serve to make the aggrieved employee whole in the context of the employment.*" ( *Id. at p.* 1387, italics added.)

Although compensatory damages, as the Attorney General argues, may serve to make whole an employee who suffers emotional distress, and may in addition deter the respondent and other employers from future discriminatory practices, unlike the other statutory remedies that focus on corrective measures the employer can take *in the workplace,* this remedy goes substantially beyond the context of the employment. Compensatory damages, often amounting to tens of thousands of dollars, [5] serve to recompense the victim of discrimination not just for the tangible detriment to the victim's employment situation, but also for the intangible injury to his or her psyche (see fn. 4, *ante*) suffered as a result of the unlawful action of another and, as such, are designed to make the victim whole in relation to the offender in the manner of traditional tort damages awarded by a jury in a private action in a court of law. (See generally Prosser & Keeton on Torts (5th ed. 1984) §§ 1-2, pp. 5-7.) This effect, we believe, is beyond the scope of the Legislature's intended purpose in enacting the FEHA to prevent and eliminate [**363] [***120] discrimination in the workplace. (Cf. *Gutwein v. Easton Publishing Company* (1974) 272 Md. 563 [325 A.2d 740, 743, 85 A.L.R.3d 340].)

> 5    For the dollar amounts of emotional distress damages awarded by the Commission in employment cases, see, e.g., *Dept. Fair Emp. & Hous. v. Ambylou Enterprises, Inc., supra,* FEHC Dec. No. 82-06, CEB 3 (harassment; $ 15,000); *Dept. Fair Emp. & Hous.* v. *Marriott Hotel* (1983) No. 83-10, FEHC Precedential Decisions 1982-1983, CEB 11 (harassment; $ 5,000); *Dept. Fair Emp. & Hous.* v. *C.E. Miller Corp., et al.* (1984) No. 84-02, FEHC Precedential Decisions 1984-1985, CEB 1 (discrimination; $ 10,000); *Dept. Fair Emp. & Hous.* v. *Bee Hive Answering Service et al.* (1984) No. 84-16, FEHC Precedential Decisions 1984-1985, CEB 8 (harassment, discrimination and retaliation; $ 35,000); *Dept. Fair Emp. & Hous.* v. *Hart and Starkey, Inc., et al.* (1984) No. 84-23, FEHC Precedential Decisions 1984-1985, CEB 9 (harassment; $ 135,000 divided among four victims); *Dept. Fair Emp. & Hous.* v. *La Victoria Tortilleria, Inc.* (1985) No. 85-04, FEHC Precedential Decisions 1984-1985, CEB 13 (harassment; $ 40,000); *Dept. Fair Emp. & Hous.* v. *California State University Sacramento* (1988) No. 88-08, FEHC Precedential Decisions 1988-1989, CEB 3 (discrimination; $ 75,000).

[*50]    Analysis of the relevant statutory language supports our conclusion. *Section 12970, subdivision (a)* authorizes the Commission to order the respondent to take "*such action*" as the Commission believes will effectuate the purposes of the Act. (Italics added.) Unlike hiring, reinstatement or upgrading, with or without backpay, and the other specified remedies, payment of compensatory damages arguably is not, in the common usage of the term, an *action* to be taken by the employer, nor, in any event, is payment of damages the *kind of specific and limited action* directed to elimination of discrimination and its effects in the workplace as the Commission is otherwise empowered to require the employer to take.

(4) "'[T]he doctrine of *ejusdem generis* . . . states that where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only to persons or things of the same general nature or class as those enumerated. The rule is based on the obvious reason that if the Legislature had intended the general words to be used in their unrestricted sense, it would not have mentioned the particular things or classes of things which would in that event become mere surplusage.'" ( *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 331, fn. 10 [158 Cal.Rptr. 370, 599 P.2d 676].) Application of the doctrine of *ejusdem generis* is particularly appropriate when, as here, the Legislature in related and otherwise similar statutes has expressly provided for the remedy in question and thus has demonstrated the ability, had it wished, to do so in *section 12970*. (5) "Where the [Legislature] has demonstrated the ability to make [its] intent clear, it is not the province of this court to imply an intent left unexpressed." ( *Mutual Life Ins. Co.* v. *City of Los Angeles* (1990) 50 Cal.3d 402, 412 [267 Cal.Rptr. 589, 787 P.2d 996].)

Thus, section 12987 of the FEHA, relating to housing discrimination, authorizes the Commission to order the respondent to cease and desist from the discriminatory practice and "to take such actions, as, in the judgment of the commission, will effectuate the purpose of this part, *including, but not limited to,* any of the following: [para.] (1) The sale or rental of the housing accommodation . . . or . . . of a like housing accommodation, . . . [para.] (2) The payment of punitive damages in an amount not to exceed one thousand dollars . . . *and the payment of actual damages*." (Italics added.) [6] Although of separate origin, the housing and employment provisions of the FEHA [*51] were combined and chaptered together in 1980 to form the FEHA, with enforcement of both sections of the Act vested in the Commission. (Stats. 1980, ch. 992, p. 3138 et seq.; see *Dyna-Med, supra,* 43 Cal.3d at p. 1394.) Had the Legislature intended to authorize the Commission to award damages in employment as in housing cases, it could easily have

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

expressly so provided at that time, yet it did not. (See generally *Dyna-Med, supra, at pp. 1394-1396.*)

> 6    Until 1981 the Commission's authority to award damages in housing discrimination cases was limited, first to $ 500 and later to *$ 1,000.* ( *Dyna-Med, supra, 43 Cal.3d at p. 1394, fn. 17.*) In 1981 the Act was amended to remove the limit on the amount of compensatory damages, while retaining a $ 1,000 limit, adjusted for inflation, on punitive damages. (§ 12987, subd. (2); Stats. 1981, ch. 899, § 3, p. 3424.)

Section 19702, subdivision (e) of the Civil Service Act, relating to the Civil Service Personnel Board, similarly authorizes the board on a finding of discrimination to issue an order "requiring the appointing authority to cause the discrimination to cease and desist and to take any action, *including, but not limited to,* hiring, reinstatement or upgrading of employees, with or without back pay, *and compensatory damages,* which in the judgment of the board, will effectuate the purposes of this part." (Italics added.) As we observed in *Dyna-Med, supra,* "if, as Commission argues, the nonexhaustive language of *section 12970* were sufficient to embrace the authority to award damages, the specific  [**364] [***121] references to damages in both the Civil Service Act and the housing section of the FEHA would be mere surplusage.  (6) '[S]tatutes must be harmonized, both internally and with each other, to the extent possible.  [Citations.] Interpretive constructions which render some words surplusage . . . are to be avoided.  [Citations.]' [Citation.]" (*43 Cal.3d at p. 1397,* fn. omitted.)

(3b)  In light of the foregoing, we are reluctant to infer that through the expansive language of *section 12970* the Legislature intended by implication to grant the Commission the authority not only to award compensatory damages, but to award such damages without limit. [7]

> 7    Because we resolve this case on the basis of statutory interpretation, we need not determine whether an administrative agency's award of unlimited compensatory damages is violative of the judicial powers clause (*Cal. Const., art. VI, § 1*). (Cf. *McHugh v. Santa Monica Rent Control Bd. (1989) 49 Cal.3d 348 [261 Cal.Rptr. 318, 777 P.2d 91]; Youst v. Longo (1987) 43 Cal.3d 64, 80 [233 Cal.Rptr. 294, 729 P.2d 728].*)

## C. Legislative Intent

Contrary to our analysis, the Attorney General argues that the legislative intent has always been, or at the least is now, that the FEHA remedy intangible as well as tangible losses resulting from discrimination.  He points

to Assembly Bill No. 1163, 1987-1988 Regular Session, passed by the Legislature after our decision in *Dyna-Med, supra, 43 Cal.3d 1379,* but vetoed by the Governor, who described the legislation as "premature" in light of the pendency of the instant case.  Assembly Bill No. 1163 would have amended [*52] *section 12970* to explicitly authorize the Commission to award "actual damages" (Assem. Bill No. 1163, § 3) and specified that its remedy provisions were "clarifying and declaratory of existing law" (Assem. Bill No. 1163, § 1, subd. (c)).

(7)  The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law.  ( *Teamsters v. United States (1977) 431 U.S. 324, 354, fn. 39 [233 Cal.Rptr. 294, 729 P.2d 728];* see Dickerson, The Interpretation and Application of Statutes (1975) p. 179.) This is especially true when, as here, such declared intent is without objective support in either the language or history of the legislation and (until recently) is contrary as well to the practice of the affected agency. [8] That the Legislature, as indicated in Assembly Bill No. 1163, may *now* intend that intangible losses be remedied does not of itself empower the Commission to award damages for such losses; the Commission is bound by the statute presently in effect, not by a legislative statement of intent that failed to become law.

> 8    The Commission did not award compensatory damages in employment discrimination cases until 1982, when it did so pursuant to regulation promulgated in 1980 and repealed in 1985. (*Dept. Fair Emp. & Hous. v. Ambylou Enterprises, Inc., supra,* FEHC Dec. No. 82-06, CEB 3; see *Dyna-Med, supra, 43 Cal.3d at p. 1388, fn. 9.*)
>
> Under the current regulations, adopted in 1985, the Commission is authorized to order payment of backpay, injunctive and other equitable relief, including, but not limited to, cease and desist orders, hiring, reinstatement or upgrading of employees, and prospective relief, e.g., rightful place and front pay.  ( *Cal. Code Regs., tit. 2, § 7286.9.*) The Commission, however, continues to award compensatory damages.

(3c)  The Attorney General points also to Assembly Bill No. 1985, 1981-1982 Regular Session (Stats. 1982, ch. 1193, § 2, pp. 4259-4260), which amended the FEHA expressly to prohibit harassment and to provide that "[l]oss of tangible job benefits shall not be necessary in order to establish harassment. The provisions of this subdivision are declaratory of existing law . . . ." This legislative declaration, however, does not serve to amend the remedy provisions of the FEHA.  Rather, the statement confirms that harassment on a basis enumerated in the

Act constitutes unlawful discrimination regardless of whether the victim can show a loss of tangible job benefits. (See *Dept. Fair Emp. & Hous. v. Fresno Hilton Hotel, supra,* FEHC Dec. No. 84-03, CEB 2, p. 28; *Dept. Fair Emp. & Hous. v. La Victoria Tortilleria, supra,* FEHC Dec. No. 85-04, CEB 13, p. 14.) This view is [**365] [***122] consistent with the Commission's definition of sexual harassment (see fn. 2, *ante,* which describes activity that does not necessarily impact on the victim's employment status. (See also *Meritor Savings Bank v. Vinson (1986) 477 U.S. 57, 64-67 [91 L.Ed.2d 49, 57-60, 106 S.Ct. 2399]* [discussing "hostile environment" harassment].) Once harassment has been established as provided in section 12940, subdivision (h), the Commission is authorized, [*53] as in other cases, to order the employer to take appropriate steps to eliminate the practice. (*§ 12970, subd. (a).*) [9]

> 9   In *Dept. Fair Emp. & Hous. v. Fresno Hilton Hotel, supra,* FEHC Dec. No. 84-03, CEB 2, page 41, the Commission noted that "Because sexual harassment is insidious and has the ready potential to disrupt not only the life of its victims, but the entire workplace as well, it is incumbent upon employers to act affirmatively to prevent it. The Act requires that employers 'take all reasonable steps to prevent harassment from occurring.' [§ 12940, subd. (h).]"

The Attorney General argues, however, that in harassment cases, as here, where no detriment to the employment has been shown and the employee's out-of-pocket losses are minimal, the only injury is emotional distress and the only redress is compensatory damages. This argument, we believe, takes too narrow a view of both the problem and the purpose of the Act, as well as the available remedies.

While emotional distress may be the individual employee's only injury, the practice of harassment once proven remains to be eliminated. Consequently, if the employee's complaint is administratively determined, on finding harassment the Commission will order such corrective measures as will benefit both the complainant *and others,* including that the employer cease and desist the practice, report the manner of compliance, and take other remedial action as appropriate. [10] In addition, the Commission will thereafter conduct a compliance review to see that the employer is fully obeying the order. (§ 12973.) Hence, the administrative procedure serves the statutory purpose of providing effective remedies that will eliminate the discriminatory practice and prevent its recurrence, not just as to the immediate victim, but as to all employees, present and future (*§ 12920*). [11]

10   In the case at bench, for example, in addition to ordering payment of compensatory damages, the Commission ordered the respondent: "1. . . . to cease and desist from discriminating against its female employees on the basis of sex; [para.] 2. To develop and disseminate a written policy regarding sexual harassment, and to conduct a training program regarding this policy at each of its campuses for all management and supervisory employees within ninety (90) days from the effective date of the Commission order herein; [para.] 3. To inform all of its employees of its policy regarding sexual harassment and of specific procedures by which employees may report incidents of sexual harassment; [para.] 4. To instruct [Ms. Brown's supervisor] specifically, concerning his obligations and duties to employees under his supervision regarding sexual harassment; [para.] 5. . . . [para.] 6. To report to the Commission in writing describing the steps it has taken to comply with the Commission's orders; and [para.] 7. To take any other action deemed necessary, just and proper by the Commission."

11   When in 1984 the Legislature amended former subdivision (i) of section 12940 (see now § 12940, subd. (h)), it made the following statement of policy: "It is the existing policy of the State of California, as declared by the Legislature, that procedures be established by which allegations of prohibited harassment and discrimination may be filed, timely and efficiently investigated, and fairly adjudicated, and that agencies and employers be required to establish affirmative programs which include prompt and remedial internal procedures and monitoring so that worksites will be maintained free from prohibited harassment and discrimination by their agents, administrators, and clientele. To further this intent, the Legislature enacts this act." (Stats. 1984, ch. 1754, § 1, pp. 6403-6404.)

[*54]   The administrative procedure, moreover, does not preclude the employee from instituting a private lawsuit based on nonstatutory causes of action. (See *Rojo v. Kliger, post,* at p. 82 & fn. 10 [*276 Cal.Rptr. 130, 801 P.2d 373*]; see *Brown v. Superior Court (1984) 37 Cal.3d 477, 481 [208 Cal.Rptr. 724, 691 P.2d 272];* cf. *Alcorn v. Anbro Engineering, supra,* 2 Cal.3d 493, 500, fn. 7.) Furthermore, the Department in every case has the discretion to issue the complainant a "right to sue" letter, thereby clearing the way for a private civil action under the FEHA. (*§ 12965, subd. (b);* see, [**366] [***123] e.g., *Brown v. Superior Court, supra,* 37 Cal.3d 477; *Watson v. Department of Rehabilitation (1989) 212 Cal.App.3d 1271, 1277-1278 [261 Cal.Rptr. 204];* Baker v. Children's Hospital Medical Center (1989) 209

*Cal.App.3d 1057, 1060 [257 Cal.Rptr. 768]; Stephens v. Coldwell Banker Commercial Group, Inc. (1988) 199 Cal.App.3d 1394, 1399 [245 Cal.Rptr. 606]; Ibarbia v. Regents of University of California (1987) 191 Cal.App.3d 1318, 1321, fn. 1 [237 Cal.Rptr. 92]; Monge v. Superior Court (1986) 176 Cal.App.3d 503, 507 [222 Cal.Rptr. 64].*)

"The FEHA," we observed in *Commodore Home Systems, supra, 32 Cal.3d 211*, "provides separate routes to resolution of claims; first, a complaint to the Department; second, if that agency fails to act, a private court action." ( *Id. at p. 217*.) In providing for an administrative rather than a judicial resolution of discrimination complaints, the Legislature's objective "was to provide a 'speedy and informal' process unburdened with 'procedural technicalities.' [Citation.] 'To achieve this end the [Fair Employment Practices Commission] established procedures that are as simple and uncomplicated as possible. Complaints are drafted by laymen; the commission informally attempts to eliminate discriminatory practices before instituting formal accusations; the commission, on a finding of discrimination, may fashion remedies both to correct unique cases of such practice as well as to curb its general incidence.'" ( *Dyna-Med, supra, 43 Cal.3d at p. 1393*, citing *Stearns v. Fair Employment Practice Com. (1971) 6 Cal.3d 205, 214 [98 Cal.Rptr. 467, 490 P.2d 1155]* [housing discrimination].)

Under the FEHA, moreover, the Department is the plaintiff and the employee only a witness. "[T]he Department bears the expense of investigating, conciliating and, where necessary, prosecuting the action on behalf of the claimant. [Citations. ] This includes the services of an attorney from the Department to try the case at no expense to the claimant. [Citation.]" ( *State Personnel Bd. v. Fair Employment & Housing Com., supra, 39 Cal.3d 422, 432*.)

[*55] **(8)** Consistent with the foregoing, we believe a primary purpose of the alternative systems of redress for employment discrimination is to permit efficient and prompt administrative resolution -- without cost to the victim -- of claims that are amenable to conciliation or to corrective equitable remedies, and thus do not warrant a full-scale judicial proceeding with its attendant expense and delay (see *Stearns v. Fair Employment Practice Com., supra, 6 Cal.3d at p. 214*), while reserving to the judicial system, with its attendant constitutional and statutory safeguards, those statutory claims that seek significant nonquantifiable monetary recompense or that the complainant wishes to join with nonstatutory causes of action. [12] Consequently, if the employee's complaint reveals significant intangible loss, such as emotional distress, or discloses facts suitable for an award of punitive damages (see *Civ. Code, § 3294* ; *Dyna-Med, supra, 43 Cal.3d at p. 1404*), or the complainant wishes to join

a statutory cause of action with other legal causes of action, the Department may forgo the administrative procedure in favor of a private civil action by the employee to recover all of his or her damages, including mental anguish and distress. ( *Commodore Home Systems, supra, 32 Cal.3d 211*; see *Dyna-Med, supra, 43 Cal.3d at p. 1402* [Department permits any claimant who so wishes to bring a private court action]; *Brown v. Superior Court, supra, 37 Cal.3d at p. 481* [plaintiffs joined FEHA claim after Department notified them of their right to sue]; *Watson v. Department of Rehabilitation, supra, 212 Cal.App.3d 1271, 1277* [**367] [***124] [Court of Appeal affirmed $ 1.5 million verdict on statutory causes of action]; *Stephens v. Coldwell Banker Commercial Group, Inc., supra, 199 Cal.App.3d at p. 1399* [Court of Appeal affirmed verdict of $ 100,000 emotional distress damages and $ 200,000 punitive damages on statutory cause of action]; *Snipes v. City of Bakersfield (1983) 145 Cal.App.3d 861, 864 [193 Cal.Rptr. 760]* [employee sought $ 1 million in punitive damages on statutory cause of action].)

    12    Another more general purpose is to lessen the burden of the trial courts and foster judicial economy by promoting the resolution of disputes by specialized boards. ( *Robinson v. Department of Fair Employment & Housing (1987) 192 Cal.App.3d 1414, 1417 [239 Cal.Rptr. 908].*)

Were it otherwise, as the Attorney General argues, and the Commission were authorized to award unlimited compensatory damages, no evident purpose would be served by providing alternative routes for resolution of claims. Nor would there be any standards to guide the Department in its determination as to the cases in which to seek compensatory damages rather than issue a "right to sue" letter. Finally and most significantly, the purpose of the FEHA to provide an efficient and expeditious avenue for elimination of discriminatory practices would be compromised as agency proceedings would come increasingly to resemble traditional lawsuits, a [*56] predictable result when general pecuniary damages for mental distress are permitted. (See *Zahorian v. Russell Fitt Real Estate Agency (1973) 62 N.J. 399 [301 A.2d 754, 764, 61 A.L.R.3d 927]* (dis. opn. of Hall, J.).)

**(3d)** We conclude, therefore, that in authorizing the Commission to take such action, "including, but not limited to," the enumerated remedies, the Legislature intended to authorize the Commission to fashion such other corrective or equitable remedies as, in its expertise, it may devise to eliminate the discriminatory practice and make the employee whole in relation to the employment (see *Dyna-Med, supra, 43 Cal.3d at pp. 1387, 1390-1391*), but that the Legislature did not, by contrast, intend to authorize the Commission to adjudicate none-

conomic general damage claims traditionally awarded in judicial actions between private parties (cf. *McHugh v. Santa Monica Rent Control Bd., supra,* 49 *Cal.3d 348, 381, fn. 53; Youst v. Longo, supra,* 43 *Cal.3d at p.* 80).

Practical considerations support our view. As the Commission itself recognized when in 1982 it first undertook to award compensatory damages, "Courts have traditionally been reluctant to award compensatory damages of this nature [for emotional distress] in the absence of circumstances which afford some guarantee of the genuineness of the claimed injury." (*Dept. Fair Emp. & Hous. v. Ambylou Enterprises, supra,* FEHC Dec. No. 82-06, CEB 3, p. 9.) Although California "has long recognized this type of injury as compensable in cases . . . which involve extreme and outrageous intentional invasions of one's mental and emotional tranquility" (*id.* at p. 10), the Commission noted that in seeking to place a dollar value on the complainant's injuries it had found little in legal authority to guide it, for the reason that "[i]t has traditionally been left to the trier of fact to assess the degree of harm suffered and to fix a monetary amount as just compensation therefor. (See, e.g., *Agarwal v. Johnson [1979]* 25 *Cal.3d 932, 953 [160 Cal.Rptr. 141, 603 P.2d 58],* and cases cited therein.)" (*Id.* at p. 11.)

**(9)** In *Agarwal v. Johnson, supra,* cited by the Commission, we recognized that harm suffered from emotional distress, "though less susceptible of precise measurement than more tangible pecuniary losses or physical injuries would be, is no less real or worthy of compensation." (25 *Cal.3d at p.* 953.) Given the intangible nature of the harm, "it is the members of the jury," we admonished, "who, when properly instructed, are in the best position to assess the degree of the harm suffered and to fix a monetary amount as just compensation therefor. [Citations.]" (*Ibid.;* see *Capelouto v. Kaiser Foundation Hospitals, supra,* 7 *Cal.3d at p.* 893; see also Prosser & [*57] Keeton on Torts, *supra,* § 12 at p. 55 [referring to the difficulty of proof and measurement of damages for emotional distress].) [13]

> 13  Whether the Commission requires proof that the complainant actually suffered emotional distress or will simply infer such injury from the nature of the wrong is unclear. Although the Commission often cites evidence in the record as demonstrating emotional injury (e.g., *Dept. Fair Emp. & Hous. v. Ambylou Enterprises, Inc., supra,* FEHC Dec. No. 82-06, CEB 3, p. 10; *Dept. Fair Emp. & Hous.* v. *Del Mar Avionics* (1985) No. 85-19, FEHC Precedential Decisions 1984-1985, CEB 16, pp. 27-28, it has stated that "[i]n any discrimination case we are permitted to infer from the circumstances of the discriminatory conduct itself that emotional injury occurred.

[Citations.]" (*Dept. Fair Emp. & Hous. v. Bee Hive Answering Service, et al., supra,* FEHC Dec. No. 84-16, CEB 8, p. 25; accord, *Dept. Fair Emp. & Hous.* v. *Hart and Starkey, Inc., et al., supra,* FEHC Dec. No. 84-23, CEB 9, p. 35 [Commission can and will infer injury].)

[**368] [***125] Although we are not called upon in the instant case to determine whether the Commission's award of unlimited compensatory damages violates the right to jury trial (*Cal. Const., art. 1, § 16*) and we express no view on that issue (cf. *McHugh v. Santa Monica Rent Control Bd., supra,* 49 *Cal.3d 348, 379-381 & fn.* 53; *id.,* dis. opn. of Panelli, J., at pp. 386-387), we reaffirm the well-established principle stated in *Agarwal v. Johnson, supra,* 25 *Cal.3d at page* 953, that the jury, as the trier of fact, is in the best position to determine just compensation for emotional and mental distress.

*D. Sister States and Federal Statutes*

As we noted in *Dyna-Med, supra,* 43 *Cal.3d at page 1400,* courts in our sister states are divided on the availability of compensatory damages under statutory schemes similar to ours. (See generally Annot. (1978) 85 A.L.R.3d 351, §§ 6-10, pp. 367-379.) According to the Attorney General, a review of the decisions upholding the authority of state civil rights agencies to award compensatory damages, even absent specific statutory language explicitly authorizing such awards, reveals many similarities between those laws and the FEHA. The reasoning in the cases, he urges, applies with equal force in the instant case. Thus, the decisions cite (1) the need to provide full relief to the victim of unlawful discrimination (e.g., *Bournewood Hosp. v. Mass. Comm. Against Discrim.* (1976) 371 *Mass.* 303 [358 *N.E.2d 235, 242-243];* A. *P. Green Serv. D. of Bigelow-L. Corp. v. State F.E.P.C.* (1974) 19 *Ill. App. 3d 875 [312 N.E. 2d 314, 319-320]*) and the remedial nature of compensatory damages ( *Andersen v. Exxon Co.* (1982) 89 *N.J. 483 [446 A.2d 486, 496]; Chauffeurs, Loc. U. 238 v. Civil Rights Com'n (Iowa 1986) 394 N.W.2d 375, 383);* (2) the role such damages serve in eliminating the effects of discrimination ( *Williams v. Joyce* (Ore.Ct.App. 1971) 479 *P.2d 513, 523-524 [40 A.L.R.3d 1272]*); A. *P. Green Serv. D. of Bigelow-L. Corp., supra,* 312 *N.E. 2d at p.* 319); and (3) deference to legislation granting the civil rights agency discretion to order appropriate relief [*58] ( *Bournewood Hosp., supra,* 358 *N.E.2d at p.* 242; *Chauffeurs, Loc. U. 238, supra,* 394 *N.W.2d at p.* 383).

What the Attorney General overlooks is that the issue before us is not the beneficial effect of awarding compensatory damages but, rather, whether the FEHA authorizes the Commission to make such an award. Furthermore, of the state statutes at issue in the cited cases,

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

only those of New Jersey and Massachusetts are sufficiently similar to ours to warrant comparison.

Thus, the Iowa statute authorizes "'remedial action,'" which includes but is not limited to "'*damages for an injury caused by the discriminatory practice which damages shall include but are not limited to actual damages . . . .*'" ( *Chauffeurs, Loc. U. 238* v. *Civil Rights Com'n, supra,* 394 N.W.2d at p. 382, italics added); the FEHA, by contrast, is silent on the award of damages. The Oregon statute states its purposes are to "'insure human dignity'" and to "'*protect* [*the victim's*] *health*" from the consequences of [discrimination]'" and its intent is to "'provide an adequate remedy *for persons aggrieved*'" by unlawful discriminatory acts; the statute authorizes a cease and desist order requiring the respondent to perform acts to carry out the purposes of the law and "'to eliminate the effects'" of the unlawful practice. ( *Williams v. Joyce, supra,* 479 P.2d at pp. 523-524, italics added.) Similarly, the [**369] [***126] Illinois statute, since amended, authorized the agency to require such further affirmative or other actions "'*with respect to the complainant* as will eliminate *the effect*'" of the discriminatory practice. [14] ( *A. P. Green Serv. D. of Bigelow-L. Corp. v. State F.E.P.C., supra,* 312 N.E.2d at p. 319, first italics in original, second italics added.) Our statute, by contrast, speaks only of remedies that will eliminate *the discriminatory practice* and makes no mention of eliminating its *effects* or of remedies *for the person aggrieved.* (§§ 12920, 12970.)

> [14]    The Illinois statute now expressly authorizes the payment of "actual damages . . . for injury or loss suffered by the complainant." (Ill. Rev. Stat. ch. 68, par. 8A-104 [8A Lab. Rel.Rptr. (BNA) FEPM No. 633, p. 453:2626].)

The New Jersey statute, while similar to ours, was interpreted to allow compensatory damages only in such limited amounts as may be characterized as "minor or incidental" awards. ( *Zahorian v. Russell Fitt Real Estate Agency, supra,* 301 A.2d 754, 761-762 [§ 750]; see *Andersen v. Exxon Co., supra,* 446 A.2d 486, 496 [§ 500].) The Massachusetts statute, likewise similar to the FEHA ( *Mass. Gen. L. ch. 151B, § 5*), was interpreted by the Massachusetts Supreme Judicial Court in *Bournewood Hosp. v. Mass. Comm. Against Discrim., supra,* 358 N.E.2d 235, as authorizing damages not merely for discrimination, but for the independent and more egregious [*59] offense of *retaliation* against an employee who was "simply doing that which the law" provides is her right, i.e., filing a complaint about discrimination; the availability of damages for discrimination alone was not decided. ( *Id.* at pp. 242-243; accord, *College-Town v. Mass. Com'n Against Discrim.* (1987) 400 Mass. 156 [508 N.E.2d 587, 594-595] [discrimination and retaliation]; but see *Buckley Nursing Home v. Com'n Against Discrim.* (1985) 20 Mass. App. 172 [478 N.E.2d 1292, 1299] [emotional distress damages allowed for discrimination only].)

Neither the New Jersey court's limitation on the amount of damages, nor the Massachusetts court's distinction between discrimination and retaliation, is to be found in the applicable statutes. Rather, evidently to achieve a result they found just, both courts engaged in patent judicial legislation. We are unwilling to do the same. Rather, we find persuasive the reasoning of the numerous courts in our sister states with statutes similar to ours that have concluded their statutes do not empower a commission to award nonquantifiable pain and suffering money damages for unlawful discrimination. (See *Pennsylvania Human Relations Com'n v. Zamantakis* (1978) 478 Pa. 454 [387 A.2d 70, 73] [stating that a majority of states have found that absent express legislative authority, a civil rights agency cannot award emotional distress damages]; accord *Woods v. Midwest Conveyor Co., Inc.* (1982) 231 Kan. 763 [648 P.2d 234, 241]; *McDaniel v. Cory* (Alaska 1981) 631 P.2d 82, 88; *Gutwein v. Easton Publishing Company, supra,* 325 A.2d 740, 745-747 [quoting other state courts]; *Ohio Civil Rights Commission v. Lysyj* (1974) 38 Ohio St.2d 217 [313 N.E.2d 3, 7, 70 A.L.R.3d 1135]; see generally Annot., *supra,* 85 A.L.R.3d at pp. 370-373.)

Like the foregoing state courts, federal courts, in interpreting the closely analogous remedy language of the National Labor Relations Act (29 U.S.C. § 141 *et seq.*) relating to unfair labor practices, [15] have uniformly held that monetary awards other than back pay may not be awarded (see *Dyna-Med, supra,* 43 Cal.3d 1379, 1397 and cases cited), and a majority have held likewise in interpreting the similarly analogous remedy language of title VII of the federal Civil Rights Act of 1964, relating to employment discrimination [16] ( *Dyna-Med, supra,* 43 Cal.3d at pp. 1397-1398; see *Woods v. Midwest Conveyor Co., Inc., supra,* 648 P.2d 234, 240, citing *DeGrace v. Rumsfeld* [*60] (1st Cir. 1980) 614 F.2d 796, 808; see generally Annot., Title VII -- Compensatory Damages (1980) 48 A.L.R.Fed. 338 et seq.). Because the title VII remedies are judicially enforced, precedents under that statute are, in any event, of little relevance to the issue before us. (See *Commodore Home Systems, supra,* 32 Cal.3d at p. 217.)

> [15]    The National Labor Relations Act authorizes the National Labor Relations Board to issue a cease and desist order and require the violator "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter . . . ." (29 U.S.C. § 160(c).)

16   Section 706(g) of title VII of the federal Civil Rights Act authorizes the trial court to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . ., or any other equitable relief as the court deems appropriate." (*42 U.S.C. § 2000e-5(g).*)

Insofar as the Attorney General argues that denial of general compensatory damages in the administrative hearing constitutes a denial of equal protection to claimants who do not file suit in court, we disposed of the argument in *Dyna-Med, supra, 43 Cal.3d at pages 1401-1404.*

(3e) In sum, in view of the language and purpose of the FEHA, the failure of *section 12970* expressly to authorize an award of general compensatory damages, the existence in other civil rights statutes of express authorization for such awards, the unlikelihood of a legislative grant by implication of unbridled power to an administrative agency to make monetary awards without guidelines or limitations, the cited cases from our sister states, and relevant federal precedent, we conclude that the Commission is not authorized to award compensatory damages.

The judgment of the Court of Appeal is reversed with directions to affirm the trial court's judgment.

## DISSENT BY: BROUSSARD

## DISSENT

**BROUSSARD, J.,** Dissenting.

Having determined that the acting Dean of Students of Laney College had subjected his secretary to sexual harassment over a six-month period, including unwanted touching of her breasts and thighs, comments about her sex life, efforts to procure her as a date for himself and his friends, comments about her undergarments, continuous lewd innuendos, and finally slander of her professional competence because of her obduracy towards his sexual advances, the Fair Employment and Housing Commission (Commission) ordered, among other things, that the woman be compensated for her humiliation and distress by the payment of compensatory damages.

The majority hold that the Commission is not authorized to award compensatory damages, and that the abuse described above can adequately be addressed by an order to reinstate the employee, to cease and desist from discriminatory practices and to set up a policy regarding sexual harassment, with the Commission following up to see if there has been compliance.

These remedies, however, do not make the employee whole when reinstatement is not an issue. An employee may have stoically endured a period [*61] of harassment without a termination of employment. Nonetheless, the employee should be made whole for suffering the deprivation of the right, assured by statute, to work in an environment free from sexual harassment and discrimination. The majority would make the administrative remedy available through the Commission a barren one for such an employee.

Under the Fair Employment and Housing Act (the Act), the Commission has authority to award compensatory damages. The purpose of the Act is to provide effective remedies which will eliminate discriminatory practices. ( *Gov. Code, § 12920.*) [1] It is to be liberally construed to accomplish this purpose. (§ 12993, subd. (a).) If the Commission finds that an employer has engaged in a discriminatory practice, it orders the employer to cease and desist and also orders the employer "to take such action, including, but not limited to, hiring, reinstatement or upgrading of employees, with or without back pay, and restoration to membership in any respondent labor organization, as, in the judgment of the commission, will effectuate the purposes of this [**371] [***128] part, and including a requirement for report of the manner of compliance." (*§ 12970, subd. (a).*) This is expansive language, vesting in the Commission broad rather than limited power to devise effective remedies to eradicate employment discrimination. As we said so recently, the Act was "intended to authorize the commission to take such other remedial action as in its judgment seems appropriate to redress a particular unlawful employment practice and to prevent its recurrence, thus eliminating the practice." ( *Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1390* [**370] [***127] [*241 Cal.Rptr. 67, 743 P.2d 1323].*)

1   All further statutory references are to the Government Code unless otherwise indicated.

The measures the Commission may order the employer to undertake all "relate to matters which serve to make the aggrieved employee whole in the context of the employment." ( *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra, 43 Cal.3d 1379, 1387.*) We decided in *Dyna-Med, Inc.* that since punitive damages are not this sort of equitable, corrective measure, aimed at "making the employee whole in the context of the employment," the statute cannot be interpreted to authorize the Commission to award them. "'Punitive damages by definition are not intended to compensate the injured party, but rather to punish the tortfeasor . . . .' [Citations.]" ( *Id. at p. 1387.*)

Compensatory damages are a completely different story. It is black letter law that compensatory damage

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

awards are intended to make the injured party whole when the injury consists of emotional distress. (See *Memphis Community School Dist. v. Stachura (1986) 477 U.S. 299, 307 [91 L.Ed.2d [*62] 249, 258-259, 106 S.Ct. 2537]*; *Capelouto v. Kaiser Foundation Hospitals (1972) 7 Cal.3d 889, 892-893 [103 Cal.Rptr. 856, 500 P.2d 880]*.) Thus it is consistent with *Dyna-Med* to hold that compensatory damages, as they are not punitive but intended as compensation for injury, are within the authority of the Commission to award.

As the majority willingly acknowledge, we have recognized the emotional damage incurred by those who are subjected to racist abuse and discrimination in the workplace. ( *Alcorn v. Anbro Engineering, Inc. (1970) 2 Cal.3d 493, 497-498 [86 Cal.Rptr. 88, 468 P.2d 216]*; see also *Woods-Drake v. Lundy (5th Cir. 1982) 667 F.2d 1198, 1203*.) Sexual harassment in the workplace inflicts grave emotional injury as well. ( *Fisher v. San Pedro Peninsula Hospital (1989) 214 Cal.App.3d 590, 618 [262 Cal.Rptr. 842]*.) When an employee has been subjected to sexual abuse on the job, the injury normally is one which undermines personal dignity, not one which affects job security. The employee can only be made whole by an award which compensates her for emotional distress. Thus compensatory damages are precisely related to "matters which serve to make the aggrieved employee whole . . . ." Indeed, when reinstatement is not an issue because there has been no termination, compensatory damages are the only remedy which can be provided to the employee and can deter the employer from further transgressions.

The majority maintain that although compensatory damages may serve to make the employee whole, they go substantially beyond the context of the employment. The argument is that the remedies enumerated by the statute focus on corrective measures the employer can take in the workplace, while compensatory damages compensate for intangible injury and are designed to make the victim whole in relation to the offender in the manner of traditional tort damage awards in a jury trial. "This effect, we believe, is beyond the scope of the Legislature's intended purpose in enacting the FEHA to prevent and eliminate discrimination in the workplace." (See maj. opn., *ante*, at p. 49.)

The claim that compensatory damages for emotional injury caused by sexual or racial abuse are not compensation in the context of employment is difficult to understand. Obviously the abuse occurs in the context of employment; indeed, if the abuse caused a disabling injury, the employee would be entitled to a workers' compensation award to make her whole. (See *Cole v. Fair Oaks Fire Protection Dist.* [**372] [***129] *(1987) 43 Cal.3d 148 [233 Cal.Rptr. 308, 729 P.2d 743]*.) If the argument is that the payment of makewhole damages

will not ameliorate the employer's conduct in the workplace, it is mistaken on two grounds. First, the argument depends upon the [*63] mistaken assumption that the Act is intended to be wholly preventive, and not to operate to make the injured employee whole. Since the Act specifically provides for backpay awards, it is directed not only at improving the employer's behavior but also at making the abused employee whole. We recognized as much in *Dyna-Med.* ( *Dyna-Med, Inc. v. Fair Employment & Housing Com., supra, 43 Cal.3d at p. 1387*.) Second, as the Court of Appeal maintained, a compensatory damage award is an effective learning device for obtuse employers. "If employers are forced to compensate for all the effects of their unlawful acts, if they are hit in the pocketbook where it hurts, they will be less likely to discriminate in the future. The awarding of damages will not only deter the wrongdoer, it will send a message to other employers that they must pay for the consequences of their discrimination."

The majority express the concern that an administrative agency cannot function reliably in the inherently judicial role of assessing damages for emotional injury. (See maj. opn., *ante*, at pp. 56-57.) This argument expresses a lack of confidence in the competence of an administrative body to adjudicate a claim for compensatory damages. The Legislature does not share this lack of confidence; it has conferred express authority on the State Personnel Board to award compensatory damages for discrimination in the workplace. (§ 19702, subd. (e).) The Commission itself is explicitly authorized to award compensatory damages for housing discrimination. (See § 12987.) There is no reason to think it is less competent in assessing compensatory damages in the context of employment discrimination -- or to think that the Commission is less competent than the State Personnel Board to tackle the problem.

The majority also claim that to allow the Commission to award compensatory damages would undermine the ability of the Commission to function efficiently. If it were to award compensatory damages, instead of speedy and informal hearings, it is argued, there would be the expense and delay of factfinding sessions which would resemble proceedings in traditional lawsuits. The majority conclude that such lengthy, complex hearings are better left to the courts, in private civil actions brought against the employer.

In many cases, including this one, the only remedy that will be effective to make the victim whole and to deter future misconduct is a compensatory damage award. If we conclude that such an award can only be had in the judicial forum, we frustrate the legislative goal of providing administrative relief for the problem. Such a rule would encourage claimants to bypass administrative relief, or to treat it simply as a matter of form. If the

52 Cal. 3d 40, *; 801 P.2d 357, **;
276 Cal. Rptr. 114, ***; 1990 Cal. LEXIS 5488

claimant treats the administrative process as a matter of form, so will the employer and the conference and conciliation goals of the Act would be frustrated. [*64] Further, more cases would be brought to court, rather than resolved expeditiously in a less expensive forum, as was the intent of the Act. And only those who can afford to pay for counsel could go to court, while the less affluent would be confined to a forum which cannot afford them full compensation. Finally, it is not normally the function of this court to determine how an administrative agency can operate most efficiently; the Commission has determined that it can operate efficiently in this arena, and it is free to abandon the effort if it proves unwieldy or unprofitable.

The majority maintain that to allow the Commission to award compensatory damages would be inconsistent with the purpose of the Act to encourage prompt, inexpensive, and efficient disposition of claims. But a concern with moving the cases along must coexist with a commitment to providing an effective remedy. There is a persistent and prevalent social problem of sexual harassment and discrimination in the [**373] [***130] workplace. (See, e.g., Women Lawyers and the Practice of Law in California, The Women in Law Committee, State Bar of California (1989) [finding that nearly half of survey respondents had experienced sexual harassment on the job; 88 percent perceived subtle, pervasive gender bias within the profession].) We are often taxed with being too litigious a society; one alternative to this state of affairs is to allow administrative remedies to function effectively. This the majority refuse to do.

# TAB 9

LEXSEE 13 CAL.APP.4TH 1472

**SEQUOIA INSURANCE COMPANY et al. Petitioners, v. THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent; ROBERT A. NORDEN, Real Party in Interest.**

**No. H010413**

**COURT OF APPEAL OF CALIFORNIA, SIXTH APPELLATE DISTRICT,**

*13 Cal. App. 4th 1472*; *16 Cal. Rptr. 2d 888*; *1993 Cal. App. LEXIS 202*; *8 I.E.R. Cas. (BNA) 458*; *93 Cal. Daily Op. Service 1557*; *93 Daily Journal DAR 2733*

**March 2, 1993, Decided**

**SUBSEQUENT HISTORY:**    [***1] Real Party in Interest's Review Denied May 20, 1993, Reported at: *1993 Cal. LEXIS 2678*.

Kennard, J., is of the opinion the petition should be granted.

**PRIOR HISTORY:**    Superior Court of Santa Clara County, No. 711409, Peter G. Stone, Judge.

**DISPOSITION:**    Let a writ of mandate issue directing the superior court to vacate its order denying the motion for summary adjudication of plaintiff's first cause of action, and to enter a new order granting the motion. The stay issued by this court on November 12, 1992, is vacated.

**SUMMARY:**

**CALIFORNIA OFFICIAL REPORTS SUMMARY**

A discharged employee brought an action against his former employer, an insurance company, for wrongful discharge in violation of public policy, age discrimination, and fraud and deceit. Plaintiff alleged he was terminated because he refused to artificially increase reserves on pending cases, which, he alleged, was ordered by the company president to create an illusion of loss and reduce customer refunds due under Prop. 103 (reduction and control of insurance rates). The trial court denied defendant's motion for summary judgment or, in the alternative, for summary adjudication of each cause of action, finding that defendant's notice of motion of summary adjudication was insufficient because it failed to specify the matters to be adjudicated, and that plaintiff adequately alleged causes of action for age discrimination and discharge in violation of public policy. (Superior

Court of Santa Clara County, No. 711409, Peter G. Stone, Judge.)

The Court of Appeal ordered issuance of a writ of mandate directing the trial court to vacate its order denying the motion for summary adjudication of the cause of action for wrongful discharge in violation of public policy and to enter a new order granting the motion. The court held that the trial court erred in finding that defendant's notice of motion was deficient, since the notice listed each disputed cause of action, which was sufficient under the 1990 amendment to *Code Civ. Proc., § 437c, subd. (f)*, which eliminated use of the summary adjudication process for facts or issues that do not completely dispose of a cause of action or defense, thus obviating the need for a notice of motion to identify specific issues. The court further held that the trial court erred in denying defendant's motion for summary adjudication of the cause of action for wrongful termination in violation of public policy. The court held that in order to state a cause of action, plaintiff was required to allege conduct that violated a public policy delineated in a constitutional or statutory provision. While plaintiff alleged that defendant's conduct had violated the general purpose of Prop. 103, which, according to plaintiff, was to bar excessive insurance rates by ensuring proper profit reporting to the insurance commissioner for the purpose of determining whether an insurer's financial condition warranted a rate increase, he failed to identify a specific statement in Prop. 103 or other statutes restricting the amount of an insurer's reserves. (Opinion by Premo, J., with Cottle, P. J., and Elia, J., concurring.)

**HEADNOTES**

**CALIFORNIA    OFFICIAL    REPORTS HEADNOTES**

Classified to California Digest of Official Reports

13 Cal. App. 4th 1472, *; 16 Cal. Rptr. 2d 888, **;
1993 Cal. App. LEXIS 202, ***; 8 I.E.R. Cas. (BNA) 458

**(1) Summary Judgment § 6--Motion--Notice of Motion--Summary Adjudication of Issues--Necessity of Specifying Issues.** --In an employee's action against his former employer for wrongful discharge in violation of public policy, age discrimination, and fraud and deceit, the trial court erred in finding that defendant's notice of motion for summary adjudication of each cause of action was deficient on the ground that it failed to specify the matters to be adjudicated, where the notice, in requesting an order adjudicating that there was no merit to the causes of action alleged by plaintiff, listed each disputed cause of action. The 1990 amendment to *Code Civ. Proc., § 437c, subd. (f)*, applied to defendant's motion, and that amendment redefined the summary adjudication process, eliminating its use for facts or issues that do not completely dispose of a cause of action or defense. Thus, there is no longer any reason for a notice of motion to identify specific issues. Instead, it is sufficient to simply list the disputed causes of action in the notice.

**(2a) (2b) (2c) (2d) (2e) Employer and Employee § 9--Contracts of Employment--Actions for Wrongful Discharge--In Violation of Public Policy-- Necessity of Constitutional or Statutory Basis for Public Policy.** --In an employee's wrongful discharge action against his former insurance company employer, the trial court erred in denying defendant's motion for summary adjudication of the cause of action for wrongful termination in violation of public policy, where plaintiff alleged he was terminated because he refused to artificially increase reserves in order to create an illusion of loss and reduce customer refunds due under Prop. 103 (reduction and control of insurance rates). To state a cause of action, plaintiff was required to allege conduct that violated a public policy delineated in a constitutional or statutory provision. It was insufficient for plaintiff to allege merely that the general purpose of Prop. 103 was to bar excessive rates by ensuring proper profit reporting to the insurance commissioner for the purpose of determining whether an insurer's financial condition warranted a rate increase. Plaintiff failed to identify a specific statement in Prop. 103 or other statutes restricting the amount of an insurer's reserves.

[See 2 **Witkin**, Summary of Cal. Law (9th ed. 1987) Agency and Employment, § 170A.]

**(3a) (3b) Summary Judgment § 6--Motion--Treating as Motion for Judgment on Pleadings.** --When a defendant's summary adjudication motion asserts that the complaint fails to state a cause of action, the motion is tantamount to a motion for a judgment on the pleadings. If, in fact, the complaint fails to state a cause of action, then the defendant is entitled to summary adjudication as a matter of law, and the court need not reach the question of whether the plaintiff's opposition to the motion raises a triable issue of fact.

**(4) Words, Phrases, and Maxims--Delineate.** --To "delineate" means to describe in detail, especially with sharpness or vividness, or to describe, portray, or set forth with accuracy or in detail.

**(5) Insurance Companies § 2--Regulation--Proposition 103--Purpose.** --In approving Prop. 103 (reduction and control of insurance rates), the voters intended to protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance market-place, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians.

**(6) Pleading § 92--Motion for Judgment on Pleadings--Granting Leave to Amend.** --Where a judgment on the pleadings is appropriate, a court has discretion to grant the opposing party leave to amend.

**COUNSEL:** Carlsmith, Ball, Wichman, Murray, Case, Mukai & Ichiki, Richard R. Pace and Donn Dimichele for Petitioners.

No appearance for Respondent.

McGuinn, Hillsman & Palefsky, John A. McGuinn and Keith A. Ehrman for Real Party in Interest.

**JUDGES:** Opinion by Premo, J., with Cottle, P. J., and Elia, J., concurring.

**OPINION BY:** PREMO, J.

**OPINION**

[*1475] [**889] In this writ proceeding, we consider whether a cause of action is stated for wrongful termination in violation of public policy when the employer's conduct is not specifically prohibited by a statutory or constitutional provision. We conclude that such a provision is a foundational requirement to establish wrongful termination on public policy [***2] grounds. Accordingly, we hold that the superior court erred in denying defendant employer's motion for summary adjudication of the wrongful termination cause of action in this case. We grant a writ of mandate to obviate an expensive and complex trial of a legal issue which, as a matter of law, must be resolved in the employer's favor.

BACKGROUND

For purposes of this proceeding, we will summarize only the undisputed facts leading to the termination at issue. Plaintiff Robert Norden was hired as claims man-

ager by Sequoia Insurance Company (hereafter, Sequoia) in 1976. In 1979, his title was changed to vice-president. In 1987, Sequoia was acquired by defendant QBE Insurance Limited, an Australian insurance and reinsurance group. In connection with the transfer of ownership, plaintiff acknowledged in writing that his employment was terminable at will. Defendant Michael Moody was named president of Sequoia in late February 1990.

In November 1988, the voters of California passed Proposition 103, adding article 10 to the Insurance Code (§ 1861 et seq.) for the express purpose of reducing and controlling insurance rates. After assuming the presidency of Sequoia, Moody observed that [***3] a number of large, late increases in case reserves were appearing in the claims department. [1] Moody told plaintiff that he believed the higher reserves on these cases should have been set earlier. Later, Moody expressed his opinion to plaintiff that a pattern of large, late reserves had developed at Sequoia. Plaintiff disagreed with this assessment, believing that "for the most part" adequate case reserves were being implemented on a timely basis. In June 1990, Moody sent plaintiff a memo expressing extreme concern about late reserve development. Although Moody never directly ordered plaintiff to increase the case reserves for all pending claims, he openly disagreed with the perceived overall practice by the claims department of establishing low case reserves and ultimately spending millions of [**890] dollars on attorney fees disputing [*1476] liability for claims. Nevertheless, plaintiff received favorable performance evaluations, rating him either "satisfactory" or "excellent" in 19 out of 20 categories, with an overall rating of "satisfactory."

> [1]  As described by plaintiff, "case reserves" are amounts of money set aside by the company as an estimate of the reasonable amount the company will ultimately be required to pay on a claim.

[***4] In July 1990, Moody decided to activate a previously authorized position of "litigation specialist" and appoint plaintiff to the position. Plaintiff agreed that his abilities would best be utilized in the "legal- technical area" and accepted the transfer, which took effect September 4, 1990.

In August 1990, the company experienced an operating loss of over half a million dollars, its second major loss in three months. Moody concluded that the loss was due principally to excessive expenditures. Moody was also concerned that Sequoia's "A" rating with the Best's Insurance Group would decline as a result of these losses. In late September or early October 1990, Sequoia was notified that it had been placed on a "watch" list by Best's--a preliminary step, in Moody's view, to lowering Sequoia's rating, and a reflection of Sequoia's deteriorat-

ing financial condition. On September 24, 1990, Moody called a meeting of a large group of managers and explained to them the severity of Sequoia's financial situation. The meeting produced a long list of recommended cost-cutting measures. Subsequently, 18 to 20 measures were implemented, including the closure of offices in 2 cities.

On October [***5] 13, 1990, about one month after plaintiff assumed the duties of litigation director, Moody informed him that Sequoia was eliminating this position and that plaintiff's employment was terminated. According to Moody, the termination of plaintiff and five other employees was one of the company's cost-cutting measures; plaintiff's position was, in his words, "a job that we could do without." Plaintiff found this explanation "not credible," however. In May 1991, he filed suit, alleging (1) wrongful discharge in violation of public policy, (2) age discrimination, and (3) fraud and deceit.

With respect to the first cause of action, plaintiff alleged that he was terminated "for his refusal to inflate claim reserves." According to plaintiff, Sequoia was engaged in a "scheme" to defeat the purposes of Proposition 103, by artificially inflating case reserves in order to reduce its apparent profitability. By "creating the illusion of loss," Sequoia would be able to reduce the amounts it would be required to refund to customers under Proposition 103 and increase its premiums. Plaintiff was "in the way" of this scheme; although he was "pressured" to inflate case reserves, he refused to do [***6] so. In the second and third causes of action, plaintiff alleged he was fraudulently induced by Moody's false promise to accept the position of litigation director, and thereafter was terminated as part of a plan to "get rid of Sequoia's older employees."

[*1477] Defendants moved for summary judgment, or in the alternative, summary adjudication of each cause of action. With respect to the first cause of action, defendants argued that there was no factual or legal foundation for a wrongful termination claim based on public policy, because there was no statutory expression of a policy against increasing case reserves. Plaintiff responded that there were numerous material factual issues precluding summary judgment. He further disputed defendants' interpretation of *Gantt v. Sentry Insurance Co. (1992) 1 Cal.4th 1083 [4 Cal.Rptr.2d 874, 824 P.2d 680]*, on which defendants had relied, arguing that a public policy need only be *"based on* or *derived from"* a statute to support a cause of action for wrongful termination. After hearing argument on the matter, the trial court denied both summary judgment and summary adjudication, [***7] ruling by minute order that "defendant's [*sic*] notice fails to specify the matters to be adjudicated. Plaintiff adequately alleges Causes of Action for age

discrimination and breach of public policy, although the proof is very thin."

DISCUSSION

Defendants assert two errors in the trial court's ruling. First, they object to the [**891] court's perception of their summary adjudication motion as inadequate for failing to specify the matters to be adjudicated. Second, they challenge the court's legal determination that a cause of action is stated for wrongful termination on public policy grounds. Plaintiff responds that summary adjudication was not warranted because "*numerous*" material issues of fact existed with respect to the wrongful termination allegations. As for the legal adequacy of this cause of action, he maintains that his claim was sufficiently rooted in public policy concerns to withstand summary adjudication.

**(1)** We first consider the trial court's determination that defendants' statement of grounds for summary adjudication was deficient. The notice of motion requested summary judgment in defendants' favor, or "alternatively, if for any reason summary judgment cannot [***8] be had[,] for an order adjudicating that there is no merit to the following described causes of action contained in the complaint filed herein by Robert A. Norden; and that the final judgment in this action shall, in addition to any matters determined at trial, award judgment as established by such adjudication as to the following described causes of action: discharge in violation of public policy, unlawful age discrimination, fraud and deceit, and intentional infliction of emotional distress. Said motion will be made upon the ground that there is no triable issue of material fact as to the summary judgment or summary adjudication sought and therefore the moving party is entitled to such summary judgment or summary adjudication as a matter of law."

[*1478] Defendants' motion was made in August 1992, more than 18 months after the 1990 amendment to *Code of Civil Procedure section 437c* [2] took effect. Subdivision (f) of that statute redefines the summary adjudication process, eliminating its use for facts or issues "that do not completely dispose of a cause of action or a defense." (Stats. 1990, ch. 1561, § 1.) Accordingly, there is no longer any reason for a notice of motion to [***9] identify specific issues; a listing of the disputed causes of action, as was done here, is sufficient. The trial court's stated requirement that the "matters" at issue be more precisely identified would have been accurate under the prior system of summary adjudication (cf. *Homestead Savings v. Superior Court (1986) 179 Cal.App.3d 494 [224 Cal.Rptr. 554]*), but is unjustified under the present version of *section 437c, subdivision (f)*. [3]

2    Further statutory references are to the Code of Civil Procedure unless otherwise indicated.

3    Indeed, defendants' motion was, if anything, overly inclusive; it sought adjudication of whether plaintiff had suffered emotional distress, which had not been asserted as a separate cause of action.

**(2a)** We turn next to the trial court's ruling on the legal sufficiency of the wrongful termination cause of action. Defendants' position is that plaintiff cannot succeed on this theory because he was not directed to engage in any conduct specifically [***10] enjoined by a statutory or constitutional provision. Plaintiff suggests this issue need not be reached because there were disputed issues of fact that precluded summary adjudication of this cause of action. In any event, he argues, a specific prohibition such as defendants advocate would be "absurd"; all that is required for a public policy to be stated is that it be generally "*based on* or *derived from*" a statutory or constitutional law.

Preliminarily, we find it necessary to clarify some confusion evident in plaintiff's identification of the issues. Plaintiff appears to assume that if questions of fact exist, it is not necessary to address the merits of the controversy between the parties. Plaintiff's approach, however, is backward. **(3a)** In a case such as this, where the defendant asserts a failure of the complaint to state a cause of action, the summary adjudication motion is tantamount to a motion for judgment on the pleadings. ( *C. L. Smith Co. v. Roger Ducharme, Inc. (1977) 65 Cal.App.3d 735, 745 [135 Cal.Rptr. 483]*; see also *Robinson v. Hewlett-Packard Corp. (1986) 183 Cal.App.3d 1108, 1131 [228 Cal.Rptr. 591]*.) [***11] Defendants' motion [**892] is based on the argument that *even if* the allegations of the complaint are true, no ground for wrongful termination is stated therein. If defendants are correct, then adjudication in their favor must follow as a matter of law, and we need not reach the question whether plaintiff's opposition to the motion raises a triable issue of fact. ( *C. L. Smith Co. v. Roger Ducharme, Inc., supra,* 65 Cal.App.3d at p. 750; *Hejmadi v. AMFAC, Inc. (1988) 202 Cal.App.3d 525, 536 [249 Cal.Rptr. 5]*.)

[*1479] **(2b)** Our first task, then, is to accept as true the material factual allegations of the complaint and determine whether, on those facts, plaintiff's allegation of wrongful termination in violation of public policy is legally sufficient. The answer to this question turns on the correct interpretation of our Supreme Court's most recent exposition on the subject of public policy in the employment context in *Gantt v. Sentry Insurance, supra,* 1 Cal.4th 1083.

In *Gantt,* the plaintiff alleged he was terminated in retaliation [***12] for supporting a coworker's claim of sexual harassment and refusing to lie to investigators from the Department of Fair Employment and Housing. The Supreme Court reaffirmed the right of an employee to sue for wrongful termination "when he or she is discharged for performing an act that public policy would encourage, or for refusing to do something that public policy would condemn." (*1 Cal.4th at p.* 1090.)

The court also recognized, however, the difficulty of defining "public policy" clearly enough to distinguish truly public interests from mere private disputes between employer and employee and, at the same time, avoid "judicial policymaking" inherent in an overly broad construction of the term. Notwithstanding the division among the courts both of this state and across the country in their willingness to define this concept broadly, the *Gantt* court observed that "with few exceptions courts have, in practice, relied to some extent on statutory or constitutional expressions of public policy as a basis of the employee's claim." ( *Gantt v. Sentry Insurance, supra, 1 Cal.4th at p.* 1094.) [***13] Even those decisions favoring a broad view, the court pointed out, have typically cautioned against declaring public policy "absent some prior legislative expression on the subject." ( at p. 1095.)

The *Gantt* court embraced a more restrictive approach, which, it reasoned, would best serve the interests of employer, employee, and the public: "These wise caveats against judicial policymaking are unnecessary if one recognizes that courts *in wrongful discharge actions* may not declare public policy without a basis in either constitutional or statutory provisions. A public policy exception carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions strikes the proper balance among the interests of employers, employees and the public. The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes; so limited, the public policy exception presents no impediment to employers that operate within the bounds of law. Employees are protected against employer actions that contravene fundamental state policy. And society's interests are served through a more [***14] stable job market, in which its most important policies are safeguarded." (*1 Cal.4th at p.* 1095.)

[*1480] This statement evinces an intent by the Supreme Court to narrow the scope of the public policy exception to at-will employment. Plaintiff's selected references to portions of the *Gantt* opinion that mention public policy being generally "derived from" or "based on" a statute are misleading: they are taken not from the court's holding, but from its review of precedent in the area, which was fraught with conflict and uncertainty. [4]

Indeed, the court acknowledged [**893] that it had *not* previously taken a position on the issue of how broadly "public policy" should be defined. In *Gantt,* however, it did adopt such a position: the fundamental policies underlying the public policy exception must be *delineated in a constitutional or statutory provision.*

> 4  *Dabbs v. Cardiopulmonary Management Services (1987) 188 Cal.App.3d 1437 [234 Cal. Rptr. 129],* for example, was not cited by the *Gantt* court "with approval," as plaintiff says; on the contrary, any suggestion in *Dabbs* that public policy need not be rooted in a statute or constitution is inconsistent with the holding ultimately reached in *Gantt.* Plaintiff's other pre-*Gantt* citations likewise provide no support for his suggestion that "vague, general policies" are sufficient to protect an employee from retaliatory discharge.

[***15] A requirement that a policy be "delineated" entails more specificity than merely being "derived from" or "based" on its source. (4) To "delineate" means ". . . to describe in detail, esp. with sharpness or vividness" (Webster's Third New Internat. Dict. (1981) p. 597); ". . . to describe, portray, or set forth with accuracy or in detail" (Webster's Ninth New Collegiate Dict. (1984) p. 336). (2c) Although one should not assume that the employer's *precise act* (e.g., discharging an employee for refusing to commit a crime) must be specifically prohibited for the public policy exception to apply, [5] a constitutional or statutory provision must sufficiently describe the type of prohibited conduct to enable an employer to know the fundamental public policies that are expressed in that law.

> 5  We mention this otherwise self-evident qualification only to disaffirm plaintiff's fallacious suggestion that if generally inferring public policy from a statute is not sufficient, the alternative must be a hypertechnical requirement that the statute proscribe the very act of which the employer is accused. Such resort to either-or reasoning contributes nothing to a balanced analysis of the *Gantt* decision.

[***16] In this case, the employer is accused of violating public policy by attempting to persuade plaintiff to "inflate" case reserves. Unless plaintiff can point to a specific statement in Proposition 103 or another statute which restricts the amount of reserves an insurer may set aside for the anticipated cost of a pending claim, no public policy can be inferred.

Plaintiff cannot identify such a provision. Instead, he relies on the general purpose "to be *derived* from" Proposition 103 and related sections--in his words, "to bar insurers from charging excessive rates, by ensuring

that proper and non-deceitful profitability data is [*sic*] given to the Insurance [*1481] Commissioner, in order for the Commissioner to determine whether an insurer's financial condition is such that it should be allowed a rate increase." Consequently, he argues, his "conduct in refusing to participate in a scheme that aimed at *purposely misleading* the Insurance Commissioner as to Sequoia's profitability deserves to be *protected* and *encouraged,* since it upheld the clear purpose and policy of [Proposition] 103."

We must reject this reasoning. First, plaintiff's description of the purpose [***17] of Proposition 103 exaggerates the significance of the submission of data to the Insurance Commissioner. **(5)** In approving the initiative, the voters of California intended to "protect consumers from arbitrary insurance rates and practices, to encourage a competitive insurance marketplace, to provide for an accountable Insurance Commissioner, and to ensure that insurance is fair, available, and affordable for all Californians." (See Historical and Statutory Notes, 42A West's Ann. *Ins. Code, § 1861.01* (1993 pocket supp.) pp. 104-105.) That purpose should not be confused with the rate approval procedures, one of several mechanisms intended to further compliance with the goals of the initiative.

**(2d)** Even if we were to accept plaintiff's representation of the purpose of Proposition 103, we nonetheless can find no "direct statutory support" ( *Gantt v. Sentry Insurance, supra, 1 Cal.4th at p. 1096*) for the argument that an insurer's adjustment or manipulation of case reserves is against public policy. An employer cannot be "bound to know" that a practice of increasing reserves at an early date in the claim process is against public [***18] policy where there is no expression of that policy anywhere in the codes under which the employer operates its business. The nexus between the public's general objective of controlling the [**894] rise of insurance rates and an insurer's disingenuous motive for an otherwise legitimate business practice is simply too tenuous to serve as a basis for finding a public policy exception to employment at will. Thus, whether the conflict between plaintiff and Moody was a reflection of fundamental differences in "case-reserving philosophy" (as Moody explained it), or, as plaintiff characterizes it, a battle between a company president trying to distort its profitability figures and an employee who "refused" to " 'go along with' " that "scheme," defendants' conduct provides no basis for recovery on a wrongful termination theory.

**(3b)** As noted earlier, where a complaint is insufficient to state a cause of action, a defendant's motion for summary judgment is in legal effect a motion for judgment on the pleadings, and factual controversies are essentially irrelevant. **(6)** Where judgment on the pleadings is appropriate, a court has discretion to grant the opposing party leave to amend. ( *Hejmadi v. AMFAC, Inc., supra, 202 Cal.App.3d at p. 536.*) [***19] **(2e)** In this case, however, we see no reasonable probability that plaintiff will be able to amend his [*1482] complaint to state a cause of action for wrongful termination in violation of public policy. Accordingly, we must conclude that defendants were entitled to judgment on the pleadings--or, as they labeled the request, summary adjudication--of this count in plaintiff's complaint. [6] (See generally, *Heredia v. Farmers Ins. Exchange (1991) 228 Cal.App.3d 1345, 1358 [279 Cal.Rptr. 511]* [court may grant motion for judgment on the pleadings as to some of asserted counts].)

> [6]   Although technically this motion should have been denominated a motion for judgment on the pleadings, the ultimate result is the same: elimination of this cause of action from the controversy.  For purposes of disposition, therefore, we will treat the motion as if it had properly been brought as a request for summary judgment.

DISPOSITION

Let a writ of mandate issue directing the superior court to [***20] vacate its order denying the motion for summary adjudication of plaintiff's first cause of action, and to enter a new order granting the motion.  The stay issued by this court on November 12, 1992, is vacated.

Cottle, P. J., and Elia, J., concurred.

The petition of real party in interest for review by the Supreme Court was denied May 20, 1993.  Kennard, J., was of the opinion that the petition should be granted.

TAB 10

LEXSTAT CAL. GOVERNMENT CODE 12926

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED ***
THROUGH 2007-2008 THIRD EXTRAORDINARY SESSION CH.6 AND
CH.3 OF THE 2008 REGULAR SESSION APPROVED 3/26/08

GOVERNMENT CODE
Title 2.  Government of the State of California
Division 3.  Executive Department
Part 2.8.  Department of Fair Employment and Housing
Chapter 4.  Definitions

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Gov Code § 12926 (2007)*

### § 12926. Definitions regarding unlawful practices

As used in this part in connection with unlawful practices, unless a different meaning clearly appears from the context:

(a) "Affirmative relief" or "prospective relief" includes the authority to order reinstatement of an employee, awards of backpay, reimbursement of out-of-pocket expenses, hiring, transfers, reassignments, grants of tenure, promotions, cease and desist orders, posting of notices, training of personnel, testing, expunging of records, reporting of records, and any other similar relief that is intended to correct unlawful practices under this part.

(b) "Age" refers to the chronological age of any individual who has reached his or her 40th birthday.

(c) "Employee" does not include any individual employed by his or her parents, spouse, or child, or any individual employed under a special license in a nonprofit sheltered workshop or rehabilitation facility.

(d) "Employer" includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, the state or any political or civil subdivision of the state, and cities, except as follows:

"Employer" does not include a religious association or corporation not organized for private profit.

(e) "Employment agency" includes any person undertaking for compensation to procure employees or opportunities to work.

(f) "Essential functions" means the fundamental job duties of the employment position the individual with a disability holds or desires. "Essential functions" does not include the marginal functions of the position.

(1) A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following:

(A) The function may be essential because the reason the position exists is to perform that function.

(B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed.

(C) The function may be highly specialized, so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

Cal Gov Code § 12926

**(2)** Evidence of whether a particular function is essential includes, but is not limited to, the following:

**(A)** The employer's judgment as to which functions are essential.

**(B)** Written job descriptions prepared before advertising or interviewing applicants for the job.

**(C)** The amount of time spent on the job performing the function.

**(D)** The consequences of not requiring the incumbent to perform the function.

**(E)** The terms of a collective bargaining agreement.

**(F)** The work experiences of past incumbents in the job.

**(G)** The current work experience of incumbents in similar jobs.

**(g)** "Labor organization" includes any organization that exists and is constituted for the purpose, in whole or in part, of collective bargaining or of dealing with employers concerning grievances, terms or conditions of employment, or of other mutual aid or protection.

**(h)** "Medical condition" means either of the following:

**(1)** Any health impairment related to or associated with a diagnosis of cancer or a record or history of cancer.

**(2)** Genetic characteristics. For purposes of this section, "genetic characteristics" means either of the following:

**(A)** Any scientifically or medically identifiable gene or chromosome, or combination or alteration thereof, that is known to be a cause of a disease or disorder in a person or his or her offspring, or that is determined to be associated with a statistically increased risk of development of a disease or disorder, and that is presently not associated with any symptoms of any disease or disorder.

**(B)** Inherited characteristics that may derive from the individual or family member, that are known to be a cause of a disease or disorder in a person or his or her offspring, or that are determined to be associated with a statistically increased risk of development of a disease or disorder, and that are presently not associated with any symptoms of any disease or disorder.

**(i)** "Mental disability" includes, but is not limited to, all of the following:

**(1)** Having any mental or psychological disorder or condition, such as mental retardation, organic brain syndrome, emotional or mental illness, or specific learning disabilities, that limits a major life activity. For purposes of this section:

**(A)** "Limits" shall be determined without regard to mitigating measures, such as medications, assistive devices, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

**(B)** A mental or psychological disorder or condition limits a major life activity if it makes the achievement of the major life activity difficult.

**(C)** "Major life activities" shall be broadly construed and shall include physical, mental, and social activities and working.

**(2)** Any other mental or psychological disorder or condition not described in paragraph (1) that requires special education or related services.

**(3)** Having a record or history of a mental or psychological disorder or condition described in paragraph (1) or (2), which is known to the employer or other entity covered by this part.

**(4)** Being regarded or treated by the employer or other entity covered by this part as having, or having had, any mental condition that makes achievement of a major life activity difficult.

**(5)** Being regarded or treated by the employer or other entity covered by this part as having, or having had, a mental or psychological disorder or condition that has no present disabling effect, but that may become a mental disability as described in paragraph (1) or (2).

"Mental disability" does not include sexual behavior disorders, compulsive gambling, kleptomania, pyromania, or psychoactive substance use disorders resulting from the current unlawful use of controlled substances or other drugs.

Cal Gov Code § 12926

(j) "On the bases enumerated in this part" means or refers to discrimination on the basis of one or more of the following: race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation.

(k) "Physical disability" includes, but is not limited to, all of the following:

(1) Having any physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss that does both of the following:

(A) Affects one or more of the following body systems: neurological, immunological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genitourinary, hemic and lymphatic, skin, and endocrine.

(B) Limits a major life activity. For purposes of this section:

(i) "Limits" shall be determined without regard to mitigating measures such as medications, assistive devices, prosthetics, or reasonable accommodations, unless the mitigating measure itself limits a major life activity.

(ii) A physiological disease, disorder, condition, cosmetic disfigurement, or anatomical loss limits a major life activity if it makes the achievement of the major life activity difficult.

(iii) "Major life activities" shall be broadly construed and includes physical, mental, and social activities and working.

(2) Any other health impairment not described in paragraph (1) that requires special education or related services.

(3) Having a record or history of a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment described in paragraph (1) or (2), which is known to the employer or other entity covered by this part.

(4) Being regarded or treated by the employer or other entity covered by this part as having, or having had, any physical condition that makes achievement of a major life activity difficult.

(5) Being regarded or treated by the employer or other entity covered by this part as having, or having had, a disease, disorder, condition, cosmetic disfigurement, anatomical loss, or health impairment that has no present disabling effect but may become a physical disability as described in paragraph (1) or (2).

(6) "Physical disability" does not include sexual behavior disorders, compulsive gambling, kleptomania, pyromania, or psychoactive substance use disorders resulting from the current unlawful use of controlled substances or other drugs.

(l) Notwithstanding subdivisions (i) and (k), if the definition of "disability" used in the Americans with Disabilities Act of 1990 (Public Law 101-336) would result in broader protection of the civil rights of individuals with a mental disability or physical disability, as defined in subdivision (i) or (k), or would include any medical condition not included within those definitions, then that broader protection or coverage shall be deemed incorporated by reference into, and shall prevail over conflicting provisions of, the definitions in subdivisions (i) and (k).

(m) "Race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation" includes a perception that the person has any of those characteristics or that the person is associated with a person who has, or is perceived to have, any of those characteristics.

(n) "Reasonable accommodation" may include either of the following:

(1) Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.

(2) Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(o) "Religious creed," "religion," "religious observance," "religious belief," and "creed" include all aspects of religious belief, observance, and practice.

(p) "Sex" includes, but is not limited to, pregnancy, childbirth, or medical conditions related to pregnancy or childbirth. "Sex" also includes, but is not limited to, a person's gender, as defined in *Section 422.56 of the Penal Code*.

(q) "Sexual orientation" means heterosexuality, homosexuality, and bisexuality.

Cal Gov Code § 12926

(r) "Supervisor" means any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

(s) "Undue hardship" means an action requiring significant difficulty or expense, when considered in light of the following factors:

(1) The nature and cost of the accommodation needed.

(2) The overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility.

(3) The overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities.

(4) The type of operations, including the composition, structure, and functions of the workforce of the entity.

(5) The geographic separateness, administrative, or fiscal relationship of the facility or facilities.

**HISTORY:**

Added Stats 1980 ch 992 § 4. Amended Stats 1985 ch 1151 § 1; Stats 1990 ch 15 § 1 (SB 1027); Stats 1992 ch 911 § 3 (AB 311), ch 912 § 3 (AB 1286), ch 913 § 21.3 (AB 1077); Stats 1993 ch 1214 § 5 (AB 551); Stats 1998 ch 99 § 1 (SB 654); Stats 1999 ch 311 § 2 (SB 1185), ch 591 § 5.1 (AB 1670), ch 592 § 3.7 (AB 1001); Stats 2000 ch 1049 § 5 (AB 2222); Stats 2003 ch 164 § 1 (AB 196); Stats 2004 ch 700 § 4 (SB 1234).

**NOTES:**

**Amendments:**

**1985 Amendment:**

Added (1) "or her" after "employed by his" in subd (b); and (2) subd (i).

**1990 Amendment:**

Added subd (j).

**1992 Amendment:**

(1) Added subd (a); (2) redesignated former subds (a)-(d) to be subds (b)-(e); (3) amended the introductory clause of subd (d) by (a) deleting ", except as hereinafter provided," before "includes"; and (b) substituting ", except as follows:" for a period; (4) added subdivision designation (d)(1); (5) added subd (d)(2); (6) added subd (f); (7) redesignated former subdivisions (e) and (f) to be subds (g) and (h); (8) substituted "includes, but is not limited to," for "means" in subd (h); (9) added subd (i); (10) redesignated former subd (g) to be subd (j); (11) substituted "disability, mental disability" for "handicap" in subd (j); (12) substituted subd (k) for former subd (h) which read: "(h) 'Physical handicap' includes impairment of sight, hearing, or speech, or impairment of physical ability because of amputation or loss of function or coordination, or any other health impairment which requires special education or related services."; (13) added subds ( l ) and (m); (14) redesignated former subds (i) and (j) to be subds (n) and (o); and (15) added subd (p) and the last paragraph. (As amended 1992 ch 913, compared to the section as it read prior to 1992. This section was also amended by two earlier chapters, ch 911, ch 912. See *Gov C § 9605*.)

# TAB 11

LEXSTAT CAL GOV CODE § 12940

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED ***
THROUGH 2007-2008 THIRD EXTRAORDINARY SESSION CH.6 AND
CH.3 OF THE 2008 REGULAR SESSION APPROVED 3/26/08

GOVERNMENT CODE
Title 2.  Government of the State of California
Division 3.  Executive Department
Part 2.8.  Department of Fair Employment and Housing
Chapter 6.  Discrimination Prohibited
Article 1.  Unlawful Practices, Generally

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Gov Code § 12940* (2008)

### § 12940.  Unlawful employment practices

It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

(a) For an employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment.

(1) This part does not prohibit an employer from refusing to hire or discharging an employee with a physical or mental disability, or subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee with a physical or mental disability, where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger his or her health or safety or the health or safety of others even with reasonable accommodations.

(2) This part does not prohibit an employer from refusing to hire or discharging an employee who, because of the employee's medical condition, is unable to perform his or her essential duties even with reasonable accommodations, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations. Nothing in this part shall subject an employer to any legal liability resulting from the refusal to employ or the discharge of an employee who, because of the employee's medical condition, is unable to perform his or her essential duties, or cannot perform those duties in a manner that would not endanger the employee's health or safety or the health or safety of others even with reasonable accommodations.

(3) Nothing in this part relating to discrimination on account of marital status shall do either of the following:

(A) Affect the right of an employer to reasonably regulate, for reasons of supervision, safety, security, or morale, the working of spouses in the same department, division, or facility, consistent with the rules and regulations adopted by the commission.

(B) Prohibit bona fide health plans from providing additional or greater benefits to employees with dependents than to those employees without or with fewer dependents.

Cal Gov Code § 12940

**(4)** Nothing in this part relating to discrimination on account of sex shall affect the right of an employer to use veteran status as a factor in employee selection or to give special consideration to Vietnam era veterans.

**(5)** Nothing in this part prohibits an employer from refusing to employ an individual because of his or her age if the law compels or provides for that refusal. Promotions within the existing staff, hiring or promotion on the basis of experience and training, rehiring on the basis of seniority and prior service with the employer, or hiring under an established recruiting program from high schools, colleges, universities, or trade schools do not, in and of themselves, constitute unlawful employment practices.

**(b)** For a labor organization, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of any person, to exclude, expel or restrict from its membership the person, or to provide only second-class or segregated membership or to discriminate against any person because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of the person in the election of officers of the labor organization or in the selection of the labor organization's staff or to discriminate in any way against any of its members or against any employer or against any person employed by an employer.

**(c)** For any person to discriminate against any person in the selection or training of that person in any apprenticeship training program or any other training program leading to employment because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation of the person discriminated against.

**(d)** For any employer or employment agency to print or circulate or cause to be printed or circulated any publication, or to make any non-job-related inquiry of an employee or applicant, either verbal or through use of an application form, that expresses, directly or indirectly, any limitation, specification, or discrimination as to race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, or any intent to make any such limitation, specification or discrimination. Nothing in this part prohibits an employer or employment agency from inquiring into the age of an applicant, or from specifying age limitations, where the law compels or provides for that action.

**(e)**

**(1)** Except as provided in paragraph (2) or (3), for any employer or employment agency to require any medical or psychological examination of an applicant, to make any medical or psychological inquiry of an applicant, to make any inquiry whether an applicant has a mental disability or physical disability or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

**(2)** Notwithstanding paragraph (1), an employer or employment agency may inquire into the ability of an applicant to perform job-related functions and may respond to an applicant's request for reasonable accommodation.

**(3)** Notwithstanding paragraph (1), an employer or employment agency may require a medical or psychological examination or make a medical or psychological inquiry of a job applicant after an employment offer has been made but prior to the commencement of employment duties, provided that the examination or inquiry is job-related and consistent with business necessity and that all entering employees in the same job classification are subject to the same examination or inquiry.

**(f)**

**(1)** Except as provided in paragraph (2), for any employer or employment agency to require any medical or psychological examination of an employee, to make any medical or psychological inquiry of an employee, to make any inquiry whether an employee has a mental disability, physical disability, or medical condition, or to make any inquiry regarding the nature or severity of a physical disability, mental disability, or medical condition.

**(2)** Notwithstanding paragraph (1), an employer or employment agency may require any examinations or inquiries that it can show to be job-related and consistent with business necessity. An employer or employment agency may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that worksite.

**(g)** For any employer, labor organization, or employment agency to harass, discharge, expel, or otherwise discriminate against any person because the person has made a report pursuant to *Section 11161.8 of the Penal Code* that

Cal Gov Code § 12940

prohibits retaliation against hospital employees who report suspected patient abuse by health facilities or community care facilities.

(h) For any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part.

(i) For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so.

(j)

(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age, or sexual orientation, to harass an employee, an applicant, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees, applicants, or persons providing services pursuant to a contract in the workplace, where the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of those nonemployees shall be considered. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

(2) The provisions of this subdivision are declaratory of existing law, except for the new duties imposed on employers with regard to harassment.

(3) An employee of an entity subject to this subdivision is personally liable for any harassment prohibited by this section that is perpetrated by the employee, regardless of whether the employer or covered entity knows or should have known of the conduct and fails to take immediate and appropriate corrective action.

(4)

(A) For purposes of this subdivision only, "employer" means any person regularly employing one or more persons or regularly receiving the services of one or more persons providing services pursuant to a contract, or any person acting as an agent of an employer, directly or indirectly, the state, or any political or civil subdivision of the state, and cities. The definition of "employer" in subdivision (d) of Section 12926 applies to all provisions of this section other than this subdivision.

(B) Notwithstanding subparagraph (A), for purposes of this subdivision, "employer" does not include a religious association or corporation not organized for private profit, except as provided in Section 12926.2.

(C) For purposes of this subdivision, "harassment" because of sex includes sexual harassment, gender harassment, and harassment based on pregnancy, childbirth, or related medical conditions.

(5) For purposes of this subdivision, "a person providing services pursuant to a contract" means a person who meets all of the following criteria:

(A) The person has the right to control the performance of the contract for services and discretion as to the manner of performance.

(B) The person is customarily engaged in an independently established business.

(C) The person has control over the time and place the work is performed, supplies the tools and instruments used in the work, and performs work that requires a particular skill not ordinarily used in the course of the employer's work.

(k) For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

Cal Gov Code § 12940

(l) For an employer or other entity covered by this part to refuse to hire or employ a person or to refuse to select a person for a training program leading to employment or to bar or to discharge a person from employment or from a training program leading to employment, or to discriminate against a person in compensation or in terms, conditions, or privileges of employment because of a conflict between the person's religious belief or observance and any employment requirement, unless the employer or other entity covered by this part demonstrates that it has explored any available reasonable alternative means of accommodating the religious belief or observance, including the possibilities of excusing the person from those duties that conflict with his or her religious belief or observance or permitting those duties to be performed at another time or by another person, but is unable to reasonably accommodate the religious belief or observance without undue hardship on the conduct of the business of the employer or other entity covered by this part. Religious belief or observance, as used in this section, includes, but is not limited to, observance of a Sabbath or other religious holy day or days, and reasonable time necessary for travel prior and subsequent to a religious observance.

(m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship to its operation.

(n) For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.

(o) For an employer or other entity covered by this part, to subject, directly or indirectly, any employee, applicant, or other person to a test for the presence of a genetic characteristic.

**HISTORY:**

Added Stats 1980 ch 992 § 4. Amended Stats 1981 ch 11 § 1, ch 270 § 1; Stats 1982 ch 1184 § 1, ch 1193 § 2; Stats 1984 ch 1754 § 2; Stats 1985 ch 1151 § 2; Stats 1987 ch 605 § 1; Stats 1989 ch 1309 § 3; Stats 1992 ch 912 § 5 (AB 1286), ch 913 § 23.1 (AB 1077); Stats 1993 ch 711 § 2 (AB 675); Stats 1998 ch 485 § 85 (AB 2803); Stats 1999 ch 591 § 8 (AB 1670), ch 592 § 7.5 (AB 1001); Stats 2000 ch 1047 § 1 (AB 1856), ch 1049 § 7.5 (AB 2222); Stats 2001 ch 909 § 1 (AB 1475); Stats 2002 ch 525 § 1 (AB 1599) (ch 525 prevails), ch 664 § 94 (AB 3034); Stats 2003 ch 671 § 1 (AB 76).

**NOTES:**

**Former Sections:**

Former § 12940, relating to index of deeds, was added Stats 1963 ch 1786 § 1, operative October 1, 1963, and repealed Stats 1965 ch 371 § 149.

**Amendments:**

**1981 Amendment:**

Added subd (a)(4). (As amended Stats 1981, ch 270, compared to the section as it read prior to 1981. This section was also amended by an earlier chapter, ch 11. See *Gov C § 9605*.)

**1982 Amendment:**

(1) Added subd (e); (2) redesignated former subds (e) and (g) to be subds (f) and (h); and (3) added subd (i). (As amended by Stats 1982, ch 1193, compared to the section as it read prior to 1982. This section was also amended by an earlier chapter, ch 1184. See *Gov C § 9605*.)

# TAB 12

LEXSTAT CAL GOV CODE § 12965

DEERING'S CALIFORNIA CODES ANNOTATED
Copyright (c) 2008 by Matthew Bender & Company, Inc.
a member of the LexisNexis Group.
All rights reserved.

*** THIS DOCUMENT REFLECTS ALL URGENCY LEGISLATION ENACTED ***
THROUGH 2007-2008 THIRD EXTRAORDINARY SESSION CH.6 AND
CH.3 OF THE 2008 REGULAR SESSION APPROVED 3/26/08

GOVERNMENT CODE
Title 2.  Government of the State of California
Division 3.  Executive Department
Part 2.8.  Department of Fair Employment and Housing
Chapter 7.  Enforcement and Hearing Procedures
Article 1.  Unlawful Practices

**GO TO CALIFORNIA CODES ARCHIVE DIRECTORY**

*Cal Gov Code § 12965* (2008)

**§ 12965.  Accusation by department; Right-to-sue notice; Civil action by or on behalf of aggrieved person; Transfer of proceedings to court in lieu of hearing**

(a) In the case of failure to eliminate an unlawful practice under this part through conference, conciliation, or persuasion, or in advance thereof if circumstances warrant, the director in his or her discretion may cause to be issued in the name of the department a written accusation. The accusation shall contain the name of the person, employer, labor organization, or employment agency accused, which shall be known as the respondent, shall set forth the nature of the charges, shall be served upon the respondent together with a copy of the verified complaint, as amended, and shall require the respondent to answer the charges at a hearing.

For any complaint treated by the director as a group or class complaint for purposes of investigation, conciliation, and accusation pursuant to Section 12961, an accusation shall be issued, if at all, within two years after the filing of the complaint. For any complaint alleging a violation of *Section 51.7 of the Civil Code*, an accusation shall be issued, if at all, within two years after the filing of the complaint. For all other complaints, an accusation shall be issued, if at all, within one year after the filing of a complaint. If the director determines, pursuant to Section 12961, that a complaint investigated as a group or class complaint under Section 12961 is to be treated as a group or class complaint for purposes of conciliation and accusation as well, that determination shall be made and shall be communicated in writing within one year after the filing of the complaint to each person, employer, labor organization, employment agency, or public entity alleged in the complaint to have committed an unlawful practice.

(b) If an accusation is not issued within 150 days after the filing of a complaint, or if the department earlier determines that no accusation will issue, the department shall promptly notify, in writing, the person claiming to be aggrieved that the department shall issue, on his or her request, the right-to-sue notice. This notice shall indicate that the person claiming to be aggrieved may bring a civil action under this part against the person, employer, labor organization, or employment agency named in the verified complaint within one year from the date of that notice. If the person claiming to be aggrieved does not request a right-to-sue notice, the department shall issue the notice upon completion of its investigation, and not later than one year after the filing of the complaint. A city, county, or district attorney in a location having an enforcement unit established on or before March 1, 1991, pursuant to a local ordinance enacted for the purpose of prosecuting HIV/AIDS discrimination claims, acting on behalf of any person claiming to be aggrieved due to HIV/AIDS discrimination, may also bring a civil action under this part against the person, employer, labor organization, or employment agency named in the notice. The superior courts of the State of California shall have jurisdiction of those actions, and the aggrieved person may file in these courts. An action may be brought in any county in the state in

Cal Gov Code § 12965

which the unlawful practice is alleged to have been committed, in the county in which the records relevant to the practice are maintained and administered, or in the county in which the aggrieved person would have worked or would have had access to the public accommodation but for the alleged unlawful practice, but if the defendant is not found within any of these counties, an action may be brought within the county of the defendant's residence or principal office. A copy of any complaint filed pursuant to this part shall be served on the principal offices of the department and of the commission. The remedy for failure to send a copy of a complaint is an order to do so. Those actions may not be filed as class actions or may not be maintained as class actions by the person or persons claiming to be aggrieved where those persons have filed a civil class action in the federal courts alleging a comparable claim of employment discrimination against the same defendant or defendants. In actions brought under this section, the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs, including expert witness fees, except where the action is filed by a public agency or a public official, acting in an official capacity.

(c)

(1) If an accusation includes a prayer either for damages for emotional injuries as a component of actual damages, or for administrative fines, or for both, or if an accusation is amended for the purpose of adding a prayer either for damages for emotional injuries as a component of actual damages, or for administrative fines, or both, the respondent may within 30 days after service of the accusation or amended accusation, elect to transfer the proceedings to a court in lieu of a hearing pursuant to subdivision (a) by serving a written notice to that effect on the department, the commission, and the person claiming to be aggrieved. The commission shall prescribe the form and manner of giving written notice.

(2) No later than 30 days after the completion of service of the notice of election pursuant to paragraph (1), the department shall dismiss the accusation and shall, either itself or, at its election, through the Attorney General, file in the appropriate court an action in its own name on behalf of the person claiming to be aggrieved as the real party in interest. In this action, the person claiming to be aggrieved shall be the real party in interest and shall have the right to participate as a party and be represented by his or her own counsel. Complaints filed pursuant to this section shall be filed in the superior court in any county in which unlawful practices are alleged to have been committed, in the county in which records relevant to the alleged unlawful practices are maintained and administered, or in the county in which the person claiming to be aggrieved would have worked or would have had access to public accommodation, but for the alleged unlawful practices. If the defendant is not found in any of these counties, the action may be brought within the county of the defendant's residence or principal office. Those actions shall be assigned to the court's delay reduction program, or otherwise given priority for disposition by the court in which the action is filed.

(3) A court may grant as relief in any action filed pursuant to this subdivision any relief a court is empowered to grant in a civil action brought pursuant to subdivision (b), in addition to any other relief that, in the judgment of the court, will effectuate the purpose of this part. This relief may include a requirement that the employer conduct training for all employees, supervisors, and management on the requirements of this part, the rights and remedies of those who allege a violation of this part, and the employer's internal grievance procedures.

(4) The department may amend an accusation to pray for either damages for emotional injury or for administrative fines, or both, provided that the amendment is made within 30 days of the issuance of the original accusation.

(d)

(1) Notwithstanding subdivision (b), the one-year statute of limitations, commencing from the date of the right-to-sue notice by the Department of Fair Employment and Housing, to the person claiming to be aggrieved, shall be tolled when all of the following requirements have been met:

(A) A charge of discrimination or harassment is timely filed concurrently with the Equal Employment Opportunity Commission and the Department of Fair Employment and Housing.

(B) The investigation of the charge is deferred by the Department of Fair Employment and Housing to the Equal Employment Opportunity Commission.

(C) A right-to-sue notice is issued to the person claiming to be aggrieved upon deferral of the charge by the Department of Fair Employment and Housing to the Equal Employment Opportunity Commission.

(2) The time for commencing an action for which the statute of limitations is tolled under paragraph (1) expires when the federal right-to-sue period to commence a civil action expires, or one year from the date of the right-to-sue notice by the Department of Fair Employment and Housing, whichever is later.

Cal Gov Code § 12965

(3) This subdivision is intended to codify the holding in *Downs v. Department of Water and Power of City of Los Angeles (1997) 58 Cal.App.4th 1093.*

(e)

(1) Notwithstanding subdivision (b), the one-year statute of limitations, commencing from the date of the right-to-sue notice by the Department of Fair Employment and Housing, to the person claiming to be aggrieved, shall be tolled when all of the following requirements have been met:

(A) A charge of discrimination or harassment is timely filed concurrently with the Equal Employment Opportunity Commission and the Department of Fair Employment and Housing.

(B) The investigation of the charge is deferred by the Equal Employment Opportunity Commission to the Department of Fair Employment and Housing.

(C) After investigation and determination by the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission agrees to perform a substantial weight review of the determination of the department or conducts its own investigation of the claim filed by the aggrieved person.

(2) The time for commencing an action for which the statute of limitations is tolled under paragraph (1) shall expire when the federal right-to-sue period to commence a civil action expires, or one year from the date of the right-to-sue notice by the Department of Fair Employment and Housing, whichever is later.

**HISTORY:**

Added Stats 1980 ch 992 § 4. Amended Stats 1980 ch 1023 § 9; Stats 1984 ch 217 § 1, ch 420 § 1.5; Stats 1992 ch 911 § 5 (AB 311), ch 912 § 7.1 (AB 1286); Stats 1998 ch 931 § 183 (SB 2139), effective September 28, 1998; Stats 1999 ch 591 § 12 (AB 1670); Stats 2000 ch 189 § 1 (AB 2062); Stats 2001 ch 813 § 1 (AB 276); Stats 2002 ch 294 § 1 (AB 1146) (ch 294 prevails), ch 664 § 94.5 (AB 3034); Stats 2003 ch 62 § 118 (SB 600); Stats 2007 ch 43 § 16 (SB 649), effective January 1, 2008.

**NOTES:**

**Former Sections:**

Former § 12965, similar to present *Gov C § 14755*, was added Stats 1963 ch 1786 § 1, operative October 1, 1963, and repealed Stats 1965 ch 371 § 149.

**Amendments:**

**1984 Amendment:**

Amended subd (b) by adding **(1)** ", municipal, and justice" and ", and aggrieved person may file in any of these courts" in the third sentence; and **(2)** the fifth and sixth sentences. (As amended by Stats 1984, ch 420, compared to the section as it read prior to 1984. This section was also amended by an earlier chapter, ch 217. See *Gov C § 9605*.)

**1992 Amendment:**

**(1)** Generally eliminated "such"; **(2)** amended subd (b) by **(a)** adding "that the department shall issue, on his or her request, the right-to-sue notice" at the end of the first sentence; **(b)** adding the third and fourth sentences; and **(c)** substituting "of these counties" for "such county, such" after "found within any" in the sixth sentence; and **(3)** added subd (c). (As amended Stats 1992 ch 912, compared to the section as it read prior to 1992. This section was also amended by an earlier chapter, ch 911. See *Gov C § 9605*.)

# TAB 13

*appeared* in the action, and simply denied liability. Later, P was permitted to amend the complaint to name "Inc." as a defendant even though the statute of limitations had run. [*Prince v. Jensen Motors, Inc.* (1983) 139 CA3d 653, 655-656, 188 CR 911, 913—fact that "Inc." had cross-complained against manufacturer for indemnity showed that it was aware that it was being sued as seller]

[6:785]  *Reserved.*

- [6:786]  P mistakenly named Budget, Inc. and Budget Rent-A-Car of Santa Monica as defendants. These entities answered the complaint and participated in litigation over a three-year period without revealing the proper defendant was Budget Rent-A-Car of Westwood. They were estopped to oppose P's motion to amend to name the correct defendant after the statute of limitations had run. P's mistake was excusable because of the "strikingly similar" names involved; and the named defendants' conduct had "perpetuated the error beyond the point of repair." [*Cuadros v. Sup.Ct. (Budget)* (1992) 6 CA4th 671, 676, 8 CR2d 18, 21]

e.  [6:787]  **Adding new PLAINTIFFS after statute has run?** Amendments naming a new party plaintiff are permissible if there is no change in the claim being asserted: e.g., to reflect an assignment of the claim; or, on plaintiff's death, to substitute his executor or administrator. "Amendments for this purpose are liberally allowed." [*Branick v. Downey Sav. & Loan Ass'n* (2006) 39 C4th 235, 243, 46 CR3d 66, 72; see *Burgos v. Tamulonis* (1994) 28 CA4th 757, 763, 33 CR2d 728, 731—plaintiff entitled to continue action against decedent "by the standard method of amending the complaint to name (administratrix) as defendant in her representative capacity" (parentheses added)]

But a new plaintiff *cannot* be joined after the statute of limitations has run where he or she seeks to enforce an *independent right* or to impose greater liability upon the defendant. In such cases, the amended complaint does *not* "relate back" to the filing of the original. [*Bartalo v. Sup.Ct. (Rosman)* (1975) 51 CA3d 526, 533, 124 CR 370, 374; *Quiroz v. Seventh Ave. Ctr.* (2006) 140 CA4th 1256, 1278, 45 CR3d 222, 238 (citing text)]

All this means is that defendant must not be required to answer a *wholly different legal liability or obligation* than the one originally stated. "Similar principles govern the question whether an amendment relates back, for purposes of the statute of limitations, to the date on which the original com-

plaint was filed." [*Branick v. Downey Sav. & Loan Ass'n,* supra, 39 C4th at 243-244, 46 CR3d at 72]

(1) **[6:788]   Application—permissible amendments:** Thus, courts have permitted plaintiffs who have been determined to lack standing, or who have lost standing after the complaint was filed, to substitute as plaintiffs the *real parties in interest:*

- **[6:788.1]**   Administrator of deceased share-holder's estate could be substituted as plaintiff in a shareholder's derivative action. [*Klopstock v. Sup.Ct.* (1941) 17 C2d 13, 19-21, 108 P2d 906, 909-910]

- **[6:788.2]**   Condominium owners could be substituted for owners' association in an action against developer for negligent construction. [*Jensen v. Royal Pools* (1975) 48 CA3d 717, 721, 121 CR 805, 807]

- **[6:788.3]**   After Bus. & Prof.C. §17200 was amended to limit standing in "unfair competition" actions to persons who had personally suffered financial loss (instead of suing on behalf of the general public), an amendment was proper to substitute a plaintiff who met the modified standing requirement in place of one who did not. [*Foundation for Taxpayer & Consumer Rights v. Nextel Communications, Inc.* (2006) 143 CA4th 131, 136, 48 CR3d 836, 839]

(2) **[6:789]   Application—impermissible amendments:** But an amendment is not permitted to add or substitute a plaintiff whose claims would expose defendant to a *different* legal obligation:

- **[6:789.1]**   Widow sued originally for wrongful death of her husband. After statute of limitations ran, she amended complaint to include a claim in her capacity as *administratrix* of decedent's estate, for damage suffered by him before death. Held: This claim did not relate back and was barred by the statute of limitations . . . because it was an independent right asserted by an independent party (decedent's estate). [*Dominguez v. City of Alhambra* (1981) 118 CA3d 237, 243, 173 CR 345, 348]

- **[6:789.2]**   P falsely alleged in survivor action she had standing to sue as administratrix of decedent's estate. P was appointed administratrix after statute of limitations ran. P contended her post-limitations appointment "related back" to filing of original com-

# TAB 14

[8:272] Plaintiff sued for tax refunds for 1963 and 1964. Fifteen years later, Plaintiff filed an "amended and supplemental complaint" claiming additional refunds for 1969 through 1975, based on the same facts as the original complaint except as to dates and amounts. The later refund claims filed in 1980 did not "relate back" to the original complaint, and hence were time-barred. [*ITT Gilfillan, Inc. v. City of Los Angeles*, supra, 136 CA3d at 586-589, 185 CR at 850-852]

[8:273-274]    *Reserved.*

## G. COMPLAINTS IN INTERVENTION FOR WORKPLACE INJURIES CAUSED BY THIRD PARTY

[8:275]    A complaint in intervention, like any other complaint, is ordinarily subject to the statute of limitations; i.e., if it asserts a new cause of action from that already before the court, it must be filed within the applicable statutory period. [*Andersen v. Barton Mem. Hosp., Inc.* (1985) 166 CA3d 678, 684, 212 CR 626, 630]

But a different rule applies where an employer or employee intervenes in an action filed by the other for workplace injuries caused by a third party tortfeasor. This is because *both the employer and employee have a statutory right to sue:* The employee has the right to sue for his or her injuries, and the employer has the right to recoup disability payments it (or its workers' compensation insurer) has made to the injured employee. [See Lab.C. §3852]

Whichever files suit, the other *has the right to intervene* as party plaintiff: "If the action is brought by either the employer or employee, the other may, at any time before trial on the facts, join as party plaintiff . . ." [Lab.C. §3853]

*Cross-refer:* Intervention is discussed in detail in Weil & Brown, *Cal. Prac. Guide: Civ. Pro. Before Trial* (TRG), Ch. 2.

1. [8:276]    **Effect:**    Thus, either the employer or employee can intervene in an action timely filed by the other, even after the statute of limitations has run; and the complaint in intervention "relates back" to the original complaint for statute of limitations purposes. [See *County of San Diego v. Sanfax Corp.* (1977) 19 C3d 862, 885, 140 CR 638, 650; *Buell v. CBS, Inc.* (1982) 136 CA3d 823, 826, 186 CR 455, 457]

2. [8:277]    **Rationale:**    "Substantively, as well as procedurally . . . regardless of who brings an action (employee, employer or insurer), *it is essentially the same lawsuit.*" [*County of San Diego v. Sanfax Corp.* (1977) 19 C3d 862, 874, 140 CR 638, 643 (emphasis and parentheses added)]

   Therefore, whether the employee or the employer files suit, the other is put on notice of the claim, and the purpose of the statute of limitations is served. [See *Harrison v. Englebrick* (1967) 254 CA2d 871, 875, 62 CR 831, 834]