```
 1   Steven R. Blackburn, State Bar No. 154797
     Leslie J. Mann, State Bar No. 95467
 2   Andrew J. Sommer, State Bar No. 192844
     EPSTEIN BECKER & GREEN, P.C.
 3   One California Street, 26th Floor
     San Francisco, California 94111-5427
 4   Telephone:    415.398.3500
     Facsimile:    415.398.0955
 5   SBlackburn@ebglaw.com
     LMann@ebglaw.com
 6   ASommer@ebglaw.com

 7   Attorneys for Defendant
     LUCENT TECHNOLOGIES INC.
 8
```

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, an agency of the State of California,<br><br>Plaintiff, and<br><br>STEVEN J. CARAUDDO<br><br>Plaintiff-Intervenor<br><br>v.<br><br>LUCENT TECHNOLOGIES, INC., and DOES 1 through 20,<br><br>Defendants. | CASE NO.: 3:07-cv-03747-PJH<br><br>**DECLARATION OF KAREN UTERMAHLEN IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT OR IN THE ALTERNATIVE PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: November 19, 2008<br>Time:  9:00 a.m.<br>Location:  Courtroom 3<br>The Hon. Phyllis J. Hamilton |

I, Karen Utermahlen, declare as follows:

1. I have been employed by Lucent Technologies Inc. ("Lucent" or "the Company") since 1996 as Lucent's Medical Department nurse. I am a registered nurse and have certifications for case management and rehabilitation nursing. I have personal knowledge of all of the facts set forth in this declaration. If called upon as a witness, I could and would competently testify as to the facts set forth below.

2. On January 27, 2005, I contacted Mr. Carauddo regarding his injury. I sent him the Lucent's initial letter instructing the employee about their leave of absence and the form to be completed by the physician allowing the employee's medical status to be evaluated and documented for return to work.

3. On February 7, 2005, Mr. Carauddo's physician, Dr. Lee informed Lucent that Mr. Carauddo may:

> **return to work with three weeks of work restrictions of no climbing, no reaching above shoulder level, and no lifting over 20 lbs.**

A true and correct copy of this note is attached as Exhibit 1. Following Lucent's procedure, I notified Claudine Strange to determine if the needs of the business could accommodate his temporary work restrictions for Mr. Carauddo's return to work. Ms. Strange advised those restrictions could not be accommodated. I then sent Mr. Carauddo another Healthcare Provider's Report for completion at his next office visit.

4. In early March, 2005, Dr. Sharma took over Mr. Carauddo's care. He did not change Mr. Carauddo's work restrictions. I spoke with Mr. Carauddo who confirmed that he started physical therapy. In mid-March, I approved an MRI for Mr. Carauddo. I then sent Mr. Carauddo another Healthcare Provider's Report for completion at his next office visit.

5. In early April, 2005, I spoke with Mr. Carauddo who advised me that at his last medical visit, Dr. Sharma prescribed chiropractic sessions. I called Mr. Carauddo several times asking him to have his doctor fax his notes explaining the need for the chiropractic sessions. On April 19, Dr. Sharma advised me that the same work restrictions continued through April 25:

- 2 -

SF:190189v1

Declaration of Karen Utermahlen in Support of
Defendant's Motion for Summary Judgment/Adjudication
Case No. 3:07-cv-03747-PJH

**no climbing, no reaching above shoulder level, and no lifting over 20 lbs.**

A true and correct copy of this note is attached as Exhibit 2.

6. On April 19, 2005, I approved the requested chiropractic sessions. I also contacted Ms. Strange to determine if the work restrictions could be accommodated. Ms. Strange reply was negative. I also telephoned Mr. Carauddo to let him know the chiropractic sessions were approved.

7. In early May, 2005, Mr. Carauddo telephoned me requesting additional chiropractic sessions. On May 13, 2005, I received a request from Dr. Sharma asking to extend the chiropractic visits. I approved the extension and requested updated return to work information. I renewed my request on May 26, 2005. I later telephoned Mr. Carauddo regarding his qualified medical exam with Dr. Harrison, an occupational health physician. I also sent him the Healthcare Provider's Report to be completed at his next office visit.

8. On May 25, 2005, Dr. Sharma advised me that he had seen Mr. Carauddo on April 25, May 10, and May 25, 2005. He advised that the same restrictions "no climbing, no reaching above shoulder level, and no lifting over 20 lbs" continued through his next appointment on June 7, 2005. A true and correct copy of this note is attached as Exhibit 3. Mr. Carauddo's chiropractic treatment continued.

9. On June 14, 2005, I scheduled and advised Mr. Carauddo of his functional capacity exam for June 21, 2005. This exam is performed by a physical therapist and determines an employee's physical capabilities. The FCE was performed but the exam results significantly differed from Dr. Sharma's recommendations. The physical therapist reported that Mr. Carauddo could lift 32.5 lbs and pull 95 lbs. Questions were raised about these conclusions.

10. At this time, Mr. Carauddo's care changed to physiatry care with a new physician, Dr. Sachdev. I requested a complete report from the new physician. The physiatrist report stated that Mr. Carauddo could return to a "modified position" but failed to explain that position. If the restrictions are unclear or need explanation, the nurse communicates with the physician to

SF:190189v1

Declaration of Karen Utermahlen in Support of
Defendant's Motion for Summary Judgment/Adjudication
Case No. 3:07-cv-03747-PJH

determine the meaning o the restrictions, Dr. Sachdev was contacted but failed to explain the restrictions before he saw Mr. Carauddo on August 3, 2005.

11. In late July, 2005, I sent Mr. Carauddo another Healthcare Provider's Report to be completed at his next office visit. After his August 5 visit, my notes reflect, Dr. Sachdev explained the "modified position:"

> **a sit down job. Able to intermittently site stand walk up to 30 minutes. No climb, twist, bend stooping or reaching above shoulder level. Occasionally able to lift 20 lbs, never lift over 20 lbs.**

I sent an email to Claudine Strange to determine if a sedentary position was available. The response was negative. Mr. Carauddo's chiropractic care was continued. I telephoned Mr. Carauddo to check on his progress. He advised that he was doing bending and stretching exercises.

12. In September, 2005, I sent Mr. Carauddo three Healthcare Provider's Reports for completion by his various health care providers. On September 13, I telephoned Mr. Carauddo and reminded him to schedule the appointment with his physician for an evaluation to return to work. Throughout September, I was also in contact with Mr. Carauddo at least seven times to follow up on his medical appointments. In one of these calls, Mr. Carauddo advised me that he tried to go to the gym three times per week and went to the chiropractor once a week. I received another prescription from Dr. Sachdev for chiropractic treatment twice a week for three months.

13. On September 27, Lucent sent Mr. Carauddo a letter which explicitly advised him of the date that his disability leave entitlement would expire on January 25, 2006. A true and correct copy of my letter is attached as Exhibit 4.

14. In late October, my notes reflect, I received updated work restrictions from Dr. Sachdev as follows:

> **unable to do repetitive bending, twisting or lifting over 25 lbs. Unable to climb ladders, lift cable, lift cabinets, and prolonged sitting and standing.**

I advised Mr. Carauddo's department of these work restrictions which responded that they could not be accommodated.

- 4 -

SF:190189v1

Declaration of Karen Utermahlen in Support of
Defendant's Motion for Summary Judgment/Adjudication
Case No. 3:07-cv-03747-PJH

15. In early November, 2005, I called Mr. Carauddo to determine the date of his office visit with his new rehab physiatrist of his choosing, Dr. Kaisler-Meza. On November 18, I telephoned Mr. Carauddo again to discuss his present status and sent him another Healthcare Provider's Report. On November 28, I again telephoned Mr. Carauddo to review his existing work restrictions. I emailed the restrictions to him. I noted that the purpose of the email and discussion was so there would be "hopefully [a] reduction of WR [work restrictions]."

16. I later received the Healthcare Provider's Report completed by Dr. Kaisler-Meza on November 29, 2005, which provided:

> **No lifting or carrying over 10 lbs.**
> **Limited twisting and bending.**

A true and correct copy of this letter is attached as Exhibit 5. On December 7, Dr. Kaisler-Meza completed his Initial Physiatry Consultation Report which I received on December 19, 2005. Dr. Kaisler-Meza prescribed ten chiropractic sessions.

17. After Mr. Carauddo's December 20 exam, Dr. Kaisler-Meza continued the same physically limiting work restrictions for Mr. Carauddo:

> **Lifting not to exceed 10 lbs**
> **Carrying not to exceed 10 lbs**
> **Push/pull not exceed 10 lbs**
> **Bending/Stooping: No repetitive**

A true and correct copy of this note is attached as Exhibit 6. These restrictions were in place through January 17, 2006, eight days before his disability leave entitlement would be exhausted. I received these restrictions on January 6 by fax. I immediately contacted Mr. Carauddo's department to see if they could accommodate these restrictions. The department reported back and both Mr. Carauddo's immediate supervisor, Mike Spraggins and the then acting Operations Area Manager, Rod Lilley agreed those restrictions could not be accommodated.

18. On January 18, 2006, I telephoned Mr. Carauddo for the outcome of his exam with Dr. Kaisler-Meza. Surprisingly, Mr. Carauddo told me that he was released to full duty return to work. He had never previously said he was ready to return to work. I advised Mr. Carauddo that due to this sudden change I needed to review Dr. Kaisler-Meza's progress notes and documentation from his examination. I immediately telephoned Dr. Kaisler-Meza for the

- 5 -

SF:190189v1

Declaration of Karen Utermahlen in Support of
Defendant's Motion for Summary Judgment/Adjudication
Case No. 3:07-cv-03747-PJH

explanation. I explained to Dr. Kaisler-Meza's assistant Pakis that I needed to understand Mr. Carauddo's present status of "able to lift push pull occasionally up to 50 lbs" when earlier this month his work restrictions was "not to lift 10 lbs. and unable to bend frequently." No call, however, was received from Dr. Kaisler-Meza. Indeed the sudden change in his physical ability was never explained.

19. On January 19, 2006, I contacted Ms. Strange and Ms. Andrechick, Mr. Camacho's assistant, with Mr. Carauddo's new work restrictions clearing Mr. Carauddo to lift 50 lbs. I told them that I had called the physician to medically explain the events which transpired to foster his recent physical abilities. I continued to attempt to have Dr. Kaisler-Meza support and explain the new work restrictions. I telephoned his office again on January 20, but received a message that it was closed until January 23.

20. On January 23, 2006, two days before Mr. Carauddo's leave expired, I received Dr. Kaisler-Meza's January 17 Healthcare Provider's Report which stated Mr. Carauddo could:

**occasionally (1-35%) of his work day lift from 21 – 50 lbs and never lift over 50 lbs.**

A true and correct copy of this letter is attached as Exhibit 7. Upon receiving these restrictions, I again telephoned Mr. Carauddo and advised him that I continued to attempt to contact Dr. Kaisler-Meza several times to no avail, but supported medical documentation was needed to justify his significant physical ability. I advised Mr. Carauddo that I could not return him to work without the explanation from his physician.

21. I telephoned Mr. Carauddo again the following day and told him I still had not heard from Dr. Kaisler-Meza. I recommended he go to the Dr. Kaisler-Meza's office and request that he contact me. That same day, I faxed and mailed a written request to Dr. Kaisler-Meza for his explanation and enclosed the Occupational Requirements form for Mr. Carauddo. A true and correct copy of my letter is attached as Exhibit 8.

22. On January 26, 2006, still no response had been received from Dr. Kaisler-Meza explaining Mr. Carauddo's work restrictions. On January 27, Mr. Carauddo was sent a benefit letter by Fay Farrier to advise him that his disability leave benefit had expired. I received a copy of that letter. A true and correct copy of that letter is attached as Exhibit 9. It explained that he

- 6 -

SF:190189v1

Declaration of Karen Utermahlen in Support of
Defendant's Motion for Summary Judgment/Adjudication
Case No. 3:07-cv-03747-PJH

was terminated effective January 25, 2006 under the provisions of the Lucent Technologies Inc. Sickness and Accident Benefit Plan. The letter continued that if Mr. Carauddo or his physician disagreed with the decision, an appeal could be made to the Benefit Claim and Appeal committee.

23.     On February 3, 2006, I received a report from Dr. Kaisler-Meza. This report stated Mr. Carauddo' lifting capacity was 30 lbs. I contacted Mr. Camacho by email who responded the needs of the business could not accommodate Mr. Carauddo's necessary physical restrictions.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed in Milford, PA, on October 15, 2008.

/s/ Karen Uteermahlen
KAREN UTERMAHLEN