# EXHIBIT 1

```
00001
 1           IN THE UNITED STATES DISTRICT COURT

 2             NORTHERN DISTRICT OF CALIFORNIA

 3                     ---oOo---

 4  DEPARTMENT OF FAIR EMPLOYMENT    )
    AND HOUSING, an agency of the    )
 5  State of California, and STEVEN  )
    J. CARAUDDO,                     )
 6                                   ) No. C 07-3747 PJH
              Plaintiff,             )
 7                                   )
    vs.                              )
 8                                   )
                                     )
 9  LUCENT TECHNOLOGIES, INC., and   )
    DOES ONE through THIRTY,
10  inclusive,

11            Defendants.
    _____
12
    STEVEN J. CARAUDDO,
13
         Plaintiff-Intervenor.
14

15

16

17            Deposition of

18          STEVEN J. CARAUDDO

19      _____

20         Tuesday, July 22, 2008

21         VOLUME I, (Pages 1 - 177)

22

23

24  Reported by:
    GEORGE SCHUMER, CSR 3326         (01-411376)
25
```

Carauddo, Steven, Vol. 1 (07/22/08)                    Page 1

00046
1       MS. HYAMS:  Why don't we take a break, just to
2  stretch, at least, and use the rest room?
3       THE VIDEOGRAPHER:  Going off the record, the
4  time is 11:29.
5          (Recess taken, 11:29-11:43 a.m.)
6       THE VIDEOGRAPHER:  We're back on the record.
7  The time is 11:43.
8       MS. MANN:  May I have the last question read
9  back?
10      (Record read: "Q. Who has had that policy?
11   A. Claudine Strange.")
12         MS. MANN:  Q.  Did any Lucent employee ever
13  tell you that Lucent had a policy that every installer
14  had to be 100 percent healed from their injury before
15  returning to work?
16      A.  Yes.
17      Q.  Who told you that?
18      **A.  Claudine Strange.**
19      **Q.  What did she say, exactly?**
20      **A.  Basically that if you are off on disability,**
21  **and you cannot come back without any restrictions, they**
22  **don't take you back on to the job.**
23      **Q.  When did she say that?**
24      **A.  That was in conversations prior to my being**
25  **terminated.**

00047

1 **Q. Do you have a date, approximately?**

2 **A. To the best of my recollection it would be**
3 **sometime in 2004.**

4 **Q. Did you confirm that policy with any other**
5 **Lucent employee?**

6 **A. No.**

7 Q. Did you ask your supervisor for clarification
8 on that policy, that you heard her say?

9 A. Yes.

10 Q. Who did you ask for clarification?

11 A. Claudine Strange.

12 Q. Anybody else?

13 A. The union representative.

14 Q. Anybody else?

15 A. No.

16 Q. And who was the union representative that you
17 asked for clarification?

18 A. Al Espindola.

19 Q. When did you ask Al Espindola to clarify what
20 Claudine had said?

21 A. Sometime in the time frame of 2004 or 2003.

22 Q. What did Al say?

23 A. He had never heard of such a policy.

24 Q. He had never heard that Lucent had that
25 policy? Is that what you interpreted him to say?

00048

1    A. Correct.

2    **Q. What were the circumstances that Claudine**

3    **stated this policy to you?**

4       **MS. HYAMS: Objection. Vague.**

5       **THE WITNESS: I was representing an installer**

6    **who was off on disability, and I was attempting to**

7    **establish when he could come back. And I was basically**

8    **told by Claudine that if he wasn't 100 percent, that he**

9    **would just stay on disability.**

10      **MS. MANN: Q. Who was that installer?**

11   **A. Dale Siemon.**

12   Q. What was his injury?

13   A. He had reflux -- acid reflux. He had a

14   detached esophagus. The surgery procedure was to bore

15   four holes in his chest to reattach the esophagus.

16      He was recuperating approximately four to six

17   weeks. And I'm not positive; I'm not sure. My best

18   recollection is that he was going to have to be

19   accommodated on his return to work. And my most vivid

20   recollection, or my best recollection, would be that he

21   would not be able to lift anything; he would probably

22   have to have a desk assignment.

23   Q. He couldn't lift anything?

24   A. For a certain period of time.

25   Q. Who was Mr. Siemon's supervisor?

00051
1  Mr. Siemon returned to work?
2    A. To the best of my recollection, he was forced
3  back earlier than what the attending physician
4  recommended, and all restrictions were lifted.
5    Q. Did Mr. Siemon want to return to work, when he
6  returned to work?
7    A. No.
8    Q. How do you know that?
9    A. Because he expressed to me that he wanted to
10 recuperate for the full time that his doctor was
11 telling him to recuperate.
12   Q. So Mr. Siemon did not have a release to return
13 to work from his physician, when he returned? To your
14 knowledge.
15   A. He had to have a release from his doctor in
16 order to return to work.
17   Q. Was Mr. Siemon granted any accommodations by
18 Lucent, when he returned to work?
19   A. Not that I'm aware of.
20   Q. Can you identify any installer who went out on
21 leave, and attempted to return to work, who was not 100
22 percent healed from their injury, that Lucent refused
23 to accommodate?
24   A. No, I can't.
25   **Q. Do you know of any employee from the Hayward**

00052

1  <u>service center that was returned to work after an</u>

2  <u>injury, with accommodations?</u>

3    <u>A. Yes.</u>

4    <u>Q. Who would that be?</u>

5    <u>A. Lenny Martinez.</u>

6    <u>Q. Anybody else?</u>

7    <u>A. Chris Sofilos.</u>

8    <u>Q. Anybody else?</u>

9    <u>A. Sonny Gibbs.</u>

10   Q. Anybody else?

11   A. That is all I can think of at this time.

12      MS. HYAMS: And I'm just going to lodge the

13 objection that the question, as phrased, calls for a

14 legal conclusion, and is vague.

15      MS. MANN: Q. What accommodations were given

16 to Lenny Martinez?

17   A. He was a regular installer. I believe his

18 operation was a rotator cuff operation. He was

19 restricted to carrying cable coils. He couldn't put

20 his arms through, so he was accommodated into the tool

21 room.

22   Q. When you returned to work, he was restricted

23 from lifting his arms?

24   A. I believe above his shoulders. I believe that

25 was what the restriction was.

00056
1  told you about, that an employee had to be 100 percent
2  healed from their injury before returning to work -- in
3  writing?
4      A. No.
5      Q. And Claudine was the only person that you
6  heard from, that Lucent had that policy?
7      A. Yes.
8      Q. Did you ever ask Claudine where she learned
9  that Lucent had that policy?
10     A. Yes.
11     Q. What did she say?
12     A. From the medical department.
13     Q. Did she say who at the medical department told
14 her that?
15     A. Yes, she did, but the name escapes me at this
16 point.
17     **Q. Now did Ms. Strange use the words "100 percent**
18 **healed from their injury," when she told you about the**
19 **policy?**
20     **A. I don't believe that's the way I understood**
21 **what she said.**
22     **Q. What do you remember her saying?**
23        **MS. HYAMS: Objection. Vague.**
24        **THE WITNESS: She said there had to be no**
25 **restrictions.**

00177

1      CERTIFICATE OF REPORTER

2      I, George Schumer, a Certified Shorthand

3 Reporter, hereby certify that the witness in the

4 foregoing matter was by me duly sworn to tell the

5 truth, the whole truth and nothing but the truth in the

6 within-entitled cause;

7      That said proceeding was taken down in

8 shorthand by me, a disinterested person, at the time

9 and place therein stated, and that the testimony of the

10 said witness was thereafter reduced to typewriting, by

11 computer, under my direction and supervision;

12      That before completion of the deposition,

13 review of the transcript was not requested.

14      In witness whereof, I have subscribed my name.

15

16      DATED:_____

17      _____

18      George Schumer, CSR 3326

19

20

21

22

23

24

25