1

2

3

4

5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8

9

10   DEPARTMENT OF FAIR EMPLOYMENT
     AND HOUSING,

11                                              No. C 07-3747 PJH
                    Plaintiff,
12                                              **ORDER GRANTING DEFENDANT'S**
          v.                                    **MOTION FOR SUMMARY JUDGMENT**
13
     LUCENT TECHNOLOGIES, INC.,
14
                    Defendant.
15   _____/

16          Defendant's motion for summary judgment came on for hearing before this court on

17   November 18, 2008.  Plaintiff appeared by its counsel Susan Saylor, plaintiff-intervenor

18   appeared by his counsel Sharon Vinick, and defendant appeared by its counsel Steven R.

19   Blackburn and Leslie J. Mann.  Having read the parties' papers and carefully considered

20   their arguments and the relevant legal authority, and good cause appearing, the court

21   hereby GRANTS the motion.

22                              **INTRODUCTION**

23          This is a case alleging claims of disability discrimination under California law.

24   Plaintiff California Department of Fair Employment and Housing ("DFEH") filed suit on June

25   27, 2007, in Alameda County Superior Court, against defendant Lucent Technologies, Inc.

26   ("Lucent"), on behalf of real party in interest Steven J. Carauddo ("Carauddo").

27          DFEH alleges four causes of action under the Fair Employment and Housing Act

28   ("FEHA"), California Government Code § 12940 – a claim of termination because of

United States District Court

For the Northern District of California

1  disability under § 12940(a); a claim of failure to make reasonable accommodation for

2  known physical or mental disability, under § 12940(m); a claim of failure to engage in a

3  good-faith interactive process, under § 12940(n); and a claim of failure to take reasonable

4  steps to prevent discrimination from occurring in the workplace, under § 12940(k).

5      On July 20, 2007, Lucent removed the case, asserting diversity jurisdiction.  In an

6  order filed February 1, 2008, the court granted Carauddo's motion for permissive

7  intervention, subject to the limitation that he could file motions, or could oppose Lucent's

8  motions, only as to those claims not asserted by DFEH; and that discovery would be

9  shared and non-duplicative.  Carauddo filed his complaint-in-intervention on February 20,

10 2008.

11     The complaint-in-intervention alleges five causes of action.  The first three assert

12 termination because of disability, failure to make reasonable accommodation, and failure to

13 engage in a good-faith interactive process, as in the complaint filed by DFEH.  In addition,

14 Carauddo alleges a claim of wrongful termination in violation of public policy; and a claim of

15 unfair business practices, under California's Unfair Competition Law ("UCL"), California

16 Business & Professions Code § 17200, et seq.

17     Lucent now seeks summary judgment on all claims.

18                              **BACKGROUND**

19     Lucent sells telecommunication equipment and services to telecommunication

20 carriers, governments, and businesses.  Carauddo began working for Lucent's predecessor

21 company, Western Electric, in 1966.  At the time of the incidents that gave rise to this

22 lawsuit, he was based at Lucent's Customer Service Center in Hayward, California, working

23 as an Installer of wireless communication equipment.

24     As a Communication Installer, Carauddo was responsible for installing and

25 maintaining Lucent's wireless "cell sites" at locations throughout the Bay Area.  The

26 Installer position is a physically demanding job, requiring the employee to work with a

27 variety of heavy tools and equipment, and to bend, crawl, climb ladders, and push and pull

28 heavy objects on a regular basis.

**United States District Court**
For the Northern District of California

1    Lucent's job description for the Installer position states that the "critical demands" of

2  the job include "occasionally" (6-33% of the time) lifting up to 50 pounds from floor to waist,

3  and "frequently" (34-66% of the time) lifting up to 30 pounds from waist to overhead, and

4  carrying up to 50 pounds for a distance of up to 100 feet.  In addition, several Lucent

5  employees, including employees who work as Communication Installers (Bryan

6  Christensen, Dominic Lasquete, and Rick Quinzon), and an Operations Manager who

7  supervises Installers (Claudine Strange), provide declarations describing the Installer

8  position and its demands in some detail.  Each of the installers agrees that he could not

9  perform his job if he was unable to lift 50 pounds, and Ms. Strange confirms that an Installer

10  must be able to lift at least 50 pounds and more on a regular basis.

11    DFEH and Carauddo ("plaintiffs") submit, however, that the duties of an Installer are

12  not as strenuous as Lucent claims, basing this assertion on Carauddo's declaration, and on

13  a declaration from another Lucent employee, Travis Gatus.[1]  In general, Carauddo and

14  Gatus claim that they had never found it necessary to lift more than 30 pounds when

15  performing the duties of the Installer position, and that equipment was available to assist

16  with any necessary heavy lifting.

17    In January 2005, Carauddo injured his back while breaking down cardboard boxes.

18  He stayed home for a few days, and then sought medical attention at Kaiser.  On January

19  27, 2005, Lucent's Medical Department nurse, Karen Utermahlen, R.N., contacted

20  Carauddo regarding his injury, and sent him Lucent's initial letter instructing an injured

21  employee about the disability leave of absence.  She also sent a form to be completed by

22  Carauddo's physician (the Healthcare Provider's Report form) allowing his medical status to

23  be evaluated and documented for return to work.

24    On February 7, 2005, Carauddo's physician Dr. Theodore Yee informed Lucent that

25  Carauddo would be able to return to work in three weeks, but with restrictions that included

26  no climbing, no reaching above shoulder level, and no lifting over 20 pounds.

27  ———————————

28    [1] Lucent objects to the admission of the Gatus Declaration, on the ground that plaintiffs
never previously disclosed Mr. Gatus as a witness.

United States District Court

For the Northern District of California

1    Ms. Utermahlen contacted Carauddo's supervisor, Claudine Strange, and notified her

2  of Carauddo's work restrictions.  When asked whether those restrictions could be

3  accommodated, Ms. Strange stated that they could not, given the nature of the work

4  Carauddo performed at the Hayward facility.  That is, the Installer job could not be

5  performed without climbing, reaching above shoulder level, and heavy lifting.  She also

6  advised that there was no other work available in Lucent's Bay Area operations that

7  conformed with Carauddo's restrictions.  Accordingly, Carauddo remained out on disability

8  leave with full pay.

9    After his next medical examination on March 7, 2005, with another physician, Dr.

10 Satish Sharma, Carauddo provided Lucent with a note indicating that his work restrictions

11 remained the same – "no climbing, no reaching above shoulder level, and no lifting over 20

12 lbs."  Ms. Utermahlen also spoke with Carauddo, who confirmed that he had started physical

13 therapy.  In mid-March, she approved an MRI for Carauddo, and also sent another

14 Healthcare Provider's Report for completion at the next office visit.

15    In early April 2005, Ms. Utermahlen contacted Carauddo to check again on his status.

16 Carauddo did not say he was ready to return to work.  He told her that at his last visit Dr.

17 Sharma had prescribed chiropractic treatment.  Ms. Utermahlen called Carauddo several

18 times to ask him to have Dr. Sharma fax her a note explaining the need for the chiropractic

19 treatment.

20    On April 19, 2005, Dr. Sharma sent Ms. Utermahlen a note stating that Carauddo's

21 previously-stated work restrictions would need to be continued through April 25, 2005.  Also

22 on April 19, 2005, Ms. Utermahlen approved the chiropractic treatment for Carauddo.

23    Ms. Utermahlen also contacted Ms. Strange to ask whether Carauddo's work

24 restrictions could be accommodated.  Ms. Strange again stated that the restrictions could

25 not be accommodated in the position of Installer.  She reiterated that the duties of the

26 Installer position could not be performed by a person who was unable to climb, reach above

27 shoulder level, or lift only 20 pounds.  She stated that there was no Installer work available

28 in the Bay Area that met Carauddo's restrictions.

United States District Court

For the Northern District of California

1        In early May 2005, Carauddo called Ms. Utermahlen to request that Lucent authorize

2   additional chiropractic treatment.  Ms. Utermahlen approved the additional visits, and

3   requested that Carauddo provide her with updated return-to-work information.  Carauddo did

4   not state during this conversation that he was ready to return to work.

5        On May 25, 2005, Dr. Sharma reported to Ms. Utermahlen that he had seen

6   Carauddo on April 25, May 10, and May 25, 2005, and that Carauddo would need to have

7   the same restrictions continued through his next appointment on June 7, 2005 - "no

8   climbing, no reaching above shoulder level, and no lifting over 20 lbs."

9        On June 14, 2005, Ms. Utermahlen scheduled a functional capacity exam for

10  Carauddo for June 21, 2005, and also advised Carauddo of that appointment.  According to

11  Ms. Utermahlen, the functional capacity exam results differed significantly from Dr.

12  Sharma's recommendations, showing that Carauddo could lift and pull more weight than Dr.

13  Sharma had reported.

14       At around that same time, Carauddo changed his treatment regimen to physiatry

15  (pain management) and began seeing a new physician, Dr. Tripta Sachdev.  Ms.

16  Utermahlen requested a complete report from Dr. Sachdev.  The report stated that

17  Carauddo could return to a "modified" position, but did not explain what sort of modification

18  was necessary.  Ms. Utermahlen attempted to contact Dr. Sachdev for an explanation of the

19  new restrictions but he did not return her call.

20       In late July 2005, Ms. Utermahlen sent Carauddo another Healthcare Provider's

21  Report to be completed at his next doctor's visit.  After Carauddo's August 5, 2005, visit, Dr.

22  Sachdev completed the Report, explaining the "modified" position as requiring "[a] sit down

23  job . . . Able to intermittently sit stand [sic] able to walk up to 30 minutes.  No climb, twist,

24  bend, stooping, or reaching above shoulder level.  Occasionally able to lift 20 lbs., never lift

25  over 21 lbs."

26       In August 2005, Ms. Utermahlen called Carauddo to check on his progress.

27  Carauddo reported that he was doing bending and stretching exercises, but he did not say

28  he was ready to return to work.  Ms. Utermahlen sent Ms. Strange an e-mail to determine

United States District Court

For the Northern District of California

1    whether a more sedentary position might be available.  Ms. Strange again confirmed that no

2    such job was available.

3         In September, Ms. Utermahlen sent Carauddo three Healthcare Provider's Report

4    forms for completion by his various healthcare providers.  On September 13, 2005, she

5    telephoned Carauddo to remind him to schedule the appointment with his physician for an

6    evaluation to return to work.  She states that she contacted Carauddo at least seven times

7    during the month of September to follow up on his medical appointments, and that in one of

8    those calls Carauddo advised that he tried to go to the gym three times a week and to the

9    chiropractor once a week.  She also received another prescription from Dr. Sachdev for

10   chiropractic treatment twice a week for three months.

11        On September 27, 2005, Lucent sent Carauddo a letter explicitly notifying him that his

12   paid disability leave of absence would expire on January 25, 2006, in accordance with

13   Lucent's policy.  The letter stated that if Carauddo was unable to return to work before the

14   expiration of the disability leave, he should complete the application for long-term disability

15   ("LTD") benefits, the forms for which were enclosed.  The letter further advised that if his

16   prognosis for full recovery was within six months of the expiration of his paid disability

17   benefits, he might be eligible to apply for an unpaid leave of absence, during which time he

18   would not be eligible for LTD benefits, and would be responsible for paying his own health

19   insurance premiums.

20        In late October 2005, Ms. Utermahlen received updated work restrictions from Dr.

21   Sachdev.  Those restrictions stated, "Unable to do repetitive bending, twisting or lifting over

22   25 lbs.  Unable to climb ladders, lift cable, lift cabinets, and prolonged sitting and standing."

23   Ms. Utermahlen checked with Carauddo's supervisors in Hayward, and again was told that

24   those restrictions could not be accommodated for an Installer.

25        In early November 2005, Carauddo began treatment with a new rehab physiatrist,

26   Dr. Allen Kaisler-Meza.  On November 18, 2005, Ms. Utermahlen telephoned Carauddo to

27   discuss his status, and sent him another Healthcare Provider's Report.  She spoke to him

28   again on November 28, 2005, telling him there would be "hopefully [a] reduction of [work

United States District Court

For the Northern District of California

1    restrictions]."  Plaintiff did not tell her he was ready to return to work.

2         After his initial visit with Carauddo, Dr. Kaisler-Meza wrote a report stating that

3    Carauddo had said that "[h]is main obstacle right now to return back to work is repetitive

4    bending, squatting, and heavy lifting," and that he reported that he had "no more lifting

5    capacity on a repetitive basis than 10-15 pounds."

6         On November 29, 2005, Dr. Kaisler-Meza completed a Healthcare Provider's Report,

7    in which he further reduced Carauddo's range of allowable activities in accordance with

8    what Carauddo had told him.  The Report stated, "No lifting or carrying over 10 lbs.  Limited

9    twisting and bending."  Dr. Kaisler-Meza prescribed ten chiropractic sessions.

10        After Carauddo's December 20, 2005, exam, Dr. Kaisler-Meza provided another note,

11   again maintaining the more limited work restrictions:  "Lifting not to exceed 10 lbs.

12   occasionally.  Carrying not to exceed 10 lbs. occasionally.  Push/pull not exceed 10 lbs.

13   occasionally.  Standing, sitting, walking:  6 hours per day.  Bending/Stooping: No repetitive."

14        Dr. Kaisler-Meza indicated that these work restrictions were to remain in place

15   through January 17, 2006 – eight days before Carauddo's paid leave of absence was set to

16   expire.  Dr. Kaisler-Meza faxed this note to Ms. Utermahlen on January 6, 2006.  The note

17   indicated that Carauddo's next appointment was set for January 17, 2006.

18        When Ms. Utermahlen received Dr. Kaisler-Meza's note on January 6, 2006, she

19   contacted Carauddo's managers once again to see whether these restrictions could be

20   accommodated.  Carauddo's immediate supervisor, Mike Spraggins, and Lucent's then-

21   Acting Operations Area Manager, Rod Lilley, agreed that Carauddo's new, even more

22   limiting, restrictions could not be accommodated in the Installer position.

23        At the January 17, 2006 exam, Dr. Kaisler-Meza completed a Healthcare Provider's

24   Report stating that Carauddo could sit, stand, and walk for 8 hours; could climb,

25   twist/bend/stoop; could reach above shoulder level; could lift/carry up to 20 lbs.

26   "continuously;" could lift/carry 21-50 lbs. "occasionally;" and could lift/carry over 50 lbs.

27   "never."

28        Ms. Utermahlen states that she telephoned Carauddo on January 18, 2006, to learn

7

1   the outcome of the January 17, 2006 exam.  Carauddo asserts, however, that he was the

2   one who initiated the call, and that he had done so to confirm that Ms. Utermahlen had

3   received Dr. Kaisler-Meza's report.  (Ms. Utermahlen did not in fact receive the report until

4   January 23, 2006.)

5        Carauddo told Ms. Utermahlen that he was released to return to work and that his

6   work restrictions were limited to lifting no more than 50 pounds.  He said nothing about the

7   other restrictions that Dr. Kaisler-Meza had included in the note from the December 20,

8   2005 exam.  This abrupt change in the lifting restrictions seemed strange to Ms.

9   Utermahlen, since Dr. Kaisler-Meza had limited Carauddo to lifting "10 lbs. occasionally"

10   only a short time before, and plaintiff had never before mentioned being close to returning to

11   work.

12        Ms. Utermahlen advised Carauddo that because of this sudden change, she needed

13   to review the progress notes and documentation from his examination.  She immediately

14   telephoned Dr. Kaisler-Meza for an explanation, but was unable to reach him.  She did

15   speak to his assistant, telling the assistant that she needed to understand Carauddo's

16   present status of "able to lift push pull occasionally up to 50 lbs." in light of the fact that the

17   previous month his restrictions was "not able to lift 10 lbs. and unable to bend frequently."

18   However, Dr. Kaisler-Meza did not return her phone call.

19        Carauddo states that he went to Dr. Kaisler-Meza's office on January 18, 2006, and

20   asked the doctor's assistant to fax the progress notes to Lucent.  He claims that the

21   assistant told him that the progress notes were being transcribed, and would not be ready

22   for another week.  Carauddo says he called Ms. Utermahlen and reported what he had

23   learned about the progress notes, although Ms. Utermahlen says nothing about this call.

24        That same day (January 18, 2006), Ms. Strange e-mailed Ms. Utermahlen to follow

25   up on Carauddo's situation.  She asked whether Carauddo's previous limitations of

26   "Push/Pull not exceed 10 lbs." had been lifted.  Ms. Utermahlen responded that she was

27   trying to contact the doctor for clarification.

28        Because Carauddo's leave of absence was about to end, and termination was

United States District Court

For the Northern District of California

1  becoming a possibility, Christopher Camacho, Lucent's Director of Operations for

2  Installation in the United States, became involved in the process of assessing whether

3  Carauddo could be put back to work.

4  According to Mr. Camacho, he undertook a thorough review of Carauddo's situation.

5  He compared Carauddo's work restrictions with the work available at the Hayward Service

6  Center to see whether there was any job Carauddo could perform.  He also spoke with Dave

7  Dukovcic, Lucent's Western Region Operations Director (who reported to Mr. Camacho) to

8  determine whether any work was available in Northern California.

9  Messrs. Camacho and Dukovcic testified that they considered a variety of alternative

10  positions for Carauddo, including testing work, special customer assignments, quality

11  control, and various other jobs within the company.  They found, however, no available

12  position for which Carauddo was qualified.  They also testified that they considered whether

13  assistive devices were available to accommodate Carauddo's restrictions, but that none

14  were available.  Both determined that Carauddo's restrictions could not reasonably be

15  accommodated.

16  Meanwhile, Ms. Utermahlen continued trying to obtain clarification from Dr. Kaisler-

17  Meza regarding the recently developed ambiguity regarding Carauddo's restrictions.

18  Dr. Kaisler-Meza sent a progress report dated January 22, 2006, to the California

19  Division of Worker's Compensation, stating that Carauddo was only capable of lifting 25

20  pounds.  This report stated, under penalty of perjury, that Carauddo "[w]ill [return to work]

21  full duty on 1/15/06.  Job description notes no lifting greater than 25 lbs.  MMI at next visit."

22  Dr. Kaisler-Meza testified at his deposition that he was "returning Mr. Carauddo to work with

23  the understanding that full duty is no lifting greater than 25 pounds."

24  On January 23, 2006, two days before Carauddo's leave of absence was set to

25  expire, Ms. Utermahlen received Dr. Kaisler-Meza's January 17, 2006, Healthcare

26  Provider's Report stating that Carauddo could "occasionally (1-35%) of his work day lift from

27  21-50 lbs and never lift over 50 lbs."  The following day, January 24, 2006, Ms. Utermahlen

28  telephoned Carauddo and told him she still had not heard from Dr. Kaisler-Meza.  She

9

United States District Court

For the Northern District of California

1  recommended that Carauddo go to Dr. Kaisler-Meza's office and ask him to contact her.

2  That same day, she faxed and mailed a written request to Dr. Kaisler-Meza for his

3  explanation, and enclosed the Occupational Requirements for Carauddo's position.

4  On January 25, 2006 (the day that Carauddo's paid leave of absence was set to

5  expire), Ms. Utermahlen telephoned Carauddo and told him that she had attempted to

6  contact Dr. Kaisler-Meza several times, to no avail.  She told Carauddo she still needed

7  supporting documentation for Dr. Kaisler-Meza's statement that he could now lift up to 50

8  pounds.  She told Carauddo that he could not return to work without a medical clarification

9  of this inconsistent information.

10  On January 26, 2006, Carauddo reported for work at the Hayward Customer Service

11  Center.  (Carauddo states that it was January 25, 2006, when he reported for work, and

12  claims that he presented the Healthcare Provider's Report completed by Dr. Kaisler-Meza,

13  indicating a return-to-work date of January 25, 2006.)

14  Ms. Strange says that she immediately asked Carauddo whether he had been

15  released to return to work by Lucent's Medical Department.  When he said that he had not,

16  she told him he could not return to active duty until he had been cleared by the Medical

17  Department.

18  As of January 26, 2006, Lucent still had received no response from Dr. Kaisler-Meza

19  explaining the ambiguity in Carauddo's work restrictions.  On January 27, 2006, Lucent sent

20  Carauddo a letter notifying him that his year-long leave had expired.  The letter stated that

21  his employment was terminated, effective January 25, 2006, under the provisions of

22  Lucent's Sickness and Accident Disability Benefit Plan.

23  On January 31, 2006, Carauddo underwent a functional capacity evaluation that had

24  previously been arranged by Lucent.  He claims that he was willing to do whatever Lucent

25  wanted him to do so he could get back to work.  At the functional capacity evaluation, he

26  lifted and carried weights up to a limit of 45 pounds, although he states that he was willing to

27  lift a greater weight.  He says that no one from Lucent ever met with him to discuss the

28  results of the functional capacity exam.

1    On February 3, 2006, Lucent received yet another report from Dr. Kaisler-Meza.  This

2 report stated, also under penalty of perjury, that Carauddo's lifting capacity was 30 pounds.

3 Ms. Utermahlen contacted Camacho, and he confirmed that there was no Installer position

4 available that could accommodate that restriction.  In this communication, Dr. Kaisler-Meza

5 offered no opinion as to when, if ever, Carauddo's lifting restriction would be removed.

6    On March 6, 2006, Dr. Kaisler-Meza completed another report, in which he stated

7 that Carauddo had no disability and no restrictions, and could return to full, unrestricted

8 work, including lifting up to 50 pounds.

9                                           **DISCUSSION**

10 A.    Legal Standard

11    Summary judgment is appropriate when there is no genuine issue as to material facts

12 and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  Material

13 facts are those that might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc.,

14 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if there is sufficient

15 evidence for a reasonable jury to return a verdict for the nonmoving party.  Id.

16    A party seeking summary judgment bears the initial burden of informing the court of

17 the basis for its motion, and of identifying those portions of the pleadings and discovery

18 responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp.

19 v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof

20 at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than

21 for the moving party.  Southern Calif. Gas. Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th

22 Cir. 2003).

23    On an issue where the nonmoving party will bear the burden of proof at trial, the

24 moving party can prevail merely by pointing out to the district court that there is an absence

25 of evidence to support the nonmoving party's case.  Celotex, 477 U.S. at 324-25.  If the

26 moving party meets its initial burden, the opposing party must then set forth specific facts

27 showing that there is some genuine issue for trial in order to defeat the motion.  See Fed. R.

28 Civ. P. 56(e); Anderson, 477 U.S. at 250.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    B.     Defendant's Motion

2          Lucent seeks summary judgment on all causes of action alleged in DFEH's complaint

3    and Carauddo's complaint-in-intervention.

4          1.     Claim of disability discrimination

5          Under FEHA, it is an unlawful employment practice "[f]or an employer, because of the

6    . . . physical disability [or] medical condition . . . of any person, to refuse to hire or employ

7    the person . . . or to bar or to discharge the person from employment . . . ."  Cal. Gov't Code

8    § 12940(a); see Ross v. RagingWire Telecommunications, Inc., 42 Cal. 4th 920, 925-26

9    (2008).

10         FEHA proscribes two types of disability discrimination – discrimination arising from an

11   employer's intentionally discriminatory act against an employee because of his or her

12   disability (disparate treatment discrimination), and discrimination resulting from an

13   employer's facially neutral practice or policy that has a disproportionate effect on employees

14   suffering from a disability (disparate impact discrimination).  See Knight v. Hayward Unified

15   School Dist., 132 Cal. App. 4th 121, 128-29 (2005).  In the present case, and in opposing

16   Lucent's motion for summary judgment, plaintiffs asserts only disparate treatment

17   discrimination.

18         Discriminatory intent is an essential element of a FEHA action alleging disparate

19   treatment based on disability, whether actual or perceived.  See Green v. State of California,

20   42 Cal. 4th 254, 262 (2007).  Because direct evidence of discriminatory intent is rare,

21   California has adopted the three-stage burden-shifting test established by the United States

22   Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) for trying

23   discrimination claims based on a theory of disparate treatment when direct evidence of

24   discriminatory intent is absent.  See Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 354-55

25   (2000).  Under this three-part analysis, the initial burden is on the plaintiff to establish a

26   prima facie case of discrimination.  Id. at 354.

27         In the context of disability discrimination, the plaintiff accomplishes this by providing

28   evidence that he or she suffered from a disability or was regarded as suffering from a

United States District Court

For the Northern District of California

1  disability, could perform the essential duties of the job with or without reasonable

2  accommodations and was subjected to an adverse employment action because of the

3  disability or perceived disability.  Brundage v. Hahn,  57 Cal. App. 4th 228, 236 (1997); see

4  also Green, 42 Cal. 4th at 261 (plaintiff bears burden as part of prima facie case to show he

5  or she could perform essential duties with or without accommodation); but see Gelfo v.

6  Lockheed Martin Corp., 140 Cal. App. 4th 34, 51 (2006) (when claim is solely for perceived

7  discrimination, the plaintiff need only establish he or she was regarded or treated as

8  disabled and employer's mistaken perception was a substantial factor in the adverse

9  employment decision).

10        If the plaintiff establishes a prima facie case, a presumption of discrimination arises,

11  and the burden then shifts to the employer to rebut the presumption by producing admissible

12  evidence, sufficient to raise a genuine issue of fact and to justify a judgment for the

13  employer, that its action was taken for a legitimate, nondiscriminatory reason.  Guz, 24 Cal.

14  4th at 355.  If the employer sustains this burden, the presumption of discrimination

15  disappears, and the plaintiff must attack the employer's proffered reason as a pretext for

16  discrimination, or must offer other evidence of discriminatory motive.  Id. at 356.

17  Regardless, the ultimate burden of persuasion on the issue of actual discrimination remains

18  with the plaintiff.  Id.

19        Lucent does not argue that Carauddo was not "disabled" within the meaning of

20  FEHA.  Lucent asserts, however, that plaintiffs cannot establish a prima facie case because

21  they cannot show that Carauddo was a "qualified individual."  Section 12940(a), which

22  prohibits discrimination based on an employee's physical disability, "specifically limits the

23  reach of that proscription, excluding from coverage those persons who are not qualified,

24  even with reasonable accommodation, to perform essential job duties."  Green, 42 Cal. 4th

25  at 262.  Thus, in any disability claim under FEHA, "the plaintiff employee bears the burden of

26  demonstrating he or she was able to do the job, with or without reasonable

27  accommodation."  Id.

28        Lucent contends that it is undisputed that one of the essential qualifications of the

United States District Court

For the Northern District of California

1   Installer job was being to frequently lift more than 30 pounds, and claims that Carauddo was

2   not a "qualified individual" because when he attempted to return to work he could not lift

3   more than 30 pounds.  Lucent argues in addition that the evidence shows that there was no

4   reasonable accommodation that could have made Carauddo qualified to perform the

5   installer job.  Thus, Lucent asserts, Carauddo cannot meet his burden of showing that he

6   was able to perform the essential duties of the Installer position.

7          The essential functions of a job are "the fundamental . . . duties of the employment

8   position the individual with a disability holds or desires," not including "the marginal functions

9   of the position."  Cal. Gov't Code § 12926(f); see also 2 Cal. Code Regs

10  § 7293.8(g) (an "essential job function" is a job duty that is fundamental to the position, as

11  opposed to marginal or peripheral).  An employer's job description is considered to be the

12  most reliable evidence of what a particular job's essential functions are.  See Dark v. Curry

13  County, 451 F.3d 1078, 1087 (9th Cir. 2006) (interpreting the federal Americans With

14  Disabilities Act).  However, other relevant evidence that may be considered in determining

15  the essential functions of a job might include the actual work experience of current or past

16  employees in the job, the amount of time spent performing a function, and the

17  consequences of not requiring that an employee perform a function.  Cal. Gov't Code

18  § 12926(f)(2); 2 Cal. Code Regs § 7293.8(g)(2).

19         Lucent contends that both the written job description of the Installer position, and the

20  statements in the employee declarations demonstrate that the Installer position requires the

21  employee to lift and carry items weighing from 21 to 100 pounds for up to 66% of the work

22  day.  Lucent also points to testimony by Carauddo's supervisor Mike Spraggins that

23  Installers push, pull, or lift objects that weigh 50 pounds on a daily basis; testimony by

24  Operations Director Dave Dukovcic that Installers are regularly required to lift up to 50

25  pounds from floor to waist; and testimony by Director of Operations for Installation

26  Christopher Camacho that the lifting might sometimes exceed 100 pounds.

27         Lucent notes that Carauddo himself has admitted that his job regularly requires lifting

28  of up to 50 pounds.  According to Dr. Kaisler-Meza's initial report of examination in

United States District Court

For the Northern District of California

1    December 2005, and subsequent deposition testimony, Carauddo described his job as

2    entailing "prolonged standing and walking, repetitive bending, stooping, twisting at the waist

3    and overhead reaching , , , [,] heavy pushing and pulling, and lifting of installation materials

4    including both wires and wireless equipment.  Weights can be anywhere from 25 to 50

5    pounds."

6          In sum, Lucent asserts that Carauddo was not a "qualified individual" because when

7    he attempted to return to work he could not lift the required weight.  Lucent notes that

8    although Dr. Kaisler-Meza reported different lifting restrictions on different forms in late 2005

9    and early 2006, he reported under penalty of perjury to the Worker's Compensation Board

10   on January 22, 2006, that Carauddo was incapable of lifting more than 25 pounds, and also

11   testified in his deposition that as of January 22, 2006, Carauddo was incapable of lifting

12   more than 25 pounds.

13         Lucent notes further that on February 1, 2006, Dr. Kaisler-Meza updated his report to

14   the Worker's Compensation Board, stating, again under penalty of perjury, that Carauddo

15   was incapable of lifting more than 30 pounds.  Lucent argues that in light of this sworn

16   evidence from Carauddo's physician, DFEH and Carauddo cannot possibly establish that

17   Carauddo was capable of lifting more than 30 pounds.

18         Moreover, Lucent contends, no reasonable accommodation could have made

19   Carauddo qualified to perform the Installer job.  Lucent contends that if Carauddo had been

20   exempted from all heavy lifting, Lucent would have had to assign another employee to fill in

21   for Carauddo whenever he was performing numerous garden-variety work tasks – a solution

22   that would have been costly and inefficient.  Lucent notes that Installers typically work in

23   pairs, and argues that pairing Carauddo with a more able-bodied Installer would have

24   endangered that Installer's health and safety, since both Installers need to be able to carry

25   their own weight limits.

26         Finally, Lucent argues, even if Carauddo can establish that a triable issue exists with

27   regard to the prima facie case, the claim nonetheless fails because plaintiffs cannot show

28   that Lucent's legitimate reason for terminating Carauddo and refusing to reinstate him was a

United States District Court

For the Northern District of California

1   pretext for discrimination.

2       In opposition, plaintiffs argue that there is a genuine dispute regarding Carauddo's

3   ability to perform the "essential functions" of the Installer position.  As an initial matter,

4   plaintiffs assert, a factual dispute exists regarding how much weight Installers must lift.

5   They concede that the written job description indicates that lifting over 50 pounds is an

6   essential function.  Plaintiffs contend, however, that the employer's opinion regarding

7   essential functions is not conclusive, especially where other facts and evidence suggest that

8   the employer's professed judgment is not correct. Here, they argue, the work experience of

9   current and former Installers indicates that when heavy items need to be moved, the task

10  can be shared by the two Installers who typically work each job, and tools can be used to

11  make the lifting easier for each Installer.

12      More importantly, plaintiffs contend, the evidence shows that Carauddo's doctor

13  cleared him to lift 50 pounds as of January 17, 2006; that Carauddo was strong enough to

14  lift that weight; and that the January 31, 2006, functional capacity evaluation showed he

15  could lift 45 pounds.  Thus, plaintiffs contend, there is sufficient evidence from which a jury

16  could conclude that Carauddo was qualified to do the job.

17      The court finds that factual disputes prevent a finding that Carauddo was not qualified

18  to perform the Installer position as of the date he attempted to return to work.  Given the

19  questions raised regarding the actual lifting requirements of the position, and the conflict

20  concerning the amount of weight that Carauddo could actually lift as of January 25, 2006,

21  the court cannot find that plaintiffs failed to establish a prima facie case.

22      Nevertheless, as noted above, when an employer is moving for summary judgment

23  on a FEHA cause of action, the employer can negate the element of discriminatory intent

24  and shift the burden to the plaintiff by producing evidence of a legitimate, nondiscriminatory

25  reason for the allegedly adverse employment action.  Guz, 24 Cal. 4th at 356-57; Brundage,

26  57 Cal. App. 4th at 236.  Here, Lucent asserts that it terminated Carauddo in accordance

27  with the provisions of the Sickness and Accident Disability Benefit Plan.

28      Once the employer sets forth a nondiscriminatory reason for the decision, the burden

16

United States District Court
For the Northern District of California

1    shifts to the plaintiff to produce "substantial responsive evidence" that the employer's

2    showing was untrue or pretextual.  <u>Martin v. Lockheed Missiles & Space Co.</u>, 29 Cal. App.

3    4th 1718, 1735 (1994).  "[A]n employer is entitled to summary judgment if, considering the

4    employer's innocent explanation for its actions, the evidence as a whole is insufficient to

5    permit a rational inference that the employer's actual motive was discriminatory."  <u>Guz</u>, 24

6    Cal. 4th at 361.

7         Even assuming that Carauddo can establish a prima facie case, the court finds that

8    summary judgment must be GRANTED because plaintiffs failed to provide any evidence

9    that Lucent's articulated reason for terminating Carauddo was pretextual.  Indeed, plaintiffs

10   not only failed to address this point in their written opposition to Lucent's motion, but counsel

11   for DFEH did not address it at the hearing, even after Lucent's counsel raised it again.

12        2.    Claim of failure to accommodate

13        Under FEHA, it is an unlawful employment practice to terminate a qualified employee

14   with a disability, if that employee could have been accommodated.  Cal. Gov't Code

15   § 12940(m).  To establish a prima facie case of failure to accommodate, plaintiffs must show

16   that Carauddo suffers from a disability covered by FEHA, that he is otherwise qualified to do

17   his job, and that Lucent failed to reasonably accommodate his disability.  <u>Jensen v. Wells</u>

18   <u>Fargo Bank</u>, 85 Cal. App. 4th 245, 256 (2000).

19        Lucent argues that the cause of action for failure to accommodate fails because

20   Carauddo is not "qualified" and because Lucent did not fail to accommodate his alleged

21   disability.  Lucent contends that under <u>Green</u>, a plaintiff's inability to show that he/she is a

22   "qualified individual" is fatal to any claim under FEHA's disability provisions, whether the

23   claim is styled as discrimination or as failure to accommodate.  <u>Green</u>, 42 Cal. 4th at 265.

24   Thus, Lucent argues, because plaintiffs cannot show that Carauddo was "qualified," the

25   second cause of action for failure to accommodate fails as well.

26        In addition, Lucent asserts that plaintiffs have failed to meet their burden of showing

27   that a reasonable accommodation was possible, but that in any event, the company did

28   make reasonable concessions to Carauddo – giving him a paid leave of absence of one

17

United States District Court

For the Northern District of California

1   year to allow him time to recuperate and to explore possible accommodations.  Lucent also

2   asserts that the other accommodations suggested by plaintiffs – to modify Carauddo's job to

3   eliminate heavy lifing, and to reassign him to another job – were not reasonable

4   accommodations, as heavy lifting was an essential function of the Installer job, and there

5   were no vacant positions available for which Carauddo was qualified.

6          Lucent contends, that under FEHA, no accommodation is necessary if it would pose

7   an undue hardship on the employer.  See Ross, 42 Cal. 4th at 938.  Thus, Lucent argues,

8   "reinstating" Carauddo would have gone well beyond the bounds of "reasonableness,"

9   because he was unable to perform the "essential functions" of the job, even with reasonable

10  accommodation.

11         In opposition, plaintiffs assert that because there is a factual dispute regarding

12  whether Carauddo was qualified, and because summary judgment therefore cannot be

13  granted on the first cause of action, the court must consider whether the evidence shows

14  that there is a triable issue regarding failure to accommodate.  Plaintiffs claim that even if it

15  were true that Carauddo could lift only 30 pounds at the time he sought a return to work, he

16  would still have been able to perform all the essential functions of an Installer if reasonable

17  accommodation had been offered to him.

18         Plaintiffs assert that the evidence shows that assistive devices were available to

19  enable Carauddo to meet the lifting requirements of the job. In support, they cite

20  declarations and deposition testimony describing the various assistive devices.  Plaintiffs

21  argue that because reasonable accommodations were available, Lucent was not entitled to

22  fire Carauddo until it had attempted those accommodations.  Plaintiffs also contend that the

23  one-year leave of absence was not an accommodation, because such a leave of absence

24  was available to any Lucent employee subject to the collective bargaining agreement.

25         At the hearing, the court asked counsel for DFEH how Lucent had denied Carauddo

26  an accommodation, and counsel responded that because Lucent had perceived Carauddo

27  as disabled, it was obligated to offer him an accommodation and to engage in an interactive

28  process to determine an appropriate accommodation.  Counsel added that an appropriate

**United States District Court**
For the Northern District of California

1   accommodation would have been an extension of the one-year paid leave of absence

2   (although counsel conceded that Carauddo had not requested that or any accommodation).

3   In their opposition to the motion, plaintiffs assert that Lucent cannot reasonably argue that

4   Carauddo would have required an indefinite leave, since he required only four additional

5   days to attend Lucent's functional capacity evaluation, or six additional weeks to be cleared

6   to return to work without restrictions.

7          The court finds that the motion must be GRANTED as to this cause of action.

8   Reasonable accommodation does not require an employer to wait indefinitely for an

9   employee's medical condition to improve to the point where he can resume working.  <u>See</u>

10  <u>Hanson v. Lucky Stores, Inc.</u>, 74 Cal. App. 4th 215, 226-27 (1999).  Moreover, it is

11  undisputed that during the entire period of his one-year paid leave of absence, Carauddo

12  never indicated to Lucent a desire to return to work and never requested an

13  accommodation.

14         The evidence shows that during plaintiff's entire leave of absence, he was in

15  continual communication with Lucent's medical department; and that Ms. Utermahlen in turn

16  was in constant contact with Carauddo's medical providers to ascertain the status of

17  Carauddo's work restrictions, and repeatedly inquired of Lucent managers whether there

18  was any position available that could accommodate those work restrictions.  Nevertheless,

19  Ms. Utermahlen states that Carauddo never said anything about returning to work (and

20  Carauddo provides no evidence to counter this).

21         In addition, when the court specifically raised the question whether Carauddo had

22  ever requested an accommodation, counsel for DFEH responded that he had done so by

23  appearing at Lucent on January 26, 2006, and presenting himself as ready to return to work.

24  Counsel also stated, however, that Carauddo did not consider himself disabled as of

25  January 26, 2008, as in his view he had been cleared by Dr. Kaisler-Meza to return to work

26  as of January 17, 2006.

27         It is logically inconsistent for Carauddo to claim that he was not disabled as of

28  January 25, 2008, and was fully qualified to perform as an Installer at Lucent as of that date,

19

United States District Court

For the Northern District of California

1  and also to claim that Lucent discriminated against him by not providing him with an

2  accommodation on January 25, 2008 – particularly given the fact that he never requested an

3  accommodation.

4       Moreover, plaintiffs have not established that a reasonable accommodation was

5  possible, or that there was any reasonable accommodation not offered to Carauddo.  While

6  a leave of absence is well-recognized as an acceptable form of accommodation for a person

7  whose work limitations render him temporarily unable to perform the job, see Jensen, 85

8  Cal. App. 4th at 263, and might be made available by statute, by the employer's policies, or

9  by a collective bargaining agreement, Lucent has shown that there was no accommodation

10  possible for an Installer who could not lift the specified weight.  .

11       Nor have plaintiffs themselves offered any evidence showing that Lucent's

12  accommodation of Carauddo was not reasonable.  For example, plaintiffs have made no

13  effort to show that Carauddo might have been accommodated by moving him to another

14  position for which he was qualified, and have not suggested that a restructuring of the

15  Installer job would have been possible.  Nor have plaintiffs addressed any of the specific

16  requirements of the job and indicated what accommodation would have made Carauddo

17  qualified to meet those requirements.

18       Other than making vague suggestions that the presence of various tools and

19  "assistive devices" in the workplace would have made it possible for an employee with a 25-

20  pound lifting restriction to perform the duties of the Installer position, plaintiffs have failed to

21  identify any specific thing that Lucent failed to do which make its actions with respect to

22  Carauddo "unreasonable."

23       3.    Claim of failure to engage in the interactive process

24       Under FEHA, it is unlawful for an employer "to fail to engage in a timely, good faith,

25  interactive process with an employee to determine effective reasonable accommodations, if

26  any, in response to a request for reasonable accommodation by an employee with a known

27  physical or mental disability."  Cal. Gov't Code § 12940(n).  An employer is required to

28  engage in an interactive process even in the case of a "perceived" disability.  Gelfo, 140 Cal.

20

**United States District Court**

For the Northern District of California

1   App. 4th at 60.

2          In general, "it is the responsibility of the individual with a disability to inform the

3   employer that an accommodation is needed." Spitzer v. The Good Guys, Inc., 80 Cal. App.

4   4th 1376, 1384 (2000).  "[I]t is the employee's initial request for an accommodation which

5   triggers the employer's obligation to participate in the interactive process of determining one.

6   If the employee fails to request an accommodation, the employer cannot be held liable for

7   failing to provide one." Id. (quotation and citations omitted).

8          "An employee may file a civil action based on the employer's failure to engage in the

9   interactive process." Claudio v. Regents of Univ. of Cal., 134 Cal. App. 4th 224, 244 (2005).

10  To prevail in this claim, a plaintiff has the burden of showing that a reasonable

11  accommodation was available. Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal. App.

12  4th 952, 980-83 (2008).

13         Lucent contends that the cause of action for failure to engage in a good-faith

14  interactive process fails because the evidence shows that Lucent did everything possible to

15  interact with Carauddo about possible accommodations.  Lucent asserts that Ms.

16  Utermahlen communicated with Carauddo and his health care providers, and with his

17  managers, frequently and for more than a year, to explore every possible avenue for

18  accommodation.  In addition, Lucent contends, Ms. Utermahlen's efforts were bolstered by

19  the separate but related actions of managers Strange, Camacho, and Dukovcic.

20         In opposition, plaintiffs argue that Lucent's process was not interactive because the

21  company never involved Carauddo in determining an effective accommodation.  They also

22  assert that Carauddo's request (on the last day of his leave of absence) to return to work

23  with medical restrictions functioned as a request for an accommodation.

24         Plaintiffs argue further that even without an explicit request for an accommodation,

25  Lucent was required to engage in an interactive process with Carauddo, to the extent that it

26  considered him disabled.  Plaintiffs contend that because Lucent never included Carauddo

27  in their process of determining whether he should be returned to work, and because he was

28  qualified to return, with or without an accommodation, summary judgment of this cause of

United States District Court

For the Northern District of California

1   action is not warranted.

2         The court finds that the motion must be GRANTED, because plaintiffs have not

3   established a triable issue with regard to whether there was a failure to accommodate.

4   Moreover, plaintiffs have not established that Lucent failed to engage in the interactive

5   process or that a reasonable accommodation was possible (or that triable issues remain as

6   to this claim).  The evidence shows that Ms. Utermahlen communicated frequently with

7   Carauddo and his health care providers, and that she also frequently sought assistance

8   from Lucent management with regard to whether there was any way Carauddo could be

9   accommodated with the lifting/carrying restrictions imposed by his medical providers.

10         Plaintiffs assert that Carauddo's action of telling Utermahlen on January 18, 2006,

11   that he had been cleared to return to work should be interpreted as a request for an

12   accommodation – or, in the alternative, that his appearance at Lucent the day his one-year

13   leave of absence expired should be interpreted as a request for an accommodation – and

14   that Lucent's failure to provide an accommodation means that Lucent failed to engage in the

15   interactive process.

16         However, in his declaration, Carauddo simply states that Dr. Kaisler-Meza "released

17   me to return to work and lift up to 50 pounds" on January 17, 2006; and that on January 18,

18   2006, he "telephoned Ms. Utermahlen to confirm that she had received Dr. Kaisler-Meza's

19   report."  Carauddo does not state that he was still disabled and was seeking some

20   accommodation.  Moreover, as noted above in the discussion of the disability discrimination

21   claim, plaintiff did not consider himself disabled or limited in any way when he presented

22   himself for work on January 26, 2006.

23         4.    Claim of failure to prevent discrimination

24         It is an unlawful practice under FEHA for an employer to fail to take all reasonable

25   steps necessary to prevent discrimination and harassment from occurring.  Cal. Gov't Code

26   § 12940(k).  Lucent asserts that the cause of action for failure to take reasonable steps to

27   prevent discrimination from occurring in the workplace fails for the same reasons as

28   plaintiffs' other FEHA claims.

United States District Court

For the Northern District of California

1    In opposition, plaintiffs contend that Lucent violated its affirmative duty by failing to

2 wait until after Carauddo's functional capacity evaluation before terminating him, and by

3 excluding Carauddo from its decision-making process regarding whether he could be

4 accommodated.

5    The court finds that the motion must be GRANTED.  In the absence of a viable claim

6 of discrimination, there can be no claim of "failure to prevent discrimination."  See Carter v.

7 California Dep't of Veterans Affairs, 38 Cal. 4th 914, 925 n.4 (2006).

8        5.    Claim of wrongful termination in violation of public policy

9    Lucent argues that Carauddo's cause of action for wrongful termination in violation of

10 public policy fails because this claim is factually and legally identical to DFEH's first cause of

11 action for disability discrimination.

12    To prevail on a claim of wrongful termination in violation of public policy, a plaintiff

13 employee must establish the existence of a public policy, a nexus between his/her

14 termination and the protected activity related to that public policy, and damages resulting

15 from the termination.  Turner v. Anheuser-Busch, Inc., 7 Cal. 4th 1238, 1258-59 (1994).

16 The public policy at issue in this cause of action is FEHA's policy against termination on the

17 basis of disability.  Thus, Lucent argues, the claim is identical to the claim for disability

18 discrimination, and must be dismissed for the same reasons.

19    Plaintiffs agree that Carauddo cannot prevail on his claim of wrongful termination if

20 plaintiffs do not prevail on any of the FEHA claims.  Accordingly, the court finds that

21 summary judgment must be GRANTED on this claim for the reasons stated above with

22 regard to the FEHA claims.

23        6.    Claim under Business & Professions Code § 17200

24    Lucent contends that Carauddo's UCL claim fails, for three main reasons – because

25 the claim is not suitable for treatment as a representative action; because there is no

26 evidence that anyone other than Carauddo was affected by Lucent's alleged unlawful

27 business practice; and because the claim seeking restitution is improper.

28    The UCL defines "unfair competition" to include "any unlawful, unfair or fraudulent"

**United States District Court**
For the Northern District of California

1   business act or practice.  Cal. Bus. & Prof. Code § 17200.  The UCL prohibits "anything that

2   can properly be called a business practice and that at the same time is forbidden by law."

3   Barquis v. Merchants Collection Assn., 7 Cal. 3d 94, 113 (1972).

4        Here, Carauddo alleges that Lucent has engaged in, and continues to engage in,

5   unlawful, unfair, and fraudulent business practices, by terminating employees with

6   disabilities, by failing to accommodate employees with disabilities, by failing to engage in a

7   good-faith interactive process with employees with disabilities, and by prohibiting injured and

8   disabled employees from returning to work before they have obtained full medical releases.

9   In his complaint, Carauddo seeks restitution, pursuant to Business & Professions Code §

10   17203, "of money acquired by [d]efendants by means of their unfair and unlawful business

11   practices."

12        Lucent contends that Carauddo's claim is not suitable for treatment as a

13   representative action.  Business & Professions Code § 17203, which was amended by

14   Proposition 64, now provides that

15

16        [a]ny person may pursue representative claims or relief on behalf of others
         only if the claim meets the standing requirements of Section 17204 and
         complies with Section 382 of the Code of Civil Procedure, but these limitations

17        do not apply to claims brought under this chapter by the Attorney General, or
         any district attorney, county counsel, city attorney, or city prosecutor in this

18        state.

19   Cal. Bus. & Prof. Code § 17203.

20        Proposition 64, which the voters approved at the November 2, 2004 general election,

21   modified the UCL by imposing new standing requirements for parties seeking relief under

22   § 17200, and requiring individuals pursuing representative actions to satisfy the class action

23   requirements of California Code of Civil Procedure § 382.  Cal. Bus. & Prof. Code

24   §§ 17203, 17204; see Californians for Disability Rights v. Mervyn's, LLC, 39 Cal. 4th 223,

25   228-29 (2006); Harper v. 24 Hour Fitness, Inc., 167 Cal. App. 4th 966, 975 (2008).

26   Proposition 64 made identical changes to the requirements for standing and representative

27   actions under § 17500, the false advertising law.  Cal. Bus. & Prof. Code § 17535; see

28   Californians for Disability Rights, 39 Cal. 4th at 229 n.2; Harper, 167 Cal. App. 4th at 975.

**United States District Court**
For the Northern District of California

1   "As a result of these amendments, absent class certification, relief – and, in particular,

2   restitution – cannot extend beyond the named parties."  <u>Harper</u>, 167 Cal. App. 4th at 975.

3          Lucent contends that FEHA disability discrimination claims are particularly ill-suited

4   for class action treatment because the fact that the claim is based on a particular

5   employee's physical or mental disability makes it difficult if not impossible to identify and

6   certify the class.  In addition, Lucent asserts, the question of whether an employer is

7   required to provide reasonable accommodation must be resolved on a case-by-case basis,

8   and a plaintiff cannot show that he qualifies as a class representative in the absence of a

9   showing that the class of employees he seeks to represent all suffered identical disabilities

10  and the same adverse employment actions.

11         Here, Lucent argues, individual questions will predominate, and the court will have to

12  conduct a case-by-case factual analysis of the physical impairments of each putative class

13  member, and of the individual job circumstances in order to determine whether each

14  employee's disability was accommodated.  Thus, Carauddo's representative claim cannot

15  meet the class action requirements of Code of Civil Procedure § 382.

16         In opposition, plaintiffs argue that there is sufficient evidence to permit a trier of fact to

17  find that Lucent's allegedly illegal practices (wrongful termination of employees with

18  disabilities; failure to modify jobs to accommodate employees with disabilities; failure to

19  engage in a timely, good-faith interactive process; and refusal to allow employees to return

20  to work without a full medical release) were routinely followed when determining whether

21  other employees with disabilities could return to work.

22         Plaintiffs contend that claims regarding these practices are suitable for treatment in a

23  representative action under the UCL.  They claim that compliance with California Code of

24  Civil Procedure § 382 simply requires that a plaintiff have a "common interest" with the

25  group he seeks to represent.  They assert that because the UCL claim challenges practices

26  that have resulted in injury to Carauddo, and have been applied to other employees,

27  Carauddo has a "common interest" with the group he seeks to represent, and thus may

28  bring an action under the UCL challenging those policies.  They assert that Carauddo is not

United States District Court
For the Northern District of California

1 | challenging individual decisions made as to individual employees, but rather widespread

2 | policies that apply to all employees who seek to return to work with restrictions.

3 |      Plaintiffs argue that Lucent is trying to get the court to hold plaintiffs to a standard that

4 | has not been adopted by the California Supreme Court.  Plaintiffs also contend that the very

5 | issue raised by Lucent's motion – whether an employee may bring a UCL claim seeking

6 | recovery for himself and other individuals who have a common interest, without complying

7 | with the class action requirements – is presently before the California Supreme Court –

8 | citing Jose A. Arias v. Superior Court, 153 Cal. App. 4th 777 (2007), review granted, Case

9 | No. S 155965 (Oct. 10, 2007).

10 |      The court finds that the § 17200 claim fails because class action standards apply,

11 | and Carauddo's representative claim does not qualify as a class action.  Every court that

12 | has cited the amended language of § 17203 has concluded that the incorporation of

13 | California Code of Civil Procedure 382 in the amended statute mandates the use of class

14 | action procedures in UCL representative actions.

15 |      For example, in Fireside Bank v. Superior Court, 40 Cal. 4th 1069 (2007), the

16 | California Supreme Court explained that the "use of non-class representative action" under

17 | the UCL in that case depended on whether Proposition 64 was to be applied retroactively

18 | (which had already been affirmatively decided by the court).  Id. at 1092.  The court held that

19 | pre-Proposition 64 procedures are "unavailable" and that Proposition 64 precluded the case

20 | from proceeding as a non-class representative action.  Id.  The court noted that Proposition

21 | 64 had modified the UCL by, among other things, "imposing new standing requirements for

22 | parties seeking relief and requiring those pursuing representative actions to satisfy the class

23 | requirements of Code of Civil Procedure section 382."  Id. at 1092 n.9.

24 |      The California Court of Appeal has also read the Proposition 64 amendments to

25 | required adherence to class action standards in UCL actions.  See, e.g., Harper, 167 Cal.

26 | App. 4th at 975; Johnson v. GlaxoSmithKline, Inc., 166 Cal. App. 4th 1497, 1513 n.10

27 | (2008); California Consumer Health Care v. Kaiser Found. Health Plan, Inc., 142 Cal. App.

28 | 4th 21, 33 (2006).  Similarly, federal district courts have concluded that Proposition 64 bars

United States District Court

For the Northern District of California

1   representative actions that cannot meet California class certification requirements.  See,

2   e.g., Palmer v. Stassinos, 419 F.Supp. 2d 1151, 1154 (N.D. Cal. 2005).

3       As for the Arias case, while it is true that the California Supreme Court has granted

4   review, the issue addressed by the Court of Appeal in that case was "whether an individual

5   bringing an action on behalf of himself and others under the Unfair Competition Law . . . and

6   the Labor Code Private Attorneys General Act . . . must bring his representative claims as a

7   class action," see Arias, 153 Cal. App. 4th at 780,  not whether the Proposition 64

8   amendments require that a plaintiff bringing a representative action under the UCL must

9   satisfy class action requirements.  The fact that a related (but not identical) issue is

10  presently before the California Supreme Court does not prevent this court from deciding that

11  Carauddo's UCL claim must meet class requirements.

12      The court finds further that any challenge to Lucent's allegedly illegal "policies"

13  regarding disabled employees must, of necessity, be premised on a particular employee's

14  mental or physical disability.  In general, FEHA disability claims are best-suited for

15  individualized, not class-action, treatment.  McCullah v. Southern Cal. Gas Co., 82 Cal. App.

16  4th 495, 500 (2000).  In particular, the question whether an employer is required to provide a

17  reasonable accommodation must be resolved on a case-by-case basis.  Id. at 500-01.  In

18  the present case, plaintiffs cannot show that Carauddo qualifies as a class representative in

19  the absence of a showing that the group of employees he seeks to represent were afflicted

20  with identical disabilities and suffered the same adverse employment actions.  Id.

21      Lucent's second argument is that summary judgment is appropriate because

22  Carauddo cannot provide evidence that Lucent ever discriminated against other similarly-

23  situated disabled employees.  Lucent contends that in response to an interrogatory

24  requesting all facts supporting the UCL claim, plaintiffs responded that Lucent perceived

25  Carauddo as disabled; that Lucent refused to consider reasonable accommodations to

26  return Carauddo to work; and that Lucent had a policy that required all employees to be

27  100% recuperated before they could return to work.  Lucent argues that the first two points

28  are specific to Carauddo's situation, and that as to the third point, there is no evidence that

United States District Court

For the Northern District of California

1    Lucent had such a policy.

2        Lucent notes that plaintiffs identified two employees as Installers who were members

3    of Carauddo's purported representative action.  Lucent asserts, however, that plaintiffs have

4    no evidence that any individual was treated unlawfully; and that in fact, plaintiffs have

5    conceded that Lucent accommodated both those employees' disabilities, and that neither

6    was terminated for being unable to perform the physical requirements of the job.

7        In opposition, plaintiffs contend that Carauddo does not need to identify others that

8    have been harmed.  They claim that they have presented evidence that would allow a trier

9    of fact to conclude that Lucent's corporate practices violate the disability discrimination laws;

10   and assert, moreover, that a UCL claim may be brought based on a single act of

11   misconduct.  They also contend that under the UCL, a plaintiff is not required to identify

12   other individuals injured by the challenged practices.

13       The court agrees with Lucent that there is no merit to plaintiffs' claim that Carauddo

14   need not identify other employees who were injured in order to make out a UCL claim, so

15   long as he has identified allegedly discriminatory "practices."  Plaintiffs must establish that

16   the employees Carauddo seeks to represent were in fact disabled within the meaning of

17   FEHA, and that they were denied accommodations or discriminated against because of their

18   disabilities – both of which will require individualized assessments.  See id.

19       In addition, to the extent that Carauddo seeks back pay on behalf of other Lucent

20   employees, the trier of fact would need to make an individualized assessment as to each

21   class member's damages.  Plaintiffs have not identified any Lucent employee – other than

22   Carauddo – who was harmed by the allegedly discriminatory policies and who could form a

23   part of the representative "class."  A failure to identify employees who were disabled and

24   similarly affected as Carauddo is grounds for summary judgment.  See South Bay Chevrolet

25   v. Gen'l Motors Acceptance Corp., 72 Cal. App. 4th 861, 897 (1999)).

26       Moreover, Carauddo does not have standing to represent the seven Installers

27   referenced in the Occupational Requirements forms Lucent produced in discovery, as the

28   seven Installers did not work in California, and the UCL does not apply to injuries suffered

28

United States District Court

For the Northern District of California

1   by non-California residents caused by conduct occurring outside California.  See Norwest

2   Mortg., Inc. v. Superior Court, 72 Cal. App. 4th 214, 222-23 (1999).

3        In addition, the evidence does not support Carauddo's claim that Lucent refuses to

4   modify the duties of a job to accommodate an injured employee.  Carauddo testified that

5   several of his co-workers were returned to work with accommodations, and Christopher

6   Camacho, Director of Operations for Installation, testified that Lucent has a practice of

7   returning employees to work with restrictions.

8        Nor have plaintiffs provided evidence sufficient to create a triable issue as to whether

9   Lucent has a company-wide practice of failing to engage in the interactive process with

10   disabled employees; or whether Lucent maintains a policy requiring all employees to be

11   100% healed before they can return to work.

12        Lucent's third main argument is that the UCL claim for back pay is improper as a

13   matter of law.  Restitution is the only monetary relief allowed under the UCL, and money

14   damages are not available.  Lucent contends that Carauddo is attempting to recover "lost

15   wages" under the guise that he is seeking "restitution."  Lucent asserts, however, that there

16   is no authority that allows a court to award back pay in a UCL action where the employee

17   alleges employment discrimination.  In support, Lucent cites an age discrimination case,

18   Alch v. Superior Court, 122 Cal. App. 4th 339 (2004).

19        In that case, hundreds of television writers filed 23 class action lawsuits against

20   studios, networks, and talent agencies for age discrimination under FEHA and the UCL. The

21   writers sought an injunction preventing the employers from continuing to engage in the

22   alleged ageist hiring practices, and argued that an order compelling the employers to

23   reimburse the class for wages lost as a result of these practices – classwide back pay –

24   would be an indispensable part of the effectiveness of such injunctive relief, and that the

25   UCL authorizes the trial court to effectuate an injunction through an award of back pay.  Id.

26   at 403.

27        Business & Professions Code § 17203 describes the remedies available under the

28   UCL.  It authorizes the court to make orders "as may be necessary to prevent the use or

United States District Court

For the Northern District of California

1   employment by any person of any practice which constitutes unfair competition, . . . or as

2   may be necessary to restore to any person in interest any money or property, real or

3   personal, which may have been acquired by means of such unfair competition."  Cal. Bus. &

4   Prof. Code § 17203.

5       The writers conceded that they could not obtain restitution under the second clause

6   (the "restore" prong), because it is settled that restitution is available only if a defendant has

7   wrongfully acquired funds or property in which a plaintiff has an ownership or vested

8   interest.  However, they asserted that the trial court could order classwide back pay under

9   the first clause (the "prevent" prong), which authorizes "such orders . . . as may be

10  necessary to prevent" a practice that is unlawful under the UCL.  They argued that if the

11  court determined that an order of classwide back pay into a fluid recovery fund was

12  necessary to prevent the employers from maintaining discriminatory hiring practices, and to

13  deter others from similar practices, the court would have the authority to make such an

14  order.  Id. at 403-04.

15      The Court of Appeal disagreed, noting that damages are not available in a UCL

16  action, and that prevailing plaintiffs are limited to injunctive relief and restitution.  Id. at 404.

17  The court also observed that "the relevant precedents counsel against expanding the

18  monetary relief available under the UCL to include classwide back pay in the absence of any

19  indication the Legislature intended to provide such a remedy."  Id. at 405.  In particular, the

20  court noted that the California Supreme Court has held that disgorgement of unfairly

21  obtained profits into a fluid recovery fund is not an available remedy in a representative

22  action brought under the UCL; and has rejected the argument that a court's general

23  equitable powers under section 17203 are broad enough to encompass non-restitutionary

24  disgorgement of profits to an individual, finding "nothing to indicate that the Legislature

25  intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who

26  does not have an ownership interest in those profits."  Id. at 405-06 (citations omitted).

27      The court found it "clear that the Legislature intended to limit the available monetary

28  remedies under the UCL."  Id. at 406.  Thus, because classwide back pay is not expressly

United States District Court

For the Northern District of California

1    authorized in § 17203, the court looked to the legislative history to determine whether the

2    Legislature intended to authorize such a remedy under that section.  The court found that

3    "[t]he answer is clearly no.  No intimation in the extensive description of the statute's

4    legislative history . . . indicates that the Legislature intended to provide a back-pay remedy

5    in connection with the general equitable powers granted in [§ 17203]."  Id. at 406-07.

6        In response, plaintiffs contend that a UCL claim for restitution is proper in this case.

7    They rely on the California Supreme Court's decision in Cortez v. Purolator Air Filtration

8    Prods. Co., 23 Cal. 4th 163 (2000).  In that case, the plaintiff filed a UCL action asserting

9    that her employer failed to pay overtime wages.  The defendant argued that unpaid wages

10   are damages, not recoverable under the UCL.  The California Supreme Court held that an

11   order for payment of unlawfully withheld wages is restitutionary in nature, as wages are

12   vested property rights.  Id. at 177-78 ("[o]nce earned, those unpaid wages became property

13   to which the employees were entitled").  Thus, plaintiffs assert, under Cortez, back pay is

14   recoverable under the UCL where the employee has a demonstrable interest in the wages.

15       The court agrees with Lucent that an award of back pay to compensate for lost

16   employment is not a form of restitution and cannot be recovered under this UCL claim.  The

17   Cortez decision is not dispositive, as that case involved a UCL representative action for

18   failure to pay overtime wages, and the court held that withheld wages may be the subject of

19   a restitutionary order under § 17203.

20       Here, however, Carauddo does not seek recovery of unpaid wages for labor he or

21   similarly situated employees bestowed on their employer.  Rather, he seeks back pay for

22   wages he would have earned if he had remained employed by Lucent.  Thus, there is no

23   pay that Carauddo or any Lucent Installer earned (i.e., had a vested property right in) that

24   was not paid to him, and for which he can seek restitution.  In this regard, the present case

25   is more akin to Alch, where the screenwriters sued for "back pay" based on a claim that they

26   were not hired because of age discrimination.  Indeed, the Alch court distinguished the

27   writers' attempt to recover back pay (in the guise of restitution) from the restitutionary back

28   pay to employees authorized by the court in Cortez.  See Alch, 122 Cal. App. 4th at 407

1  n.77.

2      7.    Carauddo's claim for punitive damages

3      Lucent asserts that Carauddo's claim for punitive damages fails because there is no

4  evidence that any managing agent acted oppressively, fraudulently, or maliciously against

5  Carauddo.  Lucent contends that neither the mere refusal to permit Carauddo to return to his

6  job, nor the alleged refusal to accommodate his disability by modifying his job duties, nor the

7  alleged refusal to engage in the interactive process, rises to the level of oppression, fraud,

8  or malice.

9      In opposition, plaintiffs contend that Carauddo has a claim for punitive damages,

10  based on evidence showing that Lucent was callously indifferent toward the rights of

11  employees who were considered disabled under FEHA, and who sought to return to work

12  with restrictions following disabling, on-the-job injuries.

13      The court finds that the motion must be GRANTED.  While punitive damages may be

14  available under some circumstances for FEHA violations, see, e.g., Brewer v. Premier Golf

15  Props., __ Cal. Rptr. 3d __, 2008 WL 5076557 at *3-5 (Cal. App. 4 Dist, Dec. 3, 2008),

16  plaintiffs in the present case have presented no evidence of oppression, fraud, or malice,

17  sufficient to support an award of punitive damages.

18                          **CONCLUSION**

19      In accordance with the foregoing, the court finds that summary judgment must be

20  GRANTED as to all causes of action in DFEH's complaint and in Carauddo's complaint-in-

21  intervention.

22

23  **IT IS SO ORDERED.**

24  Dated:  December 8, 2008

25                                    _____
                                      PHYLLIS J. HAMILTON
26                                    United States District Judge

27

28

32